UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| PEGGY NESTOR, | : | Case No. 23-10627 (MEW) |
| Debtor. | : |  |

**DECISION GRANTING MOTION FOR THE
APPOINTMENT OF A CHAPTER 11 TRUSTEE**

On February 21, 2024, Lynx Asset Services, LLC filed a Motion for the Appointment of a Chapter 11 Trustee (ECF No. 95). Joinders to the motion was filed by Rosalia Baiamonte, as the court-appointed receiver for Oleg Cassini, Inc. and Cassini Parfums, Ltd. (the "Receiver") (ECF No. 98), and by Edward W. Powers, Public Administrator, as Administrator C.T.A. of the Estate of Oleg Cassini (the "Public Administrator") (ECF No. 102). The Debtor opposes the appointment of a chapter 11 trustee. A hearing on the motion was held on March 5, 2024. For the reasons set forth in this decision, the Court finds that the appointment of a chapter 11 trustee is warranted as in the best interests of creditors.

**Background**

On April 25, 2023, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Lynx holds a second priority mortgage on certain real property, a townhouse in NYC, in which the Debtor claims an ownership interest (the "Townhouse"). The filing of the bankruptcy case caused the cancellation of a scheduled foreclosure sale. By all accounts the Townhouse is the Debtor's most significant asset. Although the deed to the Townhouse reflects that both the Debtor and her sister, Marianne Nestor Cassini, are co-owners of the property, the

Debtor contends that she is the sole owner of the Townhouse and has commenced an adversary proceeding (Adv. Pro. No. 23-01195) for a declaration in that regard.

For many years, the Debtor and her sister have been involved in extensive litigation in the New York State Surrogate's Court, Nassau County (the "Surrogate's Court") concerning the probate estate of Marianne's deceased husband, Oleg Cassini. At some point, the Surrogate's Court appointed the Public Administrator to run the operations of certain companies included in the probate estate, and thereafter to serve as administrator C.T.A. of the probate estate. In 2016, the Surrogate's Court appointed the Receiver to manage and operate the companies. After gaining access to the books and records of the companies, the Receiver and the Public Administrator commenced a turnover proceeding in the Surrogate Court's against the Debtor, as well as against Marianne and a company wholly owned by the two of them, seeking the turnover of assets that allegedly were improperly diverted.

Upon motion by the Receiver, the stay in this bankruptcy case was lifted on July 7, 2023, for the limited purpose of permitting the parties to obtain a ruling from the Surrogate's Court on certain pending motions to dismiss the turnover proceeding. Those rulings have not yet been issued. The Receiver and the Public Administrator also have filed proofs of claim in this bankruptcy case. On July 31, 2023, the Receiver and the Public Administrator commenced an adversary proceeding against the Debtor [Adv. Pro. No. 23-01156] seeking a determination that any debts owed to them are not dischargeable. There has been little activity in that adversary proceeding to date.

In August 2023, the Debtor filed a plan and disclosure statement that provided for a refinancing or sale of the Townhouse. Lynx contended that a refinancing was unlikely and pressed for relief from the automatic stay to complete a foreclosure sale. After some delays and

2

considerable back-and-forth, the parties agreed to the retention of a broker and the approval of procedures that would govern the sale of the Townhouse. I approved the broker's retention and the sale procedures in December 2023. The sale procedures contemplate that bids will be solicited through no later than July 1, 2024 and that an auction will be held if multiple interested parties are identified. However, Lynx argues that, as of March 5, 2024, the Townhouse still had not been listed for sale on the open market.

The Debtor was late in filing Monthly Operating Reports for August 2023 through November 2023 but filed those reports on January 22, 2024. The report for August 2023 listed total receipts of $224,079 and disbursements of $56,489. [ECF No. 81.] The Debtor had previously represented that her only source of income was her monthly social security checks, so the Court directed that the Debtor file more complete information about the nature of the receipts and disbursements. On January 31, 2024 the Debtor filed a signed "Explanation of Cash Withdrawals and Other Disbursements." [ECF No. 88.] The list represented that on August 23, 2023 the Debtor had made a "deposit" from an unspecified source in the amount of $220,550 and that on August 31, 2023 the Debtor had paid $51,000 for unspecified "product development" purposes. The statement also represented that in August and September 2023 the Debtor had spent tens of thousands of dollars for various cleaning, repairs and furniture restorations, and that on September 20, 2023 the Debtor had issued a $6,400 bank check to her sister (Marianne) to "pay building expenses." *Id*.

The Debtor filed additional documents with regard to her receipts and disbursements on February 2, 2024 and February 5, 2025. On February 2, the Debtor filed an "Affirmation of Debtor Explaining Deposits and Funds Received." [ECF No. 90.] That affirmation revealed that the Debtor had received the sum of $220,551 in August 2023 "as an insurance recovery" as a

3

result of a fire that had destroyed certain property in Malibu, California in 2018. At the hearing on March 5, 2024 the Debtor's counsel explained that this payment was the last in a series of payments that were made following a pre-bankruptcy settlement of an insurance claim for the loss of personal property. The Debtor stated in the February 2, 2024 affirmation that "[m]y claim to recovery was listed on my amended schedules," and the Debtor's counsel similarly stated at the hearing on March 5, 2024 that the insurance payment had been identified as an asset in the Debtor's filed schedule of assets. However, that was not the case. The original schedules that were filed on May 21, 2023 [ECT No. 21] did not list any assets relating to the Malibu property. The amended schedules that were filed on June 27, 2023 [ECF No. 38] said that the Debtor had a pending claim in California "against Boeing and PSEG and/or affiliates" relating to the Malibu fire. However, that is a reference to a lawsuit in California that remains pending. There was no disclosure, in the Schedules, of a prior insurance settlement regarding lost personal property, or of additional payments that were due under that insurance settlement.

On February 5, 2024, the Debtor filed an additional Explanation of Certain Expenses Reflected on Monthly Operating Reports. [ECF No. 91.] The Debtor stated that she had spent considerable sums on repairs to the Townhouse but had paid for most of these repairs in cash. She also stated that she did not have invoices or receipts for most of the payments. The Debtor further explained that the $51,000 paid out on August 31, 2023 was for a new venture called "Tabletop Fashion by Marianne Cassini." The Debtor stated that she hoped this "new venture will enable me to continue in my business of marketing and hopefully receive income." The Debtor also stated that to the best of her knowledge the $51,000 payment was made in the form of a bank check that was payable to Marianne. Finally, the Debtor stated that many of the listed repair expenditures actually represented checks that had been payable to Marianne Nestor, who

4

"arranged for repairs and maintenance" while the Debtor was dealing with various illnesses and injuries. *Id.*

## The Pending Motion

Lynx argues that a chapter 11 Trustee is needed because the Debtor cannot and will not fulfill her fiduciary role. Lynx has pointed to the failure to keep adequate records, the apparent uses of funds for new business ventures without court approval, and significant payments to Marianne Nestor for which full details still are not available. Lynx also contends that the Debtor's explanations asserted that different amounts allegedly had been paid for the same work. Finally, Lynx argues that the Debtor has slowed the sale process and that the appointment of a trustee is needed to ensure that sale deadlines are met.

The Receiver has joined in Lynx's contentions. The Receiver also argues that within the one-year period prior to the filing of this bankruptcy case the Debtor may have transferred valuable property in Connecticut to the benefit of family members for no consideration. In addition, the Receiver points to attempts that were made by Marianne Nestor to sell artwork owned by the Debtor, and to efforts by the Debtor (or someone acting for the Debtor or in the Debtor's name) to collect on a judgment that had previously been vacated. Finally, the Receiver has identified various alleged misdeeds by the Debtor and her sister, in connection with the probate estate proceeding, as additional support for the appointment of a trustee.

The Public Administrator also has joined in the Lynx motion, for the reasons stated in the papers filed by Lynx and by the Receiver.

The Debtor argues that the appointment of a trustee is a drastic remedy and that such an appointment is not necessary in this case. Counsel points to the Debtor's recent illnesses and contends that the Debtor, despite health issues, has accomplished a number of things in the case

5

and will again take an active role now that she is on the road to recovery. The Debtor says that the proceeds of the insurance claim were used "primarily" for repairs and "cosmetic" upgrades to the Townhouse. The Debtor's counsel also argues that virtually all claims against the Debtor are contested, that the Debtor is best able to handle discussions with her sister, and that appointment of a trustee "would likely elevate the contentious nature of the case."

Curiously, at the March 5 hearing the Debtor's sister, Marianne, disputed that she had received any monies for management of the property, and disputed the contention that the Debtor had invested $51,000 with Marianne as part of new business venture. Marianne argued instead that any portion of the $51,000 that she received had been used to make payments to a senior mortgage lender. Marianne also contended that she could put together a more comprehensive list of how the Debtor's other funds had been spent. As I observed at the hearing, these comments were disturbing because they suggested that Marianne had a better idea than the Debtor had as to how the Debtor's assets were being used. As to the disputes over what the $51,000 transfer represented, I directed the Debtor and her counsel to obtain copies of documents from the bank showing who had arranged for the transfer of the $51,000 and to whom the money had been transferred.

The Debtor filed further information about the $51,000 transfers on the afternoon of March 12, 2024. [ECF No. 105.] The Debtor's counsel reported to the Court that the documentation was unclear as to who authorized the $51,000 withdrawal, and that "[t]he Debtor has neither confirmed nor denied that she authorized the withdrawal." *Id.* The bank records show that $20,000 was used to purchase a cashier's check payable to Colleen Johnson and later cashed by Ms. Johnson. Counsel explained that "[t]he Debtor has not confirmed Ms. Johnson's identity" but that "Marianne Nestor advised the undersigned that Ms. Johnson is, in sum and

6

substance, a graphic artist that has or is assisting with a book relating to Oleg Cassini." *Id.* The bank records show that the remaining $31,000 was used to purchase a cashier's check that was payable to (and later cashed by) Marianne Nestor.

## **Discussion**

Section 1104(a) of the Bankruptcy Code provides:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a). Courts have held that the listed "causes" set forth in section 1104(a)(1) are not exclusive and that other factors may constitute cause for the appointment of a trustee, including the misuse of assets and funds, inadequate record-keeping and reporting, and various instances of conduct found to establish fraud or dishonesty, lack of credibility, and lack of creditor confidence. *In re Futterman*, 584 BR 609, 616 (Bankr. S.D.N.Y. 2018). Even in the absence of "cause" a trustee may be appointed under section 1104(a)(2) if "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." The facts considered by a court when deciding a section 1104(2) request "include the trustworthiness of the debtor, the debtor's past and present performance and prospects for rehabilitation, the confidence or lack thereof of the business community and of creditors in present management, and the benefits derived from the appointment of a trustee balanced against the cost of the

7

appointment." *Futterman*, 584 BR at 617 (citing *In re 1031 Tax Group, LLC*, 374 B.R. 78, 91 (Bankr. S.D.N.Y 2007)).

The foregoing facts provide substantial support for the contention that there is "cause" for the appointment of a chapter 11 trustee in this case, but I need not make such a determination, because the undisputed facts clearly show that the appointment of a trustee is in the best interests of creditors. The Debtor did not timely file operating reports and as a result did not timely disclose her receipts of large amounts of money and her expenditures of the same. Nor did she identify the prior insurance settlement, and the remaining payment that was due, in her schedules of assets. The Debtor plainly has not kept adequate records showing how she spent the monies she received. If (as she herself claims) she invested money in her sister's business venture, that was a use of funds that required the Court's prior approval, which was not sought or obtained.

The Debtor herself has identified an instance in which Marianne Nestor sought to sell artwork belonging to the Debtor. While the Debtor claims credit for having stopped these efforts, I have no confidence – and Lynx and the Receiver justifiably have no confidence – that the Debtor's efforts at policing her sister will be fully successful. The fact that Marianne Nestor professed, at the hearing, to have a better understanding of how the Debtor has been spending money was troubling, as it suggested the possibility that Marianne may be controlling (or at least influencing) those expenditures. The Debtor's representations that she has allowed Marianne to manage many repair and renovation projects, and her admissions that she has transferred substantial sums of money to Marianne for use in making cash payments for such repairs and renovations (without appropriate invoices and receipts) just bolsters that concern. The risks seem all the more evident based on the Debtor's unwillingness or inability to confirm or deny that the Debtor herself authorized the $51,000 transfers that were made in August 2023.

8

The inconsistent explanations for the $51,000 transfers at the end of August 2023 are particularly troubling. The payments to Ms. Johnson were not identified until after I insisted that the bank records be produced. The Debtor contended that payments to Marianne represented an investment in a new venture, but Marianne has denied it. Whatever the explanations might turn out to be, the fact that $51,000 was transferred in late August 2023, without a clear record as to the purpose (whether it was to invest in a new business or something else) is inconsistent with the responsibilities that a debtor, as fiduciary, owes to her estate and her creditors. I can only conclude either that an unauthorized business investment was made, or that the Debtor used and disposed of significant amounts of money for which she kept no clear accounts or receipts and has no clear recollection.

It is also plain that the Debtor and her sister are embroiled in a series of vitriolic estate disputes that have been going on for more than 15 years and that are consuming huge amounts of time, energy and resources. Resolving these litigations, and doing it quickly and as inexpensively as possible, is one of the keys to the resolution of this bankruptcy case. The Debtor contends that the appointment of a trustee would "elevate the contentious nature of this case," but I disagree. The Debtor and her sister have been locked in battle with the Receiver and the Public Administrator, and there does not appear to be any prospect of a resolution of their many disputes. There is no guaranty that putting an independent fiduciary in charge can or will accomplish a better outcome, but it would improve the odds significantly.

The sale of the Townhouse also has not been proceeding in accordance with the schedule that I approved in December. It is in the interest of creditors generally that an independent third party be put in charge of this estate and take over primary responsibility for the sale of the Townhouse, the management of the Debtor's assets, the approval of expenditures, the conduct of

9

settlement discussions, and the confirmation of a plan.  The Debtor will have the right to object if she does not like what the trustee proposes, but she will no longer be in charge.

Accordingly, the Motion to appoint a chapter 11 trustee is granted.  An order to that effect will be entered this same date.

DATED: New York, New York
March 13, 2024

/s/ **Michael E. Wiles**
UNITED STATES BANKRUPTCY JUDGE

10