TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Brian F. Moore
Martha E. Martir

*Attorneys for Albert Togut,*
*Not Individually But Solely in*
*His Capacity as Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
:
In re:                              :         Chapter 11
:
PEGGY NESTOR,                       :         Case No. 23-10627 (MEW)
:
                      Debtor.       :
:
---------------------------------------------------------------x

**TRUSTEE'S APPLICATION FOR: (I) AN ORDER SCHEDULING BID
PROCEDURES HEARING;  (II) AN ORDER APPROVING (A) MODIFICATIONS
TO SALE PROCEDURES, (B) DESIGNATION OF STALKING HORSE BIDDER
AND APPROVAL OF STALKING HORSE BID PROTECTIONS, (C) SCHEDULING
AUCTION AND SALE HEARING, AND (D) FORM AND MANNER OF NOTICE
OF SALE, AUCTION, AND SALE HEARING;  AND (III) FOR AN ORDER
(A) APPROVING THE SALE OF TOWNHOUSE PURSUANT TO BANKRUPTCY
SECTION 363(H) ORDER AND BANKRUPTCY CODE SECTION 363(F)
AND (B) PAYMENT OF BROKER COMMISSION FROM SALE PROCEEDS**

TO THE HONORABLE MICHAEL E. WILES,
UNITED STATES BANKRUPTCY JUDGE:

           Albert Togut, not individually but solely in his capacity as Chapter 11

trustee (the "Trustee") of the estate (the "Estate") of Peggy Nestor (the "Debtor"), the

debtor in the above-captioned case (the "Chapter 11 Case"), by his attorneys, Togut,

Segal & Segal LLP (the "Togut Firm"), respectfully represents as follows in support of

the application (the "Application"):

## PRELIMINARY STATEMENT[1]

Since his appointment in March 2024, the Trustee and his professionals have worked diligently to market and sell the real property at 15 East 63rd Street, New York, NY 10065 (the "Townhouse"), as directed by the Court in the 363(h) Order.

Prior to the Trustee's appointment on December 15, 2023, the Court entered an order (the "Sotheby's Retention Order") [Docket No. 77] and authorized the Debtor to retain Sotheby's International Realty ("Sotheby's") as her broker to assist with the marketing and sale of the Townhouse pursuant to an exclusive listing agreement (the "Sotheby's Listing Agreement"). When he was appointed, the Trustee inherited the Sotheby's Listing Agreement. The Sotheby's Listing Agreement expired without an acceptable offer for the purchase of the Townhouse.

Following the Trustee's interviews of multiple real estate brokers, the Trustee determined to retain Brown Harris Stevens Residential Sales, LLC ("BHS"), pursuant to an exclusive listing agreement (as amended, the "BHS Listing Agreement"),[2] and an order authorizing the retention of BHS and the BHS Listing Agreement was entered on February 13, 2025 [Docket No. 516] (the "BHS Retention Order").[3]

BHS extensively marketed the Townhouse during the past year and as a result of those efforts, obtained multiple offers, with the offer made by 63rd St Townhouse LLC (the ("Stalking Horse Bidder"), pursuant to the stalking horse purchase agreement (the "Stalking Horse Agreement") annexed hereto as **Exhibit A**, for

---

[1]    Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed in the sections that follow.

[2]    The BHS Listing Agreement is filed at Docket No. 493, Exhibit B.

[3]    The term of the Trustee's listing agreement with BHS was extended to December 29, 2025 [Docket No. 807]. On January 5, 2026, the Trustee filed an application seeking to further extend the listing agreement to March 29, 2026 [Docket No. 818].

$34,500,000 in cash (the "Stalking Horse Consideration")[4] being the highest and best bid made to the Trustee as of the date hereof (such bid, the "Stalking Horse Bid").  The Trustee has, subject to Court approval, entered into the Stalking Horse Agreement, and it is subject to higher or better offers as described herein.

In addition, the Trustee has a binding bid from Yingkau Xu (the "Back-Up Bidder"), pursuant to the purchase agreement (the "Back-Up Agreement") annexed hereto as **Exhibit B**, for $34,100,000 in cash, being the second highest bid made to the Trustee as of the date hereof (such bid, the "Back-Up Bid").

In the first instance, the Trustee seeks entry of the proposed order (the "Scheduling Order") that is annexed hereto as **Exhibit C**, scheduling a hearing to consider modifications to the existing sale procedures, approval of bid protections and related relief.  Following entry of the Scheduling Order, the Trustee will seek entry of two additional orders in connection with the sale of the Townhouse.

Upon entry of the Scheduling Order and at the conclusion of the hearing scheduled thereby, the Trustee seeks entry of an order in the form annexed hereto as **Exhibit D** (the "Modified Sale Procedures Order"), among other things: (i) approving modifications to the *Sale Procedures*, as amended [Docket Nos. 78-1, 261] (the "Initial Sale Procedures") and the order approving the Initial Sale Procedures [Docket No. 78] (the "Initial Sale Procedures Order"), as described herein (the "Modified Sale Procedures" and, together with the Initial Sale Procedures, the "Sale Procedures");  (ii) designating and approving the Stalking Horse Bidder and the Stalking Horse Bid Protections (as defined herein) in accordance with the terms set forth in the Stalking Horse Agreement and Sale Procedures;  (iii) designating the time,

---

[4]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Stalking Horse Agreement or the Initial Sale Procedures, as applicable.

date and place for an auction (the "Auction") in the event that an offer for the

Townhouse that is higher or better than the Stalking Horse Consideration is received

by the proposed deadline for submitting such bids (the "Bid Deadline"), and a Court

hearing promptly thereafter to consider approval of the Sale of the Townhouse (the

"Sale Hearing") to the bidder having made the highest or best offer, and if an auction

is held, at the Auction (the "Successful Bidder");  and (iv) approving the notice of the

Auction and the Sale Hearing, in substantially the form attached to the Modified Sale

Procedures Order as **Exhibit 1** (the "Notice of Auction and Sale Hearing").

At the conclusion of the Sale Hearing, the Trustee will seek entry of an

order approving the sale of the Townhouse, substantially in the form annexed hereto as

**Exhibit E** (the "Sale Order"), approving, among other things, (i) the Sale of the

Townhouse to the Successful Bidder free and clear of all liens and interests pursuant to

Sections 363(b), (f), and (m) of the Bankruptcy Code, the 363(h) Order and the Sale

Procedures, and an order confirming a Trustee Plan pursuant to Bankruptcy Code

Section 1129, with all liens, claims and interests to attach to the Sale proceeds with the

same priority, extent and validity as existed on the Petition Date and pursuant to orders

entered by this Court after the Petition Date and (ii) payment of the real estate broker

commissions to be paid at closing from proceeds of the Sale.

In support of this Application, the Trustee respectfully submits the

declarations of Brian F. Moore, a member of the Togut Firm (the "Moore

Declaration"), and Sami Hassoumi (the "Hassoumi Declaration") of BHS, annexed

hereto as **Exhibits F** and **G**, respectively.  The Trustee reserves the right to file

additional documents and to present such further information or evidence to the

Court as may be appropriate in support of the relief requested herein.

As described below, the proposed Sale is the result of extensive marketing efforts by the Trustee, Sotheby's, and then BHS: the Townhouse has been listed for sale for more than 18 months, shown to potential bidders approximately 80 times, and exposed world-wide to millions of prospective purchasers. The Stalking Horse Bid and the Back-Up Bid are the products of extensive, arms-length negotiations between the Trustee and, as applicable, the Stalking Horse Bidder and the Back-Up Bidder. Lynx Assets Services, LLC ("Lynx"), the holder of the largest pre-petition lien against the Townhouse and the DIP Lender to the Estate, consents to the Sale pursuant to the Stalking Horse Agreement or the Back-Up Agreement.

Based upon the foregoing and what is set forth below, the Trustee requests approval of the Modified Sale Procedures, the Stalking Horse Bid Protections, the Sale, which will close following confirmation of the Trustee's amended Chapter 11 plan, and the payment of the Broker Commission (as defined herein).

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Application and the relief requested herein pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* for the Southern District of New York, dated January 31, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are Bankruptcy Code sections 105(a), 330, 363(b), (f) and (h), and 1146, Bankruptcy Rules 2002, 6004, 9006(c), and 9014, Local Rule 6004-1, and the *Amended Guidelines for the Conduct of Asset Sales established and adopted by the United States Bankruptcy Court for the Southern District of New York* pursuant to General Order M-383 (the "Sale Guidelines").

## BACKGROUND

### I.     The Chapter 11 Case

3.      On April 25, 2023 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing a voluntary petition in this Court (the "Court") for relief under Chapter 11 of the Bankruptcy Code [Docket No. 1] to stay a foreclosure of the Townhouse.

4.      No official committee of creditors was appointed in the Chapter 11 Case.

5.      On December 15, 2023, the Court entered the Initial Sale Procures Order.  The Initial Sale Procedures Order established certain milestone dates in connection with the sale of the Townhouse (the "Sale Milestones").  The Sale Milestones have been extended by the Court [*See* Docket Nos. 261, 425, 554, 579, 617, 681, 784].

6.      On July 26, 2024, the Court entered an order that, *inter alia*, extended the Sale Milestones and provided:  "All rights, claims, defenses and discretion reserved in favor of the Debtor in the [Initial] Sale Procedures Order are now expressly and exclusively reserved for, and are exercisable, only by the Trustee."  [*See* Docket No. 261 at ¶ 3].

### A.     The Debtor's Townhouse Sale Adversary Proceeding

7.      On November 1, 2023, the Debtor commenced Adversary Proceeding No. 23-01195 (MEW) in this Court (the "Sale Adversary Proceeding"), seeking:  (i) a declaration that the Debtor is the sole owner of the Townhouse, and (ii) authorization to sell the Townhouse pursuant to section 363(h) of the Bankruptcy

Code.  The Debtor hand-signed the complaint that commenced the Sale Adversary Proceeding.  Sale Adversary Proceeding, Docket No. 1.[5]

8.    On January 31, 2024, Marianne Nestor filed an *Admission of Service* (the "Admission") in the Sale Adversary Proceeding, and stated: "I acknowledge that I have no ownership interest in the premises located at 15 East 63th [sic] Street, New York [sic] NY 10065. Peggy Nestor is the sole owner of 15 East 63rd Street."  Sale Adversary Proceeding, Docket No. 10.

9.    Marianne Nestor also "explicitly represented to the Court . . . that she did not reside in the Townhouse, and that she had never done so."  Adv. Pro. No. 24-01342 (MEW), Docket No. 17, at 14.

10.    On March 13, 2024, the Court entered the 363(h) Order and directed the sale of the Townhouse.  Sale Adversary Proceeding, Docket No. 18.  In the 363(h) Order, the Court found that "[the Surrogate Parties] have not opposed the relief sought in count two of the Complaint, so long as their respective rights to any proceeds attributable to Marianne Nestor's ownership interest (if any) are preserved."  363(h) Order at 2.  The Court ordered:

> **ORDERED**, pursuant to section 363(h), that the [Townhouse] be sold pursuant to the sale procedures previously approved by this Court;  and it is further

---

[5]    The Defendants in the Sale Adversary Proceeding are Marianne Nestor, and creditors of Marianne Nestor:  (1) Rosalia Baiamonte, Esq., as the court-appointed receiver for Oleg Cassini, Inc. and Cassini Parfums, Ltd. (the "Receiver");  (2) the Public Administrator of Nassau County, as Administrator CTA of the Estate of Oleg Cassini (the "Public Administrator");  and (3) John J. Barnosky Esq. and Alexandre Cassini, as Executors of the Christina Cassini and as Successor Administrators of the Estate of Daria Cassini (the "Cassini Executors" and, together with the Receiver and the Public Administrator, the "Surrogate Parties").

> ORDERED, that the proceeds of such sale shall be distributed to secured creditors or to other parties in accordance with their respective rights and interest, as such rights and interests are determined by the Court in the course of further proceedings in this adversary proceeding and in the underlying chapter 11 case[.]

363(h) Order at 3.

### B.    The Debtor's Plan

11.    On August 23, 2023, the Debtor filed her Chapter 11 plan of reorganization (the "Debtor Plan") [Docket No. 62] and its related disclosure statement [Docket No. 63].  Although never confirmed, the Debtor Plan provided for, among other things, the sale of the Townhouse.  Debtor Plan § 5.1.

### C.    The Trustee's Appointment

12.    On February 21, 2024, Lynx filed its motion for the appointment of a Chapter 11 trustee (the "Trustee Motion"), which was joined by other parties [Docket Nos. 95, 98, 102].

13.    On March 13, 2024, the Court entered its decision granting the trustee appointment motion (the "Trustee Decision") [Docket No. 106].  In the Trustee Decision, the Court found, in pertinent part, that the Trustee would control the sale of the Townhouse:

> It is in the interest of creditors generally that an independent third party be put in charge of this estate and take over primary responsibility for the sale of the Townhouse, the management of the Debtor's assets, the approval of expenditures, the conduct of settlement discussions, and the confirmation of a plan. The Debtor will have the right to object if she does not like what the trustee proposes, but she will no longer be in charge.

Trustee Decision at 9-10.

14.    On March 13, 2024, the Court entered an order granting the Trustee Motion [Docket No. 107].  On March 22, 2024, the Court entered an order approving the appointment of a Chapter 11 trustee [Docket No. 112], pursuant to which the Trustee

was appointed in this Chapter 11 Case.  The Trustee qualified and is acting as the

Chapter 11 Trustee of the Debtor's Estate [Docket No. 114].

15.    On April 30, 2024, with the assistance of the U.S. Marshals Service,

the Trustee took possession of the Townhouse pursuant to the turnover order entered

by this Court (the "Turnover Order").  [*See* Adv. Pro No. 24-01342 (MEW), Docket

No. 8].

## II.    The Trustee's Efforts to Sell the Townhouse

16.    Prior to the Trustee's appointment, the Court entered the Sotheby's

Retention Order and authorized the Debtor to retain Sotheby's as broker to assist with

the marketing and sale of the Townhouse pursuant to the Sotheby's Listing Agreement.

When the Trustee was appointed, the Sotheby's Listing Agreement[6] was in effect.

17.    After the Sotheby's Listing Agreement expired without an

acceptable offer having been made, the Trustee obtained entry of an order authorizing

him to retain BHS as his broker to assist with the sale of the Townhouse.  [Docket No.

516].

18.    The Trustee selected BHS to act as his real estate broker because of

the unique expertise and experience of one of its brokers, Sami Hassoumi, who

specializes in the sale of premiere townhouses in New York City on the upper east side

of Manhattan, the neighborhood where the Townhouse is located.  *See* Moore Decl., ¶8;

*see also* Hassoumi Decl., ¶3.  In selecting Mr. Hassoumi, the Trustee determined that he

was the most qualified of all of the brokers that the Trustee considered and interviewed.

Moore Decl., ¶8.

---

[6]    This Court authorized the Trustee to extend the Sotheby's Listing Agreement through and including
December 15, 2024.  [Docket No. 290].

19.     As part of his efforts to sell the Townhouse, and following a full-

day trial, the Trustee obtained entry of the Court's Decision and Judgment determining

that all of the fixtures that are located in the Townhouse are to be included in the sale of

the Townhouse [Adv. Pro. No. 25-01037 (MEW), Docket Nos. 64, 65] (the "Fixtures

Order and Judgment").[7]

20.     On September 17, 2024, the Trustee filed a Chapter 11 plan (as

amended, the "Trustee Plan"), which contemplates a sale of the Townhouse.  [Docket

No. 327].[8]

## III.    Liens Against the Townhouse

21.     The Townhouse is subject to various post-Petition Date and pre-

Petition Date liens.

### A.    The Lynx DIP Loan and Lien

22.     Pursuant to an order of the Court dated July 26, 2024 [Docket No.

264] (the "Post-Petition Financing Order"), Lynx was authorized to make a post-petition

loan (the "DIP Loan") to the Estate in an amount not to exceed $3,400,000 in two

separate draws:  (i) $400,000 as an initial draw for costs to procure adequate insurance

for the Townhouse and to pay for other necessary maintenance, repair and other costs

related to the Townhouse pending the Sale process, and (ii) up to a $3 million second

draw ("Second Draw") to fund the necessary carve-out at closing of a Sale of the

Townhouse to address for the reasonable and necessary costs, commissions,

compensation and other expenses incurred by the Trustee and his retained

professionals in connection with the preservation, protection and sale of the Townhouse

---

[7]    On August 25, 2025, Marianne Nestor appealed the Fixtures Order and Judgment.  Marianne Nestor
did not seek or obtain a stay of the Fixture Order and Judgment pending appeal.

[8]    The Trustee anticipates amending the Trustee Plan.

for the benefit of holders of secured claims against the Townhouse and administration of the Chapter 11 Case.  The amount due on account of the DIP Loan is approximately $465,000.  Post-Petition Financing Order, ¶2(c).

23.    On December 29, 2025 the Trustee filed an application [Docket No. 813] for approval of a stipulation between the Trustee and Lynx amending the Post-Petition Financing Order providing that, among other things:  (a) if the sale price for the Townhouse equals $34 million, then (i) the amount of Lynx's pre- and postpetition claims (the "Total Lynx Indebtedness"), collectively, will be equal to $21.25 million and the amount of the Second Draw will be equal to $4 million, subject to an incremental 60/40 split of net sale proceeds in excess of $34 million;  and (ii) Lynx will limit its recovery on the Total Lynx Indebtedness to the sale proceeds of the Townhouse, and have no further claims against the Estate;  and (b) as of November 12, 2025, no further interest shall accrue on the Total Lynx Indebtedness.

**B.    The Emigrant Bank Mortgage**

24.    On or about August 30, 2010, the Debtor and Marianne Nestor executed a Mortgage and Adjustable Rate Note (the "Emigrant Mortgage") in favor of Emigrant Bank, as successor by merger with Emigrant Savings Bank – Manhattan ("Emigrant"), in the amount of $4 million.

25.    The Emigrant Mortgage is secured by a lien against *inter alia*, the Townhouse.  Proof of Claim No. 5-1 at 22.

26.    Emigrant filed Proof of Claim No. 5 in the Chapter 11 Case in the amount of $3,559,407.76 on account of the Emigrant Mortgage.

**C.    Surrogate's Court Judgment Liens**

27.    On September 10, 2014, a judgment lien in favor of Christina Cassini and against Marianne Nestor was recorded against the Townhouse to secure a

claim of $395,604.57.  That judgment is now held by Michael Katz (the "Katz Judgment").  On August 5, 2024, the Surrogate's Court entered an order and renewed the Katz Judgment, and fixed it in the amount of $421,506.83, plus interest. The principal and interest due on account of the Katz Judgment is now approximately $465,963.

28.    On November 5, 2015, Jeffrey E. Deluca, in his capacity as Public Administrator appointed by the Surrogate's Court, recorded a judgment lien against the Townhouse to secure a claim against Marianne Nestor in the principal amount of $1,046,214.59 (the "Deluca Judgment").  The principal and interest due on account of the Deluca Judgment is now approximately $2 million.

**D.    The Lynx Mortgage**

29.    Prior to the Petition Date, the Debtor and Marianne Nestor owned and operated Gemeaux Ltd ("Gemeaux"), which engaged in the licensing and promotion of products related to Oleg Cassini.

30.    On or about January 25, 2017, the Debtor, Marianne Nestor, and Gemeaux executed promissory notes and an Amended Restated and Consolidated Promissory Note (the "Lynx Mortgage") in favor of Lynx.  The Debtor and Marianne Nestor executed guarantees of Gemeaux's obligations under the Lynx Mortgage.

31.    On May 1, 2018, the Debtor and Marianne Nestor defaulted on their obligations as guarantors of the Lynx Mortgage.  On October 12, 2022, Lynx obtained entry of an *Amended Judgment of Foreclosure and Sale and Decision and Order on Motion* in a New York State foreclosure action (the "Lynx Foreclosure Judgment").

32.    A referee's sale of the Townhouse on account of the Lynx Foreclosure Judgment was scheduled for April 26, 2023 (the "Foreclosure Sale").  The

Debtor stayed the Foreclosure Sale by commencing the Chapter 11 Case one day before the Foreclosure Sale.

33.     Lynx filed Proof of Claim No. 10 in the Chapter 11 Case in the amount of $19,267,266.90 on account of the Lynx Mortgage.

34.     On February 14, 2025, the Court entered an order fixing Lynx's claim in the amount of $22,978,163.50 through December 31, 2024, plus all amounts that accrue and may become due and payable until the closing of a sale of the Townhouse. [Docket No. 521].

E.     **The Prime Plus Mortgages**

35.     On or about January 23, 2018, the Debtor, Marianne Nestor, and Gemeaux executed a Mortgage and Security Agreement in favor of Prime Plus, LLC ("Prime Plus") in the amount of $1,300,000 (the "January 2018 Prime Plus Mortgage").

36.     On or about November 16, 2018, the Debtor, Marianne Nestor, and Gemeaux executed a Mortgage and Security Agreement in favor of Prime Plus in the amount of $1,000,000 (the "November 2018 Prime Plus Mortgage" and, together with the January 2018 Prime Plus Mortgage, the "Prime Plus Mortgages").

37.     Prime Plus filed Proofs of Claim Nos. 7 and 8 in the Chapter 11 Case, which together total $4,010,586.02 on account of the Prime Plus Mortgages.

F.     **The Surrogate Parties' Junior Liens**

38.     Pursuant to a June 26, 2020 Ex Parte Order of Attachment entered by the Nassau County Surrogate's Court, the Surrogate Parties recorded a pre-judgment attachment lien against the Debtor's interest in the Townhouse in the amount of $2,594,813.42, against Marianne Nestor's interest in the amount of $57,400,000, and against Gemeaux in the amount of $11,179,916.84 (the "Surrogate Parties' Liens"). The Surrogate Parties' Liens were perfected by a New York City Sheriff's Levy.

39.     The Public Administrator and the Receiver filed Proofs of Claim Nos. 9 and 11, respectively, each with a secured amount of $2,594,813.42 on account of the Surrogate Parties' Liens.

### G.     The Wenig Saltiel Judgment Lien

40.     On August 12, 2021, Wenig Saltiel LLP ("Wenig Saltiel") obtained a judgment against the Debtor and Marianne Nestor in the amount of $128,077.18 (the "Wenig Saltiel Judgment").

41.     On August 17, 2022, the Wenig Saltiel Judgment was recorded with the New York County Clerk's office, and was secured by the Townhouse (the "Wenig Saltiel Judgment Lien" and, together with the Emigrant Mortgage, the Lynx Mortgage, the Prime Plus Mortgages, and the Surrogate Parties' Liens, the "Liens").

42.     Wenig Saltiel filed Proof of Claim No. 12 in the Chapter 11 Case in the amount of $88,450.38 on account of the Wenig Saltiel Judgment Lien.

## IV.    The Marketing Process

43.     Despite being retained on December 15, 2023, the Debtor and Marianne Nestor's documented interference prevented Sotheby's from effectively marketing the Townhouse until shortly after the Trustee took possession of the Townhouse on April 30, 2024.  Moore Decl., ¶5.

44.     From that point forward, Sotheby's extensively marketed the Townhouse and identified and contacted, through e-mail, correspondence and/or telephone calls, numerous brokers and potential buyers for the Townhouse.  *Id.* at ¶6.

45.     The marketing efforts yielded significant interest in the Townhouse.  *Id.*  The Sotheby's Listing Agreement expired during December 2024 without any acceptable offers or a signed contract of sale.  *Id.*

46.    Following expiration of the Sotheby's Listing Agreement, on February 13, 2025, the Court entered an order authorizing the Trustee's retention of BHS to assist in the marketing and sale of the Townhouse [Docket No. 516].  Moore Decl., ¶7.

47.    BHS also extensively marketed the Townhouse.  BHS identified and contacted, through email, correspondence and/or telephone calls, numerous brokers and potential buyers of the Townhouse.  Hassoumi Decl., ¶8.

48.    BHS also prepared and distributed marketing advertisements, including circulation of advertisements in *The New York Times*, *The Wall Street Journal*, *and Luxury Portfolio*.  *Id.* at ¶8.  BHS also posted marketing information regarding the Townhouse on its own website.  *Id.* at 9.  These advertisements were designed to expose the Townhouse to millions of prospective bidders and brokers worldwide.  *Id.*

49.    As explained in the Hassoumi Declaration, BHS provided numerous tours and showings of the Townhouse to interested parties on not less than 60 occasions.  *Id.* at ¶10.  Prospective bidders came from locations throughout the world to tour and inspect the Townhouse, often on more than one occasion, and with their brokers, architects, expeditors, and other representatives.  *Id.*

50.    Following discussions with BHS and the Trustee's professionals, the Trustee determined that:  the Stalking Horse Bid is the highest and best offer, and the Back-Up Bid was the second highest offer, that have been made for the Townhouse to date;  it was prudent to enter into the Stalking Horse Agreement annexed hereto as **Exhibit A**, subject to court approval;  the Stalking Horse Bid and the Stalking Horse Agreement should be accepted as the "stalking horse bid";  and the Back-Up Bid and the Back-Up Agreement should serve as the Next Highest Bid unless an Auction is held

and the Trustee determines in his business judgment to change such designation in accordance with the Sale Procedures.  Moore Decl., ¶10.

51.    The Stalking Horse Consideration of $34.5 million is to be paid in cash at closing, and is not subject to any financing contingencies.  The Trustee has concluded that the Stalking Horse Agreement is fair and reasonable, and in the best interests of the Estate, creditors and other parties in interest.

52.    The Trustee believes that the Stalking Horse Agreement presents the most value-maximizing transaction possible at this time in light of the Trustee's extensive marketing and sale process, and will provide significant value of the Estate and stakeholders, and that further marketing is not needed.

## V.    The Stalking Horse Agreement

53.    Following is a summary of the material terms of the Stalking Horse Agreement:[9, 10]

- **Purchase Price**:  $34,500,000

- **Deposit**:  $1,700,000 has been delivered to the Trustee's real estate counsel (the "Deposit").

- **Closing Conditions Required by the Purchaser:**  The Stalking Horse Bidder's closing conditions include, among other things:  (i) the conditions of title to the Townhouse, and the ability of the Trustee to deliver possession of the Townhouse at closing vacant[11] and free of liens, interests, claims and encumbrances, as provided in the Stalking Horse Agreement;  (ii) the delivery of customary closing documents;  and (iii) a Sale Order being entered pursuant to Bankruptcy Code Section 363, which Sale Order has not been stayed.

---

[9]    The summary of the Stalking Horse Agreement is provided for the convenience of the Court and parties in interest.  In the event of any inconsistency between the summary in this Application and the terms of the Stalking Horse Agreement, the terms of the Stalking Horse Agreement shall govern.

[10]    With the exception of the "Purchase Price" and "Deposit", the material terms summarized in this section also apply to the Back-Up Agreement.

[11]    Consistent with the Court's order authorizing abandonment of personal property (excluding fixtures) located at the Townhouse [Adv. Pro. No. 25-01037 (MEW), Docket No. 41], the Trustee has arranged for all of the remaining personal property to be removed prior to the closing of the Sale.

- **Closing Conditions Required by the Trustee:** The Trustee's closing conditions will generally be limited to: (i) the accuracy of the Stalking Horse Bidder's representatives and warranties; (ii) the Stalking Horse Bidder's compliance with covenants and performance of agreements and obligations; (iii) entry of the Sale Order; and (iv) entry of an order confirming a Chapter 11 Plan (the "<u>Confirmation Order</u>").

- **Closing Date:** A closing to be held within three (3) business days after entry of the Confirmation Order.

- **No Reliance on Warranties or Representations:** The Townhouse will be conveyed by the Trustee to, and accepted by the Stalking Horse Bidder "AS IS", "WHERE IS", "WITHOUT ANY EXPRESS OR IMPLIED WARRANTY OR REPRESENTATION OF ANY KIND," except as expressly provided in the Stalking Horse Agreement and the Sale Order. Without limiting the generality of the foregoing, neither the Trustee nor any other person or entity makes any warranty or representation regarding the condition, working order, existence, quantity or location of such assets, and the Stalking Horse Bidder shall have no recourse and may not assert any claim against the Trustee, its estate, or its representatives based on any such warranty or representation.

54.     Pursuant to the Sale Guidelines, the Trustee is required to highlight any "extraordinary provisions."

- Use of Proceeds: Proceeds from the Sale will be used to satisfy closing expenses in connection with the sale of the Townhouse, the costs and expenses of the Debtor's Estate, and, in whole or in part, allowed claims asserted against the Debtor in the Chapter 11 Case pursuant to the Trustee Plan.

- Tax Exemptions: Subject to entry of the Confirmation Order, the Trustee requests that the Sale Order include a determination by the Court that the Sale of the Townhouse is exempt from any stamp or similar tax pursuant to section 1146 of the Bankruptcy Code.

- Relief from Bankruptcy Rule 6004(h): The Stalking Horse Agreement seeks a waiver of Bankruptcy Rule 6004(h).

## VI.    **The Stalking Horse Bid Protections**

55.     The Stalking Horse Agreement provides that if the Court approves the Sale of the Townhouse to a third party Successful Bidder, the Stalking Horse Bidder will be entitled to the return of the Deposit, the Initial Overbid (as defined below), a

break-up fee equal to $270,000 (the "Break-Up Fee"), and an expense reimbursement of reasonable and necessary documented costs and expenses, including reasonable attorney's fees incurred by the Stalking Horse Bidder, not to exceed $70,000 (the "Expense Reimbursement" and, collectively, the "Stalking Horse Bid Protections").  The Break-Up Fee and the Expense Reimbursement would be payable upon closing of the Sale of the Townhouse to a third-party Successful Bidder (other than the Stalking Horse Bidder) from sale proceeds.[12]

56.    The Trustee respectfully submits that given the Trustee's need to maximize value for creditors through a timely and efficient marketing process, the ability to designate a stalking horse bidder and offer such bidder the Stalking Horse Bid Protections is justified, appropriate, and essential.

**RELIEF REQUESTED**

57.    By this Application, the Trustee seeks entry of (a) the Scheduling Order;  (b) the Modified Sale Procedures Order approving (i) the Modified Sale Procedures, (ii) the designation of the Stalking Horse Bidder as the stalking horse bidder and the Stalking Horse Bid Protections;  and (iii) the Notice of Auction and  Sale Hearing;  and following a hearing on this Application;  and (c) the Sale Order, approving the Sale of the Townhouse as described herein and provided for in the applicable purchase agreement.

**I.    The Proposed Modified Sale Procedures**

58.    The Trustee proposes to modify the Initial Sale Procedures to establish, in part, the following key dates and deadline for the Sale process:

---

[12]    For the avoidance of doubt, if the Back-Up Bid becomes the Successful Bid, the Trustee will not seek approval of the bid protections provided in Section 19.04 of the Back-Up Agreement.

| Key Event | Deadline[13] |
|---|---|
| Hearing to Consider Approval of Modified Sale Procedures and Stalking Horse Bid Protections | January 22, 2026 at 11:00 a.m. |
| Deadline to submit Qualifying Bids | January 26, 2026 at 4:00 p.m. |
| Deadline for the Trustee to file notice canceling the Auction and designating the Stalking Horse Bid as the Successful Bid, if no Qualifying Bid is received | January 27, 2026 |
| Deadline for the Trustee to notify bidders of (i) status as Qualified Bidders and (ii) selection of Opening Bid at Auction | January 27, 2026 |
| Auction (if any) to be held if the Trustee receives more than one Qualifying Bid at the offices of the Philips Nizer LLP | January 28, 2026 at 10:00 a.m. |
| Deadline for the Trustee to file with the Court the notice of Auction results and designation of the Successful Bid and the Next Highest Bid | January 29, 2026 |
| Deadline to file objections to Sale | February 4, 2026 at 4:00 p.m. |
| Deadline to reply to objections to Sale | February 5, 2026 at 12:00 p.m. |
| Sale Hearing, subject to the Court's availability | February [6], 2026 |

59.    The Modified Bid Procedures include the following modifications:

a) <u>Bid Deadline</u>.  Section I - The Bid Deadline is revised to January 26, 2026 at 4:00 p.m. (prevailing Eastern Time); <u>provided</u>, that the Trustee shall have the right to extend the Bid Deadline for any reason whatsoever, in his reasonable business judgment, for all or certain potential bidders, without further order of the Court, subject to providing prior notice to the Stalking Horse Bidder, Lynx, the Surrogate Parties, and all known potential bidders;

b) <u>Qualified Bidder</u>.  Section I - The delivery location of a Qualifying Bid is revised to (i) the Trustee's Broker, Brown Harris Stevens Residential Sales, LLC (Attn: Sami Hassoumi (shassoumi@bhsusa.com)) and (ii) counsel to the Trustee, Togut, Segal & Segal LLP (Attn: Brian F. Moore, Esq. (bmoore@teamtogut.com) and Martha E. Martir, Esq. (mmartir@teamtogut.com));[14]

c) <u>Qualifying Bid</u>.  Section I - In addition to the requirements in Part I of the Initial Sale Procedures, a Qualifying Bid for the Townhouse must specify the price proposed to be paid for the Townhouse, which purchase price must be in cash (and not subject to any financing contingencies) and in an amount equal to or greater than the sum of (i) the Stalking Horse Consideration ($34,500,000) and (ii) an initial overbid amount consisting of the sum of the Break-Up

---

[13]    All times herein are prevailing Eastern Time.
[14]    The Stalking Horse Bidder and the Back-Up Bidder each constitute a Qualified Bidder.

Fee ($270,000), the Expense Reimbursement ($70,000), and $50,000 (the "Initial Overbid");[15]

d) Co-Owners. Section I - Any person or entity seeking to exercise a right to purchase pursuant to Section 363(i) of the Bankruptcy Code, shall submit by the Bid Deadline (as modified herein) the information required for a "Qualifying Bid" and "Qualified Bidder" in accordance the Sale Procedures by the Bid Deadline, and the failure to make such submission shall be deemed a waiver of the right to purchase pursuant to Section 363(i) of the Bankruptcy Code (the "363(i) Bid Deadline");

e) Closing Date. Section I(viii) - The Closing Date is revised to the date that is not later than three (3) business days after entry of (i) the Sale Order and (ii) the Confirmation Order;

f) Opening Bid. Section II - Bidding at the Auction for the Townhouse will start with the highest or best Qualifying Bid received, as determined by the Trustee in his sole discretion, in consultation with Lynx and the Surrogate Parties (the "Opening Bid");

g) Credit Bid. Section III(c) - Notwithstanding anything to the contrary in the Initial Sale Procedures Order and the Initial Bid Procedures, any credit bid submitted by Lynx shall be made at or prior to the Auction, and a failure by Lynx to make a timely credit bid shall be deemed a waiver of its right to make a credit bid;

h) Stalking Horse Bid Protections. Section II - The Stalking Horse Bidder shall be entitled to payment of a break-up fee in the amount of $270,000 (the "Break-Up Fee") and expense reimbursement of up to $70,000 (the "Expense Reimbursement"); and

i) Condition Precedent. Section IV(a) – The first sentence is revised as follows: The Sale of the Townhouse shall be subject to entry of the Sale Order approving the sale of the Successful Bidder and the Confirmation Order.

60. The Trustee believes that the time periods set forth in the Modified Sale Procedures are reasonable and appropriate, and are designed to implement the 363(h) Order with a necessary degree of clarity. The Townhouse has been extensively marketed during the past 18 months, and many parties that may have an interest in

---

[15] The Stalking Horse Agreement and the Back-Up Agreement each constitute a Qualifying Bid.

bidding at the Auction likely already have visited the Townhouse, conducted diligence and will not be bidding in a vacuum.  In addition, the timeline proposed takes into account that an efficient timeline will lower administrative expenses, and maximize recoveries ultimately available for creditors.

**II.    Noticing Procedures**

61.    The Modified Sale Procedures Order provide for the procedures with regard to noticing (the "Noticing Procedures"), including:

a) Notice of Auction and Sale Hearing.  As soon as practicable, but no later than one (1) business day after entry of the Modified Sale Procedures Order, the Trustee will file with the Bankruptcy Court and serve on Sale Notice Parties, a Notice of Auction and Sale Hearing, in the form annexed to the Modified Sale Procedures Order as **Exhibit 1**, which will set forth (i) description of the Townhouse;  (ii) the date, time, and place of (A) the Auction and (B) the Sale Hearing;  and (iii) the deadlines and procedures for objecting to the Sale;

b) Deadline to Cancel the Auction.  If no Qualifying Bids (other than the Stalking Horse Bid, the Back-Up Bid, and a Lynx credit bid) are received by the Bid Deadline, the Trustee will be authorized to file a notice cancelling the auction, and designating the Stalking Horse Bid as the Successful Bid and the Back-Up as the Next Highest Bid by no later than one day prior to Auction;

c) Selection of Qualifying Bids.  The Trustee will notify bidders of (i) status as a Qualified Bidder and (ii) selection of the Opening Bid at the Auction by no later than one (1) business day before the Auction;  provided, that the Trustee shall have the right, in consultation with Lynx, to extend the Bid Deadline for any reason whatsoever, in his reasonable business judgment, for all potential bidders without further order of the Court, subject to providing notice to Lynx and the Surrogate Parties;  and

d) Notice of Auction Results.  The Trustee shall file with the Court the notice of Auction results and designation of the Successful Bid and Next Highest Bid by no later than one (1) business day after the conclusion of the Auction (if any).

### III.     Objections to The Sale

       62.     Objections, if any, to the Sale, must be filed with this Court, with a copy delivered directly to Chambers and served so as to be received by:  (a) counsel for the Trustee, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119, Attn: Brian F. Moore, Esq. (bmoore@teamtogut.com) and Martha E. Martir, Esq. (mmartir@teamtogut.com);  (b) counsel for the Stalking Horse Bidder, Becker, Glynn, Muffly, Chassin & Hosinski LLP, 299 Park Avenue, 16th Fl., New York, New York 10171, Attn: Alec P. Ostrow, Esq. (aostrow@beckerglynn.com);  (c) counsel for the Back-Up Bidder, Romer Debbas LLP, Attn: Jonathan Helfer, Esq. (jhelfer@romerdebbas.com); (d) counsel to Lynx, McGrail & Bensinger LLP, 999-C 8th Avenue #107, New York, New York 10019, Attn: Ilana Volkov, Esq. (ivolkov@mcgrailbensinger.com);  (e) counsel to the Surrogate Parties,[16] including (i) counsel to the Receiver, Westerman Ball Ederer Zucker & Sharfstein LLP, 1201 RXR Plaza, Uniondale, New York 11556, Attn: Jeffrey A. Miller, Esq. (jmiller@westermanllp.com);  (ii) counsel to the Cassini Executors, Farrell Fritz, P.C., 400 RXR Plaza, Uniondale, NY 11556, Attn: Patrick Collins, Esq. (pcollins@farrellfritz.com); (iii) counsel to the Public Administrator, Mahon, Mahon, Kerins & O'Brien, LLC, 254 Nassau Boulevard, Garden City, New York 11530, Attn: Kenneth P. Mahon, Esq. (kmahon@mmkolaw.com) and Heather Callaghan, Esq. (hcallaghan@mmkolaw.com); (f) the Office of the United States Trustee (Daniel.Rudewicz@usdoj.gov);  and (g) all other parties who have filed a Notice of Appearance in the Chapter 11 Case, so as to be actually received no later than **February 4, 2026 at 4:00 p.m. (prevailing Eastern Time)**.

---

[16]    In the Sale Procedures Order, the Surrogate Parties are defined as the "Interested Parties."  Sale Procedures Order at 2.

Objections, if any, shall state the party's interest in the Chapter 11 Case, and shall also set forth the specific grounds, legal and/or factual, for the objection.

## BASIS FOR RELIEF

### I.    The Modified Sale Procedures Order Should be Entered

#### A.    The Modified Sale Procedures Should be Approved

63.    The Modified Sale Procedures, which are standard for the sale of assets in similar cases, will ensure that the Debtor's Estate receives the greatest benefit available from the Sale of the Townhouse.  Further, the Modified Sale Procedures are fair and open, and do not unfairly favor any potential purchaser.  Finally, the Trustee submits the Sale Procedures set out a timeframe that will allow potential purchasers sufficient time to conduct due diligence and submit informed bids, while still providing for the prompt sale of the Townhouse.  As discussed above, the Initial Sale Procedures were approved by the Court in December 2023, and the property has been extensively marketed during the past 18 months, such that interested parties will have had ample opportunity to visit and conduct diligence on the Townhouse.

64.    The Trustee respectfully submits that the Modified Sale Procedures are reasonably designed to ensure that the Estate receives the highest or best purchase price for the Townhouse and, therefore, warrant Court approval.

#### B.    The Stalking Horse Bid Protections Should be Approved

65.    The Stalking Horse Agreement and the Modified Sale Procedures contain certain bid protections for the Stalking Horse Bidder, such as the Initial Overbid, the Break-Up Fee, and the Expense Reimbursement.  Bidding incentives such as these Stalking Horse Bid Protections have become commonplace in connection with sales in Chapter 11.  Moreover, approval of break-up fees as a form of bidder protections in connection with the sale of assets has become a recognized practice in

Chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the trustee believes is fair, while providing the trustee with the potential of obtaining an enhanced recovery through an auction process. *See e.g., In re 9 Crosby LLC*, No. 2512559 (LGB) (Bankr. S.D.N.Y. Dec. 1, 2025) [Docket No. 18] (approving a 3% break-up fee and expense reimbursement not to exceed $300,000 in connection with the $125 million purchase price); *In re Amsterdam House Continuing Care Retirement Community, Inc., d/b/a/ The Harborside*, No. 2370989 (AST) (Bankr. E.D.N.Y. May 17, 2023) [Docket No. 179] (approving a 3% break-up fee and an expense reimbursement not to exceed 1% of the cash consideration); *In re Evergreen Gardens Mezz LLC, et al.*, No. 21010335 (MG) (Bankr. S.D.N.Y. Oct. 4, 2021) [Docket No. 129] (approving a $20 million break-up fee and an expense reimbursement not to exceed $150,000 in connection with the $506 million offer); *In re the D&M Capital Group, LLC*, No. 1911711 (SCC) (Bankr. S.D.N.Y. Feb. 2, 2021) [Docket No. 174] (approving a 3% break-up fee); *In re 60 91st Street Corp.*, No. 2010338 (SCC) (Bankr. S.D.N.Y. Sept. 18, 2020) [Docket No. 162] (approving a 3% break-up fee and expense reimbursement not to exceed $25,000); *In re 305 East 61st Street Group LLC*, No. 1911911 (SHL) (Bankr. S.D.N.Y. Feb. 21, 2020) [Docket No. 148] (approving a break-up fee of $800,000).

66.      Approval of the Stalking Horse Bid Protections is appropriate under the circumstances at hand.  First, the Stalking Horse Bid Protections are the product of good faith-arms length negotiations between the Stocking Horse Bidder and the Trustee.  Moore Decl., ¶11.

67.      Second, the Stalking Horse Bid Protections promote competitive bidding by inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid for the Townhouse on which other bidders—and the Trustee—can rely.  The Stalking Horse Bid Protections were a material inducement for, and a condition of, the

Stalking Horse Bidder's agreement to enter into the Stalking Horse Agreement. *Id.* at ¶12. Indeed, the Stalking Horse Agreement increases the likelihood that the price at which the Townhouse will be sold will reflect its market value, and the Stalking Horse Bidder is entitled to be compensated as a result.

68. Third, the Stalking Horse Bid Protections are reasonable relative to the proposed purchase price in view of the substantial benefits that the Estate will receive from having the Stalking Horse Agreement serve as a floor for bidders that submit a bid for the Townhouse, which will enable the Trustee to receive the highest or best offer for the Townhouse. *See, e.g., In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . . due diligence"); *In re Marrose Corp.*, Case Nos. 89-B-12171 (CB) to 89-B-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"). The Break-Up Fee and Expense Reimbursement, together, represents less than one percent (1%) of the Stalking Horse Consideration, which is within the range of what courts in this District have held as reasonable.[17] Moreover, the Stalking Horse Agreement provides the Trustee with a high likelihood of consummation with a contractually committed party at a fair and reasonable purchase price. Accordingly, the Stalking Horse Bid Protections will not deter or chill bidding, are reasonable, and will enable the Trustee to maximize the value

---

[17] The Initial Sale Procedures permitted a break-up fee of "up to 1%". Initial Sale Procedures, § II.

of the Estate to ensure that the Estate receives the highest or best purchase price for the

Townhouse and, therefore, warrant Court approval.

### C.    The Noticing Procedures Should be Approved

69.    The Noticing Procedures, including the Notice of Auction and Sale

Hearing, constitute adequate and reasonable notice of the key dates and deadlines for

the Sale process, including, among other things, the deadline to object to the proposed

Sale, the Bid Deadline, and the date, time, and location of the Auction and the Sale

Hearing.  Accordingly, the Trustee requests that the Court find that the Noticing

Procedures, including the Notice of Auction and Sale Hearing, are adequate and

appropriate under the circumstances and comply with the requirements of Bankruptcy

Rules 2002 and 6004, Local Rule 2002-1, and the Sale Guidelines.

## II.    The Sale Order Should Be Entered

### A.    The Sale of the Townhouse is a Sound
Exercise of the Trustee's Business Judgment

70.    Bankruptcy Code section 363(b) governs transactions outside the

ordinary course of business involving property of a debtor's estate and provides, in

relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other

than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b).

71.    A Chapter 11 trustee's sale or use of property of the estate outside

the ordinary course of business should be approved by the Court if the Trustee can

demonstrate a sound business justification for the proposed transaction.  *See In re*

*Chrysler LLC*, 576 F.3d 108, 117-18 (2d Cir. 2009), *citing In re Iridium Operating LLC*, 478

F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estates under

§ 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly

find[s] from the evidence presented before [him or her] at the hearing [that there is] a

good business reason to grant such an application.'" (*citing Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 772 F.2d 1063, 1071 (2d Cir. 1983); *In re Gen. Motors Corp.*, 407 B.R. 463, 491 (Bankr. S.D.N.Y. 2009)).

72.     The Townhouse is the primary asset of the Estate and is a significant source of funds to pay administrative fees, claims, expenses of this case, and allowed priority tax claims which will have to be paid to achieve confirmation of a Chapter 11 plan.[18]  The Trustee has determined in his business judgment that selling the Townhouse, as directed by the 363(h) Order, is in the best interests of the Estate because there is no other viable alternative after extensive marketing of the Townhouse.

73.     Consequently, the Trustee has determined in his business judgment that selling the Townhouse pursuant to the Stalking Horse Agreement is in the best interests of the Estate.

74.     The Trustee submits that the Stalking Horse Consideration is fair and reasonable in light of the current real estate market, sale listings for comparable properties in the neighborhood where the Townhouse is located, the extensive marketing of the Townhouse that has occurred during the past eighteen (18) months, and the offers received for the Townhouse to date following competitive bidding.  *See* Hassoumi Decl., ¶14.  Finally, any concern that the Trustee may be able to sell the Townhouse on better overall terms than those provided for in the Stalking Horse Agreement should be allayed by the fact that the Stalking Horse Bid will have been tested through competitive bidding.

75.     Additionally, the Sale Order enjoins the Debtor, Marianne Nestor, and others from interfering with the Stalking Horse Bidder's title to or use and

---

[18]     Sale of the Townhouse pursuant to a confirmed Chapter 11 plan is projected to save the Estate approximately $1 million.

enjoyment of the Townhouse (the "Non-Interference Provision"). Section 105(a) of the

Bankruptcy Code confers on the Court broad equitable powers to "issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of this

title . . . [and] taking any action or making any determination necessary or appropriate

to enforce or implement court order rules, or to prevent an abuse of process." 11 U.S.C.

§ 105(a); *see also In re Ditech Holding Corporation*, Case No. 19-10412 (JLG), 2023 WL

3638049, at *7 (Bankr. S.D.N.Y. May 24, 2023). This provision is "the basis for a broad

exercise of power [by the Court] in the administration of a bankruptcy case." *In re*

*Flores*, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003). The Trustee respectfully submits that the

record in this case demonstrates that the Non-Interference Provision of the Sale Order is

necessary and appropriate, and that approving it is an appropriate exercise of the

Court's power to enforce its prior orders and to facilitate the administration of property

of the Estate. Similar relief has been granted by this Court. *See In re Hello Newman, Inc.*,

Case No. 16-12910 (SCC) (Bankr. S.D.N.Y. Sept. 24, 2018) [Docket No. 176], ¶ 8.

76.     Based upon the foregoing, the Trustee respectfully submits that the

Sale of the Townhouse and entry of the Sale Order offers the greatest benefit to the

Debtor's Estate, and is a sound exercise of his business judgment.

**B.     The Townhouse Should be Sold Free and
Clear of any Liens and Interests to the Extent
Permitted by Section 363(f) of the Bankruptcy Code**

77.     Pursuant to section 363(f) of the Bankruptcy Code, a Trustee may

sell property under Bankruptcy Code section 363(b) free and clear of any interests if one

of the following conditions is satisfied: (1) applicable nonbankruptcy law permits the

sale of the property free and clear of such interest; (2) the entity holding the lien, claim

or interest consents to the sale; (3) the interest is a lien and the price at which such

property to be sold is greater than the aggregate value of all liens on the property;

(4) the interest is in bona fide dispute;  or (5) the entity could be compelled, in a legal or

equitable proceeding, to accept a money satisfaction of its interest.  *See* 11 U.S.C.

§ 363(f);  *see also In re Smart World Tech., LLC*, 423 F.3d 166, 169 n.3 (2d Cir. 2005)

("Section 363 permits sales of assets free and clear of claims and interests.  It thus allows

Purchaser … to acquire assets [from a debtor] without any accompanying liabilities.");

*In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *3 (Bankr. S.D.N.Y. Mar. 6,

1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest

concerned may occur if any one of the conditions of § 363(f) have been met").

78.    The Trustee respectfully submits that cause exists to authorize the

Sale of the Townhouse pursuant to the Stalking Horse Agreement free and clear of all

interests and liens as described herein and as provided in the Stalking Horse

Agreement, because more than one of the conditions contained in Bankruptcy Code

section 363(f) are satisfied, with such liens to attach to the Sale proceeds.

> **i.    *Section 363(f)(2) Is Satisfied:  Holders Of Liens
> And Interests Implied Consent To The Sale***

79.    All parties in interest will be given sufficient opportunity to object

to the relief requested by the Trustee, and any such entity that does not object to the

Sale should be deemed to have consented.  *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d

281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions

under which an interest can be extinguished by a bankruptcy sale, but one of those

conditions is the consent of the interest holder, and lack of objection (provided of course

there is notice) counts as consent.  It could not be otherwise;  transaction costs would be

prohibitive if everyone who *might* have an interest in the bankrupt's assets had to

execute a formal consent before they could be sold.") (internal citations omitted);

*Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J.

1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies

section 363(f)(2)); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345

(E.D. Pa. 1988) (same). Courts in this district have applied the same principle. *See In re

Enron Corp.*, 2003 WL 21755006 at *2, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2003)

(order deeming all parties who did not object to proposed sale to have consented under

section 363(f)(2)).

      80.    Further, Marianne Nestor should be deemed to have consented,

and estopped from objecting, to the Sale by virtue of her Admission filed in the Sale

Adversary Proceeding. Indeed, in light of her Admission, the Court entered the 363(h)

Order. *See Decision and Order Denying Oral Motions to Reconsider Prior Rulings Regarding

the Possession of a Townhouse and the Sale of the Same* [Docket No. 153 at 11] ("The

assurances that Marianne Nestor Cassini had no ownership interest in [the

Townhouse]—which she later confirmed in her official response to the [Sale Adversary

Proceeding] that was filed—was an important factor in my denial of the motions for

relief from the automatic stay and in my approval of the agreed sale process"").

Marianne Nestor's numerous requests for reconsideration of this Court's holdings that

she is estopped from asserting an interest in the Townhouse have been rejected multiple

times by this Court [Docket No. 166 at 45:10-46:15 & 78:16-79:3], [Docket No. 153 at 12],

[Docket No. 156 at 1-2], [Docket No. 160 at 1-2], [Docket No. 162], [Docket No. 185], and

by the United States District Court for the Southern District of New York [24-cv-04063

(ALC), Docket No. 25].

      *ii.*    ***Section 363(f)(5) Is Satisfied***

      81.    The Sale satisfies Bankruptcy Code section 363(f)(5) because (a) any

entity holding a lien against the Townhouse, could be compelled to accept a monetary

satisfaction of its lien, and (b) the Trustee proposes that any lien against the Townhouse
will attach to the net proceeds of the Sale, subject to all claims and defenses that the
Estate may possess regarding such liens, with the same priority, validity and extent
they had on the Petition Date and pursuant to the post-petition financing order entered
in this Chapter 11 Case [*See* Docket No. 264].

82.    Here, entities that hold liens against the Townhouse junior to the
liens asserted by Lynx can be compelled to accept a monetary satisfaction of its lien
through a foreclosure sale.  *See In re Urban Commons 2 West LLC*, 668 B.R. 42, 49-50
(Bankr. S.D.N.Y. 2025) (finding "the availability of a foreclosure proceeding under state
law satisfies Bankruptcy Code § 363(f)(5)"); *see also In re BAMC Development Holding,*
*LLC*, No. 8:22-BK-1487-CPM, 2025 WL 770521, at *19 (M.D. Fla. Mar. 11, 2025) ("The
existence of judicial and nonjudicial foreclosure and enforcement actions under state
law, among other proceedings, have been held to satisfy § 363(f)(5).") (quoting *In re*
*Hamilton Road Realty, LLC,* No. 8-19-72596, 2021 WL 1620046, at *5 (Bankr. E.D.N.Y. Apr.
26, 2021); *In re Boston Generating*, 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010) (same).  As a
result, the Trustee respectfully submits that the Sale of the Townhouse free and clear of
all liens satisfies section 363(f)(5) of the Bankruptcy Code.

83.    In addition, in accordance with the Post-Petition Financing Order,
certain of the Liens will attach to the proceeds of the Sale.

84.    Based upon all of the foregoing, sufficient cause exists for the Sale
of the Townhouse free and clear of the Liens pursuant to Bankruptcy Code section
363(f)(5).

### C.  The Townhouse May be Sold Free and Clear of Interests

85.     The Court's 363(h) Order directed the sale of the Townhouse free and clear of all interests, including any interests asserted by Marianne Nestor.  The 363(h) Order is final.

### D.  The 363(i) Bid Deadline is Reasonable

86.     The Trustee respectfully submits that the 363(i) Bid Deadline is reasonable and appropriate based upon the record in this Chapter 11 Case, and it will promote competitive bidding with the necessary clarity and expectations of interested parties.

### E.  The Stalking Horse Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser

87.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from the estate notwithstanding that the sale conducted under section 363(b) may later be reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m);  *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) … provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal");  *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

88.     The Second Circuit has indicated that a party would have to show

fraud or collusion between a buyer and the trustee to demonstrate a lack of good faith.

*See Kabro Assocs. of West Islip, LLC, v. Colony Hill Assocs. (In re Colony Hill Assocs.*), 111

F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a

[purchaser's] good faith status at a judicial sale involves fraud, collusion between the

[buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage

of other bidders"); *see also In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM), 97

Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997); *In re Bakalis*, 220 B.R. 525, 537

(Bankr. E.D.N.Y. 1998).

89.     Here, the Stalking Horse Bidder and the Trustee have satisfied the

requirements of Section 363(m) of the Bankruptcy Code.  The Stalking Horse Agreement

is the result of arm's-length, good-faith negotiations between the Trustee and the

Stalking Horse Bidder, and each of them have been represented by their respective

professionals.  Moore Decl., ¶11.  Moreover, the Stalking Horse Bidder and the Back-Up

Bidder were always aware that at least one other party had submitted a competing bid

to purchase the Townhouse.  Moore Decl., ¶13.  The Trustee submits that the Stalking

Horse Bidder is a "good-faith" purchaser within the meaning of section 363(m) of the

Bankruptcy Code and should be entitled to its protection.  Accordingly, the Trustee

requests that the Court make a finding that the Stalking Horse Bidder is entitled to the

protections of section 363(m) of the Bankruptcy Code.

**F.     Subject To A Chapter 11 Plan Being Confirmed In This
        Case, The Sale Should Be Exempt From Transfer Taxes
        In Accordance With Bankruptcy Code Section 1146(a)**

90.     Further to the Trustee Plan, for which the Trustee will seek

confirmation before the Sale closes, the Sale should be exempt from transfer taxes, if

any, in accordance with Bankruptcy Code section 1146(a).  Bankruptcy Code section

1146(a) provides, "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(a).

91.     In *In re NEW 118th, Inc.*, 398 B.R. 791 (Bankr. S.D.N.Y. 2009), Bankruptcy Judge Bernstein concluded that transfers of real property qualify for exemption under Bankruptcy Code section 1146(a) where (a) the sale's approval occurred pre-confirmation but the sale closing occurred post-confirmation, and (b) the transfer of real property is necessary to the consummation of a plan. *Id.* at 797-98. Here, both criteria are met:  the Trustee seeks approval of the Sale prior to confirmation of the Trustee Plan, but the Sale will close post-confirmation.

92.     Moreover, the Trustee Plan expressly contemplates the sale of the Townhouse under Bankruptcy Code 363(b) to enable distributions to the holders of allowed claims.  Indeed, given the necessity of the Sale to the feasibility of any plan filed in this case, it is unlikely that a plan could become effective absent a successful Sale. Thus, the Sale is clearly necessary to the consummation of a plan in this case.

### G.     The Broker Commission should be Allowed and Paid

93.     Pursuant to the BHS Retention Order, BHS is entitled to a broker commission (the "Broker Commission") equal to (a) four percent (4%) of the purchase price, if the Successful Bidder is represented by an outside broker, to be shared:  two (2%) percent to BHS and two (2%) percent to the outside broker; or (b) two and one-half percent (2.5%) of the purchase price, if the Successful Bidder is represented by BHS. *See* BHS Listing Agreement, ¶¶4(a)-(b).  Further, the Commission shall be deemed earned, due and payable when title to the Townhouse actually closes and the proceeds are paid to the Trustee.  *Id.* at ¶4(f).  In either instance, the BHS Retention Order dispenses with

the requirement for a separate application for an order fixing and allowing payment of the Broker Commission.  BHS Retention Order at 5.

94.    Here, BHS procured the Stalking Horse Bidder, who is represented by The Corcoran Group ("Corcoran"), an outside broker, which entitles each BHS and Corcoran to a commission of $680,000, representing two (2%) percent of the purchase price, for a total commission of $1,360,000, representing four percent (4%) of the purchase price.[19]

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

95.    The Trustee respectfully request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provided that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  In light of the notice of the Sale that was provided to parties in interest, and the fact that liens against the Townhouse will attach to the proceeds (with the exception of permitted liens and interests governed by section 363(h) of the Bankruptcy Code), yet continue to accrue interest, the Trustee submits that no party will be prejudiced by a waiver of the stay imposed by Bankruptcy Rule 6004(h) and that such waiver will help to limit the accrual of interest charges.  Moreover, a waiver of any such stay could jeopardize the consensus reached between the Trustee, Lynx, and other secured parties, and therefore would be detrimental to the Estate and its creditors.  The Sale Order will be implemented pursuant to the order confirming the Trustee Plan, and the Trustee will request that such order will also be not be subject to any stays.  To avoid any confusion,

---

[19]    The amount of the Broker Commission may increase if the total sale price increases as a result of the Auction.

however, the Trustee seeks a finding that the Sale Order is not subject to the stay imposed by Bankruptcy Rule 6004(h).

### REQUEST FOR WAIVER OF LOCAL RULE 6004-1(h)

96.    The Trustee seeks a waiver of the Local Rule 6004-1(h) requiring the advertisement or publication of notice of a sale by auction.  The Trustee respectfully submits that a waiver of the publication requirement is appropriate here because the property has been marketed extensively (locally and worldwide) by the Trustee's real estate broker (Sotheby's and/or BHS) for more than 18 months using direct and indirect methods.  Given the prior marketing efforts and the unique features of the Townhouse, Trustee submits that the cost and delay of publication outweighs the potential benefit to the Estate.

### NOTICE

97.    Notice of this Application has been given to:  (i) the United States Trustee;  (ii) the Debtor;  (iii) Marianne Nestor;  (iv) counsel to the Stalking Horse Bidder;  (v) counsel to the Back-Up Bidder;  (vi) Emigrant;  (vii) Lynx;  (viii) the Surrogate Parties;  (ix) Prime Plus;  (x) Wenig Saltiel;  (xi) all known parties asserting liens against the Townhouse;  (xii) all parties that expressed interest in acquiring the Townhouse;  (xiii) federal, state, and local taxing authorities;  and  (xiv) all other parties in interest in this Chapter 11 Case (collectively, the "Sale Notice Parties").  The Trustee respectfully submits, under the circumstances, no other or further notice need be given.

### NO PRIOR REQUEST

98.    No prior application for the relief requested herein has been made to this or any other Court.

## CONCLUSION

**WHEREFORE** the Trustee respectfully requests entry of the orders

authorizing the relief requested herein and such other and further relief as is just and

proper.

Dated:  New York, New York
       January 10, 2026

ALBERT TOGUT, not individually but solely
in his capacity as Chapter 11 Trustee,
By His Attorneys,
TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Brian F. Moore*
BRIAN F. MOORE
MARTHA E. MARTIR
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

## <u>Exhibit A</u>

**Stalking Horse Agreement**

CONTRACT made as of _December 29_ , 2025 between ALBERT TOGUT, NOT INDIVIDUALLY
BUT SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE ("Seller") OF THE ESTATE (the
"Estate") OF PEGGY NESTOR ("Debtor"), A CHAPTER 11 DEBTOR IN CASE NO. 23-10627 (MEW)
PENDING IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT
OF NEW YORK ("Bankruptcy Court"), and 63rd St Townhouse LLC ("Purchaser").

Seller and Purchaser hereby covenant and agree, subject to Bankruptcy Court approval as
expressly described in Section 18 herein, and further subject to Section 19 herein, as follows:

**Section 1.      Sale of Premises and Acceptable Title**

§1.01.      Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and
upon the terms and conditions set forth in this Contract: (a) the parcels of land more particularly
described in Schedule A attached hereto ("Land"); (b) the building and improvements situated on the
Land (collectively, "Building"); (c) all right, title and interest of Seller and/or Debtor in and to the land
lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to
any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of
grade of any street or highway; (d) all the estate and rights of Seller and/or Debtor in and to the
appurtenances, Land and Building; and (e) all right, title and interest of Seller and/or Debtor in and to the
fixtures and equipment attached or appurtenant to the Building (collectively, the "Premises"). The
Premises are located in the County, City and State of New York and known as **15 East 63rd Street, New
York, New York, tax map block 1378, lot 12**. For the avoidance of doubt, the sale expressly excludes
all personal property, furniture, furnishings, artwork, decorative items, unattached equipment, all light
fixtures, and insurance claims for occurrences prior to the date hereof.

§1.02.      Seller shall convey and Purchaser shall accept fee simple title to the Premises in
accordance with the terms of this Contract, subject only to the conditions set forth in this Contract
including: (a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions");
and (b) such other matters as the title insurer specified in Schedule D attached hereto shall be willing,
without special premium or any additional cost or expense to Purchaser, to omit as exceptions to coverage
or to except with insurance against collection out of or enforcement against the Premises.

**Section 2.      Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage,
                   Escrow of Deposit and Foreign Persons**

§2.01.      The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises
as provided in Schedule C attached hereto is **Thirty-Four Million Dollars ($34,000,000.00)** Dollars.

§2.02.      All monies payable under this Contract, unless otherwise specified in this Contract, shall
be paid at Closing by (a) certified checks of Purchaser or any person making a purchase money loan to
Purchaser drawn on any bank or trust company having a banking office in the City of New York and
which is a member of the New York Clearing House Association or (b) official bank checks drawn by any
such banking institution, payable to the order of Seller or as directed by Seller, except that uncertified
checks of Purchaser payable to the order of Seller up to the amount of Five Thousand ($5,000.00) Dollars
shall be acceptable for sums payable to Seller at the Closing, or (c) with respect to the portion of the
Purchase Price payable at the Closing, at Seller's election, by wire transfer of immediately available
federal funds to an account or accounts designated by Seller prior to the Closing.

§2.03.      (a)      The sum paid under paragraph (a) of Schedule C and any other sums paid on
account of the Purchase Price prior to the Closing (collectively, "Deposit") shall be paid by wire transfer
of immediately available federal funds delivered to Seller's attorney ("Escrowee"). Escrowee shall hold
the proceeds thereof in escrow in an interest-bearing special bank account (or as otherwise agreed in
writing by Seller, Purchaser and Escrowee) until the Closing or sooner termination of this Contract and
shall pay over or apply such proceeds in accordance with the terms of this section. Any interest that is

1



3944879.7

earned thereon shall be paid to the same party entitled to receive the Deposit or as directed by such party, and the party receiving such interest shall pay any income taxes thereon. The tax identification numbers of the parties are either set forth in Schedule D or shall be furnished to Escrowee upon request. At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller or as directed by Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within fifteen (15) days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such fifteen (15) day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this Contract or a final order of the Bankruptcy Court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the Bankruptcy Court. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)    The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part (including, without limitation, any loss suffered due to any act, omission, loss or failure of the financial institution in which the Deposit is deposited) unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this Contract, in violation of an order of the Bankruptcy Court or involving gross negligence on the part of Escrowee.

(c)    Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this Contract.

(d)    Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Deposit or any other dispute between the parties whether or not Escrowee is in possession of the Deposit and continues to act as Escrowee.

(e)    Escrowee may act or refrain from acting in respect of any matter referred to in this §2.03 in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

**Section 3.        The Closing**

§3.01.        Except as otherwise provided in this Contract, the closing of title pursuant to this Contract ("Closing") shall take place at the time and place specified in Schedule D attached hereto. For purposes of this Contract, the "Closing Date" shall mean the actual date of the Closing.

**Section 4.        Representations and Warranties of Seller**

Seller represents and warrants to Purchaser with respect to the Premises, as follows:

§4.01.        Seller has the sole authority to act in accordance with the Contract and to convey title on behalf of the Debtor and the Estate, subject to Bankruptcy Court approval.



2

3944879.7

§4.02.    As of the date of Closing, there shall be no written leases or other tenancies affecting any portion of the Premises. The Premises shall be delivered vacant and free of leases, subleases, licenses, tenants, subtenants, licensees and occupants at Closing.

§4.03.    Seller is not a "foreign person" as defined in §1445 of the Internal Revenue Code (the "Code Withholding Section").

§4.04.    Seller has received no written notice of any pending condemnation or taking affecting the Premises.

§4.05.    Seller has not received written notice of any vacate orders or stop-work orders issued by the New York City Department of Buildings, Housing Preservation and Development, or Landmarks Preservation Commission.

§4.06.    There is no known litigation or administrative proceeding pending and served on Seller or Debtor, other than the bankruptcy case, that seeks relief in rem against the Premises and would not be resolved by the Approval Order.

**Section 5.    Acknowledgments, Representations and Warranties of Purchaser**

Purchaser acknowledges that:

§5.01.    Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §8.01 and §9.03, shall accept the Premises "as is", "where is" and in their present condition, without any representations or warranties of any kind whatsoever except as may be expressly set forth in this Contract, subject to use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this Contract.

§5.02.    Before entering into this Contract, Purchaser has made such examination of the Premises (including, without limitation, any inspection for the presence of lead-based paint and/or lead-based paint hazards, the presence of any materials containing asbestos, and any other hazardous materials), the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary, or has waived Purchaser's right to do so. In entering into this Contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this Contract, whether or not any such representations, warranties or statements were made in writing or orally.

Purchaser represents and warrants to Seller that:

§5.03.    The funds comprising the Purchase Price to be delivered to Seller in accordance with this Contract are not derived from any illegal activity.

§5.04.    Purchaser has, and will at Closing have, available unencumbered cash and cash equivalents (including publicly traded securities) in a sum at least equal to (and having a then current value of) the balance of the Purchase Price and any other payments required to be made by Purchaser at Closing.

**Section 6.    Seller's Obligations as to Leases**

§6.01.    Between the date of this Contract and the Closing, Seller shall not enter into any new lease for, or permit any new occupancy of, any portion of the Premises.



3

3944879.7

**Section 7.        Responsibility for Violations**

§7.01.        Purchaser shall be required to accept title subject to: (a) all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to the date of this Contract by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises (collectively, "Violations") and (b) all fines or monetary penalties levied prior to the Closing pursuant to the Administrative Code of the City of New York ("Fines"), provided that in the event that the liquidated sums to be paid to satisfy any such Violations or Fines not discharged by the Bankruptcy Court shall exceed $7,500.00 in the aggregate, any portion in excess of such amount shall be a credit against the Purchase Price.

§7.02.        If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

**Section 8.        Destruction, Damage or Condemnation**

§8.01.        The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this Contract.

**Section 9.        Covenants of Seller**

Seller covenants that between the date of this Contract and the Closing:

§9.01.        Seller shall not enter into any Service Contract unless the same is terminable without penalty by the then owner of the Premises upon not more than 30 days' notice.

§9.02.        No fixtures or equipment included in this sale shall be removed from the Premises by Seller unless the same are replaced prior to the Closing with similar items of at least equal quality and utility.

§9.03.        Seller shall operate and maintain the Premises in "as is" condition and shall maintain the Premises from the date hereof until the Closing Date in substantially the same manner in which Seller has acted prior to the date hereof.

§9.04.        Seller shall provide Purchaser or Purchaser's representatives with reasonable access to the Premises, during business hours, upon reasonable prior telephonic notice to Seller, for visual and non-invasive inspection purposes only.

§9.05.        Seller shall maintain active all utilities at the Premises, including, but not limited to, water, electric, gas, and heat, through the date of Closing.

**Section 10.        Seller's Closing Obligations**

At the Closing, and subject to Section 19 hereof, Seller shall deliver the following to Purchaser:

§10.01.        A copy of the Approval Order (as defined herein).

§10.02.        A statutory form of bargain and sale deed without covenant against grantor's acts, properly executed in proper form for recording so as to convey the title required by this Contract.



4

3944879.7

§10.03.    To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

§10.04.    Intentionally Omitted.

§10.05.    (a) Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof, and (b) a certification of non-foreign status, in form required by the Internal Revenue Code Withholding Section, signed under penalty of perjury. Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request. Notwithstanding anything to the contrary herein, Seller agrees to indemnify and hold Purchaser harmless from and against all loss, cost, damages and expense (including reasonable attorneys' fees and expenses) that Purchaser may incur by reason of Seller's failure to file any applicable real property transfer tax returns in connection with this transaction or pay the New York City Real Property Tax, the New York Real Estate Transfer Tax, and the New York State additional transfer tax and supplemental transfer tax at Closing. Seller hereby represents and warrants that the Estate of the Debtor shall pay any tax due thereunder within the time periods required by law. Seller shall indemnify, defend, and hold Purchaser harmless from any penalties, interest, or reasonable attorney fees incurred due to Seller's failure to properly file and pay any transfer taxes due in relation to this transaction, provided however, that Purchaser shall (i) properly complete its counterparts of the New York City and New York State real property transfer tax forms and (ii) solely pay the New York State mansion taxes and New York State "supplemental mansion tax" applicable  to Purchaser. Purchaser shall indemnify, defend, and hold Seller and the Estate harmless from any penalties, interests, or reasonable attorney fees arising out of Purchaser's failure to fulfill the foregoing obligations. The provisions of this Paragraph shall survive Closing.

§10.06.    Possession of the Premises, vacant, free and clear of all claims and rights of tenancy and any occupants, and otherwise in the condition required by this Contract.

§10.07.    Any other documents required by this Contract to be delivered by Seller, including any applicable smoke detector and/or carbon monoxide affidavits.

§10.08.    All keys, access cards, alarm/security codes, and control credentials for building systems in Seller's possession

While the parties agree that the transfer of the Premises to Purchaser shall be deemed a transfer pursuant to § 1146(a) of the United States Bankruptcy Code (the "Bankruptcy Code") which should not be taxed under any law imposing a stamp, transfer, recording or surrender tax, in the event such a fee or tax is required to be paid, it shall be paid as set forth in §10.05 and §11.02.  Purchaser shall not be responsible for payment of any transfer taxes to the State or the City of New York.

**Section 11.    Purchaser's Closing Obligations**

At the Closing, Purchaser shall:

§11.01.    Deliver to Seller checks or, at Seller's option, wire transfer of immediately available federal funds to Seller, in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12 and as otherwise set forth herein.

§11.02.    Cause the deed to be recorded, duly complete all required real property transfer tax returns, and cause all such returns and checks in payment of such taxes due from Seller to be delivered to the appropriate officers promptly after the Closing. Purchaser shall pay the New York State mansion taxes

5

3944879.7

and New York State "supplemental mansion tax" and agrees to indemnify and hold Seller harmless from and against all loss, cost, damages and expense (including reasonable attorneys' fees and expenses) that Seller may incur by reason of Purchaser's failure to pay same. The provisions of this Paragraph shall survive Closing.

§11.03.    Deliver any other documents required by this Contract to be delivered by Purchaser.

**Section 12.    Apportionments**

§12.01.    The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a)    real estate taxes, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available. In the event a final water meter reading dated not more than thirty days prior to the Closing Date is not available as of the Closing Date, Seller shall deposit a reasonable sum with Escrowee until receipt of the subsequent meter reading (with the Seller being obligated to pay all such water charges pertaining to the period prior to closing and the purchaser being obligated to pay all such charges pertaining to the period thereafter) This Section 12.01(a) shall survive closing for a period of twelve (12) months;

(b)    value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes, as evidenced by an actual reading or invoice from Seller's supplier; and

(c)    any other items listed in this Contract or in Schedule D.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

§12.02.    Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting any expenses of collection thereof, which obligation shall survive the Closing.

§12.03.    If there is any tax or assessment that shall become due for the period of time prior to the Closing as a result of any reversal of a tax abatement program, tax, assessment, or charge, Seller shall be responsible to pay the amount owed that is attributable to Seller's period of ownership. The provisions of this Paragraph shall survive the Closing.

**Section 13.    Objections to Title, Failure of Seller or Purchaser to Perform**

§13.01.    Purchaser shall promptly order an examination of title and a survey and shall cause a copy of the title report and survey to be forwarded to Seller's attorney upon receipt. Subject to Section 18.01 and Section 19 of this Contract, Seller shall be entitled to a reasonable adjournment or adjournments of the Closing, but not later than thirty (30) days after the date of the Closing as set forth herein (unless a longer period is agreed to in writing by Seller and Purchaser or fixed by an order of the Bankruptcy Court), to remove any defects in or objections to title noted in such title report and survey and any other defects or objections which may be disclosed on or prior to the Closing Date.

§13.02.    If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this Contract, Purchaser, nevertheless, may elect to accept such title as Seller may be



6

3944879.7

able to convey, but without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Purchaser may terminate this Contract and the sole liability of Seller shall be to refund the Deposit to Purchaser. Upon such refund and reimbursement, this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. Unless otherwise set forth in Section §18 and Section §19 hereof, Seller shall not be required to bring any action or proceeding or to incur any expense to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract.

§13.03.    Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties (to the extent they are not disputed by Seller) may be paid out of the proceeds of the monies payable at the Closing or placed in escrow with the title company to hold pending the Bankruptcy Court's ruling as to any disputed items. In such case the charges with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

§13.04.    If Purchaser shall default in the performance of its obligation under this Contract to purchase the Premises and such default continues after Purchaser's failure to cure within ten (10) days following Purchaser's receipt of written notice from Seller, then the sole remedy of Seller shall be to retain the Deposit as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain. If Seller shall default in the performance of its obligations herein, Purchaser's sole remedy shall be to either (i) elect to cancel this Contract and receive a refund of the Deposit, or (ii) to seek specific performance of Seller's obligations pursuant to the Approval Order.

§13.05    Notwithstanding anything to the contrary in this Contract, and supplementing Section §19.05 of this Contract, if (a) the Bankruptcy Court will not approve the sale of the Premises free and clear of all liens, claims, interests, and encumbrances, with any such liens, claims, interests, and encumbrances to attach solely to the proceeds of the sale, as provided in the Approval Order and the confirmed plan, (b) Purchaser's title company will not insure Purchaser's title to the Premises pursuant to the Approval Order and the confirmed plan, at no additional cost, expense, or premium to Purchaser free of all liens, claims, interests, and other encumbrances of any kind or nature whatsoever, and (c) Seller fails to escrow or obtain a bond for the amount of the such item that is excepted from the free and clear provisions of the Approval Order and confirmed plan, Purchaser shall have the right, but not the obligation, to cancel this Contract and receive the prompt return of any and all deposits made by Purchaser hereunder.

**Section 14.    Broker**

§14.01.    If a broker is specified in Schedule D, Purchaser and Seller each represent and warrant that such broker is the only broker with whom they have dealt in connection with this Contract and that Purchaser and Seller know of no other broker(s) who have claimed or may have the right to claim a commission in connection with this transaction. The commission of such brokers referenced in Schedule D shall be paid pursuant to separate agreement by the party specified in Schedule D and pursuant to the Approval Order. Purchaser and Seller shall indemnify and defend each other against any costs, claims or expenses, including attorneys' fees, arising out of the Purchaser's or Seller's breach of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this Contract.

**Section 15.    Notices**

§15.01.    All notices to Seller and Purchaser under this Contract shall be in writing and shall be delivered personally or shall be sent by prepaid overnight courier with receipt acknowledged, addressed as set forth in Schedule D, or addressed as Seller or Purchaser shall otherwise have given notice as herein provided; notices may be given by email or fax as long as such notices are also given via personal



7

delivery or prepaid overnight courier as aforesaid. The attorneys for the parties may give any extension of time or other notice on behalf of their respective clients.

**Section 16.      Limitations on Survival of Representations, Warranties, Covenants and other Obligations**

§16.01.      Except as otherwise provided in this Contract, no representations, warranties, covenants or other obligations of Seller set forth in this Contract shall survive the Closing, and no action based thereon shall be commenced after the Closing.

§16.02.      The delivery of the Approval Order and the delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this Contract to survive the Closing.

**Section 17.      Miscellaneous Provisions**

§17.01.      Purchaser shall not assign this Contract or its rights hereunder, nor shall any interest in Purchaser be assigned or transferred, without the prior written consent of Seller, to be granted or withheld in Seller's sole discretion, except as expressly provided herein, and further provided that Purchaser and any such assignee shall be jointly and severally liable for Purchaser's obligations hereunder and that all representations and warranties of Purchaser hereunder shall apply to Purchaser and to such assignee. Notwithstanding anything herein to the contrary, Purchaser may assign this Contract without consent to a legal entity in which one or more of the individuals currently comprising the purchasing entity or an immediate family member of such current individuals owns or controls at least a 50% interest. No permitted assignment of Purchaser's rights under this Contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee not less than ten (10) days prior to the Closing Date. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

§17.02.      This Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§17.03.      This Contract shall be governed by, and construed in accordance with, the law of the State of New York. The venue for any dispute arising from this Contract shall be the Bankruptcy Court and the Bankruptcy Court shall have exclusive jurisdiction to interpret and enforce this Contract.

§17.04.      This Contract may be executed in any number of counterparts, including facsimile or electronically signed counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

§17.05.      The captions in this Contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Contract or any of the provisions hereof.

§17.06.      This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§17.07.      This Contract shall not be binding or effective upon Seller in full until (i) this Contract is properly executed and delivered by Seller and Purchaser and (ii) the Approval Order is obtained.



8

3944879.7

§17.08.    As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§17.09.    Neither Purchaser, nor any of Purchaser's officers, directors, shareholders, partners, members or associates, nor any other direct or indirect holder of any equity interest in Purchaser, is an entity or person: (i) that is listed in the Annex to, or is otherwise subject to the provisions of United States Presidential Executive Order 13224 issued on September 24, 2001 ("Executive Order"); (ii) whose name appears on the U.S. Department of the Treasury, Office of Foreign Assets Control's ("OFAC") most current list of "Specifically Designated National and Blocked Persons" (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, www.treas.gov/ofac/; (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in the Executive Order; or (iv) who is otherwise affiliated with any entity or person listed above (any and all parties or persons described in clauses (i) through (iv) above are herein referred to as a "Prohibited Person"). Purchaser covenants and agrees to use commercially reasonable efforts to ensure that neither Purchaser, nor any of its respective officers, directors, shareholders, partners, members or associates, and no other direct or indirect holder of any equity interest in Purchaser will: (a) conduct any business, or engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person; or (b) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

§17.10.    This Contract may be executed in counterparts, each of which shall be deemed an original, and all of which, taken together, shall constitute one and the same instrument for all intents and purposes. A facsimile signature, DocuSign, AdobeSign, or email/PDF signature shall be deemed binding for all intents and purposes, without necessity of an original signature being thereafter required.

**Section 18.    Bankruptcy Court Approval**

§18.01.    Purchaser acknowledges that this Contract and the transactions contemplated hereby are subject to the approval of the Bankruptcy Court and the entry by the Bankruptcy Court of an order confirming a plan of reorganization or otherwise approving the transaction contained in the Contract and affording Purchaser Section 363 protections as a good faith purchaser (the "Approval Order"), and Seller's and Purchaser's obligation to consummate the transaction contemplated hereunder is subject to approval by the Bankruptcy Court. Notwithstanding any other provision of this Contract, this Contract shall not be binding or effective in full or in part until the Approval Order is obtained except that, in the event that the closing and sale of the Premises by Seller to Purchaser does not occur by March 15, 2026 for any reason whatsoever, Purchaser shall have the absolute and unconditional right, but not the obligation, to terminate this Contract and receive the prompt return of any Deposits made hereunder and, upon such termination, this Contract shall be of no further force and effect except as otherwise set forth in Section 19 hereunder.

§18.02.    Purchaser acknowledges that Seller may not act in his personal capacity but only as the Court-appointed trustee in bankruptcy and as such is obligated to provide notice to all parties in interest, including the public, of this proposed sale, and that there will be hearings thereon in connection with seeking Bankruptcy Court approval. In addition, Seller is obligated to respond to any inquiries or and perform any and all other acts related thereto which are required by order(s) of the Bankruptcy Court and its procedures, under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Premises to parties in interest.

§18.03.    Purchaser hereby irrevocably designates and appoints Justin Marques, Esq. (the "Agent"), having an address Becker, Glynn, Muffly, Chassin & Hosinski LLP, 299 Park Avenue, New

9

3944879.7

York, New York 10171, as agent for service of process regarding the Debtors' Bankruptcy Court case, this Contract and any matter related thereto or hereto. The Agent, by signing below, irrevocably consents to and accepts its designation and appointment as agent for service of process upon Purchaser and any assignee or transferee of Purchaser herein.

§18.04.    Purchaser acknowledges and agrees that Seller is entering into this Contract not personally but solely in his capacity as Chapter 11 Trustee of the Debtor, pursuant to Bankruptcy Court orders, and Purchaser agrees that neither Seller nor Seller's retained professionals shall have any personal liability or obligation whatsoever under this Contract.

§18.05.    Notwithstanding any other provision of this Contract, Seller reserves the right to proceed to Closing pursuant to a confirmed Plan in the Debtor's bankruptcy case. Upon notice that Seller has so elected, Purchaser shall reasonably cooperate with Seller in obtaining approval of and effectuating such a Plan that includes a sale of the Premises to Purchaser on the terms set forth herein.

**Section 19.    Purchase Protection Provisions**

§19.01    Seller and Purchaser acknowledge that the Bankruptcy Court has entered the following orders that affect the sale of the Premises:

(a) *Order Approving (I) Sale Procedures for the Sale of the Townhouse Located at 15 East 63rd Street, New York, New York, Free and Clear of All Liens, Claims, Encumbrances and Other Interests; with Such Interests Attaching to the Proceeds of Sale (II) Approving the Manner and Extent of Notice and Procedures for Submitting Offers; (IV) Scheduling the Auction; (V) Scheduling a Hearing Confirming the Results of the Sale Process*, entered in Case No. 23-10627 on December 15, 2023, ECF document no. 78 (the "Sale Procedures Order");

(b) *Order Modifying Milestones Fixed by Sale Procedures Order*, entered in Case No. 23-10627 on July 26, 2024, ECF document no. 261 (the "Sale Procedures Modification Order");

(c) *Order Granting Application for Authorization to Employ and Retain Brown Harris Stevens Residential Sales, LLC as Broker for the Chapter 11 Trustee*, entered in Case No. 23-10627 on February 13, 2025, ECF document no. 516 (the "Brown Harris Stevens Retention Order");

(d) *Order Approving Extension of Brown Harris Stevens Listing Agreement*, entered in Case No. 23-10627 on July 23, 2025, ECF document no. 704 (the "First Listing Extension Order");

(e) *Order Approving Extension of Brown Harris Stevens Listing Agreement*, entered in Case No. 23-10627 on November 10, 2025, ECF document no. 807 (the "Second Listing Extension Order"); and

(f) *Order Granting Partial Judgment on the Pleadings as to the Second Claim for Relief in the Complaint*, entered in Adversary Proceeding No. 23-01195, on March 13, 2024, ECF document no. 18 (the "Section 363(h) Order").

The Sale Procedures Order attaches as Exhibit A and approves a set of Sale Procedures (the "Sale Procedures"), including certain dates and deadlines in connection with the sale of the Premises. The Sales Procedures Modification Order changes the material dates and deadlines in the Sale Procedures Order. All such dates and deadlines have passed and are in need of modification. The Brown Harris Stevens



10

3944879.7

Retention Order approves a Listing Agreement with Brown Harris Stevens Residential Sales, LLC (the "Selling Broker") and authorizes the Selling Broker "to assist the Trustee with the sale of the Townhouse in accordance with the Sale Procedures." The First Listing Extension Order and the Second Listing Extension Order extend the Listing Agreement approved in the Brown Harris Stevens Retention Order through December 29, 2025. The Section 363(h) Order directs "pursuant to section 363(h), that the Townhouse be sold pursuant to the sale procedures previously approved by this Court."

§19.02      Purchaser's obligations under this Contract are subject to the entry of an order of the Bankruptcy Court in accordance with the provisions set forth in §19.03 and/or §19.04.

§19.03      If Seller seeks to dispense with an auction and is permitted by the Bankruptcy Court to do so, then Seller shall procure the Approval Order in form and substance acceptable to Purchaser containing the provisions set forth in §19.05.

§19.04      If Seller seeks to proceed with an auction, then prior to any such auction and not later than January 23, 2026, Seller shall obtain an order of the Bankruptcy Court in form and substance acceptable to Purchaser containing the following provisions:

> (a) Purchaser shall be designated the "Stalking Horse Bidder" and this Contract shall be designated the "Stalking Horse Agreement" in accordance with Part II of the Sale Procedures;
>
> (b) Purchaser shall be entitled to a break-up fee in the amount of Two Hundred Seventy Thousand Dollars ($270,000.00) (the "Break-up Fee");
>
> (c) In the event Purchaser closes a sale of the Premises with someone other than Purchaser, then in addition to the Break-Up Fee, Purchaser shall receive from the proceeds of such sale the reimbursement of its reasonable, documented, out-of-pocket due diligence expenses incurred in connection with this Contract or the Premises, including, without limitation, fees and related expenses for legal, accounting, engineering, architectural, environmental, title, surveying, design, and photographical services, up to a maximum of Seventy Thousand Dollars ($70,000.00) (the "Expense Reimbursement");
>
> (d) The auction for the Premises (the "Auction") shall be scheduled for a date not later than 21 days after the entry of the order containing the provisions set forth in this §19.04 (the "Auction Date");
>
> (e) No bid at the Auction for the Premises shall be accepted unless such bid exceeds the Purchase Price by an amount equal to the sum of (i) the Break-up Fee, (ii) the Expense Reimbursement, and (iii) Fifty Thousand Dollars ($50,000.00);
>
> (f) No bid at the Auction for the Premises shall be accepted unless made by a "Qualified Bidder" submitting a "Qualifying Bid" in accordance with Part I of the Sale Procedures;
>
> (g) The "Bid Deadline" in accordance with Part I of the Sale Procedures shall be fixed at a date not less than five (5) days prior to the Auction Date;
>
> (h) The submission of the "Qualifying Bid" in accordance with Part I of the Sale Procedures shall be made to the Broker and to Counsel for the Seller as identified herein;



3944879.7

11

(i) Any credit bid submitted by Lynx Asset Services, LLC ("Lynx") shall be made at or prior to the Auction, and a failure by Lynx to make a timely credit bid shall be deemed a waiver of its right to make a credit bid;

(j) Any person or entity seeking to exercise a right to purchase pursuant to Section 363(i) of the Bankruptcy Code, 11 U.S.C. § 363(i), shall submit by the Bid Deadline set in subparagraph (g) above the information required for a "Qualifying Bid" in accordance with Part I of the Sale Procedures, and the failure to make such submission shall be deemed a waiver of the right to purchase pursuant to Section 363(i) of the Bankruptcy Code, 11 U.S.C. § 363(i);

(k) The "Sale Hearing" as defined in the Sale Procedures Order and modified in the Sale Procedures Modification Order shall be scheduled for a date not later than 7 business days after the Auction Date, subject to the Bankruptcy Court's availability;

(l) The "Closing Date" as defined in the Sale Procedures shall take place not later than 2 business days after the entry of the Approval Order;

(m) The Break-up Fee and Expense Reimbursement provisions set forth in subparagraphs (b) and (c) herein shall be payable solely from the proceeds of the sale to a Qualifying Bidder or third party other than the Purchaser, whenever same may occur, and shall not be subject to any rights or claims of any secured creditor or of Seller pursuant to any provision of the Bankruptcy Code or otherwise, and such obligations to pay Purchaser the Break-Up Fee and Expense Reimbursement shall survive the termination of this Contract.;

(n) The foregoing provisions shall be applicable notwithstanding any provision in any prior order of the Bankruptcy Court to the contrary.

§19.05    The Approval Order shall be in form and substance acceptable to Purchaser and contain the following provisions:

(a) The sale of all real and personal property hereunder to the Purchaser shall be free and clear of all liens, encumbrances, judgments, and other interests, and free and clear of the interest of any co-owner, pursuant to Sections 363(f) and 363(h) of the Bankruptcy Code, 11 U.S.C. § 363(f), 363(h), with the liens, encumbrances and other interests, including the interest of any co-owner to attach to the proceeds of the sale;

(b) The Purchaser is determined to be a good faith purchaser within the meaning of and entitled to the protections of Section 363(m) of the Bankruptcy Code, 11 U.S.C. § 363(m);

(c) No person or entity shall be permitted to exercise a right to purchase pursuant to Section 363(i) of the Bankruptcy Code, 11 U.S.C. § 363(i), unless such person or entity shall have (i) complied with any prior order of this Court directing the submission of information required of a "Qualifying Bid" in accordance with Part I of the Sale Procedures, and (ii) tendered the purchase price set forth in this order to the Trustee prior to the closing of the sale to the Purchaser; and

12

(d) The New York County Clerk is directed to record a certified copy of the Approval Order on the real property records maintained for the County of New York upon payment of any applicable fee.

§19.06        In the event Seller seeks to proceed with an auction and does not obtain the order described in §19.04 by the date set forth therein, then Purchaser shall have the right, but not the obligation, to terminate this Contract without liability and upon such termination Seller shall promptly refund any deposit paid by Purchaser together with any interest earned thereon. Upon the satisfaction of such obligations of Seller set forth herein, Purchaser shall have no further liability under this Contract, and this Contract shall be of no further effect.   This provision shall survive the termination of this Contract.

§19.07        In the event the Approval Order is not obtained by March 15, 2026, then Purchaser shall have the right but not the obligation to terminate this Contract without liability and upon such termination, Seller shall refund any deposit paid by Purchaser together with any interest earned thereon, Purchaser shall have no further liability under this Contract, and this Contract shall be of no further effect.

**Section 20.      Confidentiality**

§20.01        Seller acknowledges the material importance of the confidentiality of the ultimate beneficial ownership of the purchasing entity and hereby agrees to the following:

(a) For purposes of this Contract, "Confidential Information" means the identity of, and any information that directly or indirectly tends to identify, the ultimate beneficial owner(s) of Buyer or any of its direct or indirect owners, equity holders, members, partners, beneficiaries, trustees, managers, officers, directors, or affiliates (collectively, the "UBO Information"). Confidential Information includes, without limitation, names, residential or business addresses, email addresses, telephone numbers, dates of birth, taxpayer identification numbers, photographs, corporate charts or organizational charts, and any other data or materials that, alone or in combination, could reasonably be used to identify such owner(s).

(b) Seller shall, and shall cause each of Seller's agents, advisors (including legal counsel, accountants, consultants, and financial advisors), brokers, lenders, fiduciaries, prospective lenders, or any party retained by Seller, and any other representatives acting for or on behalf of Seller or its affiliates (collectively, the "Seller Parties"), to keep strictly confidential and not disclose, disseminate, publish, or otherwise make available any Confidential Information to any person or entity, and not use any Confidential Information for any purpose other than evaluating, negotiating, documenting, and consummating the transactions contemplated by this Contract. Seller shall be responsible for any breach of this Section by any Seller Party to the same extent as if Seller had committed such breach.

(c) Notwithstanding the foregoing, Seller may disclose Confidential Information only to those Seller Parties who have a strict need to know such information for the sole purpose of evaluating, negotiating, documenting, or consummating the transactions contemplated by this Contract; provided that (i) each such recipient is informed of the confidential nature of the Confidential Information and the obligations of this Section, (ii) Seller ensures that such recipient is bound by written confidentiality obligations at least as protective as those set forth herein (which may be under an existing professional duty of confidentiality in the case of outside legal counsel), and (iii) Seller remains liable for any breach by any



13

such recipient.

(d) If Seller or any Seller Party is required by applicable law, regulation, legal process, regulatory inquiry, court order, governmental directive, subpoena, examination, or similar demand (each, a "Legal Requirement") to disclose any Confidential Information, Seller shall, to the extent legally permissible, promptly notify Buyer in writing of such Legal Requirement so that Buyer may seek a protective order or other appropriate remedy. Seller shall disclose only that portion of the Confidential Information that Seller is advised by counsel is legally required to be disclosed, shall use commercially reasonable efforts to obtain confidential treatment for any Confidential Information so disclosed (including filing under seal where available), and shall cooperate with Buyer, at Buyer's expense, in seeking to limit or prevent such disclosure. Nothing in this Section permits disclosure beyond what is strictly required by the applicable Legal Requirement.

(e) Confidential Information shall not include information that Seller demonstrates by competent evidence: (i) is or becomes generally available to the public through no breach of this Contract by Seller or any Seller Party; or (ii) is independently developed by Seller without use of or reference to the Confidential Information. Information shall not be deemed within the foregoing exclusions merely because it is included within broader non-confidential information or because individual features are publicly known.

(f) Without limiting the foregoing, Seller shall not, and shall cause the Seller Parties not to, include any Confidential Information in any deed, transfer tax form, memorandum, public announcement, press release, marketing material, listing, or other public filing or record related to the Property or the transaction, except to the extent strictly required by a Legal Requirement and then only in accordance with Section (d).

(g) Seller shall not, and shall cause the Seller Parties not to, directly or indirectly contact, inquire of, or seek to confirm the identity of any ultimate beneficial owner of Buyer or its affiliates other than through Buyer's designated representatives, nor shall Seller or any Seller Party disclose to any third party the fact that Seller has been provided, or may have, Confidential Information concerning such ultimate beneficial owner(s).

(h) Upon the earlier of (i) Buyer's written request or (ii) termination of this Contract for any reason, Seller shall, and shall cause the Seller Parties to, promptly cease all use of the Confidential Information and either return to Buyer or destroy all copies (in any form or medium) of the Confidential Information in their possession or control; provided that Seller may retain one archival copy solely to comply with legal, regulatory, or professional obligations, which copy shall remain subject to this Section.

(i) Seller acknowledges that money damages may be an inadequate remedy for any breach of this Section and that any such breach may cause irreparable harm to Buyer and its ultimate beneficial owner(s). Accordingly, in addition to any other remedies available at law or in equity, Buyer shall be entitled to seek injunctive relief, specific performance, and other equitable remedies (without the necessity of posting bond or proving actual damages) to prevent or curtail any actual or threatened breach of this Section. Seller shall indemnify, defend, and hold harmless Buyer and its affiliates, and their respective owners, officers,



14

directors, managers, employees, agents, and advisors, from and against any and all losses, damages, liabilities, penalties, interest, fines, judgments, costs, and expenses (including reasonable attorneys' fees and disbursements) arising out of or relating to any breach of this Section by Seller or any Seller Party.

(j) The provisions of this Section shall survive the execution, delivery, closing, and/or any termination of this Contract and the ultimate beneficial owner(s) of Buyer are intended third-party beneficiaries of this Section with the right to enforce its terms directly.

(k) No failure or delay by Buyer in exercising any right or remedy hereunder shall operate as a waiver thereof. Any waiver must be express and in writing.

(l) This Section shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflict of laws principles. Any action or proceeding arising out of or relating to this Section shall be brought exclusively in the Bankruptcy Court, and the parties hereby submit to the exclusive jurisdiction of the Bankruptcy Court and waive any objection to venue or forum non conveniens. If, at the time of the commencement of any action or proceeding arising out of or relating to this Section, the Debtor's bankruptcy case is closed or the Bankruptcy Court determines that it will not reopen the Debtor's bankruptcy case or it lacks jurisdiction over any such action or proceeding, then any such action or proceeding shall be brought exclusively in any state or federal court located in New York County, New York, and the parties hereby submit to the jurisdiction of such court and waive any objection to venue or forum non conveniens.

(m) Without Buyer's prior written consent, Seller shall not, and shall cause the Seller Parties not to, make any public announcement, press release, or other public statement concerning Buyer's principals, ultimate beneficial owner(s), or this transaction that could reasonably be expected to reveal or suggest the identity of any such owner(s).

(n) Nothing herein limits Buyer's right to disclose its own ultimate beneficial ownership as Buyer may determine in its sole discretion or as required by law.

(o) For clarity, references to Seller causing the Seller Parties to act or refrain from acting shall be deemed covenants of Seller to ensure compliance by the Seller Parties, and Seller shall be responsible for any breach of this Section by any Seller Party.


[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]



IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the date first above written.

Seller:

_____, as Trustee
Albert Togut, not individually but
solely in his capacity as Chapter 11
Trustee of The Estate Of Peggy Nestor, Debtor

Purchaser:

_____

Name:  Justin M. Marques
Title:   Authorized Signatory

**Receipt by Escrowee**

The undersigned Escrowee hereby acknowledges receipt of $1,700,000.00 subject to collection, to be held in escrow pursuant to § 2.03.

PHILLIPS NIZER LLP

By: _____
Marc Andrew Landis
Managing Partner

16

**Schedule A**
DESCRIPTION OF PREMISES

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of 63rd Street distant 124 feet 6 inches Westerly from the corner formed by the intersection of the Northerly side of 63rd Street and the Westerly side of Madison Avenue;

RUNNING THENCE Northerly parallel with the westerly side of Madison Avenue and part of the distance through a party wall 100 feet 5 inches to the center line of the block between 63rd and 64th Street;

THENCE Westerly parallel with the Northerly side of 63rd Street 25 feet;

THENCE Southerly and again parallel with Madison Avenue part of the distance through another party wall 100 feet 5 inches to the Northerly side of 63rd Street;

THENCE Easterly along the Northerly side of 63rd Street 25 feet to the point or place of BEGINNING.



3944879.7

## Schedule B

## PERMITTED EXCEPTIONS

1.      Zoning regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title uninsurable.

2.      Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3.      Unpaid installments of assessments not due and payable on or before the Closing Date.

4.      [Intentionally omitted].

5.      (a)      Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises.

(b)      Minor encroachments and projections of less than twelve (12) inches, if any, of stoops, doors, areas, steps, cellar steps, entrances, sidewalk elevators, trim, cornices, lintels, ledges, windows, window sills, awnings, trim, ornamental projections, canopies, ledges, fences, fire escapes, hedges, coping and retaining walls and similar items projecting from the Premises over any street or highway or over any adjoining property  and minor encroachments of less than twelve inches of similar elements projecting from adjoining property over the Premises and minor variances of less than twelve inches, if any, between fences, retaining walls and the like and lines of record title.

(c)      Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

(d)      Intentionally omitted.

(e)      Laws and governmental regulations that affect the use and maintenance of the Premises.

(f)      Covenants, conditions, restrictions, easements, leases, rights, reservations, consents and agreements of record.

(g)      Subject to Section 7.01 and Section 13.05 of this Contract, any notes or notices of violations of law or municipal ordinances or requirements affecting the Premises and issued prior to the date of this Contract, including without limitation, sidewalk violations and environmental control board violations.

(h)      Possible lack of right to maintain vault or vaulted area under, and coal chutes or fuel oil supply lines in, the sidewalk.



3944879.7

**Schedule C**
**PURCHASE PRICE**

The Purchase Price shall be paid as follows:

| | |
|---|---|
| (a)     By check subject to collection, the receipt of which is hereby acknowledged by Seller: | $    1,700,000.00 |
| (b)     By check or checks, or at Seller's option, wire transfer, delivered to Seller at the Closing in accordance with the provisions of §2.02: | $ 32,300,000.00 |
| | |
| | |
| | |
| **Purchase Price** | **$ 34,000,000.00** |

3944879.7

**Schedule D**
**MISCELLANEOUS**

1.  Title insurer designated by the parties (§1.02): Any title insurer licensed to conduct business in the State of New York selected by Purchaser.

2.  Seller's tax identification number (§2.03): To be provided to Seller's counsel.

3.  Purchaser's tax identification number (§2.03): To be provided to Seller's counsel within two (2) business days prior to Closing.

4.  Scheduled time and date of Closing (§3.01): Subject and subordinate to the terms of Section 19 of this Contract, the third (3rd) business day after (a) the date that the Approval Order and (b) an order confirming a plan in the Debtor's case is obtained, at 10 a.m., unless Seller and Purchaser agree to an earlier Closing date after entry of the Approval Order. Upon one (1) business days' prior notice to Seller, Purchaser shall have the right to one (1) adjournment of the Closing for a period of up to fifteen (15) days, **TIME BEING OF THE ESSENCE** with respect to Purchaser's obligation to close hereunder on any such adjourned date. Upon one (1)business days' prior notice to Purchaser, Seller shall have the right to adjourn the Closing date on one occasion for a period of up to fifteen (15) days, **TIME BEING OF THE ESSENCE** with respect to Seller's obligation to close hereunder on any such adjourned date.

5.  Place of Closing (§3.01): The offices of Seller's attorneys.

6.  Brokers (§14.01): Brown Harris Stevens Residential Sales LLC and The Corcoran Group (Deborah Kern).

7.  Party to pay broker's commission (§14.01): Seller, pursuant to the Approval Order, shall pay both Brown Harris Stevens Residential Sales LLC and The Corcoran Group.

8.  Address for notices (§15.01):
    If to Seller:

    > Albert Togut, as Chapter 11 Trustee of Peggy Nestor
    > c/o Togut, Segal & Segal
    > One Penn Plaza, Suite 3335
    > New York, New York 10119
    > fax: (212) 967-4258          email:  mmartir@teamtogut.com
    >                                      altogut@teamtogut.com

    with a copy to Seller's attorney:
    > Marc Andrew Landis, Esq., Phillips Nizer LLP
    > 485 Lexington Avenue, 14th Floor, New York, New York 10017
    > phone: (212) 841-0705          fax:  (212) 262-5152
    > email:  mlandis@phillipsnizer.com

    If to Purchaser:
    > 63rd St Townhouse LLC
    > c/o Becker, Glynn, Muffly, Chassin & Hosinski LLP
    > 299 Park Avenue
    > New York, New York 10171
    > phone: (212) 888-3033
    > email:  jmarques@beckerglynn.com



3944879.7

with a copy to Purchaser's attorney:
Justin Marques, Esq.
Becker, Glynn, Muffly, Chassin & Hosinski LLP
299 Park Avenue
New York, New York 10171
phone: (212) 888-3033
email:  jmarques@beckerglynn.com

3944879.7

## FIRST AMENDMENT TO THE CONTRACT OF SALE

This First Amendment to the Contract of Sale (this "Amendment") is dated as of January __9__, 2026 by and between ALBERT TOGUT, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE ("Seller") OF THE ESTATE (the "Estate") OF PEGGY NESTOR ("Debtor"), A CHAPTER 11 DEBTOR IN CASE NO. 23-10627 (MEW) PENDING IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK ("Bankruptcy Court"), and 63rd St Townhouse LLC ("Purchaser").

### R E C I T A L S:

WHEREAS, Seller and Purchaser executed that certain Contract of Sale dated as of December 29, 2025 for premises known as  15 East 63rd Street, New York, NY 10065 (the "Agreement");

WHEREAS, Seller and Purchaser desire to amend the Agreement to modify the Purchase Price and Schedule C as set forth herein;

NOW THEREFORE, in consideration of ten dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto agree as follows:

### W I T N E S S E T H:

1.    **Capitalized Terms**.  All capitalized terms not otherwise defined in this First Amendment to the Contract of Sale shall have the meanings ascribed to such terms in the Agreement.

2.    **Amendment of the Agreement**.

2.1.    Reaffirmation of Agreement.

Notwithstanding anything to the contrary and except as otherwise set forth herein, the Agreement remains in full force and effect and is hereby ratified and reaffirmed in all respects. In the event of any conflict between the terms of this Amendment and the terms of the Agreement, the terms of this Amendment shall control.

2.2.    Amendment to Section 2.01 – Purchase Price.

Section 2.01 of the Agreement is hereby amended and restated in its entirety to read as follows:

The Purchase Price to be paid by Purchaser to Seller for the Premises shall be **Thirty Four Million Five Hundred Thousand and 00/100 Dollars ($34,500,000.00)**.

2.3.    Amendment to Schedule C – Purchase Price.

Schedule C of the Agreement is hereby amended and restated in its entirety as follows:

The Purchase Price shall be paid as follows:

| | |
|---|---|
| (a)     As previously paid by Purchaser pursuant to the Agreement and currently held in escrow in accordance with the Agreement (the "Deposit"): | $   1,700,000.00 |
| (b)     By check or checks, or at Seller's option, wire transfer, delivered to Seller at the Closing in accordance with the provisions of §2.02: | $ 32,800,000.00 |
| | |
| **Purchase Price** | **$ 34,500,000.00** |

3.     **Miscellaneous**.

3.1.     Neither this Amendment nor any provision hereof may be changed, modified or canceled, except by agreement in writing signed by both parties (each party acting by a duly authorized partner or officer thereof if the party is a partnership or corporation) against whom any purported change is sought to be enforced.

3.2.     This Amendment may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. This Amendment may be executed by facsimile transaction or by email via PDF format, in each case, with the same force and effect of originals.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Amendment as of the date first above written.

Seller:

_____, as Trustee
Albert Togut, not individually but
solely in his capacity as Chapter 11
Trustee of The Estate Of Peggy Nestor, Debtor

Purchaser:     63rd St Townhouse LLC

By: _____
Name:  Justin M. Marques
Title:   Authorized Signatory

2

## Exhibit B

**Back-Up Agreement**

CONTRACT made as of January 7__, 2026 between ALBERT TOGUT, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE ("Seller") OF THE ESTATE (the "Estate") OF PEGGY NESTOR ("Debtor"), A CHAPTER 11 DEBTOR IN CASE NO. 23-10627 (MEW) PENDING IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK ("Bankruptcy Court"), and YINGKAI XU ("Purchaser").

Seller and Purchaser hereby covenant and agree, subject to Bankruptcy Court approval as expressly described in Section 18 herein, and further subject to Section 19 herein, as follows:

**Section 1.     Sale of Premises and Acceptable Title**

§1.01.    Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this Contract: (a) the parcels of land more particularly described in Schedule A attached hereto ("Land"); (b) the building and improvements situated on the Land (collectively, "Building"); (c) all right, title and interest of Seller and/or Debtor, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; (d) all the estate and rights of Seller and/or Debtor in and to the appurtenances, Land and Building; and (e) all right, title and interest of Seller and/or Debtor in and to the fixtures and equipment attached or appurtenant to the Building (collectively, the "Premises").  The Premises are located in the County, City and State of New York and known as **15 East 63rd Street, New York, New York, tax map block 1378, lot 12**. For the avoidance of doubt, the sale expressly excludes all personal property, furniture, furnishings, artwork, decorative items, unattached equipment,  all light fixtures, and insurance claims for occurrences prior to the date hereof.

§1.02.    Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this Contract, subject only to the conditions set forth in this Contract including: (a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and (b) such other matters as the title insurer specified in Schedule D attached hereto shall be willing, without special premium, to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises.

**Section 2.     Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Deposit and Foreign Persons**

§2.01.    The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises as provided in Schedule C attached hereto is **Thirty-Four Million One Hundred Thousand Dollars ($34,100,000.00)** Dollars.

§2.02.    All monies payable under this Contract, unless otherwise specified in this Contract, shall be paid at Closing by (a) certified checks of Purchaser or any person making a purchase money loan to Purchaser drawn on any bank or trust company having a banking office in the City of New York and which is a member of the New York Clearing House Association or (b) official bank checks drawn by any such banking institution, payable to the order of Seller or as directed by Seller, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of Five Thousand ($5,000.00) Dollars shall be acceptable for sums payable to Seller at the Closing, or (c) with respect to the portion of the Purchase Price payable at the Closing, at Seller's election, by wire transfer of immediately available federal funds to an account or accounts designated by Seller prior to the Closing.

§2.03.    (a)    The sum paid under paragraph (a) of Schedule C and any other sums paid on account of the Purchase Price prior to the Closing (collectively, "Deposit") shall be paid by wire transfer of immediately available federal funds delivered to Seller's attorney ("Escrowee").  Escrowee shall hold the proceeds thereof in escrow in an interest-bearing special bank account (or as otherwise agreed in



1

3949928.4

writing by Seller, Purchaser and Escrowee) until the Closing or sooner termination of this Contract and shall pay over or apply such proceeds in accordance with the terms of this section. Any interest that is earned thereon shall be paid to the same party entitled to receive the Deposit or as directed by such party, and the party receiving such interest shall pay any income taxes thereon. The tax identification numbers of the parties are either set forth in Schedule D or shall be furnished to Escrowee upon request. At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller or as directed by Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within fifteen (15) days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such fifteen (15) day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this Contract or a final order of the Bankruptcy Court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the Bankruptcy Court. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)     The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part (including, without limitation, any loss suffered due to any act, omission, loss or failure of the financial institution in which the Deposit is deposited) unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this Contract, in violation of an order of the Bankruptcy Court or involving gross negligence on the part of Escrowee.

(c)     Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this Contract.

(d)     Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Deposit or any other dispute between the parties whether or not Escrowee is in possession of the Deposit and continues to act as Escrowee.

(e)     Escrowee may act or refrain from acting in respect of any matter referred to in this §2.03 in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

**Section 3.     The Closing**

§3.01.     Except as otherwise provided in this Contract, the closing of title pursuant to this Contract ("Closing") shall take place at the time and place specified in Schedule D attached hereto. For purposes of this Contract, the "Closing Date" shall mean the actual date of the Closing.

**Section 4.     Representations and Warranties of Seller**

Seller represents and warrants to Purchaser with respect to the Premises, as follows:

§4.01.     Seller has the sole authority to act in accordance with the Contract and to convey title on behalf of the Debtor and the Estate, subject to Bankruptcy Court approval.



2

3949928.4

§4.02.      As of the date of Closing, there shall be no written leases or other tenancies affecting any portion of the Premises.  The Premises shall be delivered vacant and free of leases, subleases, licenses, tenants, subtenants, licensees and occupants at Closing.

§4.03.      Seller is not a "foreign person" as defined in §1445 of the Internal Revenue Code (the "Code Withholding Section").

**Section 5.      Acknowledgments, Representations and Warranties of Purchaser**

Purchaser acknowledges that:

§5.01.      Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §8.01 and §9.03, shall accept the Premises "as is", "where is" and in their present condition, without any representations or warranties of any kind whatsoever except as may be expressly set forth in this Contract, subject to use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this Contract.

§5.02.      Before entering into this Contract, Purchaser has made such examination of the Premises (including, without limitation, any inspection for the presence of lead-based paint and/or lead-based paint hazards, the presence of any materials containing asbestos, and any other hazardous materials), the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary, or has waived Purchaser's right to do so.  In entering into this Contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this Contract, whether or not any such representations, warranties or statements were made in writing or orally.

Purchaser represents and warrants to Seller that:

§5.03.      The funds comprising the Purchase Price to be delivered to Seller in accordance with this Contract are not derived from any illegal activity.

§5.04.      Purchaser has, and will at Closing have, available unencumbered cash and cash equivalents (including publicly traded securities) in a sum at least equal to (and having a then current value of) the balance of the Purchase Price and any other payments required to be made by Purchaser at Closing.

**Section 6.      Seller's Obligations as to Leases**

§6.01.      Between the date of this Contract and the Closing, Seller shall not enter into any new lease for, or permit any new occupancy of, any portion of the Premises.

**Section 7.      Responsibility for Violations**

§7.01.      Purchaser shall be required to accept title subject to: (a) all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to the date of this Contract by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises (collectively, "Violations") and (b) all fines or monetary penalties levied prior to the Closing pursuant to the Administrative Code of the City of New York ("Fines"), provided that in the event that the liquidated sums to be paid to satisfy any such Violations or Fines not discharged by the



3

Bankruptcy Court shall exceed $34,000.00 in the aggregate, any portion in excess of such amount shall be a credit against the Purchase Price.

§7.02.   If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

**Section 8.   Destruction, Damage or Condemnation**

§8.01.   The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this Contract.

**Section 9.   Covenants of Seller**

Seller covenants that between the date of this Contract and the Closing:

§9.01.   Seller shall not enter into any Service Contract unless the same is terminable without penalty by the then owner of the Premises upon not more than 30 days' notice.

§9.02.   No fixtures or equipment included in this sale shall be removed from the Premises by Seller unless the same are replaced prior to the Closing with similar items of at least equal quality and utility.

§9.03.   Seller shall operate and maintain the Premises in "as is" condition and shall maintain the Premises from the date hereof until the Closing Date in substantially the same manner in which Seller has acted prior to the date hereof.

§9.04.   Seller shall provide Purchaser or Purchaser's representatives with reasonable access to the Premises, during business hours, upon reasonable prior telephonic notice to Seller, for visual and non-invasive inspection purposes only.

**Section 10.   Seller's Closing Obligations**

At the Closing, and subject to Section 19 hereof, Seller shall deliver the following to Purchaser:

§10.01.   A copy of the Approval Order (as defined herein).

§10.02.   A statutory form of bargain and sale deed without covenant against grantor's acts, properly executed in proper form for recording so as to convey the title required by this Contract.

§10.03.   To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

§10.04.   Intentionally Omitted.

§10.05.   (a) Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof, and (b) a certification of non-foreign status, in form required by the Internal Revenue Code Withholding Section, signed under penalty of perjury. Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request.



4

3949928.4

§10.06.    Possession of the Premises, vacant, free and clear of all claims and rights of tenancy, and otherwise in the condition required by this Contract.

§10.07.    Any other documents required by this Contract to be delivered by Seller.

While the parties agree that the transfer of the Premises to Purchaser shall be deemed a transfer pursuant to § 1146(a) of the United States Bankruptcy Code (the "Bankruptcy Code") which should not be taxed under any law imposing a stamp, transfer, recording or surrender tax, in the event such a fee or tax is required to be paid, it shall be paid as set forth in §10.05 and §11.02.  Purchaser shall not be responsible for payment of any transfer taxes to the State or the City of New York.

**Section 11.    Purchaser's Closing Obligations**

At the Closing, Purchaser shall:

§11.01.    Deliver to Seller checks or, at Seller's option, wire transfer of immediately available federal funds to Seller, in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12 and as otherwise set forth herein.

§11.02.    Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing. Purchaser shall pay the New York State mansion taxes and New York State "supplemental mansion tax" and agrees to indemnify and hold Seller harmless from and against all loss, cost, damages and expense (including reasonable attorneys' fees and expenses) that Seller may incur by reason of Purchaser's failure to pay same. The provisions of this Paragraph shall survive Closing.

§11.03.    Deliver any other documents required by this Contract to be delivered by Purchaser.

**Section 12.    Apportionments**

§12.01.    The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a)    real estate taxes, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available.  In the event a final water meter reading dated not more than thirty days prior to the Closing Date is not available as of the Closing Date, Seller shall deposit a reasonable sum with Escrowee until receipt of the subsequent meter reading (with the Seller being obligated to pay all such water charges pertaining to the period prior to closing and the purchaser being obligated to pay all such charges pertaining to the period thereafter) This Section 12.01(a) shall survive closing for a period of twelve (12) months;

(b)    value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes, as evidenced by an actual reading or invoice from Seller's supplier; and

(c)    any other items listed in this Contract or in Schedule D.



If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation.  Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed.  Any discrepancy resulting

3949928.4

from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

§12.02.    Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting any expenses of collection thereof, which obligation shall survive the Closing.

**Section 13.    Objections to Title, Failure of Seller or Purchaser to Perform**

§13.01.    Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney upon receipt. Seller shall be entitled to a reasonable adjournment or adjournments of the Closing, but not later than sixty (60) days after the date of the Closing as set forth herein (unless a longer period is agreed to in writing by Seller and Purchaser or fixed by an order of the Bankruptcy Court), to remove any defects in or objections to title noted in such title report and any other defects or objections which may be disclosed on or prior to the Closing Date.

§13.02.    If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this Contract, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey, but without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Purchaser may terminate this Contract and the sole liability of Seller shall be to refund the Deposit to Purchaser. Upon such refund and reimbursement, this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. Seller shall not be required to bring any action or proceeding or to incur any expense to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract.

§13.03.    Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties (to the extent they are not disputed by Seller) may be paid out of the proceeds of the monies payable at the Closing or placed in escrow with the title company to hold pending the Bankruptcy Court's ruling as to any disputed items. In such case the charges with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

§13.04.    If Purchaser shall default in the performance of its obligation under this Contract to purchase the Premises, the sole remedy of Seller shall be to retain the Deposit as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain. If Seller shall default in the performance of its obligations herein, Purchaser's sole remedy shall be to either (i) elect to cancel this Contract and receive a refund of the Deposit, or (ii) to seek specific performance of Seller's obligations pursuant to the Approval Order.

**Section 14.    Broker**

§14.01.    If a broker is specified in Schedule D, Purchaser represents and warrants that such broker is the only broker with whom they have dealt in connection with this Contract and that Purchaser knows of no other broker who has claimed or may have the right to claim a commission in connection with this transaction. The commission of such broker shall be paid pursuant to separate agreement by the party specified in Schedule D and pursuant to the Approval Order. Purchaser shall indemnify and defend Seller against any costs, claims or expenses, including attorneys' fees, arising out of the Purchaser's breach of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this Contract.

6

**Section 15.      Notices**

§15.01.      All notices to Seller and Purchaser under this Contract shall be in writing and shall be delivered personally or shall be sent by prepaid overnight courier with receipt acknowledged, addressed as set forth in Schedule D, or addressed as Seller or Purchaser shall otherwise have given notice as herein provided; notices may be given by email or fax as long as such notices are also given via personal delivery or prepaid overnight courier as aforesaid. The attorneys for the parties may give any extension of time or other notice on behalf of their respective clients.

**Section 16.      Limitations on Survival of Representations, Warranties, Covenants and other Obligations**

§16.01.      Except as otherwise provided in this Contract, no representations, warranties, covenants or other obligations of Seller set forth in this Contract shall survive the Closing, and no action based thereon shall be commenced after the Closing.

§16.02.      The delivery of the Approval Order and the delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this Contract to survive the Closing.

**Section 17.      Miscellaneous Provisions**

§17.01.      Purchaser shall not assign this Contract or its rights hereunder, nor shall any interest in Purchaser be assigned or transferred, without the prior written consent of Seller, to be granted or withheld in Seller's sole discretion, except as expressly provided herein, and further provided that Purchaser and any such assignee shall be jointly and severally liable for Purchaser's obligations hereunder and that all representations and warranties of Purchaser hereunder shall apply to Purchaser and to such assignee. Notwithstanding anything herein to the contrary, Purchaser may assign this Contract without consent to a legal entity or a trust in which one or more of the individuals that comprise Purchaser shall own, directly or indirectly, not less than fifty (50%) of the equity of, and shall control the operations of, such legal entity or trust. No permitted assignment of Purchaser's rights under this Contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee not less than ten (10) days prior to the Closing Date. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

§17.02.      This Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§17.03.      This Contract shall be governed by, and construed in accordance with, the law of the State of New York. The venue for any dispute arising from this Contract shall be the Bankruptcy Court and the Bankruptcy Court shall have exclusive jurisdiction to interpret and enforce this Contract.



§17.04.      This Contract may be executed in any number of counterparts, including facsimile or electronically signed counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7

3949928.4

§17.05.    The captions in this Contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Contract or any of the provisions hereof.

§17.06.    This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§17.07.    This Contract shall not be binding or effective upon Seller in full until (i) this Contract is properly executed and delivered by Seller and Purchaser and (ii) the Approval Order is obtained.

§17.08.    As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§17.09.    Neither Purchaser, nor any of Purchaser's officers, directors, shareholders, partners, members or associates, nor any other direct or indirect holder of any equity interest in Purchaser, is an entity or person: (i) that is listed in the Annex to, or is otherwise subject to the provisions of United States Presidential Executive Order 13224 issued on September 24, 2001 ("Executive Order"); (ii) whose name appears on the U.S. Department of the Treasury, Office of Foreign Assets Control's ("OFAC") most current list of "Specifically Designated National and Blocked Persons" (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, www.treas.gov/ofac/; (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in the Executive Order; or (iv) who is otherwise affiliated with any entity or person listed above (any and all parties or persons described in clauses (i) through (iv) above are herein referred to as a "Prohibited Person"). Purchaser covenants and agrees to use commercially reasonable efforts to ensure that neither Purchaser, nor any of its respective officers, directors, shareholders, partners, members or associates, and no other direct or indirect holder of any equity interest in Purchaser will: (a) conduct any business, or engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person; or (b) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001. On request by Seller from time to time, Purchaser further covenants and agrees promptly to deliver to Seller any such certification or other evidence as may be requested by Seller in Seller's sole and absolute discretion, confirming that no violation of this §17.12 shall have occurred. This §17.12 shall survive the Closing.

**Section 18.    Bankruptcy Court Approval**

§18.01.    Purchaser acknowledges that this Contract and the transactions contemplated hereby are subject to the approval of the Bankruptcy Court and the entry by the Bankruptcy Court of an order confirming a plan of reorganization or otherwise approving the transaction contained in the Contract and affording Purchaser Section 363 protections as a good faith purchaser (the "Approval Order"), and Seller's and Purchaser's obligation to consummate the transaction contemplated hereunder is subject to approval by the Bankruptcy Court. Notwithstanding any other provision of this Contract, this Contract shall not be binding or effective in full or in part until the Approval Order is obtained.

§18.02.    Purchaser acknowledges that Seller may not act in his personal capacity but only as the Court-appointed trustee in bankruptcy and as such is obligated to provide notice to all parties in interest, including the public, of this proposed sale, and that there will be hearings thereon in connection with seeking Bankruptcy Court approval. In addition, Seller is obligated to respond to any inquiries or and perform any and all other acts related thereto which are required by order(s) of the Bankruptcy Court and its procedures, under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Premises to parties in interest.



8

§18.03.    Purchaser hereby irrevocably designates and appoints Jonathan Helfer, Esq. (the "Agent"), having an address Romer Debbas LLP, 275 Madison Avenue, 8th Floor, New York, NY 10016, as agent for service of process regarding the Debtors' Bankruptcy Court case, this Contract and any matter related thereto or hereto.  The Agent, by signing below, irrevocably consents to and accepts its designation and appointment as agent for service of process upon Purchaser and any assignee or transferee of Purchaser herein.

§18.04.    Purchaser acknowledges and agrees that Seller is entering into this Contract not personally but solely in his capacity as Chapter 11 Trustee of the Debtor, pursuant to Bankruptcy Court orders, and Purchaser agrees that neither Seller nor Seller's retained professionals shall have any personal liability or obligation whatsoever under this Contract.

§18.05.    Notwithstanding any other provision of this Contract, Seller reserves the right to proceed to Closing pursuant to a confirmed Plan in the Debtor's bankruptcy case. Upon notice that Seller has so elected, Purchaser shall reasonably cooperate with Seller in obtaining approval of and effectuating such a Plan that includes a sale of the Premises to Purchaser on the terms set forth herein.

**Section 19.    Purchase Protection Provisions**

§19.01    Seller and Purchaser acknowledge that the Bankruptcy Court has entered the following orders that affect the sale of the Premises:

(a) *Order Approving (I) Sale Procedures for the Sale of the Townhouse Located at 15 East 63rd Street, New York, New York, Free and Clear of All Liens, Claims, Encumbrances and Other Interests; with Such Interests Attaching to the Proceeds of Sale (II) Approving the Manner and Extent of Notice and Procedures for Submitting Offers; (IV) Scheduling the Auction; (V) Scheduling a Hearing Confirming the Results of the Sale Process*, entered in Case No. 23-10627 on December 15, 2023, ECF document no. 78 (the "Sale Procedures Order");

(b) *Order Modifying Milestones Fixed by Sale  Procedures Order*, entered in Case No. 23-10627 on July 26, 2024, ECF document no. 261 (the "Sale Procedures Modification Order");

(c) *Order Granting Application for Authorization to Employ and Retain Brown Harris Stevens Residential Sales, LLC as Broker for the Chapter 11 Trustee*, entered in Case No. 23-10627 on February 13, 2025, ECF document no. 516 (the "Brown Harris Stevens Retention Order");

(d) *Order Approving Extension of Brown Harris Stevens Listing Agreement*, entered in Case No. 23-10627 on July 23, 2025, ECF document no. 704 (the "First Listing Extension Order");

(e) *Order Approving Extension of Brown Harris Stevens Listing Agreement*, entered in Case No. 23-10627 on November 10, 2025, ECF document no. 807 (the "Second Listing Extension Order"); and

(f) *Order Granting Partial Judgment on the Pleadings as to the Second Claim for Relief in the Complaint*, entered in Adversary Proceeding No. 23-01195, on March 13, 2024, ECF document no. 18 (the "Section 363(h) Order").



9

The Sale Procedures Order attaches as Exhibit A and approves a set of Sale Procedures (as may be amended, modified, or supplemented from time to time, the "Sale Procedures"), including certain dates and deadlines in connection with the sale of the Premises. The Sales Procedures Modification Order changes the material dates and deadlines in the Sale Procedures Order. All such dates and deadlines have passed and are in need of modification. The Brown Harris Stevens Retention Order approves a Listing Agreement with Brown Harris Stevens Residential Sales, LLC (the "Selling Broker") and authorizes the Selling Broker "to assist the Trustee with the sale of the Townhouse in accordance with the Sale Procedures." The First Listing Extension Order and the Second Listing Extension Order extend the Listing Agreement approved in the Brown Harris Stevens Retention Order through December 29, 2025. The Section 363(h) Order directs "pursuant to section 363(h), that the Townhouse be sold pursuant to the sale procedures previously approved by this Court."

§19.02      Purchaser's obligations under this Contract are subject to the entry of an order of the Bankruptcy Court in accordance with the provisions set forth in §19.03 and/or §19.04.

§19.03      If Seller seeks to dispense with an auction and is permitted by the Bankruptcy Court to do so, then Seller shall procure the Approval Order containing the provisions set forth in §19.05.

§19.04      If Seller seeks to proceed with an auction, then prior to any such auction and not later than January 23, 2026, Seller shall obtain an order of the Bankruptcy Court containing the following provisions:

      (a) Purchaser shall be designated the "Stalking Horse Bidder" and this Contract shall be designated the "Stalking Horse Agreement" in accordance with Part II of the Sale Procedures;

      (b) Purchaser shall be entitled to a break-up fee in the amount of Three Hundred Forty One Thousand Dollars ($341,000.00) (the "Break-up Fee");

      (c) The auction for the Premises (the "Auction") shall be scheduled for a date not later than 21 days after the entry of the order containing the provisions set forth in this §19.04 (the "Auction Date");

      (d) No bid at the Auction for the Premises shall be accepted unless such bid exceeds the Purchase Price by an amount equal to the sum of (i) the Break-up Fee and (ii) Fifty Thousand Dollars ($50,000.00);

      (e) No bid at the Auction for the Premises shall be accepted unless made by a "Qualified Bidder" submitting a "Qualifying Bid" in accordance with Part I of the Sale Procedures;

      (f) The "Bid Deadline" in accordance with Part I of the Sale Procedures shall be fixed at a date not less than two (2) days prior to the Auction Date;

      (g) The submission of the "Qualifying Bid" in accordance with Part I of the Sale Procedures shall be made to the Broker and to Counsel for the Seller as identified herein;

      (h) Any person or entity seeking to exercise a right to purchase pursuant to Section 363(i) of the Bankruptcy Code, 11 U.S.C. § 363(i), shall submit by the Bid Deadline set in subparagraph (g) above the information required for a "Qualifying Bid" in accordance with Part I of the Sale Procedures, and the failure to make such submission shall be deemed a waiver of the right to

10

purchase pursuant to Section 363(i) of the Bankruptcy Code, 11 U.S.C. § 363(i);

(i) The "Sale Hearing" as defined in the Sale Procedures Order and modified in the Sale Procedures Modification Order shall be scheduled for a date not later than seven (7) business days after the Auction Date, subject to the Bankruptcy Court's availability;

(j) The "Closing Date" as defined in the Sale Procedures shall take place not later than two (2) business days after the entry of the Approval Order;

(k) The Break-up Fee provision set forth in subparagraph (b) herein shall be payable solely from the proceeds of the sale to a Qualifying Bidder or third party other than the Purchaser, whenever same may occur, and shall not be subject to any rights or claims of any secured creditor or of Seller pursuant to any provision of the Bankruptcy Code or otherwise, and such obligations to pay Purchaser the Break-Up Fee shall survive the termination of this Contract;

(l) The foregoing provisions shall be applicable notwithstanding any provision in any prior order of the Bankruptcy Court to the contrary.

§19.05    The Approval Order shall contain the following provisions:

(a) The sale of all real and personal property hereunder to the Purchaser shall be free and clear of all liens, encumbrances, judgments, and other interests, and free and clear of the interest of any co-owner, pursuant to Sections 363(f) and 363(h) of the Bankruptcy Code, 11 U.S.C. § 363(f), 363(h), with the liens, encumbrances and other interests, including the interest of any co-owner to attach to the proceeds of the sale;

(b) The Purchaser is determined to be a good faith purchaser within the meaning of and entitled to the protections of Section 363(m) of the Bankruptcy Code, 11 U.S.C. § 363(m);

(c) No person or entity shall be permitted to exercise a right to purchase pursuant to Section 363(i) of the Bankruptcy Code, 11 U.S.C. § 363(i), unless such person or entity shall have (i) complied with any prior order of this Court directing the submission of information required of a "Qualifying Bid" in accordance with Part I of the Sale Procedures, and (ii) tendered the purchase price set forth in this order to the Trustee prior to the closing of the sale to the Purchaser; and

(d) The New York County Clerk is directed to record a certified copy of the Approval Order on the real property records maintained for the County of New York upon payment of any applicable fee.

§19.06    In the event Seller seeks to proceed with an auction and does not obtain the order described in §19.04 by the date set forth therein, then Purchaser shall have the right, but not the obligation, to terminate this Contract without liability and upon such termination Seller shall promptly refund any deposit paid by Purchaser together with any interest earned thereon. Upon the satisfaction of such obligations of Seller set forth herein, Purchaser shall have no further liability under this Contract,

11

and this Contract shall be of no further effect.   This provision shall survive the termination of this Contract.

§19.07        In the event the Approval Order is not obtained by March 15, 2026, then Purchaser shall have the right but not the obligation to terminate this Contract without liability and upon such termination, Seller shall refund any deposit paid by Purchaser together with any interest earned thereon, Purchaser shall have no further liability under this Contract, and this Contract shall be of no further effect.

§19.08        In the event In the event that a party other than Purchaser concludes the purchase of the Premises, and provided that Purchaser has not defaulted hereunder, the Deposit shall be returned to Purchaser..

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]



3949928.4

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the date first above written.

Seller:

_____ as Trustee
Albert Togut, not individually but
solely in his capacity as Chapter 11
Trustee of The Estate of Peggy Nestor, Debtor

Purchaser:

*Yinghai Xu*
_____
YINGKAI XU

**Receipt by Escrowee**

The undersigned Escrowee hereby acknowledges receipt of $1,705,000.00 subject to collection, to be held in escrow pursuant to § 2.03.

PHILLIPS NIZER LLP

By: _____
Marc Andrew Landis
Managing Partner

13

3949928.4

**Schedule A**
DESCRIPTION OF PREMISES

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of 63rd Street distant 124 feet 6 inches Westerly from the corner formed by the intersection of the Northerly side of 63rd Street and the Westerly side of Madison Avenue;

RUNNING THENCE Northerly parallel with the westerly side of Madison Avenue and part of the distance through a party wall 100 feet 5 inches to the center line of the block between 63rd and 64th Street;

THENCE Westerly parallel with the Northerly side of 63rd Street 25 feet;

THENCE Southerly and again parallel with Madison Avenue part of the distance through another party wall 100 feet 5 inches to the Northerly side of 63rd Street;

THENCE Easterly along the Northerly side of 63rd Street 25 feet to the point or place of BEGINNING.



3949928.4

## Schedule B

## PERMITTED EXCEPTIONS

1.      Zoning regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title uninsurable.

2.      Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3.      Unpaid installments of assessments not due and payable on or before the Closing Date.

4.      [Intentionally omitted].

5.      (a)      Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises.

(b)      Minor encroachments and projections of less than twelve (12) inches, if any, of stoops, doors, areas, steps, cellar steps, entrances, sidewalk elevators, trim, cornices, lintels, ledges, windows, window sills, awnings, trim, ornamental projections, canopies, ledges, fences, fire escapes, hedges, coping and retaining walls and similar items projecting from the Premises over any street or highway or over any adjoining property and minor encroachments of less than twelve inches of similar elements projecting from adjoining property over the Premises and minor variances of less than twelve inches, if any, between fences, retaining walls and the like and lines of record title.

(c)      Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

(d)      Any state of facts that an accurate survey would disclose.

(e)      Laws and governmental regulations that affect the use and maintenance of the Premises.

(f)      Covenants, conditions, restrictions, easements, leases, rights, reservations, consents and agreements of record.

(g)      Any notes or notices of violations of law or municipal ordinances or requirements affecting the Premises, including without limitation, sidewalk violations and environmental control board violations, subject to Section 7.01.

(h)      Possible lack of right to maintain vault or vaulted area under, and coal chutes or fuel oil supply lines in, the sidewalk.



3949928.4

**Schedule C**
**PURCHASE PRICE**

The Purchase Price shall be paid as follows:

| | |
|---|---|
| (a)     By check subject to collection, the receipt of which is hereby acknowledged by Seller: | $     1,705,000.00 |
| (b)     By check or checks, or at Seller's option, wire transfer, delivered to Seller at the Closing in accordance with the provisions of §2.02: | $ 32,395,000.00 |
| | |
| | |
| | |
| **Purchase Price** | **$  34,100,000.00** |



3949928.4

**Schedule D**
**MISCELLANEOUS**

1.  Title insurer designated by the parties (§1.02): Any title insurer licensed to conduct business in the State of New York selected by Purchaser and reasonably acceptable to Seller.

2.  Seller's tax identification number (§2.03): To be provided to Seller's counsel.

3.  Purchaser's tax identification number (§2.03): To be provided to Seller's counsel within five (5) business days prior to Closing.

4.  Scheduled time and date of Closing (§3.01): Subject and subordinate to the terms of Section 19 of this Contract, the closing shall occur at 10:00 a.m. on the fourteenth (14th) business day after (a) the date that the Approval Order and (b) an order confirming a plan in the Debtor's case is obtained, unless Seller and Purchaser agree to an earlier Closing date after entry of the Approval Order. Upon two (2) business days' prior notice to Seller, Purchaser shall have the right to one (1) adjournment of the Closing for a period of up to fifteen (15) days, **TIME BEING OF THE ESSENCE** with respect to Purchaser's obligation to close hereunder on any such adjourned date. Upon two (2) business days' prior notice to Purchaser, Seller shall have the right to adjourn the Closing date on one or more occasions for up to ninety (90) days in the aggregate, **TIME BEING OF THE ESSENCE** with respect to Purchaser's obligation to close hereunder on any such adjourned date.

5.  Place of Closing (§3.01): The offices of Seller's attorneys.

6.  Brokers (§14.01): Brown Harris Stevens Residential Sales LLC and Compass.

7.  Party to pay broker's commission (§14.01): Seller, pursuant to the Approval Order.

8.  Address for notices (§15.01):
    If to Seller:
    > Albert Togut, as Chapter 11 Trustee of Peggy Nestor
    > c/o Togut, Segal & Segal
    > One Penn Plaza, Suite 3335
    > New York, New York 10119
    > fax: (212) 967-4258          email:  mmartir@teamtogut.com
    >                                       altogut@teamtogut.com

    with a copy to Seller's attorney:
    > Marc Andrew Landis, Esq., Phillips Nizer LLP
    > 485 Lexington Avenue, 14th Floor
    > New York, New York 10017
    > phone: (212) 841-0705          fax:  (212) 262-5152
    > email:  mlandis@phillipsnizer.com

    If to Purchaser:
    > Yingkai Xu
    > 17 East 63rd Street, 3-4 Floor
    > New York, New York 10065



3949928.4

with a copy to Purchaser's attorney:
Jonathan Helfer, Esq.
Romer Debbas LLP
275 Madison Avenue, 8th Floor
New York, NY 10016
Tel: (212) 888-3100
Email: jhelfer@romerdebbas.com



3949928.4

**<u>Exhibit C</u>**

**Scheduling Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                    :
In re:                                              :           Chapter 11
                                                    :
PEGGY NESTOR,                                       :           Case No. 23-10627 (MEW)
                                                    :
                                    Debtor.         :
                                                    :
-----------------------------------------------------------------x

## ORDER SCHEDULING HEARING TO CONSIDER CHAPTER 11 TRUSTEE'S APPLICATION FOR AN ORDER APPROVING (A) MODIFICATIONS TO SALE PROCEDURES, (B) DESIGNATION OF STALKING HORSE BIDDER AND APPROVAL OF STALKING HORSE BID PROTECTIONS, AND (C) THE TIME, DATE, PLACE AND FORM OF NOTICE FOR THE AUCTION AND SALE HEARING

Upon the application (the "Application")[1] of Albert Togut, not individually but solely in his capacity as the Chapter 11 trustee (the "Trustee") of the estate ("Estate") of Peggy Nestor (the "Debtor"), the debtor in the above-captioned case (the "Chapter 11 Case"), by his attorneys, Togut, Segal & Segal LLP, for entry of an Order scheduling a hearing to consider the approval of the sale procedures portion of the Application (the "Procedures Application"):  (i) approving modifications (the "Modified Sale Procedures") to the *Sale Procedures* [Docket No. 78-1] for the Trustee's sale of the Debtor's real property located at 15 East 63rd Street, New York, New York (the "Townhouse");  (ii) designating and approving 63rd St Townhouse LLC (the ("Stalking Horse Bidder"), pursuant to the in the stalking horse purchase agreement (the "Stalking Horse Agreement") as the stalking horse bidder, and approving the Stalking Horse Bid Protections (as defined in the Application) for the Stalking Horse Bidder in accordance with the terms set forth in the Stalking Horse Agreement;

---

[1]    Capitalized terms used in this Order and not otherwise defined shall have the meanings ascribed to them in the Application.

(iii) designating the time, date and place for an auction (the "<u>Auction</u>") in the event that an offer for the Townhouse that is higher or better than the Stalking Horse Agreement is received by the proposed deadline for submitting such bids, and a Court hearing promptly thereafter to consider approval of the Sale of the Townhouse (the "<u>Sale Hearing</u>") to the bidder having made the highest or best offer, and if an auction is held, at the Auction;  and (iv) approving the notice of the Auction and the Sale Hearing;  and the Court having reviewed the Procedures Application;  and after due deliberation and sufficient cause appearing therefore, and no further notice being required, it is hereby

**ORDERED**, that for cause shown in the Application, a hearing to consider the Procedures Application will be held on **January 22, 2026, at 2:00 p.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard, before the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Southern District of New York, One Bowling Green, Courtroom 617, New York, NY 10004-1408 (the "<u>Procedures Hearing</u>");  and it is further

**ORDERED**, that for cause shown and pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002(a), 2002(m) and 9006(c), notice of the Application required to be given by the Trustee pursuant to Bankruptcy Rule 2002 shall be sufficient if a copy of this Order and the Application is served by the Trustee by: (a) first class mail or (b) electronic transmission, within one (1) business day after the date of entry of this Order upon:  (a) counsel for the Stalking Horse Bidder;  (b) counsel to the Back-Up Bidder;  (c) the United States Trustee;  (d) the Debtor;  (e) Marianne Nestor;  (f) Emigrant;  (g) Lynx;  (h) the Surrogate Parties;  (i) Prime Plus;  (j) Wenig Saltiel;  (k) all known parties asserting liens against the Townhouse;  (l) all parties that expressed interest in acquiring the Townhouse;  (m) federal, state, and local taxing authorities;  and (n) all other parties in interest in this Chapter 11 Case;  and it is further

**ORDERED**, that objections, if any, to the relief requested in the
Procedures Application must be filed with the Clerk of the Bankruptcy Court (with a
copy delivered directly to Bankruptcy Judge Wiles' Chambers), and served upon:
(i) counsel for the Trustee, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New
York, New York 10119, Attn: Brian F. Moore, Esq. (bmoore@teamtogut.com) and
Martha E. Martir, Esq. (mmartir@teamtogut.com); (ii) counsel for the Stalking Horse
Bidder, Becker, Glynn, Muffly, Chassin & Hosinski LLP, 299 Park Avenue, 16th Fl., New
York, New York 10171, Attn: Alec P. Ostrow, Esq. (aostrow@beckerglynn.com);
(iii) counsel to the Back-Up Bidder, Romer Debbas LLP, Jonathan Helfer, Esq.
(jhelfer@romerdebbas.com); (iv) counsel to Lynx, McGrail & Bensinger LLP, 999-C 8th
Avenue #107, New York, New York 10019, Attn: Ilana Volkov, Esq.
(ivolkov@mcgrailbensinger.com); (v) counsel to the Surrogate Parties, including (A)
counsel to the Receiver, Westerman Ball Ederer Zucker & Sharfstein LLP, 1201 RXR
Plaza, Uniondale, New York 11556, Attn: Jeffrey A. Miller, Esq.
(jmiller@westermanllp.com); (B) counsel to the Cassini Executors, Farrell Fritz, P.C., 400
RXR Plaza, Uniondale, NY 11556, Attn: Patrick Collins, Esq. (pcollins@farrellfritz.com);
(C) counsel to the Public Administrator, Mahon, Mahon, Kerins & O'Brien, LLC, 254
Nassau Boulevard, Garden City, New York 11530, Attn: Kenneth P. Mahon, Esq.
(kmahon@mmkolaw.com) and Heather Callaghan, Esq. (hcallaghan@mmkolaw.com);
(vi) the Office of the United States Trustee (Daniel.Rudewicz@usdoj.gov); and (vi) all
other parties who have filed a Notice of Appearance in the Chapter 11 Case, so as to be
received not later than **January 15, at 4:00 p.m. (prevailing Eastern Time)** (the
"Objection Deadline"); and it is further

**ORDERED**, that objections to the Procedures Application which are not

filed and served on or before the Objection Deadline in accordance with the provisions

of this Order shall be deemed forever barred and waived as they pertain to the relief

sought in the Procedures Application.

DATED:  New York, New York
            January __, 2026

_____
HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

## Exhibit D

**Modified Sale Procedures Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                        :

In re:                                  :                Chapter 11
                                          :

PEGGY NESTOR,                   :                Case No. 23-10627 (MEW)
                                          :

                          Debtor.      :
                                          :
---------------------------------------------------------------x

## ORDER APPROVING (A) MODIFICATIONS TO SALE PROCEDURES, (B) DESIGNATION OF STALKING HORSE BIDDER AND APPROVAL OF STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION AND SALE HEARING, AND (D) FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE HEARING

Upon the application (the "Application")[1] of Albert Togut, not individually but solely in his capacity as Chapter 11 trustee (the "Trustee") of the estate ("Estate") of Peggy Nestor (the "Debtor") in the above-captioned case (the "Chapter 11 Case"), by his attorneys, Togut, Segal & Segal LLP (the "Togut Firm"), for entry of an order pursuant to sections 105(a), 363, 1146 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 9006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") and the *Amended Guidelines for the Conduct of Asset Sales established and adopted by the United States Bankruptcy Court for the Southern District of New York* pursuant to General Order M-383 (the "Sale Guidelines") (a) approving modifications to the *Sale Procedures*, as amended [Docket Nos. 78-1, 261] (the "Initial Sale Procedures"), as described in the Application (such modifications, the "Modified Sale Procedures" and, together with the Initial Sale Procedures, the "Sale Procedures"); (ii) designating and

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Application.

approving 63rd St Townhouse LLC as the "stalking horse bidder" (the "Stalking Horse Bidder") and the purchase agreement annexed to the Application as **Exhibit A** ("Stalking Horse Agreement") as the "stalking horse bid" and approving the Stalking Horse Bid Protections (as defined in the Application) in accordance with the terms set forth in the Stalking Horse Agreement and Sale Procedures;  (iii) designating the time, date and place for an auction (the "Auction") in the event that an offer for the Townhouse that is higher or better than the Stalking Horse Consideration is received by the proposed deadline for submitting such bids (the "Bid Deadline"), and a Court hearing promptly thereafter to consider approval of the Sale of the Townhouse (the "Sale Hearing") to the bidder having made the highest or best offer, and if an auction is held, at the Auction (the "Successful Bidder");  and (iv) approving the Noticing Procedures, including the notice of the Auction and the Sale Hearing, in substantially the form annexed hereto as **Exhibit 1** (the "Notice of Auction and Sale Hearing");  and this Court having considered the Application;  and based on the Application, it appearing that the relief requested in the Application is in the best interests of the Debtor's Estate and all parties in interest;  and after due deliberation thereon and good cause appearing therefor, it is hereby:

## FOUND AND DETERMINED THAT:[2]

A.    Jurisdiction.  This Court has jurisdiction over the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Application and the relief requested therein is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, when appropriate.  *See* Fed. R. Bankr. P. 7052.

B.    <u>Modified Sale Procedures</u>.  The Trustee has articulated good and sufficient business reasons for the Court to approve the Modified Sale Procedures. The Modified Sale Procedures are fair, reasonable, and appropriate under the circumstances and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Townhouse resulting in the highest or otherwise best offer.  The Sale Procedures comply with the requirements of the Sale Guidelines.

C.    <u>Designation of Stalking Horse Bid</u>.  The Stalking Horse Bid (as reflected in the Stalking Horse Agreement) represents the highest or best offer the Trustee received during its sale process to purchase the Townhouse in accordance with the Initial Sale Procedures.  Without the Stalking Horse Agreement, the Trustee would likely realize a lower price for the Townhouse.  The contributions of the Stalking Horse Bidder to the process appear to have provided a substantial benefit to the Trustee, the Estate, and the creditors in this Chapter 11 Case.  The Stalking Horse Bid will enable the Trustee to secure a fair and adequate baseline price for the Townhouse at the Auction (if any), and accordingly, will provide a clear benefit to the Estate, the Debtor's creditors, and all other parties in interest.

D.    <u>Designation of Stalking Horse Bidder</u>.  The Stalking Horse Bidder shall act as the "stalking horse bidder" pursuant to the Stalking Horse Agreement and the Stalking Horse Bid shall be subject to higher or better offers in accordance with the Sale Procedures.  The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor or the Trustee, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder, the Debtor, or the Trustee.  Pursuit of the Stalking Horse Bidder as a "stalking-horse" bidder and its

3

Stalking Horse Bid as a "stalking-horse" purchase agreement is in the best interests of the Estate and creditors, and it reflects a sound exercise of the Trustee's business judgment.

        E.       <u>Stalking Horse Bid Protections</u>.  The Stalking Horse Bid Protections (as defined in the Application) (i) have been negotiated by the Stalking Horse Bidder and the Trustee and their respective advisors at arm's-length and in good faith and (ii) are necessary to ensure that the Stalking Horse Bidder will continue to pursue its Stalking Horse Agreement and the Sale transaction contemplated thereby.  The Stalking Horse Bid Protections are a material inducement for, and condition of, the Stalking Horse Bidder's execution of the Stalking Horse Agreement.  Unless it is assured that the Stalking Horse Bid Protections will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Sale or otherwise be bound under the Stalking Horse Agreement (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Sale Procedures).

        F.       <u>Notice of Auction and Sale Hearing</u>.  The Noticing Procedures, as described in the Application, including the Notice of Auction and Sale, the form of which is attached hereto as **<u>Exhibit 1</u>**, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Modified Sale Procedures, the Auction, the Sale Hearing, and the Sale of the Townhouse free and clear of any liens, claims, encumbrances, or interests (the "<u>Liens</u>") pursuant to sections 363(f), 1123 and 1141(c), as applicable, of the Bankruptcy Code, and any and all objection deadlines related thereto, and no other or further notice shall be required for the Application or the Sale, except as expressly required herein.  Waiver of Local Rule 6004-1(h) is reasonable and appropriate.

G.      Notice.  Good and sufficient notice of the relief sought in the

Application has been given, and no further notice is required.  A reasonable

opportunity to object or be heard regarding the relief requested in the Application

has been afforded to all interested persons and entities, including the Sale Notice

Parties (as defined herein).

H.      The Trustee has articulated good and sufficient business

reasons for the Court to approve (i) the Modified Bidding Procedures,

(ii) designation of the Stalking Horse Bidder and the Stalking Horse Bid Protections,

and (iii) the Notice of Auction and Sale Hearing.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND**

**DECREED THAT:**

1.      The Application is GRANTED to the extent provided in this Order.

2.      Except as specified below, all objections to entry of this Order or to

the relief provided herein and requested in the Application that have not been

withdrawn, waived, resolved, or settled are hereby denied and overruled in their

entirety.

**THE MODIFIED SALE PROCEDURES**

3.      The Modified Sale Procedures, as set forth in the Application, are

fully incorporated herein and approved, and, along with the Initial Sale Procedures,

shall apply to any bids for, and the Auction and Sale of the Townhouse.  The

procedures and requirements set for the in the Modified Sale Procedures, including

those associated with submitting a "Qualifying Bid" (as defined herein), are fair,

reasonable and appropriate, and are designed to maximize recoveries for the benefit of

the Estate, creditors, and other parties in interest.  The Trustee is authorized to take all

actions necessary or appropriate to implement the Sale Procedures.

5

4.      The deadline for submitting bids for the Townhouse (the "Bid Deadline") shall be **January 26, 2026 at 4:00 p.m. (prevailing Eastern Time)**; provided, that the Trustee shall have the right to extend the Bid Deadline for any reason whatsoever, in his reasonable business judgment, for all or certain potential bidders, without further order of the Court, subject to providing notice to the Stalking Horse Bidder, the Back-Up Bidder, Lynx, the Surrogate Parties, and all known potential bidders. Any party that does not submit a Qualifying Bid by the Bid Deadline in accordance with the Sale Procedures will not be allowed to (a) submit any offer after the Bid Deadline or (b) participate in the Auction.

5.      The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse Agreement (the "Stalking Horse Bid"), including as increased at the Auction (if any), is a Qualifying Bid. Bidder Yingkau Xu (the "Back-Up Bidder") is a Qualified Bidder and the bid (the "Back-Up Bid") reflected in purchase agreement annexed to the Application as **Exhibit B** (the "Back-Up Agreement"), including as increased at the Auction (if any), is a Qualifying Bid.

6.      Notwithstanding anything to the contrary in the Sales Procedures Order and the Initial Sale Procedures, any credit bid submitted by Lynx (the "Lynx Credit Bid") shall be made at or prior to the Auction, and a failure by Lynx to make a timely credit bid shall be deemed a waiver of its right to make a credit bid.

7.      Any person or entity seeking to exercise a right to purchase pursuant to Section 363(i) of the Bankruptcy Code, shall submit by the Bid Deadline the information required for a "Qualifying Bid" and "Qualified Bidder" in accordance with the Sale Procedures by the Bid Deadline, and the failure to make such submission shall

be deemed a waiver of the right to purchase pursuant to Section 363(i) of the

Bankruptcy Code.

8.    All potential bidders submitting bids determined by the Trustee to

be "Qualifying Bids" in accordance with the Sale Procedures are deemed to have

submitted to the exclusive jurisdiction of this Court with respect to all matters related to

the Auction and the terms and conditions of the Sale or transfer of the Townhouse.

9.    The Trustee, in consultation with Lynx, shall identify those bids

that qualify as Qualifying Bids (each bidder than submits such a Qualifying Bid being a

"Qualified Bidder") not later than one (1) business day before the Auction.

10.    Only Qualified Bidders will be eligible to participate in the Auction,

subject to such limitations as the Trustee may impose in good faith.  In addition,

professionals and/or other representatives of the Trustee, Lynx and the Surrogate

Parties shall be permitted to attend and observe the Auction;  provided, that, the

Trustee may, in his sole discretion, establish a reasonable limit on the number of

representatives and/or professional advisors that may appear on behalf of or

accompany Qualified Bidders or other parties at the Auction.

11.    Absent further order of the Court, no Qualified Bidder (other than

the Stalking Horse Bidder solely as provided herein) shall be entitled to any expense

reimbursement, break-up fee, termination fee, or other similar fee or payment in

connection with the Sale of the Townhouse, and by submitting a bid, such Qualified

Bidder is deemed to have waived their right to request or to file with this Court any

request for expense reimbursement or any fee of any nature, whether by virtue of

section 503(b) of the Bankruptcy Code or otherwise.

12.     If the Stalking Horse Bid (as reflected in the Stalking Horse Agreement), the Back-Up Bid (as reflected in the Back-Up Agreement), and the Lynx Credit Bid (if any) are the only Qualifying Bids received by the Trustee by the Bid Deadline, the Trustee shall not conduct an Auction for the Townhouse, and (i) the Stalking Horse Bidder shall be deemed the Successful Bidder and the Stalking Horse Bid shall be deemed the Successful Bid and (ii) the Back-Up Bidder shall be deemed the Next Highest Bidder and the Back-Up Bid shall be deemed the Next Highest Bid.  In such circumstances, the Trustee shall notify the Court that the Auction shall not occur.

13.     The Trustee, in consultation with Lynx, may, in the exercise of his business judgment, identify the highest or best Qualifying Bid as the successful bid (a "Successful Bid" and, the bidder(s) submitting such bid, a "Successful Bidder"). The Trustee may also identify which Qualifying Bid constitutes the second highest or best bid and deem such second highest or best bid a back-up bid (such bid shall each be a "Next Highest Bid" and, the bidder submitting such bid, a "Next Highest Bidder").

14.     Within one (1) business day after the conclusion of the Auction, if one is held, or as soon as reasonably practicable thereafter, the Trustee shall file with the Court a notice of the Successful Bid, Successful Bidder, Next Highest Bid, and Next Highest Bidder.

## STALKING HORSE BID PROTECTIONS

15.     The Stalking Horse Bid shall be subject to higher or better Qualifying Bids (as defined herein), in accordance with the terms and procedures of the Sale Procedures.

16.     The Stalking Horse Bid Protections are approved in their entirety. The Break-Up Fee and the Expense Reimbursement (each, as defined in the Stalking

Horse Agreement) shall be payable in accordance with, and subject to the terms of, the Stalking Horse Agreement and the Sale Procedures.[3]

17.    The Trustee is authorized to pay the Break-Up Fee and Expense Reimbursement by wire transfer of immediately available funds in accordance with the Stalking Horse Agreement and without further order of the Court.  Upon receiving the purchase price from a Successful Bidder (other than the Stalking Horse Bidder), the Trustee shall set aside an amount in cash for payment of the Break-Up Fee and Expense Reimbursement, pursuant to the terms of the Stalking Horse Agreement.

## THE AUCTION

18.    If more than one Qualifying Bid is timely received (in addition to the Stalking Horse Bid, the Back-Up Bid, and the Lynx Credit Bid (if any)), the Auction shall commence on **January 28, 2026 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Phillips Nizer LLP, real estate counsel for the Trustee, 485 Lexington Avenue, New York, New York  10117, or such later time or other place as decided by the Trustee, and the Trustee shall notify all Qualified Bidders of such later time or place;  provided, however, in the event that no such additional Qualifying Bid is received by the Bid Deadline, the Trustee shall not be required to conduct an Auction, and in such event the Trustee shall file a notice of cancellation of the Auction on the electronic docket that is maintained for this Chapter 11 Case one day prior to the date of the Auction, and serve such notice on all of the Sale Notice Parties and proceed with the approval of the Sale of the Property to the Stalking Horse Bidder.

---

[3]    For the avoidance of doubt, nothing in this order shall be construed to approve or authorize the bidding protections provided for in Section 19.04 of the Back-Up Agreement.

**SALE HEARING**

19.     The Sale Hearing shall be held before the Honorable Michael E.

Wiles, United States Bankruptcy Judge for the Southern District of New York, on _____

\_\_, 2026 at \_\_:\_\_ \_.m. (prevailing Eastern Time) at the United States Bankruptcy Court,

One Bowling Green, New York, New York 10004, at which time this Court shall

consider:  (a) approval of the Sale to the Successful Bidder free and clear of all Liens;

(b) entry of the proposed Sale Order, substantially in the form attached to the

Application as **Exhibit D**;  (c) any other issues or objections that are timely interposed

by any parties;  and (d) the granting of such other or further relief as this Court may

deem just or proper.

20.     Except as may be limited by the Stalking Horse Agreement, the Sale

Hearing may be adjourned by the Trustee, after consultation with the Successful Bidder,

from time to time without further order of this Court, by filing a notice on the electronic

docket that is maintained for this Chapter 11 Case, and serving such notice on the Sale

Notice Parties and all Qualified Bidders.

21.     The Successful Bidder (which may be the Stalking Horse Bidder or

the Back-Up Bidder) shall appear at the Sale Hearing and be prepared, if necessary, to

have a representative testify in support of the Successful Bid and the Successful Bidder's

ability to close in a timely manner.

**NOTICE OF AUCTION AND SALE HEARING**

22.     The Noticing Procedures and the Notice of Auction and Sale

Hearing, substantially in the form attached hereto as **Exhibit 1**, are hereby approved,

and no further notice of the Auction, the Sale Hearing, the Sale Objection Deadline, or

the Sale shall be required if the Trustee serves such notice, in the manner provided in

the Sale Procedures and this Order.  The Notice of Auction and Sale Hearing contains

10

the type of information required under Bankruptcy Rule 2002, Local Rule 6004-1 and

the Sale Guidelines, and complies in all respects with applicable provisions of the

Bankruptcy Code, Bankruptcy Rules, and Local Rules.

           23.    All parties in interest shall receive or be deemed to have received

good and sufficient notice of:  (a) the Application;  (b) the Auction;  (c) the Sale

Objection Deadline;  (d) the Sale of the Townhouse;  and (e) the Sale Hearing, and no

further notice of the foregoing shall be required, if as soon as practicable, but no later

than one (1) business day after entry of this Order, the Trustee causes the Notice of

Auction and Sale Hearing to be filed with this Court and served by email, mail, or

overnight delivery to:  (i) the United States Trustee;  (ii) the Debtor;  (iii) Marianne

Nestor;  (iv) counsel to the Stalking Horse Bidder;  (v) counsel to the Back-Up Bidder;

(vi) Emigrant;  (vii) Lynx;  (viii) the Surrogate Parties;  (ix) Prime Plus;  (x) Wenig Saltiel;

(xi) all known parties asserting liens against the Townhouse;  (xii) all parties that

expressed interest in acquiring the Townhouse;  (xiii) federal, state, and local taxing

authorities;  and  (xiii) all other parties in interest in this Chapter 11 Case (collectively,

the "Sale Notice Parties").

           24.    Notwithstanding the applicability of Local Rule 6004-1(h) or any

other provision of the Bankruptcy Rules or Local Rules stating to the contrary, the

requirement for publication notice is hereby waived.

## OBJECTIONS TO THE SALE

           25.    Objections, if any, to the Sale of the Townhouse (each, a "Sale

Objection") pursuant to the Application, other than with respect to the relief granted

herein, shall be filed with this Court and served so as to be **actually received** no later

than **4:00 p.m. (prevailing Eastern Time) on February 4, 2026** (the "Objection

Deadline"), by:  (a) counsel for the Trustee, Togut, Segal & Segal LLP, One Penn Plaza,

Suite 3335, New York, New York 10119, Attn: Brian F. Moore, Esq.

(bmoore@teamtogut.com) and Martha Martir, Esq. (mmartir@teamtogut.com);

(b) counsel for the Stalking Horse Bidder, Becker, Glynn, Muffly, Chassin & Hosinski

LLP, 299 Park Avenue, 16th Fl., New York, New York 10171, Attn: Alec P. Ostrow, Esq.

(aostrow@beckerglynn.com);  (c) counsel for the Back-Up Bidder, Romer Debbas LLP,

Attn: Jonathan Helfer, Esq. (jhelfer@romerdebbas.com);  (d) counsel to Lynx, McGrail &

Bensinger LLP, 999-C 8th Avenue #107, New York, New York 10019, Attn: Ilana Volkov,

Esq. (ivolkov@mcgrailbensinger.com);  (e) counsel to the Surrogate Parties, including (i)

counsel to the Receiver, Westerman Ball Ederer Zucker & Sharfstein LLP, 1201 RXR

Plaza, Uniondale, New York 11556, Attn: Jeffrey A. Miller, Esq.

(jmiller@westermanllp.com);  (ii) counsel to the Cassini Executors, Farrell Fritz, P.C., 400

RXR Plaza, Uniondale, NY 11556, Attn: Patrick Collins, Esq. (pcollins@farrellfritz.com);

(iii) counsel to the Public Administrator, Mahon, Mahon, Kerins & O'Brien, LLC, 254

Nassau Boulevard, Garden City, New York 11530, Attn: Kenneth P. Mahon, Esq.

(kmahon@mmkolaw.com) and Heather Callaghan, Esq. (hcallaghan@mmkolaw.com);

(f) the Office of the United States Trustee (Daniel.Rudewicz@usdoj.gov);  and (g) all

other parties who have filed a Notice of Appearance in the Chapter 11 Case

(collectively, the "Objection Notice Parties").  All Sale Objections, if any, shall state the

party's interest in the Chapter 11 Case and shall also set forth the specific grounds, legal

and/or factual, for the objection.  All Sale Objections will be heard by this Court at the

Sale Hearing.

26.    **The failure of any objecting person or entity to timely file and**

**serve a Sale Objection on the Objection Notice Parties shall be a bar to the assertion,**

**at the Sale Hearing or thereafter, of any objection to the Application, or to the**

**consummation and performance of the Sale contemplated by the Stalking Horse Bid and the Back-Up Bid, or, if the Auction is held, any purchase agreement with the Successful Bidder or the Next Highest Bidder, including the transfer of the Townhouse to the Successful Bidder or the Next Highest Bidder, free and clear of all Liens and interests pursuant to sections 363(f), 1123, and 1141(c), as applicable, of the Bankruptcy Code.  Failure to object shall constitute consent for the purposes of sections 363(f), 1123, and 1141(c), as applicable, of the Bankruptcy Code.**

27.    The deadline to file any replies to Sale Objections is February 5, 2026 at 12:00 p.m. (prevailing Eastern Time).

## ADDITIONAL PROVISIONS

28.    The terms and conditions of this Order shall be effective immediately upon its entry.

29.    Notwithstanding the applicability of Bankruptcy Rule 6004(h) or any other provision of the Bankruptcy Rules or Local Rules stating to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

30.    The Trustee is authorized and empowered to take such steps, incur and pay such costs and expenses, and do such things as may be reasonably necessary to fulfill the notice requirements established by this Order.

31.    Entry of this Order shall in no way impair the ability of the Court, United States Trustee, or the Trustee to implement or enforce other orders of the Court entered in the Chapter 11 Case, and all such orders shall continue in full force and effect.

32.    This Court shall retain exclusive jurisdiction over any matter or dispute arising from or relating to the implementation, interpretation, or enforcement of this Order.

DATED:  New York, New York
          [___], 2026

_____
HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Notice of Auction and Sale Hearing**

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Brian F. Moore
Martha E. Martir

*Attorneys for Albert Togut,*
*Not Individually But Solely in*
*His Capacity as Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                               :

In re:                        :          Chapter 11
                               :

PEGGY NESTOR,        :          Case No. 23-10627 (MEW)
                               :

                  Debtor.    :

------------------------------------------------------------x

## NOTICE OF SALE, BIDDING PROCEDURES, AUCTION AND SALE HEARING

      On January [_], 2026, Albert Togut, not individually but solely in his capacity as Chapter 11 trustee (the "Trustee") of the estate (the "Estate") of Peggy Nestor (the "Debtor"), the debtor in the above-captioned Chapter 11 case (the "Chapter 11 Case"), filed with the United States Bankruptcy Court for the Southern District of New York the ("Bankruptcy Court") an application [Docket No. [__]] (the "Application")[1] for the entry of an order (the "Modified Sale Procedures Order"), among other things,: (a) approving modifications to the *Sale Procedures*, as amended [Docket Nos. 78-1, 261] (the "Initial Sale Procedures"), as described in the Application (such modifications, the "Modified Sale Procedures" and, together with the Initial Sale Procedures, the "Sale Procedures"); (ii) authorizing the Trustee to designate a "stalking horse bidder"; (iii) approving certain protections for the stalking horse bidder; (iv) setting the deadline for potential bidders to submit a proposal (the "Bid Deadline") to purchase the real property at 15 East 63rd Street, New York, New York 10065 (the "Townhouse"), scheduling an auction (the "Auction"), and scheduling the hearing (the "Sale Hearing") with respect to approval of the sale of the Townhouse to the Successful Bidder or the Next Highest Bidder (the "Sale"); and (iv) authorizing and approving the form and manner of the Notice of Auction and Sale Hearing.

      On [__], 2026, the Bankruptcy Court entered the Modified Sale Procedures Order [Docket No. [__]] approving, among other things, the Modified Sale Procedures, which establishes key dates and times related to the Auction, the Sale, and the Sale Hearing. All

---

[1] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Application or Sale Procedures, as applicable.

interested bidders should carefully read the Modified Sale Procedures Order and the Sale Procedures in their entirety.[2]

## Stalking Horse Bid

A binding stalking horse bid has been submitted by 63rd St Townhouse LLC (the "Stalking Horse Bidder").  On December 29, 2025, the Trustee executed a purchase agreement with the Stalking Horse Bidder (as amended on January 9, 2026) (the "Stalking Horse Agreement") for the purchase of the Townhouse (the "Stalking Horse Bid").[3]  The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and provisions of the Sale Procedures.

## The Back-Up Bid

A binding bid has been submitted by Yingkai Xu (the "Back-Up Bidder").  On January 7, 2025, the Trustee executed a purchase agreement with the Back-Up Bidder (the "Back-Up Agreement") for the purchase of the Townhouse (the "Back-Up Bid").[4]  The Back-Up Bid shall serve as the Next Highest Bid unless an Auction is held and the Trustee determines in his business judgment to change such designation in accordance with the Sale Procedures.

## Important Dates and Deadlines

- **Bid Deadline**.  Any person or entity interested in participating in the Auction for the sale of the Townhouse must submit a Qualifying Bid on or before **January 26, 2026 at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").  For the avoidance of doubt, this Bid Deadline applies to any person or entity seeking to exercise a right to purchase the Townhouse pursuant to Section 363(i) of the Bankruptcy Code.

- **Auction**.  If the Trustee receives more than one Qualifying Bid (in addition to the Stalking Horse Bid, the Back-Up Bid, and the Lynx Credit Bid, if any), the Trustee will conduct an Auction, which has been scheduled for **January 28, 2026 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Phillips Nizer LLP, 485 Lexington Avenue, New York, New York  10117 or such other dates, time, and location as shall be timely communicated to all entities entitled to attend the Auction.

- **Sale Objection Deadline**.  Objections to the Sale (a "Sale Objection"), including any objections to the sale of the Townhouse free and clear of all claims and interests, must be (i) filed in accordance with the Modified Sale Procedures Order, (ii) filed with the Bankruptcy Court, and (iii) served on

---

[2]   To the extent of any inconsistencies between the Sale Procedures and the summary descriptions of the Sale Procedures in this notice, the terms in the Sale Procedures shall control in all respects.
[3]   The Stalking Horse Agreement is annexed to the Application as Exhibit A.
[4]   The Back-Up Agreement is annexed to the Application as Exhibit B.

the Objection Notice Parties (as defined herein) so as to be received on or before **February 4, 2026 at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Sale Objection Deadline</u>").

- **<u>Sale Hearing</u>**. A hearing to approve the Sale of the Townhouse to the Successful Bidder or the Next Highest Bidder will be held before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10007 on or before **February [_], 2026 at [__]:[__] [_].m. (prevailing Eastern Time)** or such other date as determined by the Bankruptcy Court (the "<u>Sale Hearing</u>").

The Trustee intends to close the Sale pursuant to a chapter 11 plan of reorganization (the "<u>Plan</u>") and intends to seek confirmation thereof at a hearing subsequent to the Sale Hearing. The Trustee will provide parties with notice of the filing of the Plan and related objection deadlines once the Plan is filed, in accordance with any procedures that may be approved by the Bankruptcy Court in connection therewith. The Sale Hearing may be adjourned or continued to a later date by the Trustee, after consultation with the Successful Bidder by filing a notice on the electronic docket in the Chapter 11 Case and by serving such notice on the Sale Notice Parties and all Qualified Bidders. No further notice of any such adjournment or continuance will be required to be provided to any party.

<u>**Filing Objections**</u>

Sale Objections, if any, must (i) be in writing, (ii) state with specificity, the legal and factual bases thereof, (iii) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (iv) be filed with the Court no later than the Sale Objection Deadline, and (v) be served on (a) counsel for the Trustee, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119, Attn: Brian F. Moore, Esq. (bmoore@teamtogut.com) and Martha E. Martir, Esq. (mmartir@teamtogut.com); (b) counsel for the Stalking Horse Bidder, Becker, Glynn, Muffly, Chassin & Hosinski LLP, 299 Park Avenue, 16th Fl., New York, New York 10171, Attn: Alec P. Ostrow, Esq. (aostrow@beckerglynn.com); (c) counsel to the Back-Up Bidder, Romer Debbas LLP, Attn: Jonathan Helfer, Esq. (jhelfer@romerdebbas.com); (d) counsel to Lynx, McGrail & Bensinger LLP, 999-C 8th Avenue #107, New York, New York 10019, Attn: Ilana Volkov, Esq. (ivolkov@mcgrailbensinger.com); (e) counsel to the Surrogate Parties, including (i) counsel to the Receiver, Westerman Ball Ederer Zucker & Sharfstein LLP, 1201 RXR Plaza, Uniondale, New York, Attn: Jeffrey A. Miller, Esq. (jmiller@westermanllp.com); (ii) counsel to the Cassini Executors, Farrell Fritz, P.C., 400 RXR Plaza, Uniondale, NY 11556, Attn: Patrick Collins, Esq. (pcollins@farrellfritz.com); (iii) counsel to the Public Administrator, Mahon, Mahon, Kerins & O'Brien, LLC, 254 Nassau Boulevard, Garden City, New York 11530, Attn: Kenneth P. Mahon, Esq. (kmahon@mmkolaw.com) and Heather Callaghan, Esq. (hcallaghan@mmkolaw.com); (f) the Office of the United States Trustee (Daniel.Rudewicz@usdoj.gov); and (g) all other parties who have filed a Notice of Appearance in the Chapter 11 Case (collectively, the "<u>Objection Notice Parties</u>").

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE MODIFIED SALE PROCEDURES ORDER BY THE SALE OBJECTION DEADLINE SHALL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING ANY OBJECTION TO THE APPLICATION, THE SALE ORDER, THE PROPOSED SALE TRANSACTION, OR THE TRUSTEE'S CONSUMMATION OF THE STALKING HORSE BID, THE BACK-UP BID OR ANY OTHER AGREEMENT EXECUTED BY THE TRUSTEE AND A SUCCESSFUL BIDDER OR NEXT HIGHEST BIDDER.**

## Additional Information

The Sale Procedures set forth the requirements for becoming a Qualifying Bidder and submitting a Qualified Bid, and any party interested in making an offer to purchase the Townhouse  must comply with the Sale Procedures. Only Qualified Bids will be considered by the Trustee, in accordance with the Sale Procedures.

Any party interested in submitting a bid should contact the Trustee's real estate broker, Brown Harris Stevens Residential Sales, LLC (Attn: Sami Hassoumi (shassoumi@bhsusa.com)) and legal advisor, Togut, Segal & Segal LLP (Attn: Brian F. Moore (bmoore@teamtogut.com) and Martha E. Martir (mmartir@teamtogut.com)), as soon as possible but no later than January 26, 2026 at 4:00 p.m. (prevailing Eastern Time).

Copies of the Application, the Modified Sale Procedures Order, the Sale Procedures Order, and the Sale Procedures, as well as all related exhibits, the Stalking Horse Bid, and all other agreements filed with the Court may be requested by email at mmartir@teamtogut.com.

Dated:  New York, New York
      January [__], 2026

ALBERT TOGUT, not individually but solely
in his capacity as Chapter 11 Trustee,
By His Attorneys,
TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Draft*
BRIAN F. MOORE
MARTHA E. MARTIR
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

**Exhibit E**

**Sale Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x
                         :

In re:                       :        Chapter 11
                         :

PEGGY NESTOR,         :        Case No. 23-10627 (MEW)
                       :

              Debtor.    :
                       :

--------------------------------------------------------------x

## ORDER APPROVING SALE OF PROPERTY

Upon the application (the "Application")[1] of Albert Togut, not individually but solely in his capacity as Chapter 11 trustee (the "Trustee") of the estate (the "Estate") of Peggy Nestor (the "Debtor"), the debtor in the above captioned case, for entry of an order authorizing the Trustee's sale (the "Sale") of 15 East 63rd Street, New York, NY 10065 (the "Townhouse") to 63rd St Townhouse LLC (the "Purchaser"), pursuant to the Court's prior order [Adv. Pro. No. 23-01195 (MEW), Docket No. 18] (the "363(h) Order") directing the sale of the Townhouse pursuant to section 363(h) of title 11 of the United States Code (the "Bankruptcy Code"), the Fixtures Order and Judgment [Adv. Pro. No. 25-01037 (MEW), Docket Nos. 64, 65], and sections 105(a) and 363(f) and (m) of the Bankruptcy Code, Rules 2002, 6004, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules");  and this Court having reviewed the Application and the form of Purchase Agreement for the Townhouse attached to the Application as **Exhibit A** (the "Purchase Agreement");  and upon the declarations of Brian F. Moore and Sami Hassoumi annexed to the Application as **Exhibits E** and **F**, respectively;  and upon the 363(h) Order, the Fixtures Order and Judgment, and this Court's prior orders approving the

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Application except where indicated otherwise.

bidding procedures in connection with the Sale [Docket Nos. 78, 261, [__]] (the "Sale Procedures Order");  and good and sufficient notice of the Application and the Sale Procedures Order having been given to all parties entitled thereto;

NOW, THEREFORE, upon the record of the hearing on the Application (the "Sale Hearing") and upon all of the prior pleadings and proceedings in this case, and after due deliberation thereon and good cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      This Court has jurisdiction over the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this case and the Application in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Application are sections 105(a), 330 and 363 of the Bankruptcy Code, and Bankruptcy Rules 2002 and 6004.

C.      Proper, timely, adequate and sufficient notice of the Application and the relief requested therein, the Sale Hearing, the Sale, and the transaction described in the Purchase Agreement has been provided by the Trustee in accordance with section 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9006, and Local Rules 2002-1 and 6004-1.  Waiver of Local Rule 6004-1(h) is reasonable and appropriate.

D.      As demonstrated by (i) testimony and/or other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Trustee has extensively marketed the Townhouse, the Purchase Agreement was tested through competitive bidding, and the offer made by the Purchaser is the highest and best bid made to the Trustee for the Townhouse.

E.      Creditors, parties-in-interest and other entities have been afforded a reasonable opportunity to bid for the purchase of the Townhouse.  A reasonable opportunity to object or be heard regarding the Application and the relief requested therein has been afforded to all interested persons and entities.

F.      The Trustee has the authority to consummate the Sale pursuant to the Purchase Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Trustee to consummate the Sale.

G.      Approval of the Purchase Agreement and consummation of the Sale are in the best interests of the Estate, its creditors, and other parties-in-interest.

H.      The Trustee has demonstrated (i) good, sufficient, and sound business purpose and justification and (ii) compelling circumstances for the Sale pursuant to sections 363(b), (f), and (h) of the Bankruptcy Code.

I.      The Purchase Agreement was negotiated, proposed and entered into by and between the Trustee and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  There is no evidence suggesting that the Trustee or the Purchaser have engaged in any conduct that would cause or permit the avoidance of the Purchase Agreement or the consummation of the Sale, or the imposition of costs or damages under section 363(n) of the Bankruptcy Code.

J.      The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby in that:  (a) the Purchaser recognized that the Trustee was free to deal with any other party interested in a transaction regarding the Sale;  (b) the Purchaser agreed to provisions in the applicable Purchase Agreement that would enable the Trustee to accept a higher or better offer in respect of the Sale;  (c) the Purchaser made the highest or best offer in respect of the Townhouse;  (d) all payments to be made by or to the

3

Purchasers and other agreements or arrangements entered into by the Purchaser in connection with the transaction have been disclosed; and (e) the negotiation and execution of the Purchase Agreement and any other agreements or instruments related thereto were in good faith and constitute arm's-length transactions between the Purchaser and the Trustee. The Purchaser has acted in good faith and will continue to be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transaction contemplated by the Purchase Agreement.

K.      The terms and conditions of the Purchase Agreement are fair and reasonable. The consideration provided by the Purchaser for the Townhouse pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest or best offer for each of the Townhouse, (iii) will provide a greater recovery for the Estate than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law.

M.      Neither the Trustee nor the Purchaser are or will be liable to any agent, broker, person or firm acting or purporting to act on behalf of either the Trustee or the Purchaser for any commission, broker's fee or finder's fee respecting the Sale, except as provided for in the Purchase Agreement and this Order.

N.      The Townhouse constitutes property of the Debtor's estate and, pursuant to the 363(h) Order, the Trustee is authorized to sell the Townhouse, notwithstanding any interest that may or may not be held by Marianne Nestor, with issues regarding the allocations of sales proceeds to secured creditors, to the Estate and/or to Marianne Nestor, if any, to await further determinations. The transfer of the Townhouse by the Trustee to the Purchaser will be a legal, valid, and effective transfer of the Townhouse, and will vest the Purchaser with all right, title, and interest of the Debtor (and, if applicable, Marianne Nestor) in and to the Townhouse free and clear of

4

all liens, claims, interests, obligations, rights, charges and encumbrances, except as expressly provided for in the Purchase Agreement.  After the Closing of the Sale under the Purchase Agreement, the applicable Purchaser shall have no liability for any claims asserted against or liabilities of the Debtor, the Estate or, for the avoidance of doubt, Marianne Nestor.

O.    The Trustee may sell the Townhouse free and clear of all liens, claims and interests of other parties (collectively, "Liens, Claims and/or Interests") to the fullest extent permitted by section 363(f) of the Bankruptcy Code and except as otherwise provided in the Purchase Agreement because (a) parties who received notice and who did not object to the sale have waived the right to object, and (b) non-debtor parties with Liens, Claims and/or Interests can be compelled to accept a monetary satisfaction of their liens, claims or interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

P.    The Sale of the Townhouse is exempt from any and all real estate transfer taxes, as it is a conveyance pursuant to the Bankruptcy Code and a plan filed in the Debtor's case.  Specifically, the Sale of the Townhouse is essential to the consummation of the *Chapter 11 Plan for the Bankruptcy Estate of Peggy Nestor as Proposed by the Chapter 11* Trustee, dated as of September 17, 2024 [Docket No. 327] (as may be subsequently amended, supplemented or otherwise modified from time to time, the "Plan"), and such tax exemption is allowed pursuant to section 1146(a) of the Bankruptcy Code and is deemed to be a transfer under a plan confirmed under section 1129 of the Bankruptcy Code, subject in all respects to this Court's entry of an Order confirming the Plan.  Purchaser shall not be responsible for payment of any transfer taxes.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

5

**General Provisions**

1.      The Application is GRANTED to the extent set forth herein.

2.      The findings of fact set forth above and conclusions of law set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this case pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.      All objections, if any, to the Application or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case, all parties which asserted such objections and reservations of rights are enjoined from taking any action against the Trustee or the Purchaser or any other purchaser of the Townhouse, their affiliates or any agent of the foregoing in any manner including, without limitation, to recover any claim which such person or entity has solely against the Debtor, the Estate, or Marianne Nestor.

**Approval of the Purchase Agreement**

4.      The Sale, and all of the terms and conditions and transactions contemplated by the Purchase Agreement are hereby authorized and approved pursuant to sections 105(a) and 363 of the Bankruptcy Code.

5.      Pursuant to sections 363 of the Bankruptcy Code, the Trustee is authorized to consummate the Sale pursuant to and in accordance with the terms and conditions of the Purchase Agreement and shall at all times act in accordance with the terms thereof and this Order.

6.      The Trustee is authorized to expend such funds and he and his retained attorneys are authorized to execute and deliver, and empowered to perform

6

under, consummate, and implement the Purchase Agreement, together with all
additional instruments and documents that may be reasonably necessary, convenient or
desirable to implement the Purchase Agreement and consummate the Sale pursuant
thereto and effectuate the provisions of this Order and the transaction approved hereby,
and to take all other actions as may be necessary for the purpose of assigning,
transferring, granting, conveying and conferring to the Purchaser, the Townhouse, as
may be necessary or appropriate to the performance of the obligations as contemplated
by the Purchase Agreement and this Order.

### Transfer of the Townhouse

7.    Except as expressly provided in the Purchase Agreement, pursuant
to sections 105(a) and 363(f) and (h) of the Bankruptcy Code, upon the closing of the
Sale (the "Closing"), the Townhouse (and good and marketable title to such) and all of
the attendant respective rights, title and interest therein shall be transferred to the
Purchaser free and clear of all Liens, Claims and/or Interests to the fullest extent
permitted by sections 363(f) and (h) of the Bankruptcy Code, including, without
limitation, tax liens, with all such Liens, Claims and/or Interests to attach to the net
cash proceeds of the Sale of the Townhouse in the order of their priority, with the same
validity, force and effect which they now have as against the Townhouse, subject to any
claims and defenses, setoffs or rights of recoupment that the Trustee or the Estate may
possess with respect thereto.

8.    To the fullest extent permitted by section 363(f) of the Bankruptcy
Code, and except as expressly provided in the Purchase Agreement, all persons and
entities holding Liens, Claims and/or Interests against, in or with respect to the Trustee,
the Debtor's Estate and/or the Townhouse arising or accruing under or pursuant to the
Debtor's ownership of the Townhouse are forever barred, estopped, and permanently
enjoined from asserting such persons' or entities' Liens, Claims and/or Interests against

7

the Townhouse, against the Purchaser or any of the Purchaser's successors or assigns. Following the Closing of the Sale under the Purchase Agreement, no holder of such a Lien, Claim and/or Interest, including, without limitation the Debtor, Marianne Nestor, or any relative of the Debtor, shall interfere with the Purchaser's title to, or use and enjoyment of, the Townhouse based on or related to such Lien, Claim and/or Interest or any actions that the Trustee has taken or may take in this Chapter 11 Case.  To the fullest extent permitted by sections 363(f) and (h) of the Bankruptcy Code, and effective upon the Closing, the Purchaser shall have no liability for any Claims (as defined in section 101(5) of the Bankruptcy Code) or interests against the Trustee or the Estate concerning the Townhouse.

9.    The transfer of the Townhouse to the Purchaser pursuant to the Purchase Agreement constitutes a legal, valid, and effective transfer of the Townhouse, and shall vest the Purchaser with all right, title, and interest of the Debtor (and, if applicable, Marianne Nestor) in and to the Townhouse.

**Additional Provisions**

10.    Without limiting the other terms of this Order, prior to or upon the Closing, the Debtor, Marianne Nestor, and each of their respective creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release their interests, if any, in the Townhouse as such Liens, Claims and/or Interests may have been recorded or may otherwise exist.

11.    Except as expressly provided in the Purchase Agreement, this Order shall be (a) effective as a determination that, upon the Closing, all Liens, Claims and/or Interests existing with respect to the Townhouse prior to the Closing have been released, discharged and terminated as to the Purchaser and the Townhouse, and that the conveyances described herein have been effected, and (b) binding upon all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of

8

deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Townhouse.

12.    Each and every federal, state, and local governmental agency or department or office is hereby directed to accept this Order and any and all documents and instruments necessary and appropriate to consummate the transaction contemplated by the Purchase Agreement.

13.    The Purchaser and/or the Trustee are hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims and/or Interests in, against or regarding the Townhouse.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office.

14.    The Townhouse shall be conveyed by the Trustee to, and accepted by the Purchaser, "AS IS", "WHERE IS", "WITHOUT FAULTS", "WITHOUT ANY EXPRESS OR IMPLIED WARRANTY OR REPRESENTATION OF ANY KIND", except as expressly provided in the Purchase Agreement and this Order.  Without limiting the generality of the foregoing, neither the Trustee nor any other person or entity makes any warranty or representation regarding the condition, working order, existence, quantity or location of such assets, and the Purchaser shall have no recourse and may not assert any claim against the Trustee, or the his representatives, based on any such warranty or representation.

15.     Notwithstanding the applicability of Bankruptcy Rule 6004(h) or any other provision of the Bankruptcy Rules or Local Rules stating to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

16.     Notwithstanding the applicability of Local Rule 6004-1(h) or any other provision of the Bankruptcy Rules or Local Rules stating to the contrary, the requirement for publication notice is hereby waived.

17.     This Court hereby retains exclusive jurisdiction, regardless of whether a Chapter 11 plan has been confirmed and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement this Order, the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects including, but not limited to, retaining jurisdiction to (a) compel compliance with this Order and the Purchase Agreement, (b) resolve any dispute, controversy or claim arising under or related to the Purchase Agreement, or the breach thereof and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

18.     Nothing contained in any plan confirmed in this Chapter 11 Case or any order of this Court confirming such plan shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order.

19.     Entry of this Order shall in no way impair the ability of the Court, United States Trustee, or the Trustee to implement or enforce other orders of the Court entered in the Debtor's case, and all such orders continue in full force and effect.

20.     The transaction contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the

10

Bankruptcy Code.  The Purchaser is a purchaser in good faith of the Townhouse and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Purchaser.

21.    The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of the Trustee, the Estate, the Purchaser, and any of such parties' respective affiliates, designees, successors, and assigns, and shall be binding in all respects upon all of the Estate's creditors, all prospective and actual bidders for the Townhouse, and all persons and entities receiving notice of the Application, and/or the Sale Hearing notwithstanding any subsequent appointment of any examiner(s), plan trustee/representative, or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor, her Estate, her creditors, or any examiner(s) or receiver(s).

22.    The Broker Commissions are fixed and awarded in the amounts of: (a) $[680,000], payable to BHS and (b) $[680,000] payable to The Corcoran Group ("Corcoran"), and the Trustee is authorized and directed to pay and satisfy the Broker Commissions to BHS and Corcoran from the proceeds of the Sale without further Order of this Court.

23.    The failure specifically to include any particular provision of either of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that each Purchase Agreement be authorized and approved in its entirety.

11

24.     The Purchase Agreement and any related agreements, documents, or other instruments may be further modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

DATED:  New York, New York
          [_____], 2026

_____
HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit F</u>**

**Moore Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                               :

In re:                          :        Chapter 11
                                 :

PEGGY NESTOR,          :        Case No. 23-10627 (MEW)
                               :

               Debtor.    :
                               :
--------------------------------------------------------------x

**DECLARATION OF BRIAN F. MOORE IN SUPPORT
OF TRUSTEE'S APPLICATION FOR (I) AN ORDER
APPROVING (A) MODIFICATIONS TO SALE PROCEDURES,
(B) DESIGNATION OF STALKING HORSE BIDDER AND APPROVAL
OF STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION
AND SALE HEARING, AND (D) FORM AND MANNER OF NOTICE
OF SALE, AUCTION, AND SALE HEARING;  AND (II) AN ORDER
APPROVING THE SALE OF TOWNHOUSE PURSUANT TO BANKRUPTCY
SECTION 363(H) ORDER AND BANKRUPTCY CODE SECTION 363(F)
AND (B) PAYMENT OF BROKER COMMISSION FROM SALE PROCEEDS**

        Under 28 U.S.C. § 1746, I, Brian F. Moore**,** declare as follows under

penalty of perjury:

        1.      I am a Partner of Togut, Segal & Segal, LLP, counsel for Albert

Togut, Chapter 11 trustee (the "Trustee") of the estate (the "Estate") of Peggy Nestor

(the "Debtor"), the debtor in the above-captioned case.

        2.      I submit this Declaration (the "Declaration") in support of the

Trustee's application (the "Application")[1] for entry of an order authorizing, among

other things, modification to the existing sale procedures, approval of bid protections,

and sale of the real property located at 15 East 63rd Street, New York, NY 10065 (the

"Townhouse").

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the
    Application.

3.     Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, privileged discussions with the Trustee and his retained professionals, and/or my opinion based upon my experience, knowledge and information concerning the Debtor and its Estate. If called upon to testify, I would testify competently to the facts set forth herein.

4.     On December 15, 2023, the Court entered an order (the "Sotheby's Retention Order") [Docket No. 77] and authorized the Debtor to retain Sotheby's International Realty ("Sotheby's") as her broker to assist with the marketing and sale of the Townhouse pursuant to an exclusive listing agreement (the "Sotheby's Listing Agreement").  When he was appointed, the Trustee inherited the Sotheby's Listing Agreement.

5.     Despite being retained on December 15, 2023, the Debtor and Marianne Nestor's documented interference prevented Sotheby's from effectively marketing the Townhouse until shortly after the Trustee took possession of the Townhouse on April 30, 2024 (the "Turnover Date").

6.     From and after the Turnover Date, Sotheby's extensively marketed the Townhouse and identified and contacted, through e-mail, correspondence and/or telephone calls, numerous brokers and potential buyers for the Townhouse.  Sotheby's marketing efforts yielded significant interest in the Townhouse.  The Sotheby's Listing Agreement expired on December 15, 2024 without any acceptable offers or a signed contract of sale.

7.     After the Sotheby's Listing Agreement expired without an acceptable offer having been made, the Trustee obtained entry of an order authorizing

him to retain Brown Harris Stevens Residential Sales, LLC ("BHS"), as his broker to assist with the sale of the Townhouse [Docket No. 516].

8.    The Trustee selected BHS to act as his real estate broker because the unique expertise and experience of one of its brokers, Sami Hassoumi, who specializes in the sale of premiere townhouses in New York City on the upper east side of Manhattan, the neighborhood where the Townhouse is located.  In selecting Mr. Hassoumi, the Trustee determined that he was the most qualified of all of the brokers that the Trustee considered and interviewed.

9.    After weeks of constructive dialogue and extensive negotiations, the Trustee received (via BHS) a binding $34.5 million cash bid from 63rd St Townhouse LLC (the "Stalking Horse Bidder") for the Townhouse and, on December 29, 2025, executed a purchase agreement, which was amended on January 9, 2026 (the "Stalking Horse Agreement").

10.    Following discussions with BHS and the Trustee's professionals, the Trustee determined that (a)(i) the Stalking Horse Bidder's offer is the highest and best offer, and (ii) bidder Yingkau Xu's (the "Back-Up Bidder") offer of $34.1 million (the "Back-Up Bid"), as reflected in purchase agreement annexed to the Application as **Exhibit B** (the "Back-Up Agreement"), was the second highest offer, that have been made for the Townhouse to date, (b) it was prudent to enter into the Stalking Horse Agreement, subject to court approval, (c) the Stalking Horse Bidder's offer and the Stalking Horse Agreement should be accepted as the "stalking horse bid", and (d) the Back-Up Bid should serve as the Next Highest Bid unless an Auction is held and the Trustee determines in his business judgment to change such designation in accordance with the Sale Procedures.

11.     The Stalking Horse Agreement, including the Stalking Horse Bid Protections, is the result of arm's-length, good-faith negotiations between the Trustee and the Stalking Horse Bidder, and each of them have been represented by their respective professionals.  The Back-Up Agreement is the result of arm's length, good faith negotiation between the Trustee and the Back-Up Bidder, and each of them have been represented by their respective professionals.

12.     The Stalking Horse Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse Agreement.

13.     The Stalking Horse Bidder and the Back-Up Bidder were always aware that at least one other party had submitted a competing bid to purchase the Townhouse.

14.     Upon information and belief, the Stalking Horse Bidder and the Back-Up Bidder are not an "insider" or "affiliate" of the Debtor or the Trustee, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder, the Back-Up Bidder, the Debtor, or the Trustee.


I declare under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on January 10, 2026
New York, New York

 /s/ Brian F. Moore
Brian F. Moore

## Exhibit G

**Hassoumi Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                    :
In re:                                              :        Chapter 11
                                                    :
PEGGY NESTOR,                                       :        Case No. 23-10627 (MEW)
                                                    :
                              Debtor.               :
                                                    :
-----------------------------------------------------------------x

## DECLARATION OF SAMI HASSOUMI IN SUPPORT
## OF TRUSTEE'S APPLICATION FOR ENTRY OF ORDER
## APPROVING SALE OF TOWNHOUSE PURSUANT TO
## SECTION 363(h) ORDER AND BANKRUPTCY CODE SECTION 363(f)

Sami Hassoumi, being duly sworn, states the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am a licensed broker with Brown Harris Stevens Residential Sales, LLC ("BHS").  I have been a broker with BHS since 1996.  I submit this Declaration (the "Declaration") in support of the Trustee's application (the "Application")[1] for entry of an order authorizing the Trustee's sale of the real property located at 15 East 63rd Street, New York, NY 10065 (the "Townhouse").

2.      Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

## QUALIFICATIONS

3.      BHS is a licensed real estate brokerage firm that specializes in transactions concerning luxury real estate since its founding in 1873.  BHS has brokers in fifteen office locations in New York City, and has offices throughout the United States.  BHS and I have substantial expertise in the disposition of residential single

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Application.

family homes in New York City, including in the upper east side neighborhood of New

York City, where the Townhouse is located.  Specifically, I have previously sold these

upper east side townhouses:

- 36 East 63rd Street, New York, NY 10065 (closing on February 15, 2026);
- 121 East 64th Street, New York, NY 10065;
- 161 East 64th Street, New York, NY 10065;
- 7 East 67th Street, New York, NY 10065 (twice);
- 14 East 67th Street, New York, NY 10065;
- 115 East 70th Street, New York, NY 10021;
- 10 East 73rd Street, New York, NY 10021;
- 12 East 73rd Street, New York, NY 10021 (twice);
- 18 East 73rd Street, New York, NY 10021 (three times);
- 4 East 75th Street, New York, NY 10021 (twice);
- 8 East 75th Street, New York, NY 10021;
- 17 East 75th Street, New York, NY 10021;
- 12 East 76th Street, New York, NY 10021 (twice);
- 156 East 78th Street, New York, NY 10075;
- 19 East 82nd Street, New York, NY 10028;
- 9 East 84th Street, New York, NY 10028;  and
- 15 East 88th Street, New York, NY 10128.

### THE MARKETING PROCESS

4.    On February 13, 2025, the Court entered its Order (the "BHS

Retention Order") approving the employment and retention of BHS as broker to the

Trustee to assist in the marketing and sale of the Townhouse *nunc pro tunc* to January

10, 2025 [Docket No 516].  Pursuant to the exclusive listing agreement between BHS and

the Trustee (as amended, the "BHS Listing Agreement") [Docket No. 493, Ex. B], I was

designated as the BHS agent representing the Townhouse and responsible for BHS's

responsibilities under the BHS Listing Agreement.[2]

---

[2]    The term of the BHS Listing Agreement was extended to December 29, 2025 [Docket No. 807].  On January 5, 2026, the Trustee filed an application seeking to further extend the listing agreement to March 29, 2026 [Docket No. 818].

5.    I understand that prior to the entry of the BHS Retention Order, Sotheby's International Realty ("Sotheby's") was retained to assist in the marketing and sale of the Townhouse.  I understand that Sotheby's initially listed the Townhouse for sale at a price of $65 million, which was subsequently reduced incrementally over a nine-month period.  I further understand that Sotheby's exclusive listing agreement with the Trustee expired during December 2024 without any acceptable offers or a signed contract of sale for the Townhouse.

6.    Prior to listing the Townhouse for sale, BHS was asked by the Trustee to prepare a price analysis of the Townhouse.  To properly evaluate the Townhouse for its marketability and value, BHS performed an on-site inspection of the Townhouse.  BHS also arranged for our architectural photographers to photograph the listing from all angles, and prepare marketing materials that reflected and promoted the unique character of the Townhouse.  Additionally, BHS worked with a floorplan drafter to develop a high quality floorplan draft of the Townhouse, and a lighting expert to add lighting to accentuate the attributes of the Townhouse.

7.    Based upon market conditions, and after consultation with the Trustee and Lynx Asset Services, LLC, the Townhouse was listed for sale by BHS at $39,500,000 million.

8.    Following listing the Townhouse for sale, BHS, among other things: (a) identified and contacted numerous brokers and potential buyers for the Townhouse, through direct e-mail correspondence and/or telephone outreach;  and (b) prepared and distributed marketing advertisements, including paid print advertising multiple times in *The New York Times*, *The Wall Street Journal*, and *Luxury Portfolio.*

9.      Additionally, BHS posted marketing information regarding the Townhouse on its own website, on the websites of BHS's partners through BHS Partnering Worldwide, and on websites syndicated by the NYC Residential Listing Service (RLS).  BHS also arranged for the listing of the Townhouse to appear in the following real estate marketing websites:  *Unique Homes*, *The Wall Street Journal*, *Robb Report*, *UPMKT*, *Mansion Global*, *Barron's*, *Market Watch*, and *Properstar*.  All of the above forms of listing were designed to expose the Townhouse to millions of prospective bidders, and thousands of brokers worldwide.

10.      To date, BHS has shown the Townhouse to interested parties approximately 60 times during the period from February 2025 through January 2026. Prospective bidders from around the world have visited and inspected the Townhouse, often on more than one occasion, and with their brokers, architects, expeditors and other representatives.

11.      On November 11, 2025, BHS received an offer by 63rd St Townhouse LLC (the "Stalking Horse Bidder") of $34,000,000, which, on January 6, 2026, was increased to $34,500,000 million, to purchase the Townhouse free and clear of liens and encumbrances on an "as is, where is" basis without any representations or warranties, to be paid in cash at closing without any financing contingencies.  The terms of the proposed sale are set forth in a contract of sale entered into by and between the Trustee and the Stalking Horse Bidder on December 29, 2025 (as amended on January 9, 2026) (the "Stalking Horse Agreement").  Prior to the Stalking Horse Bidder's offer, BHS has received multiple offers, none of which were Qualifying Bids that exceeded the value of the Stalking Horse Bidder's offer and/or resulted in a binding written purchase agreement.

12.     On December 31, 2025, BHS received an offer by Yingkai Xu (the "Back-Up Bidder") of $34,100,000 to purchase the Townhouse free and clear of liens and encumbrances on an "as is, where is" basis without any representations or warranties, to be paid in cash at closing without any financing contingencies.  The terms of the proposed sale are set forth in a contract of sale entered into by and between the Trustee and the Back-Up Bidder on January 7, 2026.

13.     Consistent with the Trustee's instructions, I continued to show the Townhouse and make it available for showings and bids after receipt of the offer made by the Stalking Horse Bidder.

14.     Based on my extensive experience, I believe that the Townhouse has been appropriately and extensively marketed, and that the offer submitted by the Stalking Horse Bidder reflects the highest and best offer available in the market for the Townhouse at this time.

I declare under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on January 10, 2026
New York, New York

/s/ Sami Hassoumi
SAMI HASSOUMI