ACCEPTANCES OR REJECTIONS WITH RESPECT TO THE PLAN WILL BE SOLICITED PURSUANT TO THIS DISCLOSURE STATEMENT, WHICH THE BANKRUPTCY COURT HAS YET TO APPROVE ON A PROVISIONAL BASIS AND WHICH REMAINS SUBJECT TO FINAL APPROVAL AT THE COMBINED HEARING.  THE TRUSTEE RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT. THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITIATION VERISON AND IS NOT INTENDED FOR SOLICITATION OF VOTES ON THE PLAN.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
|  | : |  |
| In re: | : | Chapter 11 |
|  | : |  |
| PEGGY NESTOR, | : | Case No. 23-10627 (MEW) |
|  | : |  |
| Debtor. | : |  |
------------------------------------------------------------------ x

**DISCLOSURE STATEMENT FOR
THE AMENDED CHAPTER 11 TRUSTEE'S PLAN**

Brian F. Moore, Esq.
Martha E. Martir, Esq.
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

*Counsel for Albert Togut,
not individually but solely in
his capacity as Chapter 11 Trustee*

**Dated: February 3, 2026**

**DISCLAIMER**

THIS DISCLOSURE STATEMENT RELATES TO THE CHAPTER 11 PLAN FOR THE BANKRUPTCY ESTATE OF PEGGY NESTOR AS PROPOSED BY ALBERT TOGUT, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE, AND HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  THE TRUSTEE IS THE PROPONENT OF THE PLAN.  THE PLAN SETS FORTH THE PROPOSED DISTRIBUTIONS CREDITORS OF THE DEBTOR WILL RECEIVE IN THE CHAPTER 11 CASE.

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR'S ASSETS AND ESTATE.  ALL SUCH HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, ANY EXHIBITS ANNEXED TO THE PLAN, AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE INDICATED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW.  THIS DISCLOSURE STATEMENT AND THE PLAN DESCRIBED HEREIN HAVE NOT BEEN REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER REGULATORY AUTHORITY, NOR HAVE THEY APPROVED, DISAPPROVED OR PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THE PLAN OR HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR IN THIS BANKRUPTCY CASE SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.  NO PERSON MAY GIVE ANY INFORMATION ON BEHALF OF THE TRUSTEE OR ESTATE REGARDING THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT

THE EXPRESS WRITTEN CONSENT OF THE TRUSTEE AND THE PARTY AGAINST WHOM SUCH INFORMATION IS SOUGHT TO BE ADMITTED.

THE PLAN PROVIDES FOR AN INJUNCTION AGAINST CERTAIN PARTIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS AGAINST THE DEBTOR, FOR A RELEASE OF CERTAIN PARTIES IN CONNECTION WITH THE PLAN, AND FOR THE EXCULPATION OF CERTAIN PARTIES INVOLVED IN THE CHAPTER 11 CASE.  PARTIES SHOULD THEREFORE BE AWARE THAT IF THE PLAN IS CONFIRMED AND IF THE EFFECTIVE DATE OF THE PLAN OCCURS, CERTAIN PARTIES WILL BE GETTING THE BENEFITS OF THE INJUNCTION, THE RELEASE AND EXCULPATION PROVISIONS AND CERTAIN PARTIES WILL BE BOUND BY THE INJUNCTION, RELEASE, AND EXCULPATION PROVISIONS AS SET FORTH IN ARTICLES 9.2, 9.3, AND 9.4 OF THE PLAN AND SECTIONS X.B, X.C, AND X.D OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE ESTATE.

ANY CAPITALIZED TERMS THAT ARE NOT OTHERWISE DEFINED IN THE DISCLOSURE STATEMENT ARE DEFINED IN THE PLAN.  IT IS RECOMMENDED THAT ONE REFER TO THOSE DEFINITIONS WHEN READING THIS DOCUMENT.

# TABLE OF CONTENTS

I.    Executive Summary ........................................................................................... 1

II.    Legal Requirements ......................................................................................... 2

    a.    Overview of Chapter 11 ........................................................................ 2

    b.    Summary of Classification and Treatment Under the Plan .................... 3

    c.    Voting ................................................................................................... 12

    d.    Confirmation......................................................................................... 12

    e.    Best Interests of Creditors Test ........................................................... 13

    f.    Feasibility of the Plan .......................................................................... 14

III.    Background ..................................................................................................... 15

    a.    Commencement of the Chapter 11 Case............................................... 15

    b.    Appointment of the Trustee .................................................................. 17

    c.    The Townhouse ..................................................................................... 18

    d.    The Sale and Auction Process .............................................................. 20

    e.    Postpetition Financing to Facilitate Maintenance and the Sale of the
    Townhouse ................................................................................................. 22

    f.    Sale of Personal Property ..................................................................... 23

    g.    Insurance Claims................................................................................... 23

IV.    The Debtor's Pre-Petition Secured Liabilities ............................................... 24

    a.    Emigrant Mortgage............................................................................... 24

    b.    The Lynx Mortgage.............................................................................. 24

    c.    The Prime Plus Mortgages.................................................................... 25

    d.    The Attachment Liens ........................................................................... 25

    e.    The Judgment Liens.............................................................................. 26

    f.    The Wenig Saltiel Judgment Lien ........................................................ 26

V.    Adversary Proceedings ................................................................................... 27

VI.      Means for Implementation and Execution ................................................ 34

    a.    The Rule 2004 Order and the Trustee's Investigation ........................... 34

    b.    Plan Funding ........................................................................... 34

    c.    Section 1123(a)(8) and Section 1129(a)(15) of the Bankruptcy Code .................. 36

    d.    Distributions on Account of Assets .................................................. 37

    e.    Tax Exemption ........................................................................ 37

    f.    Closing of the Chapter 11 Case ...................................................... 37

    g.    Powers and Duties of the Plan Administrator Under the Plan ......................... 38

    h.    Vesting of Assets ...................................................................... 40

    i.    No Liability ............................................................................. 40

    j.    Payment of Case Professionals for Post-Effective Date Services and
Reimbursement of Expenses ............................................................... 40

    k.    Direction to Parties ................................................................... 41

    l.    Exemptions ............................................................................ 41

    m.    Insurance ............................................................................. 41

    n.    Settlements ............................................................................ 41

    o.    Closing the Transaction, and Sections 363(i), 363(j), and 1146(a) ................. 42

    p.    General Settlement of Claims and Interests .......................................... 42

VII.     Distributions under the Plan .......................................................... 42

    a.    Distributions .......................................................................... 42

    b.    Manner of Payment Under the Plan ..................................................... 43

    c.    Payment Dates .......................................................................... 43

    d.    *De Minimis* Distributions ............................................................ 43

    e.    Unclaimed Distributions and Property ................................................. 43

    f.    Distributions Free and Clear .......................................................... 43

VIII.    Resolutions of Disputed Claims ........................................................ 44

a.    Objections ................................................................................................ 44

b.    Amendment of Claims ............................................................................ 44

c.    Reserve for Disputed Claims and Disputed Liens ................................. 44

d.    Claim Procedures Not Exclusive ........................................................... 45

IX.    Executory Contracts and Unexpired Leases .................................................. 45

a.    Assumption or Rejection of Executory Contracts and Unexpired Leases .......... 45

b.    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases ........................................................................................ 45

c.    Bar Date for Proofs of Claim Relating to Rejected Executory Contracts and Unexpired Leases ...................................................................... 45

d.    Reservation of Rights ............................................................................. 46

X.    Effect of the Confirmation Date, and, Surrender and Cancellation of Claims ...... 46

a.    Discharge ................................................................................................ 46

b.    Confirmation Date Injunction ................................................................ 46

c.    Releases by the Trustee and the Estate .................................................. 47

d.    Exculpation ............................................................................................ 48

e.    Release of Liens ..................................................................................... 48

XI.    Conditions Precedent to Confirmation Date and Effective Date of the Plan ........ 48

a.    Conditions to the Occurrence of the Confirmation Date. ...................... 48

b.    Conditions to the Occurrence of the Effective Date. ............................. 49

c.    Non-Occurrence of the Effective Date;  Non-Waiver of Conditions ..... 49

XII.    Reserved. ......................................................................................................... 50

XIII.    Retention of Jurisdiction ................................................................................. 50

XIV.    Risk Factors to be Considered ........................................................................ 52

a.    Failure to Confirm the Plan ................................................................... 52

b.    Classification and Treatment of Claims and Interests ............................ 52

c.    Risks of Failure to Satisfy Conditions Precedent .................................. 53

d.   Risks of the Transaction Failing to Consummate ..................................................... 53

e.   Risks Relating to Avoidance Actions and Other Causes of Action ..................... 53

f.   Risks Relating to the Allowance and Resolution of Claims ................................. 54

g.   Risks of Increased Administrative Expenses .......................................................... 54

h.   Risks Relating to the Timing of Distributions ....................................................... 54

i.   Risks of Adverse Court Rulings or Appeals .......................................................... 54

j.   Risks Relating to the Conduct or Non-Cooperation of the Debtor or
Related Parties ............................................................................................................... 54

k.   Risks Relating to Insurance Claims or Other Contingent Assets ....................... 54

l.   Risks Associated with Conversion to Chapter 7 ................................................... 55

XV.    Tax Consequence of the Plan ........................................................................................... 55

XVI.   Notices ................................................................................................................................. 56

## <u>EXHIBITS</u>

| | |
|---|---|
| **EXHIBIT 1** | **CHAPTER 11 PLAN** |
| **EXHIBIT 2** | **LIQUIDATION ANALYSIS** |

## I.    Executive Summary

Albert Togut, not individually but solely in his capacity as the trustee (the "Trustee") of the Chapter 11 Estate (the "Estate") of Peggy Nestor (the "Debtor"), debtor in the above-captioned case (the "Chapter 11 Case"), by and through his attorneys, Togut, Segal & Segal LLP (the "Togut Firm"), respectfully submits this Disclosure Statement pursuant to section 1125(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in connection with the *Amended Chapter 11 Trustee's Plan*, dated February 3, 2026 [Docket No. 865] (as may be amended, modified, or supplemented from time to time, the "Plan")[1] to all known Holders of Claims against, or Interests in, the Debtor's assets or the Estate, to disclose information that is material, important, and necessary to make a reasonably informed judgment about the Plan.  A true and complete copy of the Plan is attached to this Disclosure Statement as **Exhibit 1**.

The Debtor commenced this Chapter 11 Case in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court" or the "Court") to stay a foreclosure sale of the real property located at 15 East 63rd Street, New York New York 10065 (the "Townhouse"), which is the Debtor's primary asset.  As more fully described below, the Trustee has, among other things, taken possession of, and is marketing for sale, the Townhouse pursuant to an order of the Bankruptcy Court [Adv. Pro. No. 24-01342, Docket No. 8] after extensive motion practice and hearings in the Bankruptcy Court.  As of January 2026, the Trustee has identified multiple potential purchasers and on January 27, the Bankruptcy Court approved the modification of bid procedures to designate the purchaser with the highest and best bid as a stalking horse bidder, subject to higher and better bids, and scheduling an auction on February 19, 2026 at 2:00 p.m. (prevailing Eastern Time) and a hearing on February 25, 2026 at 11:00 a.m. (prevailing Eastern Time) for approval of the sale of the Townhouse to the bidder making the highest and best bid (the "Sale Transaction" or the "Transaction").  *See* [Docket No. 851].

Distributions to the Holders of Allowed Claims are predicated upon, and cannot occur until after, confirmation of the Plan and the closing of the Sale Transaction, which is one of the conditions to the occurrence of the Effective Date of the Plan.

The Plan provides for payment in full for Secured Claims, subject to the provisions of the Post-Petition Financing Order (defined below), as modified, and the amounts of 506(c) Charges and 363(j) Charges, as applicable, except to the extent the Holder of a Secured Claim accepts less favorable treatment (and subject to such variations as set forth in further detail in the Plan).  The Plan also provides for payment in full for Administrative Claims and other Claims entitled to priority, including Professional Fee Claims, Priority Tax Claims, and Priority Non-Tax Claims.  However, the Transaction Proceeds from the Sale Transaction will not likely be sufficient to enable Distributions to Holders of General Unsecured Claims; provided, however, that, in the

---

[1]    Capitalized terms used but not defined in this Disclosure Statement shall have the meaning ascribed them in the Plan.  Previous versions of the Plan were filed at Docket Nos. 327, 840, and 855.

event all Administrative Claims and all Claims that are senior to Allowed General Unsecured Claims have been satisfied, Holders of Allowed General Unsecured Claims, including Holders of Allowed Secured Creditor Deficiency Claims, may receive a Distribution of any remaining assets of the Estate.

Following the Effective Date, the Plan provides for the appointment of a Plan Administrator to, among other things, wind down the affairs of the Estate, resolve disputed Claims, pursue or settle Retained Causes of Action if appropriate, and make any distributions in accordance with the Plan. Holders of Claims or Interests against the Debtor or the Estate should understand that the timing and amount of any distributions will depend on, among other things, the consummation of the Sale Transaction, the resolution of claims objections and disputes, including any issues with respect to the 506(c) Charges and the 363(j) Charges, where applicable, and the realization of any additional Estate Assets.

In the Trustee's judgment, the Plan provides creditors with at least as much as they would receive in a hypothetical chapter 7 liquidation, while avoiding the additional costs, delays, and risks associated with conversion and a renewed liquidation process. Creditors are encouraged to review the Plan and this Disclosure Statement, including any and all exhibits, in their entirety for a complete description of claim classifications, treatment, implementation mechanics, the role of the Plan Administrator, and the risk factors associated with the Plan.

**NOTE: THE PLAN PROVIDES FOR AN INJUNCTION AGAINST CERTAIN PARTIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS AGAINST THE DEBTOR, FOR A RELEASE OF CERTAIN PARTIES IN CONNECTION WITH THE PLAN, AND FOR THE EXCULPATION OF CERTAIN PARTIES INVOLVED IN THE CHAPTER 11 CASE. PARTIES SHOULD THEREFORE BE AWARE THAT IF THE PLAN IS CONFIRMED AND IF THE EFFECTIVE DATE OF THE PLAN OCCURS, CERTAIN PARTIES WILL BE GETTING THE BENEFITS OF THE INJUNCTION, THE RELEASE AND EXCULPATION PROVISIONS AND CERTAIN PARTIES WILL BE BOUND BY THE INJUNCTION, RELEASE, AND EXCULPATION PROVISIONS AS SET FORTH IN ARTICLES 9.2, 9.3, AND 9.4 OF THE PLAN AND SECTIONS X.B, X.C, AND X.D OF THIS DISCLOSURE STATEMENT.**

II.   <u>Legal Requirements</u>

   a.   **Overview of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. The commencement of a chapter 11 case creates an Estate that is comprised of all of the legal and equitable interests of the Debtor as of the filing date. Confirmation and consummation of a plan of reorganization or liquidation are the principal objectives of a chapter 11 case.

In general, confirmation of a plan by the Bankruptcy Court makes the plan binding upon a debtor, any person acquiring assets under the plan, and any holder of a claim or interest of an estate whether or not they vote to accept the plan. Before

soliciting acceptances of a proposed plan, however, section 1125 of the Bankruptcy Code requires a trustee to prepare a disclosure statement containing "adequate information" of a kind, and in sufficient detail, to enable a creditor to make an informed judgment in voting to accept or reject the plan. The Trustee is submitting this Disclosure Statement to Holders of Claims or interests against the Debtor and the Estate to satisfy the requirements of section 1125 of the Bankruptcy Code.

### b.    Summary of Classification and Treatment Under the Plan

As more fully described herein, the Plan (i) divides Claims and interests into unclassified categories and classified Classes, (ii) sets forth the treatment afforded to each category and Class, and (iii) provides the means by which Assets of the Estate, including the Transaction Proceeds, will be distributed. The following table sets forth a summary of the treatment of each Class of Claims and interests under the Plan:[2]

| Class Number and Description | Estimated Amount of Allowed Claims[3] | Treatment of Allowed Claims | Estimated Recovery and Voting Status |
|---|---|---|---|
| **Unclassified –** <br><br>**Administrative Claims** | To be determined | Except to the extent that any Person or Entity entitled to payment of an Allowed Administrative Claim agrees to a different treatment, each Holder of an Allowed Administrative Claim shall receive a Distribution in Cash in an amount equal to such Holder's Allowed Administrative Claim on the Effective Date or as soon as practicable after the date such Administrative Claim becomes an Allowed Administrative Claim.<br><br>Each Holder of an Administrative Claim is required to file a proof of Administrative Claim by the Administrative Claims Bar Date. The Plan Administrator shall have ninety (90) days after the Effective Date to file objections, if any, to Administrative Claims and serve such objections upon the Holder of | - 100%<br><br>- Not entitled to vote |

---

[2]    This summary contains only a brief description of the classification and treatment of Claims or Interests under the Plan. It does not describe every provision of the Plan. Accordingly, reference should be made to the entire Disclosure Statement (including exhibits) and the Plan for a complete description of the classification and treatment of Claims and Interests.

[3]    Amounts listed in this column are as of March 15, 2026, unless indicated otherwise.

| Class Number and Description | Estimated Amount of Allowed Claims[3] | Treatment of Allowed Claims | Estimated Recovery and Voting Status |
|---|---|---|---|
| | | the affected Claim.  The Plan Administrator shall have the right to seek authority from the Bankruptcy Court to extend the dates for filing and serving the objections to the Holders of such Claims. | |
| **Unclassified – Professional Fee Claims** | Approximately $8,200,000 | All Case Professionals seeking an allowance of their Professional Fee Claim for services rendered and expenses incurred through and including the Effective Date under sections 330, 331, and/or 506(c) of the Bankruptcy Code shall file their respective applications for allowance of their Professional Fee Claim by not later than the date which is thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court for services rendered through the Effective Date.  If granted, the Allowed Professional Fee Claim shall be paid by the Plan Administrator in full, in Cash and in such amounts as are Allowed by the Bankruptcy Court from the Post-Confirmation Fund (i) on the date upon which such Professional Fee Claim becomes an Allowed Claim or as soon thereafter as is practicable, (ii) upon such other terms as may be mutually agreed upon between the Holder of an Allowed Professional Fee Claim and the Plan Administrator, or (iii) in accordance with the terms and conditions of any applicable order entered by the Bankruptcy Court. | - 100% <br><br> - Not entitled to vote |

| Class Number and Description | Estimated Amount of Allowed Claims[3] | Treatment of Allowed Claims | Estimated Recovery and Voting Status |
|---|---|---|---|
| **Unclassified –** <br><br> **Priority Tax Claims** | $58,469.78 as of the Petition Date, plus interest | Except to the extent a Holder of an Allowed Priority Tax Claim has been satisfied prior to the Effective Date or agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable after the date such Priority Tax Claim becomes Allowed, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, release, and settlement of such Claim, a Distribution in Cash in the Allowed amount of its Claim with interest if required by the Bankruptcy Code or the Plan. | - 100% <br><br> - Not entitled to vote |
| **Unclassified –** <br><br> **Post-Petition Financing Claim** | $400,000 plus interest | The Post-Petition Financing Claim shall be paid in accordance with the terms and conditions of the Post-Petition Financing Order, as amended by the Post-Petition Financing Stipulation. No 506(c) Charge or 363(j) Charge will be assessed against the Post-Petition Financing Claim or the Liens securing the Post-Petition Financing Claim. <br><br> The Trustee shall receive the Carve-Out from the Second Draw as defined in the Post-Petition Financing Order, as amended by the Post-Petitioning Financing Stipulation, or in the event that any of the Second Draw Conditions Precedent are not satisfied, Lynx as lender, shall make the Second Look Carve-Out available. | - 100% <br><br> - Not entitled to vote |
| **Unclassified –** <br><br> **U.S. Trustee Fees** | To be determined | On the Effective Date or as soon thereafter as reasonably practicable, the Plan Administrator shall pay all U.S. Trustee Fees that are due and payable on the Effective Date. | - 100% <br><br> - Not entitled to vote |

| Class Number and Description | Estimated Amount of Allowed Claims[3] | Treatment of Allowed Claims | Estimated Recovery and Voting Status |
|---|---|---|---|
| | | Following the Effective Date, the Plan Administrator shall (a) pay the U.S. Trustee Fees as such fees are assessed and come due for the Chapter 11 Case for each quarter (including any fraction thereof) and (b) file quarterly reports in a form reasonably acceptable to the United States Trustee. The Plan Administrator shall remain obligated to pay U.S. Trustee Fees to the United States Trustee and to file quarterly reports until the earliest of the Chapter 11 Case being closed, dismissed, or converted under chapter 7 of the Bankruptcy Code. | |
| **Class 1 – Priority Non-Tax Claim** | To be determined | Except to the extent a Holder of an Allowed Priority Non-Tax Claim has been satisfied prior to the Effective Date or agrees to less favorable treatment, on the Effective Date or as soon as practicable after the date such Priority Non-Tax Claim becomes Allowed, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, release and settlement of such Claim, at the option of the Trustee or Plan Administrator, as applicable, (a) a Distribution in Cash in the Allowed amount of its Claim, or (b) on the Effective Date, such holder's Priority Non-Tax Claim shall be Reinstated. | - 100%<br><br>- Unimpaired; deemed to accept |
| **Class 2 – Emigrant Mortgage Claim** | $4,090,066.78<br><br>(Does not include reduction for 506(c) Charge and/or 363(j) Charge) | Except to the extent that the Holder of the Allowed Emigrant Mortgage Claim agrees to different treatment, subject to section 5.1 of the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder shall receive, in full satisfaction, release and | - 100%<br><br>- Unimpaired; deemed to accept |

| Class Number and Description | Estimated Amount of Allowed Claims[3] | Treatment of Allowed Claims | Estimated Recovery and Voting Status |
|---|---|---|---|
| | | settlement of the Emigrant Mortgage Claim, Cash in an amount equal to the Allowed amount of such Claim, *less* any applicable 506(c) Charge and/or 363(j) Charge; <u>provided</u>, <u>however</u>, <u>that</u>, nothing in the Plan shall limit the Trustee's ability to sell the Townhouse and consummate the Transaction free and clear of all Liens, claims and encumbrances pursuant to the Sale Procedures Order and/or Bankruptcy Code section 363(f). Distributions on account of Section 4.2 of the Plan shall be subject to repayment or reservation in full of the Post-Petition Financing Claim. | |
| **Class 3 –** **Allowed Lynx Secured Claim** | $21,440,785.07 | Except to the extent that the Holder of the Allowed Lynx Secured Claim agrees to different treatment, the Holder of the Allowed Lynx Secured Claim shall be paid in accordance with the terms and conditions of the Post-Petition Financing Order, as amended by the Post-Petition Financing Stipulation. No 506(c) Charge or 363(j) Charge will be assessed against the Allowed Lynx Secured Claim or Liens securing the Allowed Lynx Secured Claim. | - Estimated at 88% <br><br> - Impaired. Eligible to vote |
| **Class 4 –** **Prime Plus Mortgages Claims** | $4,010.586.02 as of the Petition Date <br><br> (Does not include reduction for 506(c) Charge and/or 363(j) Charge) | Except to the extent that a Holder of an Allowed Prime Plus Mortgages Claim agrees to different treatment, subject to section 5.1 of the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder shall receive, in full satisfaction, release and settlement of such the Prime Plus Mortgages Claims, Cash in an amount equal to the Allowed | - Recovery to be determined <br><br> - Impaired. Eligible to vote |

| Class Number and Description | Estimated Amount of Allowed Claims[3] | Treatment of Allowed Claims | Estimated Recovery and Voting Status |
|---|---|---|---|
| | | amount of such Claim *less* any applicable 506(c) Charge and/or 363(j) Charge; <u>provided</u>, <u>however</u>, <u>that</u>, nothing in the Plan shall limit the Trustee's ability to sell the Townhouse and consummate the Transaction free and clear of all Liens, claims, and encumbrances pursuant to the Sale Procedures Order and/or Bankruptcy Code section 363(f); <u>provided</u>, <u>further</u>, the Holder of the Prime Plus Mortgages Claim shall be entitled to assert a Secured Creditor Deficiency Claim to the extent the applicable Allowed Claim exceeds the value of the Townhouse or Transaction Proceeds securing such Claim; <u>provided</u>, <u>further</u>, that, Distributions on account of Section 4.4 of the Plan shall be subject to repayment or reservation in full of (i) the Post-Petition Financing Claim, (ii) the Emigrant Mortgage Claim, (iii) the Judgment Liens, and (iv) the Allowed Lynx Secured Claim. | |
| **Class 5 –** **Attachment Liens Claims** | $2,594,813.41[4] (Does not include reduction for the 506(c) Charge and/or 363(j) Charge) | Except to the extent that a Holder of the Allowed Attachment Lien Claim agrees to different treatment, subject to section 5.1 of the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder shall receive, in full satisfaction, release and settlement of the Attachment Lien Claim, Cash in an amount equal to the Allowed amount of such Claim *less* any applicable 506(c) Charge and/or | - Recovery to be determined - Impaired. Eligible to vote |

---

[4]   This amount is the portion of the Attachment Liens arising from the June 26, 2020 Ex Parte Order of Attachment entered by the Surrogate's Court, Nassau County attributable to solely the Debtor's interest in the Townhouse.  The portion of the Attachment Liens attributable to M. Nestor's interest is $57,400,000.  As discussed in further detail below, the Trustee reserves all of the Estate's rights, claims, and defenses regarding the Attachment Liens.  *See infra.* Section IV.d and Section V.ii.

| Class Number and Description | Estimated Amount of Allowed Claims[3] | Treatment of Allowed Claims | Estimated Recovery and Voting Status |
|---|---|---|---|
| | | 363(j) Charge; _provided_, _however_, _that_, nothing in the Plan shall limit the Trustee's ability to sell the Townhouse and consummate the Transaction free and clear of all Liens, claims, and encumbrances pursuant to the Sale Procedures Order and/or Bankruptcy Code section 363(f); _provided_, _further_, the Holder of the Attachment Lien Claim shall be entitled to assert a Secured Creditor Deficiency Claim to the extent the applicable Allowed Claim exceeds the value of the Townhouse or Transaction Proceeds securing such Claim; _provided_, _further_, that, Distributions on account of Section 4.5 of the Plan shall be subject to repayment or reservation in full of (i) the Post-Petition Financing Claim, (ii) the Emigrant Mortgage Claim, (iii) the Judgment Liens, (iv) the Allowed Lynx Secured Claim, and (v) the Prime Plus Mortgage Claims. | |
| **Class 6 –**<br><br>**Wenig Saltiel Claim** | $88,450.38 as of the Petition Date<br><br>(Does not include reduction for 506(c) Charge and/or 363(j) Charge) | Except to the extent that a Holder of an Allowed Wenig Saltiel Claim agrees to different treatment, subject to section 5.1 of the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder shall receive, in full satisfaction, release and settlement of the Wenig Saltiel Claim, (i) Cash in an amount equal to the Allowed amount of such Claim _less_ any applicable 506(c) Charge and/or 363(j) Charge; _provided_, _however_, _that_, nothing in the Plan shall limit the Trustee's ability to sell the Townhouse and consummate the Transaction free and clear of all Liens, claims, and encumbrances | - Recovery to be determined<br><br>- Impaired. Eligible to vote |

| Class Number and Description | Estimated Amount of Allowed Claims[3] | Treatment of Allowed Claims | Estimated Recovery and Voting Status |
|---|---|---|---|
| | | pursuant to the Sale Procedures Order and/or Bankruptcy Code section 363(f); <u>provided</u>, <u>further</u>, the Holder of the Wenig Saltiel Claim shall be entitled to assert a Secured Creditor Deficiency Claim to the extent the applicable Allowed Claim exceeds the value of the Townhouse or Transaction Proceeds securing such Claim; <u>provided</u>, <u>further</u>, that, Distributions on account of this Section 4.5 shall be subject to repayment or reservation in full of (i) the Post-Petition Financing Claim, (ii) the Emigrant Mortgage Claim, (iii) the Judgment Liens, (iv) the Allowed Lynx Secured Claim, (v) the Prime Plus Mortgage Claims, (vi) the Attachment Lien Claims, and (vii) the Attachment Liens. | |
| **Class 7 –** <br><br> **Other Secured Claims** | To be determined <br><br> (Does not include reduction for 506(c) Charge and/or 363(j) Charge) | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to different treatment, subject to section 5.1 of the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder shall receive, in full satisfaction, release and settlement of the Other Secured Claim, (i) Cash in an amount equal to the Allowed amount of such Claim *less* any applicable 506(c) Charge and/or 363(j) Charge; (ii) Reinstatement of such Allowed Other Secured Claim; (iii) property securing such Allowed Other Secured Claim, with any deficiency to result in an General Unsecured Claim; or (iv) to the extent applicable, treatment as permitted under Bankruptcy Code section 1129(a)(9)(D); <u>provided</u>, payments made pursuant to Bankruptcy Code section | - Recovery to be determined <br><br> - Unimpaired; deemed to accept |

| Class Number and Description | Estimated Amount of Allowed Claims[3] | Treatment of Allowed Claims | Estimated Recovery and Voting Status |
|---|---|---|---|
| | | 1129(a)(9)(D) shall be made prior to five (5) years after the date of the order for relief under sections 301 and 302 of the Bankruptcy Code; provided, further, that, nothing in the Plan shall limit the Trustee's ability to sell the Townhouse and consummate the Transaction free and clear of all Liens, claims, and encumbrances pursuant to the Sale Procedures Order and/or Bankruptcy Code section 363(f); provided, further, the Holder of an Other Secured Claim shall be entitled to assert a Secured Creditor Deficiency Claim to the extent the applicable Allowed Claim exceeds the value of the Townhouse or Transaction Proceeds securing such Claim. | |
| **Class 8 –** **General Unsecured Claims** | $7,824,626.02 | Each Holder of an Allowed General Unsecured Claim, which shall include any Allowed Secured Creditor Deficiency Claims, shall neither receive nor retain any Distribution, property, or interest in property on account of such Claim; provided, that, in the event all Administrative Claims, all Claims that are senior to Allowed General Unsecured Claims, and Valid Liens have been satisfied, Holders of Allowed General Unsecured Claims, including Allowed Secured Creditor Deficiency Claims, may receive a Distribution of any remaining Assets of the Estate, in full satisfaction, release and settlement of such General Unsecured Claims. | - To be determined<br><br>- Impaired. Eligible to vote. |

| Class Number and Description | Estimated Amount of Allowed Claims[3] | Treatment of Allowed Claims | Estimated Recovery and Voting Status |
|---|---|---|---|
| **Class 9 –**<br><br>**Equity Interests** | To be determined | On the Effective Date, all Equity Interests shall be canceled, released, eliminated and extinguished and be of no further force or effect, and no payments on account of Equity Interests shall be made, absent further Bankruptcy Court order. | - No distribution to be made<br><br>- Impaired. deemed to reject |

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtor's, the Trustee's or the Plan Administrator's rights and defenses, both legal and equitable, with respect to any Claims, interests, or Liens including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### c.    Voting

Under the Bankruptcy Code, the only Classes that are entitled to vote to accept or reject a Plan are classes of Claims that are Impaired under the Plan and that are not deemed to reject the Plan.

Classes 1, 2, and 7 are Unimpaired by and under the Plan and, therefore, are each deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Classes 3, 4, 5, 6, and 8 are Impaired under the Plan and are eligible to vote.

Class 9 is Impaired under the Plan and, because such Holders are not receiving or retaining any value under the Plan are deemed to reject the Plan pursuant to 1126(g) of the Bankruptcy Code.  Accordingly, Holders of interests in Class 9 are not entitled to vote for or against the Plan.

### d.    Confirmation

Section 1129(a) of the Bankruptcy Code establishes conditions for the confirmation of the Plan.  The findings required for confirmation include, without limitation, the following:  (a) the Plan classifies Claims or interests in a permissible manner;  (b) the Plan complies with applicable provisions of the Bankruptcy Code; (c) the Trustee, as the Plan proponent, has complied with applicable provisions of the Bankruptcy Code;  (d) the Plan has been accepted by the requisite votes of Holders of Claims or interests (except to the extent that confirmation is available under section 1129(b) of the Bankruptcy Code);  (e) the Plan has been proposed in good faith and not by any means forbidden by law;  (f) the disclosure requirements of section 1125 of the Bankruptcy Code have been met;  (g) the Plan is feasible, if applicable, and confirmation will likely not be followed by liquidation or the need for further reorganization of the

Estate, unless such liquidation or reorganization is proposed in the Plan; (h) the Plan is in the best interests of all Holders of Claims or interests in an Impaired Class by providing to such Holders on account of their Claims property of a value that is not less than the amount that such Holder would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan; and (i) all fees and expenses payable under 28 U.S.C. § 1930 have been paid or the Plan provides for their payment.

The Bankruptcy Court has not yet held a hearing to consider confirmation of the Plan. The hearing at which the Bankruptcy Court will determine whether to confirm the Plan will take place on **March__, 2026 at __ _.m. (prevailing Eastern Time),** before the Honorable Michael E. Wiles, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom Number 617, New York, New York 10004-1408. Objections to confirmation of the Plan must be filed with the Bankruptcy Court and served upon Togut, Segal & Segal LLP, counsel for the Trustee, One Penn Plaza, Suite 3335, New York, New York 10119, Attn: Brian F. Moore, Esq. and Martha E. Martir, Esq., by no later than **at 4:00 p.m. (prevailing Eastern Time) on March __, 2026** to be considered.

This description is non-exhaustive, and parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 Plan, the confirmation process and/or the requirements for Plan confirmation.

### e.    Best Interests of Creditors Test

Under the best interest of creditors test, which is codified in section 1129(a)(7) of the Bankruptcy Code, the Plan is confirmable if, with respect to each Impaired Class of Claims or Interests, each Holder of an Allowed Claim or interest in such Class has either (i) accepted the Plan, or (ii) receives or retains under the Plan, on account of its Claim or interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtor's Estate were to be liquidated under chapter 7 of the Bankruptcy Code.

Here, Holders in Class 3 (Allowed Lynx Secured Claim), Class 4 (Prime Plus Mortgage Claims), Class 5 (Attachment Lien Claims), Class 6 (Wenig Saltiel Claim) and Class 7 (General Unsecured Claims) are impaired because the proposed distribution under the Plan will result in an alteration in the legal, equitable, or contractual rights of such Holder. Holders in impaired classes are not expected to receive a distribution under the Plan because the proceeds from the sale of the Townhouse will be insufficient, after payment of Administrative Claims and other Claims senior in priority, to provide a distribution to such Holders. Importantly, Holders of Claims in impaired classes would likewise receive no distribution in a hypothetical chapter 7 liquidation, where the Transaction Proceeds would be further reduced by the costs of conversion, additional professional fees, and delay associated with a renewed marketing and sale process.

Although no distribution to Holders in impaired classes is anticipated, the Plan nevertheless provides that, in the event all Claims with a higher priority are paid in accordance with the Plan, such Holders, may receive a pro rata distribution of any

proceeds from the liquidation of any remaining Assets of the Estate, including the Retained Causes of Action, Avoidance Actions, Insurance Claims and the Contempt Payments.

Accordingly, the Trustee submits that the Plan satisfies the best interests of creditors test under section 1129(a)(7) of the Bankruptcy Code because Holders of impaired Classes will receive at least as much under the Plan as they would receive in a chapter 7 liquidation—namely, no distribution—while avoiding the additional costs, delay, and value erosion that would result from conversion.  Any speculative recovery for Holders in impaired Classes in a Chapter 7 liquidation may be further diminished by the uncertainty, cost, and delay inherent in restarting the sale process under a different fiduciary.

This is particularly true at this advanced stage of the Chapter 11 Case, where the Trustee's efforts have already resulted in a committed purchaser for the Townhouse, and conversion to chapter 7 would risk the closing of the Transaction and increase administrative expenses through a more protracted liquidation process.  A sale of the Townhouse pursuant to the Plan also enables parties in interest to realize the savings and benefits of section 1146(a) of the Bankruptcy Code, which would not be available under chapter 7 of the Bankruptcy Code.

Moreover, conversion of the Debtor's case to chapter 7 would delay both the Sale and Distributions to Holders of Allowed Claims, to the detriment of all parties in interest.  The Trustee therefore submits that the Plan will result in lower total costs, greater net value to the Estate, and faster Distributions for creditors than would liquidation under chapter 7 of the Bankruptcy Code.  Holders of Allowed Claims or interests are advised to review the Liquidation Analysis attached as **Exhibit 2** for further information of expected recoveries in a hypothetical chapter 7 liquidation.

### f.    Feasibility of the Plan

To be confirmed, the Plan must also be feasible, meaning that it is not likely to be followed by liquidation or further financial restructuring, unless such liquidation or further financial restructuring is proposed in the Plan.  Here, the Plan contemplates the sale of the Townhouse and the liquidation of the Assets of the Debtor.  Moreover, the 506(c) Charge and/or 363(j) Charge will help facilitate payment and satisfaction of amounts necessary for Confirmation of the Plan.  Accordingly, the Trustee submits the Plan is feasible.

In the event the Debtor lacks sufficient cash to make the payments to Allowed Administrative Claims and Allowed Priority Claims necessary for the Plan to go effective, the Trustee may withdraw the Plan and seek to close the proposed Sale on a standalone basis pursuant to section 363 of the Bankruptcy Code and as approved by the Bankruptcy Court and/or seek conversion of the Chapter 11 Case to chapter 7.

## III.    **Background**

### a.    **Commencement of the Chapter 11 Case**

On April 25, 2023 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing a petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  No official committee of unsecured creditors has been appointed in this Chapter 11 case.

On May 12, 2023, the Debtor filed her Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket No. 21] (the "Initial Schedules"), which the Debtor amended on June 27, 2023 [Docket No. 38] (the "Amended Schedules" and together with the Initial Schedules, the "Schedules").  In her Schedules, the Debtor listed an ownership interest in the Townhouse.  *See* Initial Schedules, Schedule A/B, Part 1, Question 1.1;  Am. Schedules, Schedule A/B, Part 1, Question 1.1.  The Schedules attribute a value of $55 million to the Townhouse, and indicate that it is encumbered by mortgages and liens that secure obligations totaling $21,751,886.48.  *See* Docket Nos. 21 and 38.

On May 16, 2023, the Court entered the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 25], which established July 11, 2023 as the general claims date, and October 23, 2023 as the governmental bar date.  On October 30, 2024, the Court entered the *Order Establishing Deadline for Filing Administrative Expense Proofs of Claim Arising From April 25, 2023 to October 31, 2024 and Approving Form and Manner of Notice Thereof* [Docket No. 391], which established December 5, 2024 as the deadline for filing proofs of Claim for Administrative Claims between the Petition Date and October 31, 2024.

As reflected in the Claims register, the following proofs of Claim have been filed in the Case:

| Claimant | POC # | Amount[5] |
|---|---|---|
| **Administrative Claims** | | |
| Penachio Malara LLP | 14-1 | $        200,000.00 |
| New York City Department of Finance | 15 | $        466,584.92 |
| | | |
| **Secured Claims** | | |
| Emigrant Bank | 5-1 | $      3,559,407.76 |
| Lynx Asset Services, LLC | 10-1 | $   19,267,266.90[6] |

---

[5]    Amounts listed in this column are the amounts listed in the applicable proofs of Claim.

[6]    Lynx's proof of claim has been modified pursuant to the *Order Fixing and Allowing the Amount of Lynx Asset Services, LLC's Secured Claim* [Docket No. 521], the *Stipulation and Order Regarding Emergency Advances by Lynx Services, LLC to the Estate* [Docket No. 770], and the *Stipulation and Order Modifying and Amending the Post-Petition Financing Order and Post-Petition Loan* [Docket No. 850].  The amount of this claim, as filed, does not include the Second Draw in the amount of $4,000,000, and the other

| Prime Plus, LLC | 7-1 | $ | 2,311,454.12 |
|---|---|---|---|
| Prime Plus, LLC | 8-1 | $ | 1,699,131.90 |
| Public Administrator of Nassau County (O. Cassini Estate) | 9-2 | $ | 2,594,813.42 |
| Rosalia Baiamonte, as receiver of Oleg Cassini, Inc. and Cassini Parfums Ltd for the Public Administrator (O. Cassini Estate) | 11-1 | $ | 2,594,813.42 |
| Wenig Saltiel LLP | 12-1 | $ | 88,450.38 |

| Priority Claims | | | |
|---|---|---|---|
| NY State Department of Taxation | 1-1 | $ | 5,551.79 |
| Internal Revenue Service | 2-2 | $ | 52,917.99 |

| General Unsecured Claims | | | |
|---|---|---|---|
| NY State Department of Taxation | 1-1 | $ | 939.10 |
| Internal Revenue Service | 2-1 | $ | 14,410.00 |
| Bank of America, N.A. | 3-1 | $ | 500.00 |
| Bank of America, N.A. | 4-1 | $ | 43,935.56 |
| Bank of America, N.A. | 6-1 | $ | 15,013.34 |
| Public Administrator of Nassau County (O. Cassini Estate) | 9-2 | $ | 7,086,816.55 |
| Rosalia Baiamonte, as receiver of Oleg Cassini, Inc. and Cassini Parfums Ltd for the Public Administrator (O. Cassini Estate) | 11-1 | $ | 7,086,816.55 |
| The Greenspan Company / Adjusters International | 13 | $ | 663,011.47 |

On August 23, 2023, the Debtor filed her *Chapter 11 Plan of Reorganization of the Debtor* [Docket No. 62] (the "Debtor Plan") and *Disclosure Statement for Chapter 11 Plan of Reorganization Proposed by the Debtor* [Docket No. 63] (the "Debtor Disclosure Statement"). The Debtor Plan provided for, among other things, the sale of the Townhouse in the event the Debtor was unable to obtain financing to address the claims against her and the liens asserted against her assets. Debtor Plan § 5.1. The Debtor Disclosure Statement was never approved by the Court, and the Debtor Plan was neither solicited nor confirmed.

The Townhouse is the Estate's most substantial asset. On August 23, 2023, an appraisal of the Townhouse prepared by Trust Appraisals Inc. was filed with the Court which assigned the Townhouse an appraised value of $55 million as of September 23, 2022 [Docket No. 63, Ex. B].

---

changes as set forth in the Post-Petition Financing Stipulation. For further detail, consult Section IV.b of this Disclosure Statement.

On December 15, 2023, the Court entered an order [Docket No. 77] (the "Sotheby's Retention Order") approving the Debtor's retention of Sotheby's International Realty ("Sotheby's") as the exclusive real estate broker to market and sell the Townhouse.

On December 15, 2023, the Court entered an order (as may be amended, modified or supplemented, the "Sales Procedures Order") approving the Debtor's motion seeking the establishment of certain sale procedures [Docket No. 78] (the "Initial Sales Procedures") and authorizing the commencement of a sales and marketing process for the Townhouse (the "Sale Process"). The Initial Sales Procedures provided for certain initial milestones, including *inter alia*: (i) an auction date; (ii) a deadline for Lynx Asset Services, LLC ("Lynx") to provide a credit bid; (iii) a bid deadline; (iv) a sale hearing date; and (v) a sale closing date (the "Initial Sale Procedures Dates") all of which were scheduled to occur in June and July of 2024. The Initial Sale Procedures Dates were established with the understanding that: (a) that the Debtor and her sister, Marianne Nestor Cassini ("M. Nestor") would pursue and cooperate with the sale; and (b) the Townhouse was in a good condition to be marketed and shown to potential buyers.

Following approval of the Debtor's Initial Sale Procedures, however, the Debtor was unable to obtain financing and took no actions in furtherance of a sale.

### b.    Appointment of the Trustee

On February 21, 2024, Lynx filed its *Motion for the Appointment of a Chapter 11 Trustee*, which was joined by other parties [Docket Nos. 95, 98, 102] (together, the "Motion to Appoint Trustee"). In its Motion to Appoint Trustee, Lynx asserted, among other things, that: the Debtor was not cooperating with Sotheby's or otherwise attempting to sell the Townhouse; the Debtor had received and spent Estate property without disclosure to or authority from the Court; and that the Debtor was otherwise acting to impair creditors' rights.

On March 13, 2024, the Court issued a decision finding that the appointment of a chapter 11 trustee was warranted as in the best interests of creditors [Docket No. 106] (the "Trustee Appointment Decision") and entered the *Order Granting Motion for Appointment of Chapter 11 Trustee* (the "Trustee Order") [Docket No. 107]. In the Trustee Appointment Decision, the Court held, in pertinent part, that the Trustee would control the sale of the Townhouse:

> The sale of the Townhouse also has not been proceeding in accordance with the schedule that I approved in December. It is in the interest of creditors generally that an independent third party be put in charge of this estate and take over primary responsibility for the sale of the Townhouse, the management of the Debtor's assets, the approval of expenditures, the conduct of settlement discussions, and the confirmation of a plan. The Debtor will have the right to object if she does not like what the trustee proposes, but she will no longer be in charge.

Trustee Appointment Decision at 9-10.

On March 22, 2024, the Court entered the *Order Approving the Appointment of Chapter 11 Trustee* [Docket No. 112], pursuant to which Albert Togut was appointed as the Trustee. The Trustee is duly qualified and is acting as the Trustee of the Debtor's Estate [Docket No. 114].

Following his appointment, the Trustee retained the Togut Firm as his bankruptcy counsel to assist in the administration of the Debtor's Estate. The retention of Togut, Segal & Segal LLP was approved by an order of the Bankruptcy Court [Docket. No. 121] dated April 22, 2024. Additionally, the Trustee retained Vinay Agarwal, CPA, LLC as his accountant [Docket. No. 197], Phillips Nizer LLP as his special real estate counsel [Docket. No. 146], Preferred Construction Mgt. Co. Inc as his estimator [Docket No. 479], Brown Harris Stevens Residential Sales, LLC as his broker [Docket No. 516], Roland Antiques Gallery, Inc. as his auctioneer [Docket No. 703], and Fairview Adjuster Co., Inc. as his public adjuster [Docket No. 789].

     **c.**     **The Townhouse**

In or about 1984, the Debtor and M. Nestor together purchased the Townhouse. *See* Adv. Pro. No. 23-01195 (MEW), the Declaratory Relief Action, defined below, Complaint at ¶ 14, Docket No. 1.

The deed to the Townhouse was recorded with the Clerk of New York County on or about February 27, 1984. *Id.* at ¶ 15.

In or about 2017, M. Nestor executed a deed conveying her interest in the Townhouse to the Debtor as sole owner, which deed has never been recorded. *Id.* at ¶¶ 28-29.

On November 1, 2023, prior to the Trustee's appointment, the Debtor commenced Adversary Proceeding No. 23-01195 (MEW) in this Court (the "Declaratory Relief Action") and sought: (i) a declaration that she is the sole owner of the Townhouse; and (ii) authority to sell the Townhouse, pursuant to section 363(h) of the Bankruptcy Code. The Debtor hand-signed the complaint that commenced the Declaratory Relief Action. Declaratory Relief Action, Docket No. 1.

On January 31, 2024, M. Nestor filed an *Admission of Service* in this Court and, under the penalties of perjury, stated: "I acknowledge that I have no ownership interest in the premises located at 15 East 63rd [sic] Street, New York . [sic] NY. 10065. Peggy Nestor is the sole owner of 15 East 63rd." *See* Declaratory Relief Action, Admission of Service at ¶ 8 [Docket No. 10]. M. Nestor continues to assert that she is a 50% co-owner of the Townhouse. *See, e.g.*, [Docket No. 822] ("I am, as well, co-owner [of the Townhouse] with my sister, Peggy Nestor.").

On March 13, 2024, the Court entered an order granting partial summary judgment in the Declaratory Relief Action [Declaratory Relief Action, Docket No. 18] (the "363(h) Sale Order"). In the 363(h) Sale Order, the Court stated:

**ORDERED**, pursuant to section 363(h), that the Townhouse be sold pursuant to the sale procedures previously approved by this Court; and it is further

**ORDERED**, that the proceeds of such sale shall be distributed to secured creditors or to other parties in accordance with their respective rights and interests, as such rights and interest are determined by the Court in the course of further proceedings in this adversary proceeding and in the underlying chapter 11 case; and it is further

**ORDERED**, that the proceeds of sale of the Townhouse shall be segregated and not paid to any persons except as ordered by the Court.

*See* 363(h) Sale Order at 3.

As set forth above, in the Trustee Appointment Decision, the Court ordered that the Trustee would be in charge of the Sale Process which was authorized under the 363(h) Sale Order.

On April 10, 2024, the Trustee commenced Adversary Proceeding No. 24-01342 (MEW) in this Court (the "Turnover Action") against the Debtor and M. Nestor to compel the turnover of the Townhouse to the Trustee pursuant to sections 521 and 542 of the Bankruptcy Code due to the Debtor's and M. Nestor's interference with the Trustee's management of the Sale process. Turnover Action [Docket No. 1].

Following the hearing held on April 23, 2024 to consider the Trustee's *Application for an Order to Show Cause Scheduling Hearing to Consider Chapter 11 Trustee's Request for Issuance of Preliminary Injunction Directing Defendants to Immediately Vacate, Surrender and Turn Over Possession of New York City Townhouse*, Turnover Action [Docket No. 2] (the "Trustee's Turnover Motion"), the Court entered the *Order Compelling the Defendants to Turn Over Possession of Townhouse to Trustee*, Turnover Action [Docket No. 8] (the "Turnover Order") which, among other things, compelled the Debtor and M. Nestor to provide the Trustee access to the Townhouse and to turn over to the Trustee a set of keys for complete access to the Townhouse within forty-eight (48) hours after entry of such order.

The Debtor and M. Nestor failed to comply with the Turnover Order, and on April 30, 2024, the Trustee, with the assistance of U.S. Marshals Service, took possession of the Townhouse in accordance with the Turnover Order. *See* Turnover Action [Docket No. 14] ¶ 25. On May 13, 2024, the Court entered its *Decision and Order Denying Oral Motions to Reconsider Prior Rulings Regarding the Possession of a Townhouse and the Sale of the Same. See* Turnover Action [Docket No. 17] (the "May 13 Order"). In the May 13 Order and during hearings in this Chapter 11 Case, the Court has ruled that M. Nestor is estopped from asserting any ownership interest in the Townhouse "because she had expressly denied having any such ownership interest." *See* May 13 Order at 13-14.

Among other things, the May 13 Order found that "[h]aving officially and consistently taken the position that she does not own any interest in the Townhouse, and having secured relief on that basis, Marianne Nestor Cassini cannot now take an opposite position." *Id.* In the May 13 Order, the Court held that "the Trustee shall remain in control and possession of the Townhouse and in control of the sale process that is underway." *Id.*

On May 17, 2024, the Court again reiterated that "Marianne Nestor Cassini is estopped from contending that she is a part owner of the Townhouse that is at issue, and she is estopped from challenging the Trustee's right to take control of the Townhouse and to sell it." *See* Turnover Action, *Order Denying a Further Request for Reconsideration Dated May 17, 2024* [Docket No. 23] at 1-2 (the "May 17 Order").

In addition to the May 13 Order and the May 17 Order, the Court issued other decisions and orders denying M. Nestor's repeated motions to reconsider the Turnover Order on May 15 and May 20, 2024 (the "May 20 Order"). On May 24, 2024, M. Nestor filed a notice of appeal regarding the May 20 Order (the "Reconsideration Appeal"). M. Nestor has failed to perfect the Reconsideration Appeal.

### d.    The Sale and Auction Process

Following his appointment, the Trustee worked with Sotheby's over the course of weeks to clean, stage, photograph and begin to market the Townhouse in the manner envisioned by the Sotheby's Retention Order and the Sales Procedures Order.

Although the Trustee and Sotheby's have actively marketed the Townhouse, the delays caused by the Debtor and M. Nestor rendered the milestone dates in the Sales Procedures Order unworkable and not in the best interests of the Estate and its stakeholders, resulting in the modification of the Initial Sales Procedures and the Initial Sale Procedures Dates [Docket No. 261].

On December 15, 2024, the listing agreement with Sotheby's expired without an acceptable offer having been made for the Townhouse. On February 13, 2025, the Court authorized the Trustee to retain Brown Harris Stevens Residential Sales, LLC ("BHS") as his replacement broker in connection with the Sale Process [Docket No. 516].

Following an extensive marketing process lasting between December 2023 through January 2026 and after weeks of constructive dialogue and extensive negotiations, the Trustee received (via BHS) a binding $34.5 million cash bid from 63rd St Townhouse LLC (the "Stalking Horse Bidder") for the Townhouse and, on December 29, 2025, the Trustee executed a purchase agreement (as amended on January 9, 2026, the "Stalking Horse Agreement").

Following discussions with BHS and the Trustee's professionals, the Trustee determined that (a) (i) the Stalking Horse Bidder's offer is the highest and best offer, and (ii) the offer of Yingkau Xu (the "Back-Up Bidder") for $34.1 million (the "Back-Up Bid") was the second highest offer, that have been made for the Townhouse to date, (b) it was prudent to enter into the Stalking Horse Agreement, subject to Court approval, (c) the Stalking Horse Bidder's offer and the Stalking Horse Agreement should be

accepted as the "stalking horse bid", and (d) the Back-Up Bid should serve as the next highest bid unless an auction is held and the Trustee determines in his business judgment to change such designation in accordance with the Modified Sale Procedures (defined below).

In furtherance of the Sale to the Stalking Horse Bidder, on January 10, 2026, the Trustee filed an application [Docket No. 823] (the "Sale Application") seeking to approve the Stalking Horse Agreement, to modify the Initial Sale Procedures to designate and approve the Stalking Horse Bidder and stalking horse bid protection, and related modifications (the "Modified Sale Procedures"), and to schedule an auction for soliciting higher and better bids and a sale hearing for approval of the highest and best bid received for the Townhouse.

On January 27, 2026, the Court entered an order approving the Sale Application and the Modified Sale Procedures, as revised [Docket No. 851]. In connection therewith, the Court set (i) February 17, 2026 at 4:00 p.m. (prevailing Eastern Time) as the deadline for submitting bids for the Townhouse (the "Bid Deadline"), (ii) February 19, 2026 at 10:00 a.m. (prevailing Eastern Time) as the time of the auction (the "Auction"), and (iii) February 25, 2026 at 11:00 a.m. (prevailing Eastern Time) as the time for the sale hearing for approval of the highest and best bid received for the Townhouse following the Auction (the "Sale Hearing").

The proposed Sale to the Stalking Horse Bidder is the result of extensive marketing efforts by the Trustee, Sotheby's, and then BHS: the Townhouse has been listed for sale for more than 18 months, shown to potential bidders approximately 80 times, and was exposed world-wide to millions of prospective purchasers. The Stalking Horse Bid and the Back-Up Bid are the product of extensive, arms-length negotiations between the Trustee and, as applicable, the Stalking Horse Bidder and the Back-Up Bidder. Lynx, the holder of the largest prepetition lien against the Townhouse and the DIP Lender to the Estate consents to the Sale pursuant to the Stalking Horse Agreement or the agreement with the Back-Up Bidder (the "Back-Up Agreement").

A condition to the closing of the Sale is entry of an order confirming the Plan, which the Trustee seeks to save approximately $1.38 million in transfer taxes pursuant to section 1146(a) of the Bankruptcy Code. If an order confirming the Plan is not entered by March 15, 2026 (the "Outside Date"), the Stalking Horse Bidder will have the absolute and unconditional right, but not the obligation, to terminate the Stalking Horse Agreement. Upon closing and receipt of the Sale proceeds, such proceeds will be used to fund distributions in accordance with the Plan.

The Trustee has determined in his business judgment that selling the Townhouse is in the best interests of the Estate as it is the Estate's primary asset, will result a significant source of funds and there is no other viable alternative after extensive marketing of the Townhouse.[7]

---

[7] Based upon information currently available to the Trustee, the Sale Transaction, if any, may result in a capital gains tax liability.

e.     **Postpetition Financing to Facilitate Maintenance and the Sale of the Townhouse**

The Townhouse was inadequately insured when the Trustee was appointed. Moreover, it required cleaning and maintenance, and payments were past due to Consolidated Edison ("ConEd") for utility services.

On July 26, 2024, the Court entered the *Final Order (A) Authorizing the Trustee to Obtain Post-Petition Financing, (B) Granting a First Priority Senior Mortgage Lien to DIP Lender, and (C) Granting Other Related Relief in Aid of Sale Pursuant to 11 U.S.C. § 364* [Docket. No. 264] (as amended, the "Post-Petition Financing Order")[8] which authorized the Trustee to enter into a post-petition financing facility (the "Post-Petition Financing Facility") to obtain post-petition financing from Lynx, an existing secured creditor, on behalf of the Estate up to the amount of $3,400,000 (the "Post-Petition Financing") in two separate draws:  (i) $400,000, as an initial draw (the "Initial Draw") in accordance with a budget for costs to procure adequate insurance on the Townhouse and pay for any other necessary maintenance, repair, utility service and other costs related to the Townhouse during the Sale Process;  and (ii) up to a $3 million second draw ("Second Draw") to fund the necessary Carve-Out at closing of a Sale for the allowed costs, commissions, compensation and other expenses incurred by the Trustee and his retained professionals in connection with the preservation, protection and sale of the Townhouse for the benefit of the DIP Lender and other parties that assert secured claims against the Townhouse.

The Trustee has fully drawn the Initial Draw.

The Second Draw will be credited to the Trustee at the closing of a Sale from the proceeds of sale of the Townhouse net of commissions due to BHS and any other ordinary and customary closing costs (collectively, the "Net Sale Proceeds");  provided, however, that the Second Draw will be available only if and to the extent that the Net Sale Proceeds exceed the amount of the following, as of the date of the closing:  (i) the Initial Draw;  (ii) all accrued and unpaid real estate taxes, interest and late fees;  (iii) the Allowed Emigrant Mortgage Claim;  (iv) any valid judgment liens against the Townhouse to which Lynx is junior in priority;  and (v) the Prepetition Lynx Obligation (defined below in Section IV).

On December 22, 2025, the Trustee and Lynx entered into a stipulation [Docket No. 813] (as revised by Docket No. 850, the "Post-Petition Financing Stipulation") modifying the Post-Petition Financing Documents and the Post-Petition Financing Order to increase the amount of the Second Draw (the "Upsized Second Draw") to provide the Trustee with necessary additional liquidity to fund the Carve-Out, enable sufficient funding to achieve confirmation of the Plan, and to help achieve a tax-efficient sale of the Townhouse pursuant to the Plan.  On January 26, 2026, the Court approved the Post-Petition Financing Stipulation, as revised.  [Docket No. 850].

---

[8]     Pursuant to stipulations filed with and approved by the Court [Docket Nos. 579, 617, 684, 784], the Trustee and Lynx agreed to extend the maturity date and certain milestone dates of the Post-Petition Financing Order.

The Post-Petition Financing Stipulation provides that, in the event the purchase price for the Townhouse equals $34,000,000, (i) the Total Lynx Indebtedness (as defined in the Post-Petition Financing Stipulation) shall be equal to $25,250,000 and (ii) the Second Draw shall increase to $4,000,000 (from $3,000,000) for the payment of the reasonable and necessary costs, commissions, compensation and other expenses incurred by the Trustee and his retained professionals in connection with the sale of the Townhouse and related professional fees and expenses to preserve the value of the DIP Lender's collateral and to administer the Chapter 11 Case (the "Trustee Professional Fees and Costs"), to be paid to the Trustee at the Closing from the proceeds of the sale of the Townhouse (the "Sale Proceeds"); *provided that*, in the event the purchase price for the Townhouse exceeds $34,000,000, (i) the Total Lynx Indebtedness shall increase on a dollar for dollar basis net of any corresponding increases to Closing Costs (as defined in the Post-Petition Financing Stipulation) and (ii) the Second Draw shall correspondingly increase by 40% of the Sales Proceeds exceeding $34,000,000, net of any corresponding increase to the Closing Costs, in each case, until the amount (notwithstanding the Lynx Settlement, as defined in the Post-Petition Financing Stipulation) of the Total Lynx Indebtedness and the Trustee Professional Fees and Costs are each fully satisfied.  No interest is payable on the Second Draw.

The foregoing summary of the Post-Petition Financing Stipulation is provided for descriptive purposes only, does not purport to be complete, and is qualified in its entirety by reference to the Post-Petition Financing Stipulation.

### f.    Sale of Personal Property

On July 23, 2025, the Court approved the Trustee's retention of Roland Antiques Gallery, Inc. ("Roland") as his auctioneer to sell two non-exempt works of art (the "Estate Artwork") located in the Townhouse and listed in the Debtor's Schedules.  *See* [Docket No. 703]; *see also* [Docket No. 38] (listing Estate Artwork).  On November 15, 2025, Roland held an auction for the sale of the Estate Artwork, resulting in a bid submitted by M. Nestor for the Estate Artwork, resulting in $12,150 in sale proceeds to the Estate [Docket No. 837].

In addition to the Estate Artwork, there remains certain other items of personal property located in the Townhouse that may constitute property of the Estate.  The Trustee continues to evaluate the nature, ownership, and potential value of such items and, in the exercise of his business judgment, may determine to sell certain additional non-exempt personal property for the benefit of the Estate.  There can be no assurance that any such property will be sold instead of abandoned, that any sale will be approved by the Court, or that any proceeds realized from the sale of such property would be material or available for distribution after payment of applicable costs and expenses.

### g.    Insurance Claims

On August 2, 2025, the Trustee became aware of a water leak at the Townhouse (the "Water Leak").  On account of the Water Leak, an insurance claim (Claim No. GPAR035772501) (the "Water Leak Claim") was submitted under the primary policy

insuring the Townhouse (Policy No. BAN1015892-00) (the "Primary Policy").  Pursuant to section 541 of the Bankruptcy Code, the Debtor's interests in the Primary Policy and the Water Leak Claim are property of the Estate.  The Trustee, on behalf of the Estate, retains all rights to pursue, prosecute, negotiate, and resolve the Water Leak Claim, subject to the terms and conditions of the Primary Policy and applicable law.  Any recovery under the Water Leak Claim would inure to the benefit of the Estate.  However, the recovery, if any, would be subject to coverage determinations, deductibles, exclusions, and applicable policy limits, and would be net of any loss associated with the Water Leak and costs associated with pursuing such claim.  There can be no assurance that any recovery obtained would be material or available for distributions to creditors.

## IV.    The Debtor's Pre-Petition Secured Liabilities

As of the Petition Date, the asserted secured mortgages and liens (the "Secured Liens") recorded against the Debtor's interest in the Townhouse total approximately $29,520,524.48, as follows:

### a.    Emigrant Mortgage

On or about August 30, 2010, the Debtor executed a Mortgage and Adjustable Rate Note (the "Emigrant Mortgage") in favor of Emigrant Bank, as successor by merger with Emigrant Savings Bank-Manhattan ("Emigrant Bank") in the amount of $4 million.  The Emigrant Mortgage is secured by a lien against the Townhouse.  Emigrant Bank filed Proof of Claim No. 5 in the Chapter 11 Case in the amount of $3,559,407.76 on account of the Emigrant Mortgage.  *See* Proof of Claim No. 5.

As of December 31, 2025, the Emigrant Mortgage Claim had increased to approximately $4,044,903, and the Trustee estimates that on March 15, 2026, the Emigrant Mortgage Claim will amount to approximately $4,090,066.78.

### b.    The Lynx Mortgage

On or about January 25, 2017, Gemeaux Ltd. ("Gemeaux"), a company in which the Debtor and M. Nestor are owners, executed an Amended, Restated and Consolidated Promissory Note (the "Lynx Note") in favor of Lynx in the amount of $9.5 million.  Gemeaux's obligations under the Lynx Note were guaranteed by the Debtor and M. Nestor and secured under an Amended, Restated and Consolidated Mortgage, Security Agreement and Fixture Filing dated as of January 25, 2017 (the "Lynx Mortgage").  The Lynx Mortgage granted Lynx a lien against the Townhouse.

Pursuant to an Amended Judgment of Foreclosure and Sale entered on October 12, 2022 in the Lynx foreclosure action in the Supreme Court of the State of New York, New York County, Index No. 85019/2019, the Debtor was held to be indebted to Lynx in an aggregate outstanding principal amount of not less than $17,251,881.48, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) (the "Prepetition Lynx Obligation").

As of the Petition Date, Lynx asserted the Debtor was indebted in the amount of $19,267,266.90 on account the Prepetition Lynx Obligation. Lynx filed Proof of Claim No. 10 in the Chapter 11 Case in the amount of $19,267,266.90. *See* Proof of Claim No. 10.

As of December 31 2025, the Prepetition Lynx Obligation had increased to approximately $24,390,311. However, pursuant to the Post-Petition Financing Stipulation, the claim in favor of Lynx shall be fixed at $25,250,000 in the event the purchase price for the Sale of the Townhouse equals $34,000,000; *provided that*, in the event the purchase price for the sale of the Townhouse exceeds $34,000,000, the Total Lynx Indebtedness (as defined in the Post-Petition Financing Stipulation) shall increase on a dollar for dollar basis net of any corresponding increases to Closing Costs (as defined in the Post-Petition Financing Stipulation). However, the Total Lynx Indebtedness (including the DIP Lender Expenses) shall be repaid solely from Sale Proceeds and not from any other property of the Estate at such time or in the future.

The foregoing summary of the Post-Petition Financing Stipulation is provided for descriptive purposes only, does not purport to be complete, and is qualified in its entirety by reference to the Post-Petition Financing Stipulation.

### c.    The Prime Plus Mortgages

On or about January 23, 2018, the Debtor, M. Nestor and Gemeaux executed a Promissory Note and Mortgage (the "<u>First Prime Plus Mortgage</u>") in favor of Prime Plus, LLC ("<u>Prime Plus</u>") in the amount of $1.3 million. The First Prime Plus Mortgage is secured by a lien against the Townhouse that is subordinate to the Emigrant Mortgage and the Lynx Mortgage. Prime Plus filed Proof of Claim No. 7 in the Chapter 11 Case in the amount of $2,311,454.12 on account of the First Prime Plus Mortgage. *See* Proof of Claim No. 7.

On or about November 16, 2018, the Debtor, M. Nestor and Gemeaux executed a Promissory Note and Mortgage (the "<u>Second Prime Plus Mortgage</u>" and, together with the First Prime Plus Mortgage, the "<u>Prime Plus Mortgages</u>" and, collectively with the Emigrant Mortgage and the Lynx Mortgage, the "<u>Mortgages</u>") in favor of Prime Plus in the amount of $1 million. The Second Prime Plus Mortgage is secured by a lien against the Townhouse that is subordinate to the First Prime Plus Mortgage, the Emigrant Mortgage and the Lynx Mortgage.

Prime Plus filed Proof of Claim No. 8 in this Chapter 11 Case in the amount of $1,699,131.90 on account of the Second Prime Plus Mortgage. *See* Proof of Claim No. 8.

As of December 31, 2025, the Prime Plus Mortgages Claims had increased to approximately $5,193,240.

### d.    The Attachment Liens

The Townhouse is also subject to pre-judgment liens pursuant to orders entered by the Surrogate's Court of the State of New York, Nassau County (the "<u>Surrogate's Court</u>") and the Supreme Court of the State of New York, County of Kings, against M.

Nestor and the Debtor.  *See* Proofs of Claim Nos. 9 and 11.  The Trustee has not yet determined whether those are valid or enforceable liens against the Townhouse, but believes that they are junior to the Estate's interests in the Townhouse.

The Public Administrator of Nassau County ("Public Administrator") filed Proof of Claim No. 9 in this Chapter 11 Case in the amount of $2,594,813.42 as a secured claim against Debtor.  *See* Proof of Claim No. 9.

Rosalia Baiamonte, the court-appointed receiver for Oleg Cassini, Inc. and Cassini Parfums, Inc. (the "Receiver"), filed Proof of Claim No. 11 in this Case in the amount of $2,594,813.42 as a secured claim against Debtor.  *See* Proof of Claim No. 11.

As to M. Nestor's asserted interest in the Townhouse, the Surrogate's Court granted attachment relief in the amount of approximately $57 million, which interest is subject to the Declaratory Relief Action (Adv. Pro. No. 23-01195) (discussed further below).

The Trustee reserves all of the Estate's rights, claims, and defenses regarding these Attachment Liens.  For the avoidance of doubt, Holders of Attachment Liens shall be entitled to vote solely on account of and to the extent of their Attachment Lien Claim.

### e.    The Judgment Liens

The Townhouse is also subject to judgment liens pursuant to judgments entered by the Surrogate's Court of the State of New York and the Supreme Court of the State of New York, Nassau County against M. Nestor.

On November 5, 2015, Jeffrey E. Deluca, in his capacity as the Public Administrator, recorded a lien against the Townhouse in connection with a judgment entered on November 24, 2025 against M. Nestor by the Surrogate's Court in the amount of $1,041,336,which judgment was renewed by the Surrogate's Court, File No. 343100/G (Matter of Oleg Cassini) on April 28, 2025.

On September 10, 2014, Christina Cassini, in her capacity as executor of the Estate of Oleg Cassini, recorded a lien against the Townhouse in connection with a judgment entered against M. Nestor by the Supreme Court of the State of New York, Nassau County, which judgment is now held by Michael Katz and was renewed on August 6, 2024, Index No. 601835/2024 (Katz v. Cassini), in the principal amount of $421,506.83.

The Trustee reserves all of the Estate's rights, claims, and defenses regarding these judgment liens.

### f.    The Wenig Saltiel Judgment Lien

On August 12, 2021, Wenig Saltiel LLP ("Wenig Saltiel"), former counsel to the Debtor in connection with various state court litigations and proceedings, obtained a judgment against the Debtor and Marianne Nestor in the amount of $128,077.18 (the "Wenig Saltiel Judgment").  On August 17, 2022, the Wenig Saltiel Judgment was

recorded with the New York County Clerk's office, and was secured by the Townhouse. Wenig Saltiel filed Proof of Claim No. 12 in the Chapter 11 Case in the amount of $88,450.38 on account of the Wenig Saltiel judgment lien.

## V.    Adversary Proceedings

There are twelve pending adversary proceedings in this Chapter 11 Case (and one closed adversary proceeding), including the Declaratory Relief Action and the Turnover Action (collectively, the "Adversary Proceedings"). The nature of each Adversary Proceeding and their current status is as follows:

i.    *Baiamonte v. Nestor* – Adv. Pro. No. 23-01156 (MEW) (the "Receiver Nondischargeability Action")

On July 31, 2023, the Receiver commenced the Receiver Nondischargeability Action against the Debtor seeking a declaration that the Debtor's purported secured debt to the Receiver in the amount of $9,681,629.97 is non-dischargeable pursuant to sections 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code. *See* Receiver Nondischargeability Action [Docket No. 1]. The Debtor's answer to the Receiver's complaint, filed on October 27, 2023, included a counterclaim for a declaration that the Receiver's claim against the Debtor is wholly unsecured. The Receiver answered the Debtor's counterclaim on February 15, 2024.

There have been no further developments in the Receiver Nondischargeability Action.

ii.    *The Declaratory Relief Action* – Adv. Pro. No. 23-01195 (MEW)

As described in further detail above, on November 1, 2023, the Debtor commenced the Declaratory Relief Action in this Court and sought: (i) a declaration that she is the sole owner of the Townhouse, and (ii) authority to sell the Townhouse, pursuant to section 363(h) of the Bankruptcy Code.

On March 13, 2024, the Court entered the 363(h) Sale Order, pursuant to which the Trustee is seeking to sell the Townhouse.

By virtue of the Trustee Appointment Order and section 1006 of the Bankruptcy Code, the Trustee has replaced the Debtor as the plaintiff in the Declaratory Relief Action, and he alone controls the Debtor-plaintiff's rights, claims, and defenses therein. Since then, the Trustee has engaged in discovery with the defendants in the Declaratory Relief Action, other than M. Nestor, to facilitate a resolution to the Declaratory Relief Action in connection with the Sale.

On October 30, 2024, an order scheduling formal discovery among the Trustee and those defendants, Declaratory Relief Action [Docket No. 36], was entered.

27

There have been no further developments in the Declaratory Relief Action.

iii.    *The Turnover Action* – Adv. Pro. No. 24-01342 (MEW)

As described in further detail above, on April 10, 2024, the Trustee commenced the Turnover Action against the Debtor and M. Nestor to compel the turnover of the Townhouse to the Trustee pursuant to sections 521 and 542 of the Bankruptcy Code, resulting in entry of the Turnover Order on April 23, 2024.

On April 30, 2024, after the Debtor's and M. Nestor's failure to comply with the Turnover Order, the Trustee, with the assistance of U.S. Marshals Service, took possession of the Townhouse as authorized by the Turnover Order.

In light of M. Nestor's failure to perfect the aforementioned related Reconsideration Appeal, on November 25, 2024, the Trustee submitted proposed findings of fact and conclusions of law and an order granting judgment to close the Turnover Action.

There have been no further developments in the Turnover Action.

iv.    *Togut v. Nestor et al.* – Adv. Pro. No. 24-01348 (MEW) (the "Rule 2004 Injunction Action").

On April 24, 2024, the Trustee filed the Rule 2004 Injunction Action, seeking a preliminary and permanent injunctive relief restraining the Debtor, M. Nestor, and any other recipients of subpoenas from the Trustee (collectively, the "Rule 2004 Injunction Action Defendants") from removing, destroying, transferring or altering the Debtor's books and records, and other property of the Estate.  Rule 2004 Injunction Action [Docket No. 1].  On April 26, 2024, the Court entered an order preliminarily enjoining the Debtor, M. Nestor, and subpoena recipients from destroying or altering the Debtor's books and records.  Rule 2004 Injunction Action [Docket No. 4].

On December 12, 2024, the Court entered findings of fact and conclusions of law and an order permanently enjoining the destruction or alteration of the Debtor's books and records.  Rule 2004 Injunction Action [Docket No. 34].

There have been no further developments in the Rule 2004 Injunction Action.

v.    *Nestor v. Berger et al.* – Adv. Pro. No. 24-04021 (MEW) (the "Removed Action") (closed)

28

On August 6, 2024, M. Nestor commenced an action against Neil Berger, a member of the Togut Firm, and the Togut Firm (together, the "Removed Action Defendants") in the Civil Court of the City of New York (the "NYS Civil Court"), Index Number LT-001408-24/NY (now, the "Removed Action"). In the Removed Action, M. Nestor sought: (1) an order directing the Trustee to relinquish possession of the Townhouse to her; and (2) treble damages in an undefined amount pursuant to New York Real Property Actions and Proceedings Law § 713.

On August 13, 2024, the Trustee filed Bankruptcy Rule 9027 notices of removal in the United States District Court for the Southern District of New York (the "District Court") and in the NYS Civil Court (collectively, the "Removal Notices") and served copies of the Removal Notices on M. Nestor by email and FedEx. Pursuant to Bankruptcy Rule 9027(c), the Removed Action was automatically removed to the District Court. *See* Case No. 24-cv-06143 (JMF) (S.D.N.Y.). The District Court referred the Removed Action to this Court pursuant to the *Amended Standing Order of Reference* for the Southern District of New York, dated January 31, 2021. [District Court Docket No. 4].

On October 25, 2024, the Court entered an order, *see* Removed Action [Docket No. 15] (the "Removed Action Dismissal Order"), dismissing the Removed Action and permanently enjoining M. Nestor from or continuing any non-appellate actions against the Removed Action Defendants, the Trustee, or his attorneys, professionals or personnel in any court other than the Bankruptcy Court without the Bankruptcy Court's prior authorization.

On November 11, 2024, M. Nestor appealed the Removed Action Dismissal Order, *see* Removed Action [Docket No. 20], but subsequently failed to perfect the appeal. On July 24, 2025, the District Court entered an order dismissing the appeal with prejudice. *See* 24-cv-9250-JHR-SLC [Docket No. 12].

vi.     *Togut v. Butterfly Beach House, LLC* - Adv. Pro. No. 24-04023 (MEW) (the "Connecticut Property Action")

On August 30, 2024, the Trustee commenced the Connecticut Property Action against Butterfly Beach House, LLC ("Butterfly"), and Brenda Nestor, another of the Debtor's sisters (together with Butterfly, the "Connecticut Property Action Defendants"). In the Connecticut Property Action, the Trustee alleges that within two years prior to the Petition Date, the Debtor made a voidable conveyance when she conveyed the entirety of her interests in Butterfly (the "Butterfly Interest Transfer"), and real property located at 21 Point Road, Norwalk, Connecticut 06854 (the "Connecticut Property") to Brenda Nestor in exchange for $1 (the "Butterfly Property Transfer, and together with the Butterfly Transfer, the "Avoidable Transfers").

The Trustee initially sought avoidance and recovery of the Avoidable Transfers pursuant to sections 544(b), 547, 548(a)(1)(a), 550(a), and 551of the Bankruptcy Code, and sections 273(a)(1), (a)(2) and (b), 274, and 276 of the New York Uniform Voidable Transactions Act. Connecticut Property Action [Docket No. 1]. Following discovery and production of documents demonstrating that the Butterfly Interest Transfer may have occurred after the Petition Date, on November 25, 2025, the Trustee filed an amended complaint asserting a cause of action under section 549 of the Bankruptcy Code, seeking avoidance of the Butterfly Interest Transfer as an unauthorized postpetition transfer. Connecticut Property Action [Docket No. 48] (the "Amended Complaint").

On December 30, 2025, the Trustee filed a motion for summary judgment on the section 549 claim, Connecticut Property Action [Docket No. 54], which was granted by the Court at a hearing held on January 22, 2026. An order granting the motion for summary judgment was entered on January 23, 2026. Connecticut Property Action [Docket No. 64].

On January 6, 2026, the Connecticut Property Action Defendants filed an amended answer to the Trustee's Amended Complaint asserting eight affirmative defenses and a counterclaim, Connecticut Property Action [Docket No. 58]. On January 27, 2026, the Trustee filed a reply and defenses to the Connecticut Property Action Defendants' counterclaim. Connecticut Property Action [Docket No. 65].

vii.    *Wenig Saltiel LLP v. Nestor* - Adv. Pro. No. 24-04033 (MEW) (the "Wenig Saltiel Action")

On October 30, 2024, Wenig Saltiel commenced the Wenig Saltiel Action seeking a declaration that the Wenig Saltiel Claim is not dischargeable under 11 U.S.C. § 523(a)(2). Following the Debtors failure to file an answer, on October 21, 2025, the Clerk of the Court for the Bankruptcy Court (the "Clerk of the Court") issued an Entry of Default against the Debtor pursuant to Bankruptcy Rule 7055. Wenig Saltiel Action [Docket No. 14].

On October 29, 2025, Wenig Saltiel sought entry of a default judgment against the Debtor. Wenig Saltiel Action [Docket No. 17]. As of the date hereof, no judgment has been entered in the Wenig Saltiel Action.

viii.    *The Greenspan Company/Adjusters International v. Nestor* - Adv. Pro. No. 24-04045 (MEW) (the "Greenspan Action")

On December 17, 2024, The Greenspan Company/Adjusters International ("Greenspan"), a former public adjuster of the Debtor in connection with an insurance claim arising from a fire loss to the Debtor's property located in Malibu, California, commenced the Greenspan Action seeking a declaration that Greenspan's claim arising from an arbitration

award against the Debtor is not dischargeable under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(3)(B), and 523(a)(4).

On June 24, 2025, the Court entered an order denying the Debtor's motion to dismiss, declaring that the arbitration award was void by reason of the automatic stay, and lifting the automatic stay to permit the arbitration proceeding to proceed. Greenspan Action [Docket No. 21].

On December 4, 2025, the Court entered a scheduling order and set a pretrial conference for April 9, 2026 at 11:00 a.m. (prevailing Eastern Time). On December 30, 2025, the Debtor filed an answer to the complaint.

There have been no further developments in the Greenspan Action.

ix.    *Togut v. Nestor, et al.* - Adv. Pro. No. 25-01037 (MEW) (the "Personal Property Action")

On March 3, 2025, the Trustee commenced the Personal Property Action seeking a declaration that all of the personal property located in the Townhouse constitutes property of the Estate to which the Trustee has clear title and that can be sold or otherwise administered by the Trustee free and clear of any claims or interests asserted by the Debtor, M. Nestor, the Debtor's sister, Brenda Nestor and Gemeaux (collectively, the "Personal Property Action Defendants"), to facilitate the Trustee's efforts to sell the Townhouse.

On May 13, 2025, the Court entered an order authorizing the abandonment of certain personal property located in the Townhouse and directing the Personal Property Action Defendants to retrieve and remove the personal property during a removal period to be set by the Trustee. Personal Property Action [Docket No. 41]. Between July 14, 2025 and October 28, 2025, the Trustee filed three notices informing the Personal Property Action Defendants of personal property he intended to abandon to them, which was retrieved by the Personal Property Action Defendants on various occasions over the course of that period. Personal Property Action [Docket Nos. 53, 59, 85].

On August 13, 2025, the Court issued a decision granting partial summary judgment on motion of the Trustee in the Personal Property Action determining that certain disputed items in the Townhouse, including fireplaces, paneling, flooring, external and interior doors, fireplace surrounds, and doors are fixtures (the "Fixtures") and property of the Estate that the Trustee may sell or otherwise administer free and clear of any ownership claims or interests asserted by the Personal Property Action Defendants. Personal Property Action [Docket No. 64, 65] (the "Fixtures Order and Judgment").

31

On August 25, 2025, M. Nestor appealed the Fixtures Order and Judgment. Personal Property Action [Docket No. 75]. As of January 27, 2026, the appeal was fully briefed and awaiting the scheduling of oral argument. *See* No. 25 Civ. 07217 (JMF) (S.D.N.Y.).

x.    *Togut v. Lee Nestor, et al.* - Adv. Pro. No. 25-01088 (MEW) (the "Lee Nestor Avoidance Action")

On April 21, 2025, the Trustee commenced the Lee Nestor Avoidance Action against Lee Nestor, the Debtor's daughter, and her company, Flying Dog Productions, Inc., seeking to avoid and recover $413,104 in transfers made by the Debtor to the Lee Nestor Avoidance Action defendants prior to the Petition Date as fraudulent transfers pursuant to 11 U.S.C. § 544, 548(a), 550, N.Y. Debtor and Creditor Law §§ 273-76 and 278-79, and 28 U.S.C. §§ 3304 and 3306.

On January 14, 2026, the Trustee filed an application seeking the approval of a stipulation with the Lee Nestor Avoidance Action defendants which provides for the payment of $310,000 to the Trustee in full settlement of the Lee Nestor Avoidance Action. Lee Nestor Avoidance Action [Docket No. 13]. A hearing on the stipulation is scheduled for February 25, 2026 at 11:00 a.m. (prevailing Eastern Time).

xi.    *Togut v. Johnson* - Adv. Pro. No. 25-01089 (MEW) (the "Johnson Avoidance Action")

On April 21, 2025, the Trustee commenced the Johnson Avoidance Action against Colleen Johnson, the Debtor's sister, seeking to avoid and recover (i) $32,848.71 in transfers made by the Debtor to the Colleen Johnson prior to the Petition Date as fraudulent transfers pursuant to 11 U.S.C. § 544, 550, and 551, N.Y. Debtor and Creditor Law §§ 273-76 and 278-79, and 28 U.S.C. §§ 3304 and 3306, and (ii) $20,000 in transfers made by the Debtor to Colleen Johnson after the Petition Date as unauthorized post-petition transfers pursuant to 11 U.S.C. §§ 549 and 550.

On January 14, 2026, the Trustee filed an application seeking the approval of a stipulation with Colleen Johnson which provides for the payment of $40,000 to the Trustee in full settlement of the Johnson Avoidance Action. Johnson Avoidance Action [Docket No. 17]. A hearing on the stipulation is scheduled for February 25, 2026 at 11:00 a.m. (prevailing Eastern Time).

xii.    *Togut v. Nestor Cassini* - Adv. Pro. No. 25-01090 (MEW) (the "M. Nestor Avoidance Action")

On April 21, 2025, the Trustee commenced the M. Nestor Avoidance Action against M. Nestor seeking to avoid and recover $31,000 in transfers made by the Debtor to the M. Nestor after the Petition Date as unauthorized post-petition transfers pursuant to 11 U.S.C. §§ 549 and 550.

On December 12, 2025, the Court denied M. Nestor's motion to dismiss the M. Nestor Avoidance Action.

The M. Nestor Avoidance Action will proceed to trial, and will be scheduled on a date to be determined.

xiii.    *Togut v. Argonaut Insurance Company, et al.* - Adv. Pro. No. 25-01133 (MEW) (the "Insurance Action")

On August 27, 2025, the Trustee commenced the Insurance Action against Argonaut Insurance Company ("Argonaut"), Brownstone Agency, Inc. ("Brownstone"), Hub International Limited ("Hub" and, collectively with Argonaut and Brownstone, the "Insurer Parties"), the Debtor and M. Nestor seeking (i) a declaration that the Debtor's insurance policies are property of the Estate and the Trustee is the party with the sole authority and control over the insurance policies, (ii) an order directing the Insurer Parties to amend the Primary Policy insuring the Townhouse to name the Trustee as the Named Insured, (iii) an order directing the Insurance Action defendants to assist the Trustee is his submission of claims against the Primary Policy, and (iv) an injunction against (a) Argonaut from engaging with any party not required to process insurance claim(s), including the Debtor and M. Nestor, and (b) the Debtor and M. Nestor from interfering with the Primary Policy or with the Trustee's efforts to make or process claims against the Primary Policy or to resolve any other insurance-related matters.  In connection therewith, the Trustee sought a preliminary injunction directing the Insurer Parties to immediately recognize the Trustee as the Named Insured under the Primary Policy.

The Trustee commenced the Insurance Action due to Argonaut's and Brownstone's months' long refusal to recognize the Trustee as a Named Insured or a party with the authority or capacity to file claims under the Primary Policy, preventing the Trustee from submitting a claim under the policy, which took on heightened significance after the Trustee's discovery on August 2, 2025 of the Water Leak in the Townhouse, requiring immediate remediation.

Following constructive dialogue between the Trustee and the Insurer Parties, on September 9, 2025, the parties entered into a stipulation, approved by the Court on September 17, 2025, *see* Insurance Action [Docket No. 21], providing, *inter alia*, that (i) the Trustee succeeds to the rights and benefits of the Debtor under the Primary Policy, (ii) the Trustee has the sole right to administer the insurance claim filed in connection with the Water Leak (the "Water Leak Claim"), including, but not limited to, submission of the proof of loss, engaging in settlement discussions, settlement of the Water Leak Claim, in each case without requiring the Debtor's or M. Nestor's approval or consent, and (iii) all payment(s) issued on account of the Water Leak Claim will be delivered and made payable to the Trustee as the sole payee, to be distributed to

creditors or to other parties in accordance with their respective rights and interests, as determined by further order of the Court.

There have been no further developments in the Insurance Action.

## VI.    Means for Implementation and Execution

### a.    The Rule 2004 Order and the Trustee's Investigation

On April 22, 2024, the Court entered the *Order Authorizing Chapter 11 Trustee to Issue Subpoenas for Records and Testimony* [Docket No. 123] (the "Rule 2004 Order").  The Rule 2004 Order authorizes the Trustee, *inter alia*, "to issue subpoenas: (a) requiring the production of  all books, records, and / or documents, whether physical or electronic . . . related to the Debtor or her property or otherwise evidencing the Debtor's assets and financial affairs . . . held by any person or entity, and (b) requiring deposition testimony concerning any asset, liability, duty, obligation, contract, transaction, transfer, or other issue related in any way to the Debtor and her financial affairs."  Rule 2004 Order at 1.

Pursuant to the Rule 2004 Order and section 1106(a)(3) of the Bankruptcy Code, the Trustee is working to investigate the Debtor's financial affairs and identify affirmative claims and defenses that may be asserted on behalf of the Estate.  To date, the Trustee has served 46 subpoenas (the "Subpoenas") on various parties the Trustee believes are in possession of documents and information in connection with the Debtor's financial affairs.  This investigation may lead to the discovery of causes of action and claims in favor of the Estate and other sources of recoveries including, without limitation, the liquidated value of the contents of the Townhouse that may not be included in the Transaction.

To date, both the Debtor and M. Nestor have failed to comply with Subpoenas served upon them.  *See* [Docket Nos. 258, 259, 355].

As set forth in further detail above, the Trustee is pursuing various Avoidance Actions against parties who the Trustee believes received prepetition or post-petition transfers that are subject to avoidance and recovery under the Bankruptcy Code.  As of January 14, 2026, the Trustee has secured settlements with three defendants in the Lee Nestor Avoidance Action and the Johnson Avoidance Action, which will result in the recovery of $350,000 to the Estate, subject to Court approval and collection.  *See supra* Section V – Adversary Proceedings.

### b.    Plan Funding

The Plan shall be funded by (i) unrestricted Cash on hand on the Effective Date, including any Disposable Income, (ii) the Transaction Proceeds, if any, less any 506(c) Charges and / or 363(j) Charges, (iii) Avoidance Action proceeds, if any, (iv) Insurance Claims proceeds, if any, (v) Retained Causes of Action proceeds, if any, (vi) the proceeds from the liquidation of any other available Assets of the Estate, and (vii) the Contempt Payments.

As soon as reasonably practicable after the Transaction is consummated, the Transaction Proceeds will be transferred to the Post-Confirmation Fund and will be used to satisfy obligations under the Plan in accordance with the terms and conditions of the Plan, the Approval Order, and the Confirmation Order.

The 506(c) Charges shall be used to fully fund, among other things, the Allowed Administrative Claims, the Allowed Professional Fee Claims, the Allowed Priority Claims, and any other amounts that are necessary to confirm the Plan. The amount of any 506(c) Charge shall be determined either (i) pursuant to a settlement among such parties and, as applicable, the Trustee or the Plan Administrator, or (ii) by adjudication by the Bankruptcy Court; provided, for the avoidance of doubt, upon determination of the amount of the 506(c) Charge, if any, chargeable against a Holder of an Allowed Secured Claim, the Trustee or Plan Administrator, as applicable, may issue a Distribution to such Holder on or as reasonably practicable after the Effective Date. Until the specific amount of any 506(c) Charges that are recoverable from any of the Holders of Secured Claims is resolved: (a) the Secured Claims shall be deemed Disputed; (b) no Distributions shall be made to the Holder of a Secured Claim on account of such Holder's Secured Claim; (c) no interest shall accrue on and such Disputed Claims; and (d) the Plan Administrator and Trustee Professionals shall be entitled to seek compensation from amounts maintained in the Disputed Claim Reserve on account of the Secured Claims for fees and expenses (if any) in connection with resolving such 506(c) Charges and resolving the allowance of such Disputed Secured Claims. Nothing in the Plan shall preclude the Plan Administrator from objecting to the Secured Claims on any other basis. For the avoidance of doubt, no 506(c) Charge will be assessed against the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim or the Liens securing the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim.

The 363(j) Charges shall be used to fully fund, among other things, the Allowed Administrative Claims, the Allowed Professional Fee Claims, the Allowed Priority Claims, and any other amounts that are necessary to confirm the Plan. The amount of any 363(j) Charge shall be determined either (i) pursuant to a settlement among such parties and, as applicable, the Trustee or the Plan Administrator, or (ii) by adjudication by the Bankruptcy Court; provided, for the avoidance of doubt, upon determination of the amount of the 363(j) Charge, if any, chargeable against a Holder of an Allowed Secured Claim and/or Valid Lien, the Trustee or Plan Administrator, as applicable, may issue a Distribution or payment to such Holder on or as reasonably practicable after the Effective Date. Until the specific amount of any 363(j) Charges that are recoverable from any of the Holders of Valid Liens is resolved: (a) the Secured Claims and Liens shall be deemed Disputed Claims and/or Disputed Liens, as applicable; (b) no Distributions or payments shall be made to the Holder, as applicable, of a Secured Claims on account of such Holder's Secured Claim or Holder of a Lien on account of such Holder's Valid Lien; (c) no interest shall accrue on and such Disputed Claims; and (d) the Plan Administrator and Trustee Professionals shall be entitled to seek compensation from amounts maintained in the Disputed Claim Reserve on account of the Secured Claims and Liens for fees and expenses (if any) in connection with resolving such 363(j) Charges and resolving the validity, priority, and extent of such Disputed Liens. Nothing in the Plan shall preclude the Plan Administrator from objecting to the Secured Claims and Liens on any other basis. For the avoidance of

35

doubt, no 363(j) Charge will be assessed against the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim or the Liens securing the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim.

**c.     Section 1123(a)(8) and Section 1129(a)(15) of the Bankruptcy Code**

The Debtor in this Chapter 11 Case is an individual.  Section 1123(a)(8) of the Bankruptcy Code requires a plan in a case in which the debtor is an individual "provide for the payment to creditors under the plan by all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan."  11 U.S.C. § 1123(a)(8).  Further, section 1129(a)(15) of the Bankruptcy Code provides that if a creditor objects to confirmation of an individual chapter 11 plan, the plan may only be confirmed if:

(A)  the value, as of the effective date of the plan, of property to be distributed under the plan on account on account of such claim is not less than the amount of such claim; or

(B)  the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

11 U.S.C. § 1129(a)(15).

The Trustee has determined based on information currently available that the Debtor does not project significant, if any, Disposable Income.  Based on the Debtor's Schedules, the Debtor's monthly income consists solely of social security payments in an amount of $3,300 per month.  *See* [Docket No. 28] at 20; *see also* [Docket No. 36] at 13.  The Social Security Act (42 U.S.C. § 407) protects the right of any person to any future payment under subchapter II of chapter 7 of title 42 of the U.S. Code, and such payments are not subject to operation of any bankruptcy law.  *See* 42 U.S.C. § 407(a).  Moreover, section 101(10A) explicitly excludes "benefits received under the Social Security Act (42 U.S.C. 301 et seq.)" from the defined term "current monthly income" as used in the Code.  Section 1325(b)(2) defines "disposable income" as "current monthly income received by the debtor . . ."  Accordingly, the Trustee believes the Debtor has no Disposable Income and creditors are, therefore, not receiving less than the projected Disposable Income of the Debtor to be received during the 5-year period following the effective date of the Plan.

The Trustee nevertheless reserves all rights to seek appropriate relief in the event that material changes in the Debtor's financial circumstances occur, or if it is later determined that the Debtor has Disposable Income not presently disclosed or anticipated, consistent with the Bankruptcy Code and applicable law.

### d.    Distributions on Account of Assets

As provided for below and in the Plan, the Plan Administrator shall establish, maintain and administer the Post-Confirmation Fund and make Distributions therefrom in accordance with the following procedures:

i.    First, to make Distributions as necessary to satisfy Allowed Administrative Claims, Allowed Professional Fee Claims, the Allowed Priority Claims, and the Allowed Post-Petition Financing Claim (the latter of which is to be paid in full in Cash on the Transaction Closing Date as required under the Post-Petition Financing Order) as set forth in Article II of the Plan, and to retain an amount of Cash to establish the Post-Confirmation Reserve for the reasonable and necessary costs, commissions, compensation and other expenses incurred by the Trustee and any Case Professionals in connection with the Chapter 11 Case, including preservation of the Townhouse pending the Sale Process and the sale of the Townhouse and any future Distributions on account of Allowed Professional Fee Claims.

ii.    Second, to make Distributions as necessary to satisfy the Allowed Claims in Classes 1-8 and the Valid Liens, pursuant to the terms of the Plan in the order of priority as set forth in the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, and to retain an amount of Cash to fund the Disputed Claim Reserve in accordance with the terms and conditions of the Plan.

### e.    Tax Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan, including but not limited to a Transaction involving the Townhouse, shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (a) the Transaction;  (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest by the Trustee or Plan Administrator;  (c) the making or assignment of any contract, lease or sublease;  or (d) the making or delivery of any deed or other instrument or transfer under, in furtherance of, or in connection with the Plan or the Transaction.  All such transfers, assignments and sales will not be subject to any stamp tax, or other similar tax held to be a stamp tax or other similar tax by applicable non-bankruptcy law.

### f.    Closing of the Chapter 11 Case

After all Disputed Claims filed against the Debtor have become Allowed Claims or have been Disallowed, and all Assets have been liquidated and converted into Cash (other than those Assets that have been or may be abandoned), and such Cash has been distributed in accordance with the Plan, or at such earlier time as the Plan Administrator deems appropriate, the Plan Administrator shall seek authority from the

Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### g.    Powers and Duties of the Plan Administrator Under the Plan

The Trustee shall be discharged on the Effective Date, and on the Effective Date, the Confirmation Order shall approve the appointment of the Plan Administrator.  The Plan Administrator shall have all the powers, authority and responsibilities necessary and appropriate to implement the Plan and the other transactions contemplated by the Plan and all contracts, instruments, releases, and other agreements or documents entered into or delivered in connection with the Plan, including without limitation the powers and authority of a trustee under sections 704 and 1106 of the Bankruptcy Code.  The compensation for the Plan Administrator shall be based upon his customary hourly billing rate.  The Plan Administrator will act in accordance with the terms and conditions of the Plan and shall make and effectuate all Distributions to Holders of Allowed Claims required under the Plan, shall have the exclusive right to settle or compromise any Disputed Claim and be responsible for the reserve to be established hereunder for Disputed Claims, if any.  In addition to the duties and rights described above, the powers and duties of the Plan Administrators shall also include, without limitation:

  i.    making Distributions to Holders of Allowed Claims and paying taxes and other obligations owed by the Estate or incurred by the Plan Administrator in connection with winding down the Estate, subject to the terms of the Plan;

  ii.    engaging or retaining, without any further order of the Bankruptcy Court, attorneys, consultants, agents, employees, and any other professional Persons, to assist the Plan Administrator with respect to the Plan Administrator's responsibilities;

  iii.    executing and delivering all documents and taking all actions necessary to consummate the Plan, the Transaction and wind up of the Estate;

  iv.    coordinating the turnover of Estate property, if any;

  v.    coordinating the storage, maintenance, abandonment and destruction of the books and records of the Estate;

  vi.    overseeing compliance with the accounting, finance, and reporting obligations of the Estate;

  vii.    preparing financial statements and United States Trustee post-Effective Date quarterly reports, until such time a final decree has been entered;

  viii.    overseeing the filing of final tax returns of the Estate, refund requests, audits, and other corporate dissolution documents, as required;

  ix.    performing any additional corporate actions as necessary to carry out the wind up and liquidation of the Estate;

x.      paying the fees and expenses of the Case Professionals and the attorneys, consultants, agents, employees, and other professional Persons retained by the Plan Administrator and the Trustee and to pay all other expenses for winding down the affairs of the Debtor and the Estate, subject to the terms of the Plan;

xi.      disposing of, and delivering title to others of, or otherwise realizing the value of, all the remaining Assets (including, without limitation, litigation of the Retained Causes of Action, which may include prosecution, settlement, abandonment, or dismissal of any such Causes of Action, without further order of the Bankruptcy Court or consent of any other party, except as provided in the Plan);

xii.      obtain and pay for, out of the Assets, all reasonably necessary insurance coverage for the Plan Administrator and his designees, employees, agents, representatives, or professionals;

xiii.      objecting to, prosecuting, compromising, and settling Claims;

xiv.      prosecuting, compromising, and settling of any Retained Causes of Action, including the Avoidance Actions or the Insurance Claims;

xv.      prosecuting, compromising, and settling Avoidance Actions;

xvi.      objecting to, prosecuting, compromising, and settling the validity, priority or extent of Liens;

xvii.      objecting to, prosecuting, compromising, and settling exemptions asserted by the Debtor;

xviii.      asserting, prosecuting, compromising, and settling claims under Bankruptcy Code section 506(c) and 363(j);

xix.      acting on behalf of the Estate, the Trustee and the post-Effective Date Debtor in all adversary proceedings, appeals and contested matters (including, without limitation, any Causes of Action) pending on the Effective Date, if any, and to settle, retain, enforce, dispute, or adjust any Claim and otherwise pursue actions involving the Estate's Assets that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise waived or relinquished in the Plan;

xx.      establish or release appropriate reserves for administration of the Chapter 11 Case;

xxi.      implementing and/or enforcing all provisions of the Plan;  and

xxii.      such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or other order of the Bankruptcy Court, or as may be needed or appropriate to carry out the provisions of the Plan.

### h.    Vesting of Assets

After the Effective Date, the Debtor shall have no interest in the Assets and the Plan Administrator and all Assets shall be managed and distributed by the Plan Administrator pursuant to the terms of the Plan and Confirmation Order, and shall be held in the name of the Plan Administrator free and clear of all Claims and interests except for rights to such Distributions provided to Holders of Allowed Claims, as provided in the Plan; provided, that, except as otherwise provided in the Plan and the Confirmation Order, and after all Distributions in accordance with Section 5 of the Plan have been made, Assets, if any, remaining shall vest in the Debtor pursuant to section 1141(b) of the Bankruptcy Code, in each case free and clear of all Claims, Liens and interests.

On the Effective Date, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) of the Debtor and Trustee shall vest in the Plan Administrator and his representatives (and the Plan Administrator and his representatives shall be deemed to be successors in interest with respect to such privileges), and the Debtor, Trustee, and Plan Administrator are authorized and directed to take all necessary actions to effectuate transfer of such privileges.

### i.    No Liability

The Plan Administrator shall not be liable for any actions taken, or not taken, and Distributions made in accordance with the Plan and Confirmation Order.  Unless otherwise ordered by a Final Order of the Bankruptcy Court or otherwise provided in the Plan, the record date for Distributions shall be the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case. The Plan Administrator shall not be liable to the Debtor, M. Nestor, Gemeaux, the Purchaser, any Holder or any other Person, firm or corporation, for any error of judgment or for any mistake of law or fact or any act done, caused to be done, or omitted to be done, by the Plan Administrator or any of his agents, except for acts of willful misconduct, gross negligence or breach of fiduciary duty by itself or such agents.

### j.    Payment of Case Professionals for Post-Effective Date Services and Reimbursement of Expenses

The Plan Administrator is further authorized to retain such Case Professionals that the Plan Administrator in his discretion believes are necessary to carry out the terms of the Plan, including retaining the same Case Professionals that were retained to represent the Trustee and the Estate in the Chapter 11 Case, without any further notice to or action, order, or approval of the Bankruptcy Court.  The fact that such Case Professionals may have represented the Trustee or the Estate during the Chapter 11 Case shall not disqualify those Case Professionals from continuing to provide services to the Plan Administrator, or impact their disinterestedness, or give rise to a conflict of interest that would preclude such representation, provided, however, no Professional shall be entitled to compensation from the Plan Administrator or the Estate for services rendered to the Debtor or Trustee after the Effective Date without the express written consent of the Plan Administrator.  The reasonable compensation and out-of-pocket

40

expenses incurred after the Effective Date by Case Professionals retained by the Plan Administrator, including the Plan Administrator, for post-Effective Date services and shall be paid by the Plan Administrator within thirty (30) days after presentation of invoices for such professional services to the Plan Administrator without any further order of the Bankruptcy Court; provided, however, that if the Plan Administrator and any Case Professional cannot agree on the amount of post-Effective Date fees and expenses to be paid to such Case Professionals, such amount shall be determined by the Bankruptcy Court.

### k. Direction to Parties

From and after the Effective Date, the Plan Administrator may apply to the Bankruptcy Court for an order directing any necessary party or entity to execute or deliver, or to join in the execution or delivery of, any instrument required to perform any act that is necessary for the consummation of the Plan, pursuant to section 1142(b) of the Bankruptcy Code.

### l. Exemptions

Any state and/or federal exemption asserted by the Debtor in Schedule C of the Schedules or otherwise is Disputed and shall be subject to further order of the Bankruptcy Court.

### m. Insurance

Notwithstanding any other provision of the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code and in accordance with the terms of the Plan, the Insurance Policies shall be treated as an Executory Contract to the extent permitted by law, unless any Insurance Policy was previously assumed, assumed and assigned, or rejected by the Debtor or the Trustee, as applicable, pursuant to a Bankruptcy Court order or is the subject of a motion to assume or motion to reject pending on the Effective Date.

Nothing in the Plan shall affect, impair or prejudice the rights of the insurance carriers, insureds, the Debtor, the Trustee, and the Plan Administrator, as applicable, under the Insurance Policies (including, but not limited to, with respect to the Insurance Claims and the Insurance Stipulation) in any manner, and such insurance carriers, insureds, the Debtor, the Trustee, the Plan Administrator, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds, the Trustee, and the Plan Administrator in the same manner and according to the same terms and practices applicable to the Debtor and the Trustee, as existed prior to the Effective Date, as modified by the Insurance Stipulation.

### n. Settlements

To the extent the Trustee is able to reach settlements with Holders of Secured Claims and/or Liens, such settlements will be incorporated into the Plan, and a copy of such settlements will be provided in the Plan Supplement.

o.    **Closing the Transaction, and Sections 363(i), 363(j), and 1146(a)**

Pursuant to prior orders of the Bankruptcy Court, M. Nestor is estopped from asserting an ownership interest in the Townhouse.

A holder of Section 363(i) Rights, if any, shall be deemed to have waived and relinquished all rights and interests of such holder pursuant to section 363(i) of the Bankruptcy Code, and such holder shall be forever barred from seeking to exercise or enforce any such rights or interests if the following is not submitted within one (1) business day following the Bankruptcy Court's entry of the Confirmation Order:  (A) a bid at or exceeding the purchase price provided in the Purchase Agreement, (B) a Cash deposit equal to five (5%) percent of the purchase price provided in the Purchase Agreement, and (C) sufficient financial information that demonstrates, to the Trustee's satisfaction, the ability to close the Transaction on or prior to March 15, 2026;  provided, in the event that such showing is not made by a holder of Section 363(i) Rights within one (1) business day following the entry of the Confirmation Order, then the Trustee is authorized to close the Transaction pursuant to the terms of the Purchase Agreement, the Approval Order, and the Confirmation Order.

Distributions, if any, pursuant to Section 363(j) of the Bankruptcy Code, shall be subject to further order of the Bankruptcy Court.

The Trustee is authorized, but not required, to close the Transaction prior to the Effective Date.

The Transaction is pursuant to the Plan and as a result, the provisions of section 1146(a) of the Bankruptcy Code apply to the Transaction.

p.    **General Settlement of Claims and Interests**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, interests, and controversies released, settled, compromised, discharged or otherwise resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of all such compromises and/or settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such compromises and/or settlements are in the best interest of the Debtor, the Estate and Holders of Claims, Liens and interests and are fair, equitable and reasonable.

VII.    <u>**Distributions under the Plan**</u>

a.    **Distributions**

The Trustee or Plan Administrator, as applicable, shall make all Distributions from the Post-Confirmation Fund.  Whenever any Distribution shall be due on a day

other than a Business Day, such Distribution shall instead be made, without interest, on the day immediately succeeding a Business Day, but shall be deemed to have been made on the date due.  For federal income tax purposes, a Distribution will be allocated to the principal amount of a Claim first and then to the extent the Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest, to the extent applicable.

### b.    Manner of Payment Under the Plan

Unless the Person receiving a payment agrees otherwise, any payment in Cash made by the Plan Administrator shall be made by check drawn on a domestic bank, wire transfer or by automated clearing house transfer.

### c.    Payment Dates

If any payment or act under the Plan is required to be made, or falls, on a date which shall be a Saturday, Sunday or a legal holiday, then the making of such payment or performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed timely.

### d.    *De Minimis* Distributions

The Plan Administrator shall not be required to make any Cash payment of less than twenty-five dollars ($25.00) with respect to any Claim unless a request therefor is made in writing to the Plan Administrator on or before twenty (20) days after the Effective Date.  Any de minimis distributions not subject to a timely request for payment shall be forfeited and deposited into either the Disputed Claim Reserve or the Post-Confirmation Reserve, at the discretion of the Plan Administrator.

### e.    Unclaimed Distributions and Property

Except as otherwise provided in the Plan, in the event any Holder fails to claim by a writing delivered to the Plan Administrator and negotiate any Distribution within ninety (90) days from the date of such Distribution, such claimant shall forfeit all rights thereto and to any and all future payments, and thereafter the Allowed Claim for which such Cash was distributed shall be treated as a Disallowed Claim or interest as the case may be.  Distributions to claimants entitled thereto shall be sent to their last known address set forth on the most recent proof of claim filed with the Bankruptcy Court or, if no proof of claim is filed, on the Schedules filed by the Debtor or to such other address as may be later designated by a creditor in writing to, as applicable, the Trustee or the Plan Administrator.  All unclaimed Cash shall be distributed or remitted in accordance with the terms and conditions of the Plan.

### f.    Distributions Free and Clear

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims under the Plan shall be clear of any Liens, claims and encumbrances, and no other Entity shall have any interest (legal, beneficial or otherwise) in such Distribution.

## VIII.   Resolutions of Disputed Claims

### a.      Objections

An objection to either the allowance of a Claim or an amendment to the Schedules shall be in writing and may either be filed with the Bankruptcy Court or pursued and resolved by other means by, as applicable, the Trustee or the Plan Administrator, at any time within ninety (90) days after the Effective Date, or within such other time period as may be fixed by the Bankruptcy Court for cause, without prejudice to, as applicable, the Trustee or the Plan Administrator's right to seek an extension of such deadline.  The Plan Administrator may object to, and settle, any Claims and may settle, compromise or prosecute all Claim objections in accordance with the Plan.

### b.      Amendment of Claims

A Claim may be amended prior to the Effective Date only as agreed upon by the Trustee and the Holder of such Claim and as approved by the Bankruptcy Court or as otherwise permitted by the Bankruptcy Code and Bankruptcy Rules.  After the Effective Date, a Claim may be amended as agreed upon by the Holder thereof and the Plan Administrator only to decrease, but not increase, the face amount thereof.

### c.      Reserve for Disputed Claims and Disputed Liens

As soon as practicable after the Effective Date, the Plan Administrator shall establish, fund, and maintain a reserve account for Holders of Disputed Claims and Disputed Liens with Cash that would otherwise be distributable to such Holder on the Effective Date if such Disputed Claim or Disputed Lien were an Allowed Claim or Valid Lien on the Effective Date, after deduction for any 506(c) Charge and/or 363(j) Charge, or such other amount as either:  (i) the Holder of such Disputed Claim or Disputed Lien and the Plan Administrator or Trustee, as applicable, may agree upon; or (ii) as may be fixed by an order of the Bankruptcy Court.

The Cash so reserved for such Holder, to the extent such Disputed Claim is Allowed or such Disputed Lien is a Valid Lien, and only after such Disputed Claim or Disputed Lien becomes a subsequently Allowed Claim or Valid Lien, as applicable, shall thereafter be distributed to such Holder.

Until the specific amount of a 506(c) Charge and/or 363(j) Charge from each of the Holders of Allowed Secured Claims and/or Valid Liens is resolved:  (a) the Secured Claims and Liens shall be deemed Disputed Claims and/or Disputed Liens, as applicable;  (b) no Distributions shall be made to the Holders of Allowed Secured Claims on account of such Holder's Secured Claim and no payment shall be made to the Holders of Valid Liens on account of such Liens;  (c) no interest shall accrue on such Secured Claim(s);  and (d) the Plan Administrator and his professionals shall be entitled to seek compensation from amounts maintained in the Disputed Claim Reserve on account of the Secured Claims and Liens, for fees and expenses (if any) in connection with resolving the 506(c) Charge, the 363(j) Charge, and resolving the allowance of the Allowed Secured Claims and the validity, priority, and extent of the Valid Liens.

The Holder of a subsequently Allowed Claim shall not be entitled to any interest on the Allowed amount of its Claim, regardless of when Distribution thereon is made to or received by such Holder.

In the event there is any excess Cash held in the Disputed Claim Reserve following resolution of the Disputed Claims and Disputed Liens, such excess Cash will be distributed pursuant to the terms and conditions under the Plan.

### d.    Claim Procedures Not Exclusive

All of the aforementioned Claims procedures are cumulative and not necessarily exclusive of one another.  On and after the Effective Date, Claims which were previously Disputed may subsequently be compromised, settled, withdrawn, or otherwise resolved by the Plan Administrator pursuant to further order of the Bankruptcy Court.

## IX.    Executory Contracts and Unexpired Leases

### a.    Assumption or Rejection of Executory Contracts and Unexpired Leases

Effective on the Confirmation Date, except as expressly provided in the Plan, all Executory Contracts and Unexpired Leases, to the extent such exist, are hereby specifically deemed rejected, except for any Executory Contract or Unexpired Lease (a) that has been specifically assumed, or assumed and assigned, by the Debtor or Trustee on or before the Confirmation Date with the approval of the Bankruptcy Court, (b) in respect of which a motion for assumption or assumption and assignment has been filed with the Bankruptcy Court on or before the Confirmation Date, or (c) that is specifically designated as a contract to be assumed on a schedule to be included as part of the Plan Supplement.

### b.    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order, but subject to the occurrence of the Effective Date, shall constitute (a) the approval pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code of the assumption, or assumption and assignment, of the Executory Contracts and/or Unexpired Leases assumed, or assumed and assigned, in accordance with Section 8.1 of the Plan, and (b) the approval pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code of the rejection of the Executory Contracts and/or Unexpired Leases rejected in accordance with Section 8.1 of the Plan.

### c.    Bar Date for Proofs of Claim Relating to Rejected Executory Contracts and Unexpired Leases

Claims against the Debtor arising out of the rejection of Executory Contracts and/or Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court no later than thirty (30) days after the later of service of (a) notice of entry of an order approving the rejection of such Executory Contract and/or Unexpired Lease which

Order may be the Confirmation Order, and (b) notice of occurrence of the Effective Date. Any such Claims not filed within such time shall be forever barred from assertion against the Estate, and any and all of the Assets of the Estate.

### d. Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on the Schedules, the schedule of Executory Contracts and Unexpired Leases in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Trustee that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Estate has any liability thereunder.

## X.    Effect of the Confirmation Date, and, Surrender and Cancellation of Claims

### a. Discharge

The Debtor shall not be entitled to a discharge of any debt unless the Bankruptcy Court approves a motion of the Trustee or the Plan Administrator, as applicable, in which the Trustee certifies that (a) all Trustee expenses have been paid or reserved for, (b) the Debtor has fully complied with all of the terms and conditions of the Plan, Confirmation Order, and all orders entered in the Chapter 11 Case that require the Debtor to act or otherwise perform an obligation, (c) all Distributions required to be made under the Plan are made, including payments made to Holders of Allowed Claims, and (d) all of the Debtor's non-exempt property, including any Disposable Income, of the Estate is turned over to, as applicable, the Trustee or the Plan Administrator. No discharge granted to the Debtor shall be inconsistent with the terms of any Order of the Bankruptcy Court determining that any debt is nondischargeable, or with the provisions of sections 1141(d)(2) or (d)(6) of the Bankruptcy Code.

Notwithstanding anything to the contrary in this Article IX, except as may otherwise be prohibited by the provisions of the Bankruptcy Code, nothing herein shall preclude a holder of an Allowed Claim, which Allowed Claim has been determined by order of the Court to be nondischargeable, from enforcing, levying, attaching or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, from any assets or property of the Debtor which are not the Assets of the Estate, including any Disposable Income.

### b. Confirmation Date Injunction

Effective upon the Confirmation Date, all Persons who have held, hold or may hold Claims or interests are enjoined from taking any of the following actions against or affecting the Debtor's, the Trustee's or the Plan Administrator's administration of the Plan on account of or in connection with any Claims or interests, except as otherwise set forth in the Plan and the Confirmation Order (other than actions brought to enforce any rights or obligations under the Plan or appeals, if any):

       *i.*    Commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, arbitration, or other proceeding of any kind against the

Debtor, the Trustee, the Trustee Professionals, the Plan Administrator, or the Townhouse, the Assets, on account of or in connection with any Claims or interests;

ii.    Enforcing, levying, attaching, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Townhouse, the Assets, the Trustee, or the Plan Administrator;

iii.    Creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Townhouse, the Assets, the Trustee, the Plan Administrator, or the Purchaser;

iv.    Asserting any setoff, right of subrogation, or recoupment of any kind, directly or indirectly, against the Debtor, the Trustee, or the Plan Administrator;

v.    Commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or interests released, settled or discharged pursuant to the Plan;

vi.    Proceeding or acting in any manner and any place whatsoever that does not conform to or comply with the provisions of the Plan, the Confirmation Order or any other Order of the Bankruptcy Code;  and

vii.    Challenging Purchaser's ownership (in accordance with the Approval Order) of the Townhouse, or in any manner whatsoever interfering with Purchaser's quiet enjoyment of the Townhouse.

c.    **Releases by the Trustee and the Estate**

**Except for the right to enforce the Plan, or as otherwise provided in the Plan, the Estate, and the Trustee shall, effective upon occurrence of the Effective Date, be deemed to forever release, waive and discharge each Released Party of and from any and all Claims, demands, Causes of Action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise; provided, however, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any such party effective from and after the Effective Date;  provided, further, that notwithstanding the foregoing or any other provision of the Plan, nothing in the Plan, any Plan Supplement, or any order confirming the Plan shall affect any Causes of Action, Claims, or counter-Claims that may be asserted by the Trustee in connection with an objection to a Claim that has not been Allowed, in each case as determined by the Bankruptcy Court; provided, further, that nothing in the P lan shall prohibit the Trustee and the Trustee Professionals from enforcing their rights under the Plan;  provided, further, that such release shall not operate as a release of Claims or obligations determined by a final order to have arisen from bad faith, willful misconduct, gross negligence, breach of fiduciary duty, malpractice, fraud,**

criminal conduct, unauthorized use of confidential information that causes damages, and/or ultra vires acts

### d.  Exculpation

**Effective as of the Effective Date, to the extent permitted under section 1125(e) of the Bankruptcy Code, no Exculpated Party shall have or incur liability for, and each Exculpated Party is exculpated from any Cause of Action related to any act or omission taking place between the Petition Date and the Effective Date, in connection with, relating to, or arising out of, the Chapter 11 Case and the proceedings therein, the formulation, preparation, dissemination, negotiation, or filing of the Plan, the Disclosure Statement, any Plan Supplement, or Transaction approved by the Bankruptcy Court in these Chapter 11 Case, the Post-Petition Financing Facility, except for (a) any Cause of Action related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted fraud, willful misconduct, or gross negligence of such Person, and (b) any Cause of Action related to any liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1);  provided, however, that, for the avoidance of doubt, any such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit.**

### e.  Release of Liens

Except as otherwise provided in the Plan, the Confirmation Order, or any instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall revert to the Trustee or the Plan Administrator, as applicable.

## XI.  Conditions Precedent to Confirmation Date and Effective Date of the Plan

### a.  Conditions to the Occurrence of the Confirmation Date.

The following are conditions precedent to the occurrence of the Confirmation Date:

    i.  The Confirmation Order is in form and substance reasonably satisfactory to the Trustee.

    ii.  The Confirmation Order shall approve the terms and conditions of the Plan.

    iii.  The Confirmation Order shall approve the appointment of the Plan Administrator and authorize him to take all actions necessary or appropriate to implement the Plan and the other transactions contemplated by the Plan and all

contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, and the Approval Order.

    iv.  The Plan shall not have been materially amended, altered or modified, unless such material amendment, alteration or modification has been made in accordance with the terms of the Plan.

    v.  All exhibits and schedules to the Plan are in form and substance reasonably satisfactory to the Trustee.

    vi.  The Approval Order is in form and substance reasonably satisfactory to the Trustee.

  b.  **Conditions to the Occurrence of the Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date of the Plan:

    i.  The Bankruptcy Court shall have entered the Confirmation Order, which shall grant final approval of the Plan and the exculpation contained therein.

    ii.  No stay of the Confirmation Order shall then be in effect, unless the Plan shall have been substantially consummated before entry of any stay.

    iii.  The Plan and the Plan Supplement, and any exhibits and schedules thereto, shall not have been materially amended, altered or modified, unless such material amendment, alteration or modification has been made in accordance with the Plan.

    iv.  The Transaction shall have been consummated and not be subject to any stay.

    v.  The Bankruptcy Court shall have entered the Approval Order.

provided, that, notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Effective Date; provided, further, that to the extent a condition precedent (a "Prerequisite Condition") may be required to occur prior to another condition precedent (a "Subsequent Condition") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

  c.  **Non-Occurrence of the Effective Date;  Non-Waiver of Conditions**

In the event that:  (a) the Trustee determines that the conditions to the Effective Date set forth in Section 10.2 of the Plan cannot be satisfied;  or (b) the Effective Date has not occurred within ninety (90) days of the Confirmation Date, the Plan shall, at the Trustee's election in his sole discretion, be null and void in all respects and nothing

contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by the Debtor or Trustee or Claims against the Debtor; (ii) prejudice in any manner the rights of the Debtor, the Trustee, any Holders of a Claim or interest or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, the Trustee, any Holders, or any other Entity in any respect. The Trustee may propose a new plan, may modify the Plan as permitted by law, or may request other relief.

**XII.    Reserved.**

**XIII.    Retention of Jurisdiction**

Pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case, the Transaction, and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

i.    Allow, Disallow, determine, subordinate, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or interest (whether filed before or after the Effective Date and whether or not contingent, Disputed, or unliquidated or for contribution, indemnification, or reimbursement), including the compromise, settlement, and resolution of any request for payment of any Claims or interests, the resolution of any objections to the allowance or priority of Claims or interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any objection to such Claim or interest to the extent permitted under applicable law; provided, that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Trustee or the Plan Administrator, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

ii.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

iii.    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider an act upon the compromise and settlement of any Claim or interest, or Cause of Action;

iv.    determine and resolve the amount(s) and allocation(s) with respect to any claims under Bankruptcy Code sections 506(c) and 363(j);

v.    determine and resolve exemptions asserted by the Debtor;

vi.    determine and resolve matters concerning Liens, including, without limitation, the validity, priority, and extent of Liens;

vii.      determine and resolve any matters related to (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, and (ii) any dispute regarding whether a contract or lease is or was executory or unexpired;

viii.      ensure that all Distributions to Holders of Allowed Claims under the Plan and the performance of the provisions of the Plan are accomplished as provided in the Plan and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

ix.      construe, take any action, and issue such orders, prior to and following the Confirmation Date and consistent with Bankruptcy Code section 1142, as may be necessary for the enforcement, implementation, execution, and consummation of the Plan and all contracts, instruments, releases, other agreements, or documents created in connection with the Plan, including, without limitation, the Approval Order and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with Bankruptcy Code sections 524 and 1141 following the occurrence of the Effective Date;

x.      determine and resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation of the Plan or interpretation, implementation, or enforcement of the Plan (and all exhibits and schedules to the Plan) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

xi.      modify the Plan or the Confirmation Order before or after the Effective Date, pursuant to Bankruptcy Code section 1127, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

xii.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation of the Plan or implementation or enforcement of the Plan or the Confirmation Order;

xiii.      enter and implement such orders as are necessary or appropriate if the Approval Order or Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

xiv.      determine any other matters that may arise in connection with or relating to the Plan, the Approval Order, the Confirmation Order, the Transaction, or

any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order;

       xv.       determine such other matters and for such other purposes as may be provided in the Approval Order or the Confirmation Order;

       xvi.       hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

       xvii.       enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

       xviii.       determine and resolve controversies related to the Estate, the Debtor, the Trustee, and the Plan Administrator, from and after the Effective Date;

       xix.       hear and determine any other matter relating to the Plan; and

       xx.       enter a final decree closing the Chapter 11 Case.

## XIV.  <u>Risk Factors to be Considered</u>

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the Exhibits and documents referenced herein). This information, however, does not describe the only risk involved in connection with the Plan and its implementation. Nothing in the Plan constitutes an admission of, or shall be deemed evidence of, any fact or legal conclusion or of the legal effects of the Plan.

### a.    **Failure to Confirm the Plan**

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a chapter 7 liquidation. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan. Although the Trustee believes that the Plan will satisfy all requirements necessary for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation. If the Plan is not confirmed or modifications are necessary, there is a possibility that the Trustee will need to recommence solicitation, which would further delay confirmation and proposed distributions, and would increase the risk that the Transaction is not consummated.

### b.    **Classification and Treatment of Claims and Interests**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and interests. The Bankruptcy Code also requires that, except for certain Clams classified for administrative convenience, the Plan may place a Claim or interest in a particular Class only if such Claim or interest is substantially similar to the other Clams or interests of such Class. The Trustee believes that all Claims and interests have been

appropriately classified. To the extent the Bankruptcy Court finds that a different classification is required for confirmation, the Trustee may seek to modify the Plan to provide whatever classification might be required for confirmation. There can be no assurance the Bankruptcy Court would approve the Plan based upon such modification.

### c.    Risks of Failure to Satisfy Conditions Precedent

The Plan provides for certain conditions that must be satisfied or waived for the Plan to be confirmed and for the Plan to become effective. Some of the conditions are outside of the control of the Trustee. There can be no assurance that any or all of the conditions in the Plan will be satisfied or waived. Accordingly, even if the Plan is confirmed, there can be no assurance that the Plan will be consummated or that the Chapter 11 Case will not be converted to a chapter 7 liquidation. The Trustee believes such an outcome may materially reduce Distributions to creditors.

### d.    Risks of the Transaction Failing to Consummate

The Transaction Proceeds constitute substantially all of the value that is available for distribution to creditors in this case. In the event that the Transaction fails to be consummated for any reason (including, failure to obtain entry of the Confirmation Order by the Outside Date or the refusal of the Purchaser to consummate the Transaction), Distributions in this case will be delayed and may also be materially less depending on the terms of any alternative transaction (if any). In the event that the Transaction fails to be consummated, the Trustee may seek conversion of the Case to chapter 7.

### e.    Risks Relating to Avoidance Actions and Other Causes of Action

The Plan contemplates that the Plan Administrator may pursue Causes of Action, including Avoidance Actions, belonging to the Estate, which, if successfully prosecuted or settled, could result in additional recoveries available for distribution to creditors in accordance with the Plan. However, the pursuit of such Causes of Action is inherently uncertain and involves substantial risks, including factual and legal defenses, evidentiary challenges, litigation costs, delays, and the possibility of adverse rulings. The successful prosecution or settlement of any such Causes of Action is not guaranteed and may require significant time and expense, which may reduce the utility of pursuing them. Any proceeds realized from the Causes of Action would be net of the costs associated with investigating, prosecuting, and resolving such matters.

Due to the inherent uncertainty associated with the merits, collectability, timing, and cost of pursuing the Causes of Action, the Trustee has not assigned or ascribed any value to such assets for purposes of the Plan or the Liquidation Analysis. Accordingly, there can be no assurance that the pursuit of the Causes of Action will result in any recovery, or that any recovery obtained will be sufficient to provide a distribution to Holders of Allowed Claims beyond those otherwise contemplated under the Plan.

f.    **Risks Relating to the Allowance and Resolution of Claims**

The amount and timing of any distributions under the Plan depend on the allowance of Claims and the resolution of any objections thereto.  Claims asserted in this Chapter 11 Case may be subject to objection, estimation, settlement, or litigation, which could delay distributions and affect the amounts ultimately available for distribution to Holders of Allowed Claims.  There can be no assurance that Claims will be allowed in the amounts asserted, or that disputes regarding Claims will be resolved in a timely manner.

g.    **Risks of Increased Administrative Expenses**

The administration of the Chapter 11 Case, including consummation of the Plan and the pursuit of any Causes of Action, may result in administrative expenses that exceed current estimates.  Increases in administrative costs, including professional fees and expenses, could reduce the funds available for distribution to creditors and may delay the timing of any such distributions.

h.    **Risks Relating to the Timing of Distributions**

The timing of distributions under the Plan depends on a variety of factors, including the consummation of the Transaction, the allowance of Claims, the satisfaction of conditions precedent to the Effective Date, and the resolution of any disputes or litigation.  As a result, distributions, if any, may be delayed and may not occur on the timeline anticipated by Holders of Claims.

i.    **Risks of Adverse Court Rulings or Appeals**

Orders of the Bankruptcy Court, including the Confirmation Order or the Approval Order, may be subject to appeal.  The pendency of any appeal could delay consummation of the Plan and distributions to creditors and increased administrative expenses.  There can be no assurance that any appeal would be resolved in a manner favorable to the Estate or within a particular timeframe.

j.    **Risks Relating to the Conduct or Non-Cooperation of the Debtor or Related Parties**

The implementation of the Plan and consummation of the Transaction may be adversely affected by actions taken by the Debtor or other related parties, including the assertion of objections, motions, appeals, or other proceedings.  Such actions, regardless of their ultimate merit, could delay consummation of the Transaction and the Plan, increase administrative costs, impair buyer confidence, or otherwise reduce the value of the Estate available for the distribution to creditors.

k.    **Risks Relating to Insurance Claims or Other Contingent Assets**

The Estate may hold certain contingent or unliquidated assets, including potential insurance claims or other contingent rights.  The existence, scope, collectability, and timing of any recovery on such assets are uncertain and may be

subject to coverage defenses, exclusions, or disputes.  There can be no assurance that any such contingent assets will result in recoveries available for distribution to creditors.

### l.    Risks Associated with Conversion to Chapter 7

If the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, a chapter 7 trustee would be appointed, and the administration of the Estate would proceed under a different statutory framework.  Conversion could result in additional delay, increased administrative expenses, and the potential delay, remarketing, or renegotiation of the Sale of the Townhouse, any of which could reduce the net proceeds available for distributions to creditors.

### XV.    Tax Consequence of the Plan

Confirmation of the Plan may have federal income tax consequences for Holders of Claims and Interests.  Any federal income tax matters raised by confirmation of the Plan are governed by the Internal Revenue Code and the regulations promulgated thereunder.  Creditors are urged to consult their own counsel and tax advisors as to the consequences to them, under federal and applicable state, local and foreign tax laws, of the Plan.  The federal, state and local tax consequences of the Plan may be complex in some circumstances and, in some cases, uncertain.  Accordingly, each Holder of a Claim and Interest is strongly urged to consult with his or her own tax advisor regarding the federal, state and local tax consequences of the Plan, including but not limited to the receipt of cash and/or stock under the Plan.

**CREDITORS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.**

The Trustee does not anticipate that confirmation of the Plan will result in the Debtor being assessed or owing any federal income tax.  Therefore, the Trustee will not withhold taxes or comply with applicable report requirements, and will issue an IRS 1099 Form to the recipient of a distribution, if requested.

**XVI.** **Notices**

All notices and correspondence should be forwarded in writing to:

> Attorneys for the Trustee
> Togut, Segal & Segal LLP
> One Penn Plaza, Suite 3335
> New York, New York 10119
> Attn: Brian F. Moore and Martha E. Martir
> Email: bmoore@teamtogut.com and
> mmartir@teamtogut.com.

## CONCLUSION

The Trustee submits that the Plan complies in all respects with Chapter 11 of the Bankruptcy Code.

Dated: New York, New York
February 3, 2026

> ALBERT TOGUT, not individually but solely
> in his capacity as Chapter 11 Trustee,
> By His Attorneys,
> TOGUT, SEGAL & SEGAL LLP
> By:
>
> /s/ Brian F. Moore
> BRIAN F. MOORE
> MARTHA E. MARTIR
> One Penn Plaza
> New York, New York 10119
> (212) 594-5000

**<u>EXHIBIT 1</u>**

**Plan**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                         :

In re:                             :     Chapter 11
                                        :

PEGGY NESTOR,                 :     Case No. 23-10627 (MEW)
                                        :

                    Debtor.     :

------------------------------------------------------------------ x

## <u>AMENDED CHAPTER 11 TRUSTEE'S PLAN</u>

        Brian F. Moore, Esq.
        Martha E. Martir, Esq.
        TOGUT, SEGAL & SEGAL LLP
        One Penn Plaza, Suite 3335
        New York, New York 10119
        (212) 594-5000

        *Counsel for Albert Togut,*
        *not individually but solely in*
        *his capacity as Chapter 11 Trustee*

**Dated: February 3, 2026**

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ...................................................................................................1

**ARTICLE II DESIGNATION AND TREATMENT OF UNCLASSIFIED CLAIMS** ....12

    2.1   Administrative Claims. ..............................................................................................12

    2.2   Professional Fee Claims. ...........................................................................................13

    2.3   Priority Tax Claim. ...................................................................................................13

    2.4   Post-Petition Financing Claim. .................................................................................13

    2.5   U.S. Trustee Fees. ....................................................................................................14

**ARTICLE III DESIGNATION OF CLASSIFIED CLAIMS AND INTERESTS** ...........14

    3.1   Classification of Claims. ..........................................................................................14

    3.2   Classes. ....................................................................................................................14

**ARTICLE IV TREATMENT OF CLASSES UNDER THE PLAN** ..................................15

    4.1   **Class 1: Priority Non-Tax Claim** ........................................................................15

    4.2   **Class 2:  Emigrant Mortgage Claim.** ..................................................................15

    4.3   **Class 3:  Allowed Lynx Secured Claim.** .............................................................16

    4.4   **Class 4:  Prime Plus Mortgages Claims.** ............................................................16

    4.5   **Class 5:  Attachment Lien Claims.** .....................................................................16

    4.6   **Class 6:  Wenig Saltiel Claim** .............................................................................17

    4.7   **Class 7:  Other Secured Claims.** .........................................................................17

    4.8   **Class 8:  General Unsecured Claims.** .................................................................18

    4.9   **Class 9:  Equity Interests.** ..................................................................................18

    4.10  Reservation of Rights Regarding Claims, Interests, and Liens. ................................19

**ARTICLE V MEANS FOR IMPLEMENTATION AND EXECUTION** ..........................19

    5.1   Plan Funding. ...........................................................................................................19

    5.2   Distributions on Account of Assets. .........................................................................20

    5.3   Tax Exemption**.** ....................................................................................................20

5.4    Closing of the Chapter 11 Case....................................................................21

5.5    Powers and Duties of the Plan Administrator Under the Plan. ...........................21

5.6    Vesting of Assets..........................................................................................23

5.7    No Liability...................................................................................................23

5.8    Payment of Case Professionals for Post-Effective Date Services and
         Reimbursement of Expenses.........................................................................23

5.9    Direction to Parties. .....................................................................................24

5.10   Exemptions..................................................................................................24

5.11   Insurance.....................................................................................................24

5.12   Settlements..................................................................................................25

5.13   Closing the Transaction, and Sections 363(i), 363(j), and 1146(a). .........................25

5.14   General Settlement of Claims and Interests....................................................25

**ARTICLE VI DISTRIBUTIONS UNDER THE PLAN** ........................................................26

6.1    Distributions. ...............................................................................................26

6.2    Manner of Payment Under the Plan. ...............................................................26

6.3    Payment Dates. ............................................................................................26

6.4    *De Minimis* Distributions. ..............................................................................26

6.5    Unclaimed Distributions and Property. ............................................................26

6.6    Distributions Free and Clear. .........................................................................26

**ARTICLE VII RESOLUTION OF DISPUTED CLAIMS** ....................................................27

7.1    Objections....................................................................................................27

7.2    Amendment of Claims. ..................................................................................27

7.3    Reserve for Disputed Claims and Disputed Liens.............................................27

7.4    Claim Procedures Not Exclusive. ...................................................................28

**ARTICLE VIII EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ..................................28

8.1    Assumption or Rejection of Executory Contracts and Unexpired Leases.............28

8.2    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases. ................................................................................................28

8.3    Bar Date for Proofs of Claim Relating to Rejected Executory Contracts and Unexpired Leases. ........................................................................28

8.4    Reservation of Rights. ........................................................................28

**ARTICLE IX EFFECT OF THE CONFIRMATION DATE, AND, SURRENDER AND CANCELLATION OF CLAIMS** ........................................................29

9.1    Discharge. ........................................................................................29

9.2    Confirmation Date Injunction. ............................................................29

9.3    Releases by the Trustee and the Estate. ................................................30

9.4    Exculpation. ......................................................................................30

9.5    Release of Liens. ...............................................................................31

**ARTICLE X CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF THE PLAN** ....................................................31

10.1    Conditions to the Occurrence of the Confirmation Date. .......................31

10.2    Conditions to the Occurrence of the Effective Date. ..............................31

10.3    Non-Occurrence of the Effective Date;  Non-Waiver of Conditions. ........32

10.4    Substantial Consummation. ...............................................................32

**ARTICLE XI [RESERVED]** ...........................................................32

**ARTICLE XII RETENTION OF JURISDICTION** ................................33

**ARTICLE XIII GENERAL AND MISCELLANEOUS PROVISIONS** ..........35

13.1    Modification of the Plan. ....................................................................35

13.2    Notices. ...........................................................................................35

13.3    Enforceability. ..................................................................................36

13.4    Applicable Law. ................................................................................36

13.5    Successors and Assigns. .....................................................................36

13.6    Reservation of Rights. .......................................................................36

13.7    Continuation of Bankruptcy Stays. ......................................................36

13.8  Prior Orders.................................................................................................................36

Prior to the Chapter 11 Trustee's appointment, Peggy Nestor, the Debtor, proposed her own plan [Docket No. 62], which provided that in the event she was unable to obtain financing to address the many claims against her and liens asserted against her assets, she would sell the property that is the primary asset of this estate, a townhouse located at 15 East 63rd Street in Manhattan.  Although she retained a real estate broker, she did not take actions in furtherance of a sale.  Lynx Asset Services, LLC, a pre-petition secured creditor,  moved for the appointment of a Chapter 11 trustee which is why the trustee herein was appointed.

Albert Togut, not individually but solely in his capacity as trustee of the Chapter 11 estate of Peggy Nestor, by and through his attorneys, Togut, Segal & Segal LLP, hereby proposes the following amended plan pursuant to the provisions of Chapter 11 of the Bankruptcy Code (as defined below).  This Plan supersedes and replaces the prior plans that were proposed by the Debtor [Docket No. 62] and the Trustee [Docket Nos. 327, 840, 855].

## ARTICLE I
## DEFINITIONS

For the purposes of this Plan and the accompanying Disclosure Statement, the following terms shall have the respective meanings set forth below:

*1.1*    "363(j) Charge" means, pursuant to section 363(j) of the Bankruptcy Code, any amounts that are recoverable by the Estate from the secured interests of any owners of the Townhouse from the sale proceeds of the Transaction, which includes, among other things, the costs and expenses of the sale of the Townhouse, including the Transaction.  For the avoidance of doubt, no 363(j) Charge will be assessed against the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim or the Liens securing the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim.

*1.2*    "506(c) Charge" means, pursuant to section 506(c) of the Bankruptcy Code, any amounts that are recoverable from the secured interests from the sale proceeds of the Transaction, which includes, among other things (i) the reasonable and necessary costs, commissions, compensation, and other expenses incurred by the Trustee and his retained professionals in the sale of the Townhouse and confirmation of a Chapter 11 plan including customary closing expenses and taxes associated with the sale of the Townhouse, and sums needed for confirmation of a Chapter 11 plan;  and (ii) the amounts necessary to satisfy in full the Priority  Claims which have been asserted against the Estate in the Chapter 11 Case, and which must be satisfied in connection with confirmation of a Chapter 11 plan.  For the avoidance of doubt, no 506(c) Charge will be assessed against the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim or the Liens securing the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim.

*1.3*    "Administrative Claim" means, except as otherwise set forth in this Plan, all or that portion of a Claim for any cost or expense of administration in connection with the Chapter 11 Case, including, without limitation, any actual, necessary costs and expenses of preserving the Estate and the Assets, and all fees and charges assessed against the Estate, pursuant to 28 U.S.C. § 1930.  The term "Administrative Claim" does

not include Professional Fee Claims, Post-Petition Financing Claims, or U.S. Trustee Fees, which are treated separately in this Plan.

1.4    "*Administrative Claims Bar Date*" means (i) December 5, 2024, for Administrative Claims arising on or after the Petition Date through October 31, 2024, pursuant to the Bankruptcy Court's Order, dated October 30, 2024 [Docket No. 391] and (ii) the date that is thirty (30) days after the date of the Effective Date, for Administrative Claims incurred on or after November 1, 2024 through the Effective Date.

1.5    "*Allowed*" means, with reference to any Claim (including any Administrative Claim) that portion of a Claim:  (i) which has been allowed by a Final Order;  (ii) which is allowed under the terms of this Plan;  or (iii) (a) which has been scheduled by the Debtor as not disputed, not contingent and not unliquidated, or (b) for which a proof of claim was timely and otherwise properly filed on or before the Bar Date with the Bankruptcy Court, and with respect to Claims described in this clause (iii) as to which no objection to the allowance thereof has been interposed within the period of time fixed by the Bankruptcy Code, the Plan, the Bankruptcy Rules or an order of the Bankruptcy Court, or as to which any objection has been determined by a Final Order of the Bankruptcy Court allowing such Claim or any portion thereof. Except as otherwise specifically set forth in this Plan, each Allowed Claim shall be net of any valid setoff exercised with respect to such Claim pursuant to the Bankruptcy Code and applicable law.

1.6    "*Allowed Lynx Secured Claim*" means any outstanding Claim arising from or related to the Amended Judgment of Foreclosure and Sale entered on October 12, 2022 in the foreclosure action in the Supreme Court of the State of New York, New York County, bearing Index No. 85019/2019, in an aggregate outstanding principal amount of not less than $17,251,881.48, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) through the Transaction Closing Date, as provided or modified in the Bankruptcy Court's (i) Post-Petition Financing Order (including the Post-Petition Financing Stipulation); (ii) *Order Fixing and Allowing the Amount of Lynx Asset Services, LLC's Secured Claim* [Docket No. 521]; (iii) the *Order (A) Authorizing the Chapter 11 Trustee to Enter into Amendment of Insurance Premium Financing Agreement and (B) Authorizing Lynx Asset Services, LLP to Make Payments Thereunder* [Docket No. 722];  and (iv) the *Stipulation and Order Regarding Emergency Advances by Lynx Asset Services, LLC to the Estate* [Docket No. 770].

1.7    "*Approval Order*" means the Bankruptcy Court's Order approving the sale of the Townhouse under the Plan and/or section 363 of the Bankruptcy Code.

1.8    "*Assets*" mean all property of the Debtor, including, but not limited to, non-exempt property pursuant to section 522(b) of the Bankruptcy Code and property included in the Estate pursuant to section 1115 of the Bankruptcy Code, of any nature whatsoever, including, without limitation, the Townhouse, Causes of Action, any Transaction Proceeds, accounts receivable, tax refunds, claims of rights, interests and property, real and personal, tangible and intangible, and proceeds of all of the foregoing, as they exist as of the Effective Date and any Disposable Income.

1.9    *"Attachment Lien Claims"* means any outstanding Claim arising from or relating to the June 26, 2020 Ex Parte Order of Attachment entered by the Nassau County Surrogate's Court, establishing a pre-judgment attachment Lien asserted against the Debtor's interest in the Townhouse.

1.10    *"Attachment Liens"*  means any pre-judgment attachment Liens relating to the June 26, 2020 Ex Parte Order of Attachment entered by the Nassau County Surrogate's Court, establishing a pre-judgment attachment Lien asserted against the Debtor's and/or M. Nestor's interest in the Townhouse, including the Lien securing the Attachment Lien Claims.  For the avoidance of doubt, Holders of Attachment Liens shall be entitled to vote solely on account of and to the extent of such Holder's Attachment Lien Claim.

1.11    *"Avoidance Actions"* mean any cause of action assertable under sections 542, 543, 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code or similar non-bankruptcy law.

1.12    *"Bankruptcy Code"* means title 11 of the United States Code, 11 U.S.C. §§101, et seq., as in effect on the Petition Date.

1.13    *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York, Manhattan Division.

1.14    *"Bankruptcy Rules"* mean the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, including the Local Rules of the Bankruptcy Court.

1.15    *"Bar Date"* means (i)(a) July 11, 2023, as the Claims bar date for all pre-petition Claims and (b) October 23, 2023 as the Claims bar date for all pre-petition Claims held by governmental units, pursuant to the Bankruptcy Court's Order, dated May 16, 2023 [Docket No. 25]; and (ii) the Administrative Claims Bar Date.

1.16    *"Business Day"* means any day on which commercial banks are open for business in the City of New York other than a Saturday, Sunday or legal holiday in the State of New York.

1.17    *"Case Professionals"* mean all Persons or entities retained pursuant to a Final Order of the Bankruptcy Court who are to be compensated pursuant to sections 326, 327, 328, 330, and 1103 of the Bankruptcy Code.

1.18    *"Cash"* means the legal tender of the United States of America or its equivalent.

1.19    *"Causes of Action"* means, without limitation, (i) all pending suits and adversary proceedings to which the Debtor and/or the Trustee is a party, whether as plaintiff or defendant, as of the date the Confirmation Order becomes a Final Order, and (ii) any and all other actions, proceedings, causes of action, liabilities, obligations, suits, accounts, controversies, agreements, rights to legal remedies, rights to equitable remedies, rights to payment and claims, damages, judgments, claims and demands

3

whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, existing or hereafter arising, to which the Debtor, the Trustee and/or the Estate had any rights or obligations whatsoever, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case (including through the Effective Date), including, without limitation, all Avoidance Actions and Insurance Claims.

1.20    *"Chapter 11 Case"* means the above-captioned case commenced by the filing of a voluntary petition by the Debtor seeking relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court on the Petition Date.

1.21    *"Claim"* means a claim as defined in section 101(5) of the Bankruptcy Code; including, without limitation, claims arising under section 502 of the Bankruptcy Code.

1.22    *"Class"* means a class of Holders of Claims described in Article III of this Plan.

1.23    *"Confirmation Date"* means the date upon which the Confirmation Order is entered by the Bankruptcy Court.

1.24    *"Confirmation Order"* means the order of the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code confirming the Plan.

1.25    *"Contempt Payments"* means Cash paid or payable by M. Nestor to the Trustee or the Plan Administrator, as applicable, pursuant to the Bankruptcy Court's *Order Holding Marianne Nestor Cassini a/k/a Marianne Nestor in Contempt and Imposing Coercive Civil Sanctions* [Docket No. 386].

1.26    *"Debtor"* means Peggy Nestor (a/k/a Margaret Nestor).

1.27    *"Disallowed"* means any Claim, or any portion thereof, that (i) has been disallowed by Final Order or settlement; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which a Bar Date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the orders establishing the Bar Date, or otherwise deemed timely filed under applicable law; or (iii) is not scheduled on the Schedules and as to which a Bar Date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the orders establishing the Bar Date, or otherwise deemed timely filed under applicable law.

1.28    *"Disclosure Statement"* means the disclosure statement filed in accordance with section 1125 of the Bankruptcy Code and relating to this Plan.

4

1.29    *"Disposable Income"* means the Debtor's *"disposable income"* as that term is defined in section 1325(b)(2) of the Bankruptcy Code received during the five (5) year period beginning on the Effective Date.

1.30    *"Disputed"* means, with respect to a Claim, any Claim that is not yet Allowed or Disallowed.

1.31    *"Disputed Claim Reserve"* means the reserve established pursuant to Section 7.3 of this Plan.

1.32    *"Disputed Lien"* means, with respect to a Lien, any Lien that the validity, priority or extent has not been determined by, as applicable, the Trustee, Plan Administrator, or the Bankruptcy Court to be a Valid Lien.

1.33    *"Distribution"* means the distribution or distributions on account of Allowed Claims to be made by the Trustee or the Plan Administrator, as applicable, in accordance with the terms and conditions of the Plan.

1.34    *"Distributable Assets"* means (i) the Debtor's unrestricted Cash on hand, including any Disposable Income; (ii) the Transaction Proceeds, if any, and (iii) proceeds from the liquidation of any other Assets of the Estate, if any, including Causes of Action, Avoidance Actions and Insurance Claims, and (iv) the Contempt Payments.

1.35    *"Effective Date"* means the first Business Day that is one (1) Business Day after the date upon which the Confirmation Order becomes a Final Order and the conditions precedent set forth in Article X of this Plan have either been duly satisfied or waived.

1.36    *"Emigrant"* means Emigrant Bank, as successor by merger with Emigrant Savings Bank-Manhattan.

1.37    *"Emigrant Mortgage"* means Mortgage and Adjustable Rate Note in favor of Emigrant executed on or about August 30, 2010. The Emigrant Mortgage is secured by a Lien against the Townhouse under which $3,559,407.76 was outstanding as of the Petition Date.

1.38    *"Emigrant Mortgage Claim"* means any outstanding Claim arising from or relating to the Emigrant Mortgage.

1.39    *"Entity"* means an *"entity"* as that term is defined in section 101(15) of the Bankruptcy Code.

1.40    *"Equity Interests"* means any interest in the Debtor.

1.41    *"Estate"* means the estate of the Debtor created on the Petition Date by the commencement of the Chapter 11 Case as provided for in Bankruptcy Code section 541.

1.42    *"Exculpated Party"* means, the (i) Trustee; (ii) the Trustee Professionals, including: (a) Togut, Segal & Segal LLP; (b) Vinay Agarwal, CPA, LLC; (c) Phillips

Nizer LLP;  (d) Sotheby's International Realty;  (e) Brown Harris Stevens Residential Sales, LLC;  (f) Preferred Construction Management Co. Inc.;  (g) Fairview Adjuster Company, Inc.;  and (h) Roland Antiques Gallery, Inc.;  (iii) Lynx;  and (iv) with respect to each of the forgoing in clauses (i)–(iii), each of their Related Parties.

1.43    *"Executory Contract"* means a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code. For the avoidance of doubt, the Purchase Agreement is not an Executory Contract.

1.44    *"First Prime Plus Mortgage"* means the promissory note and mortgage in favor of Prime Plus under which $2,311,454.12 was asserted as outstanding as of the Petition Date.  The First Prime Plus Mortgage is secured by a Lien against the Townhouse that is subordinate to the Emigrant Mortgage Claim and the Allowed Lynx Secured Claim.

1.45    *"First Prime Plus Mortgage Claim"* means any outstanding Claim arising from or related to the First Prime Plus Mortgage in favor of Prime Plus under which $2,311,454.12 was asserted as outstanding as of the Petition Date.

1.46    *"Final Order"* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal or move for reargument or for a rehearing or for leave to appeal has expired, or (b) if an appeal has been sought, no stay (temporary or otherwise) pending appeal has been obtained.

1.47    *"Gemeaux"* means Gemeaux LLC.

1.48    *"General Unsecured Claim"* means any Claim against the Debtor, which is not an Administrative Claim, Professional Fee Claim, U.S. Trustee Fees, Secured Claim, Priority Claim or Post-Petition Financing Claim, or Other Secured Claims, as of the Petition Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court;  provided, any Allowed Secured Creditor Deficiency Claim shall be deemed to be a General Unsecured Claim.

1.49    *"Holder"* means any Person or Entity holding a Claim or Lien against, as applicable, the Estate or Asset of the Estate.

1.50    *"Impaired"* means a Claim, interest,  Class of Claims, or Class of interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.51    *"Insurance Claims"* means any Claim or portion of a Claim that is, or may be, insured under any of the Insurance Policies, including, but not limited to, the Water Leak Claim.

1.52    *"Insurance Policies"* means any insurance policy issued at any time to the Debtor, M. Nestor and/or the Trustee or under which the Debtor and/or the Trustee has sought or may seek coverage, and all agreements, documents, or instruments relating thereto.

1.53    *"Insurance Stipulation"* means the *Stipulation and Order Regarding Primary Insurance Policy* [Adv. Pro. No. 25-01133 (MEW), Docket No. 21].

1.54    *"Judgment Liens"* means, collectively, (i) the Katz Judgment Lien and (ii) the Public Administrator Judgment Lien. For the avoidance of doubt, Holders of Judgment Liens shall not be entitled to vote in favor of or against the Plan.

1.55    *"Katz Judgment Lien"* means a judgment Lien in favor of Christina Cassini and against M. Nestor, which, on or about September 10, 2014, was recorded against the Townhouse, which judgment is now held by Michael Katz, and on August 6, 2024 was renewed by the Supreme Court of the State of New York, Nassau County, Index No. 601835/2024 (Katz v. Nestor Cassini) in the amount of $421,506.83.

1.56    *"Lien"* shall have the meaning set forth in, as applicable, sections 101(37) and 101(36) of the Bankruptcy Code. For the avoidance of doubt, the term "Lien" includes the Attachment Liens, the Judgment Liens and the Liens securing the Secured Claims.

1.57    *"Lynx"* means Lynx Asset Services, LLC.

1.58    *"M. Nestor"* means Marianne Nestor (a/k/a Marianne Nestor Cassini), the Debtor's sister.

1.59    *"Other Secured Claim"* means any Secured Claim other than the Emigrant Mortgage Claim, Allowed Lynx Secured Claim, Prime Plus Mortgage Claims, Attachment Lien Claims, and Wenig Saltiel Claim.

1.60    *"Petition Date"* means April 25, 2023.

1.61    *"Person"* means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity.

1.62    *"Plan"* means this amended plan and any amendments and supplements hereto or modifications hereof made in accordance with the requirements of the Post-Petition Financing Order, the provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

1.63    *"Plan Administrator"* means Albert Togut, not individually but solely in his capacity as plan administer pursuant to the provisions of this Plan and as designated by the Confirmation Order, who shall have all powers and authorities set forth in Section 5.5 of the Plan.

1.64    *"Plan Supplement"* means a supplemental appendix to the Plan containing among other things, forms of applicable documents, schedules, and exhibits to the Plan to be filed with the Bankruptcy Court, including, but not limited to, the following: (a) the Purchase Agreement, (b) Retained Causes of Action, (c) schedule of Executory Contracts and Unexpired Leases to be assumed, and (d) settlements described in Section 5.12 of the Plan (if any); <u>provided</u>, <u>that</u>, through the Effective Date, the Trustee

shall have the right to amend the documents contained in the Plan Supplement in accordance with the terms of the Plan.

1.65    *"Post-Confirmation Fund"* means the fund established and maintained by the Plan Administrator, which is comprised of: (i) the Distributable Assets, (ii) the Post-Confirmation Reserve, and (iii) the Disputed Claim Reserve.  For the avoidance of doubt, the foregoing amounts need not be deposited in the same bank account.

1.66    *"Post-Confirmation Reserve"* means Cash (i) that is transferred from the Distributable Assets for any future Distributions on account of Allowed Administrative Claims, Professional Fee Claims, or U.S. Trustee Fees and (ii) from the proceeds of (A) any 506(c) Charge, (B) 363(j) Charge, or (C) Carve-Out from the Second Draw under the Post-Petition Financing Order or the Second Look Carve-Out under the Post-Petition Financing Order, for the reasonable and necessary costs, commissions, compensation and other expenses incurred by the Trustee and any Case Professionals in connection with the Chapter 11 Case, including preservation of the Townhouse pending the Sale Process, and the sale of the Townhouse and any future Distributions on account of Allowed Professional Fee Claims.

1.67    *"Post-Petition Financing Claim"* means the Claim of Lynx as the lender pursuant to the Post-Petition Financing Order, the Post-Petition Financing Documents and section 364(c) of the Bankruptcy Code.

1.68    *"Post-Petition Financing Documents"* means those certain loan documents as between the Trustee and Lynx and approved by the Post-Petition Financing Order, which include, but are not limited to that certain Post-Petition Mortgage and Post-Petition Loan Agreement, each as defined in the Post-Petition Financing Order, and entered into between the Trustee, on behalf of the Estate, and Lynx.

1.69    *"Post-Petition Financing Facility"* means the facility provided for under the Post-Petition Financing Documents and Post-Petition Financing Order.

1.70    *"Post-Petition Financing Order"* means, collectively, the *Final Order (A) Authorizing The Trustee To Obtain Post-Petition Financing, (B) Granting A First Priority Senior Mortgage Lien To Dip Lender, And (C) Granting Other Related Relief In Aid Of Sale Pursuant To 11 U.S.C. § 364*, dated July 26, 2024 [Docket No. 264], as modified or amended from time to time [Docket Nos. 579, 617, 681, 784] and the Post-Petition Financing Stipulation.

1.71    *"Post-Petition Financing Stipulation"* means the *Stipulation and Order Modifying and Amending the Post-Petition Financing Order and Post-Petition Loan* [Docket No. 850] between the Trustee and Lynx.

1.72    *"Prime Plus"* means Prime Plus, LLC.

1.73    *"Prime Plus Mortgages"* means the First Prime Plus Mortgage together with the Second Prime Plus Mortgage.

1.74    *"Prime Plus Mortgages Claims"* means any outstanding Claim arising from or related to the First Prime Plus Mortgage and Second Prime Plus Mortgage.

1.75    *"Priority Claims"* means Priority Tax Claims and Priority Non-Tax Claims.

1.76    *"Priority Non-Tax Claim"* means any Claim, other than an Administrative Claim, Professional Fee Claim, General Unsecured Claim, Priority Tax Claim, Post-Petition Financing Claim, Secured Claim, or Other Secured Claim, that is entitled to priority under section 507 of the Bankruptcy Code.

1.77    *"Priority Tax Claim"* means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) or 507(a)(8) of the Bankruptcy Code.

1.78    *"Professional Fee Claim"* means a Claim by any Case Professional and the Trustee for compensation for legal and other services rendered and for reimbursement of expenses incurred, as such amounts may be Allowed or awarded under Bankruptcy Code sections 326, 327, 328, 330(a), 331 or 506(c).

1.79    *"Public Administrator"* means the Public Administrator of Nassau County as administrator C.T.A. of the estate of Oleg Cassini.

1.80    *"Public Administrator Judgment Lien"* means a judgment Lien in favor of Jeffrey E. Deluca, in his capacity as the Public Administrator, and against M. Nestor, which, on or about November 5, 2015, was recorded against the Townhouse, and on April 28, 2025 was renewed by the Surrogate's Court of the State of New York, File No. 343100/G (Matter of Oleg Cassini) in the principal amount of $1,041,336.00.

1.81    *"Purchase Agreement"* means the purchase agreement by and between the Trustee and the Purchaser for the sale of the Townhouse, a copy of which is included in the Plan Supplement, together with all exhibits, appendices, supplements, documents, and agreements ancillary thereto, in each case as amended, supplemented, or modified from time to time.

1.82    *"Purchaser"* means the Person or Entity who acquires ownership of the Townhouse pursuant to the Transaction, as disclosed in the Purchase Agreement.

1.83    *"Receiver"* means Rosalia Baiamonte, the court-appointed receiver for Oleg Cassini, Inc. and Cassini Parfums, Inc.

1.84    *"Reinstate", "Reinstated"* or *"Reinstatement"* means leaving a Claim Unimpaired under the Plan.

1.85    *"Related Party"* means, collectively, with respect to (i) any Entity or Person; (ii) such Entity's or Person's predecessors, predecessors in interest, successors and assigns, parents, owners, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, or managers;  (iii) with respect to each of the foregoing in clauses (i) and (ii), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are

held directly or indirectly, and any fund managers, fiduciaries, or other agents with any involvement related to the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals;  and (iv) with respect to each of the foregoing in clauses (i)–(iii), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

*1.86*    *"Released Party"* means (i) Lynx;  and (ii) Lynx's Related Parties.

*1.87*    *"Removal Order"* means the Bankruptcy Court's *Order: (I) Permitting the Chapter 11 Trustee to Intervene as a Necessary Party;  (II) Dismissing the Removed Action; (III) Enjoining Marianne Nestor Cassini a/k/a Marianne Nestor or Marianne Cassini from Commencing Further Actions Against the Trustee or His Representatives in Any Court Other Than This Court (Or in Any Appellate Court to this Court) Except With This Court's Prior Approval* [Adv. Pro. No. 24-04021 (MEW), Docket No. 15].

*1.88*    *"Retained Causes of Action"* means the Causes of Action identified in the schedule included in the Plan Supplement.

*1.89*    *"Sale Procedures Order"* means the order entered by the Bankruptcy Court December 15, 2023, [Docket No. 78] and as amended by further order [Docket Nos. 261 and 851], approving the procedures for the bidding and sale of the Townhouse.

*1.90*    *"Schedules"* mean the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor [Docket Nos. 21 and 38] as they may be modified or amended, as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007.

*1.91*    *"Second Look Carve-Out"* means the sum of up to $500,000 less the amount of funds available to the Estate from assets other than from the sale of the Townhouse and any carve-out monies received by the Trustee from sources other than Lynx as provided under Post-Petition Financing Order.

*1.92*    *"Second Prime Plus Mortgage"* the promissory note and mortgage in favor of Prime Plus, under which $1,699,131.90 was asserted as outstanding as of the Petition Date.  The Second Prime Plus Mortgage is secured by a Lien against the Townhouse that is subordinate to the First Prime Plus Mortgage, the Emigrant Mortgage and the Allowed Lynx Secured Claim.

*1.93*    *"Second Prime Plus Mortgage Claims"* means any outstanding Claim arising from or related to the Second Prime Plus Mortgage.

*1.94*    *"Section 363(i) Rights"* means the rights of a non-debtor co-owner, if any, of the Townhouse pursuant to section 363(i) of the Bankruptcy Code.  For the avoidance of doubt, M. Nestor is estopped from asserting any Section 363(i) Rights [Docket Nos. 153, 156, 160, 162, 185].

1.95    *"Secured Claim"* means any Claim other than a Claim which is an Administrative Expense Claim, a Priority Claim, a Professional Fee Claim, or a General Unsecured Claim, that is secured by a Lien on property in which the Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) or 1129(b) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.  For the avoidance of doubt, the term "Secured Claim" includes the Emigrant Mortgage Claim, Allowed Lynx Secured Claim, Attachment Lien Claims, Prime Plus Mortgages Claims, Wenig Saltiel Claim and Other Secured Claims.

1.96    *"Secured Creditor Deficiency Claim"* means that portion of any Allowed Claim held by the Holder of a Secured Claim that exceeds the value of the Townhouse or proceeds from the sale of the Townhouse, if any, or any assets securing such Allowed Claim.

1.97    *"Transaction"* means the sale of the Townhouse in accordance with the terms of the Sale Procedures Order and the Post-Petition Financing Order, the proceeds of which sale, if any, will be used to implement the Plan as provided for herein.

1.98    *"Transaction Closing Date"* means the date upon which the Transaction is consummated.

1.99    *"Transaction Proceeds"* mean the Cash purchase price paid by the Purchaser in connection with the Transaction after payment (or reservation) of:  (i) the actual and customary closing adjustments and other transaction costs required to be paid at the Transaction Closing Date (i.e. brokers' commissions, real estate taxes); (ii) the Post-Petition Financing Claim;  (iii) the Emigrant Mortgage Claim;  (iv) the Judgment Liens;  and (v) the Allowed Lynx Secured Claim, if any.

1.100   *"Trustee"* means Albert Togut, not individually but solely in his capacity as Chapter 11 trustee of the Estate of the Debtor.

1.101   *"Trustee Professionals"* means those Case Professionals retained in the Chapter 11 Case after the Trustee's appointment, including, but not limited to: (i) Togut, Segal & Segal LLP;  (ii) Vinay Agarwal, CPA, LLC;  (iii) Phillips Nizer LLP; (iv) Sotheby's International Realty;  (v) Brown Harris Stevens Residential Sales, LLC; (vi) Preferred Construction Management Co. Inc.;  (vii) Fairview Adjuster Company, Inc.;  and (viii) Roland Antiques Gallery, Inc., as well as professionals, if any, providing post-Effective Date services to the Plan Administrator.

1.102   *"Townhouse"* means the real property and building located at 15 East 63rd Street, New York, New York 10065.

1.103   *"Unexpired Lease"* means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

*1.104    "Unimpaired"* means a Claim or Class of Claims that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

*1.105    "U.S. Trustee Fees"* means fees arising under section 1930(a)(6) of title 28 of the United States Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

*1.106    "Valid Lien"* means any Lien that the validity, priority or extent has been determined to be valid by, as applicable, the Trustee, Plan Administrator, or the Bankruptcy Court.

*1.107    "Water Leak Claim*" means the Insurance Claim (Claim No. GPAR03572501) made under the Debtor's and M. Nestor's insurance policy (Policy No. BAN1015892-00) with Argonaut Insurance Company related to a water leak discovered in the Townhouse on August 2, 2025.

*1.108    "Wenig Saltiel Claim"* means a judgment Lien against the Debtor and M. Nestor in the amount of $128,077.18 obtained by Wenig Saltiel LLP.

*1.109*    Rules of Interpretation;  Application of Definitions and Rules Construction.  Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  Words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings  when used in the Plan, unless a different definition is ascribed in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Unless otherwise provided, any reference in this Plan to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented or otherwise modified.  If a time or date is specified for any payments or other Distribution under the Plan, it shall mean on or as soon as reasonably practicable thereafter.  Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral.

## ARTICLE II
## DESIGNATION AND TREATMENT OF UNCLASSIFIED CLAIMS

2.1    Administrative Claims.  Except to the extent that any Person or Entity entitled to payment of an Allowed Administrative Claim agrees to a different treatment, each Holder of an Allowed Administrative Claim shall receive a Distribution in Cash in an amount equal to such Holder's Allowed Administrative Claim on the Effective Date or as soon as practicable after the date such Administrative Claim becomes an Allowed Administrative Claim.

Each Holder of an Administrative Claim is required to file a proof of Administrative Claim no later than the Administrative Claims Bar Date. Nothing herein extends any Bar Date previously established by the Bankruptcy Court. Any request for payment of an Administrative Claim that is not timely filed as set forth above shall be forever barred, and Holders of such Claims shall not be able to assert such Claims in any manner against the Debtor, the Estate, the Trustee, Trustee Professionals or any of the foregoing parties' accountants, advisors, agents, attorneys, consultants, directors, employees, members, officers, representatives.

The Plan Administrator shall have ninety (90) days after the Effective Date to file objections, if any, to Administrative Claims, and serve such objections upon the Holder of the affected Claim. The Plan Administrator shall have the right to seek authority from the Bankruptcy Court to extend the dates for filing and serving the objections to the Holders of such Claims.

2.2    <u>Professional Fee Claims</u>. All Case Professionals seeking an allowance of their Professional Fee Claim for services rendered and expenses incurred through and including the Effective Date under sections 330, 331, and/or 506(c) of the Bankruptcy Code shall file their respective applications for allowance of their Professional Fee Claim by not later than the date which is thirty (30) days after the Effective Date, or such other date as may be fixed by the Bankruptcy Court, for services rendered through the Effective Date. If granted, the Allowed Professional Fee Claim shall be paid by the Plan Administrator in full, in Cash and in such amounts as are Allowed by the Bankruptcy Court from the Post-Confirmation Fund (i) on the date upon which such Professional Fee Claim becomes an Allowed Claim or as soon thereafter as is practicable, (ii) upon such other terms as may be mutually agreed upon between the Holder of an Allowed Professional Fee Claim and the Plan Administrator, or (iii) in accordance with the terms and conditions of any applicable order entered by the Bankruptcy Court.

2.3    <u>Priority Tax Claim</u>. Except to the extent a Holder of an Allowed Priority Tax Claim has been satisfied prior to the Effective Date or agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable after the date such Priority Tax Claim becomes Allowed, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, release, and settlement of such Claim, a Distribution in Cash in the Allowed amount of its Claim with interest if required by the Bankruptcy Code or this Plan.

2.4    <u>Post-Petition Financing Claim</u>. The Post-Petition Financing Claim shall be paid in accordance with the terms and conditions of the Post-Petition Financing Order, as amended by the Post-Petition Financing Stipulation. No 506(c) Charge or 363(j) Charge will be assessed against the Post-Petition Financing Claim or the Liens securing the Post-Petition Financing Claim.

The Trustee shall receive the Carve-Out from the Second Draw as defined in the Post-Petition Financing Order, as amended by the Post-Petitioning Financing Stipulation, or in the event that any of the Second Draw Conditions Precedent are not satisfied, Lynx as lender, shall make the Second Look Carve-Out available.

2.5     U.S. Trustee Fees.  On the Effective Date or as soon thereafter as reasonably practicable, the Plan Administrator shall pay all U.S. Trustee Fees that are due and payable on the Effective Date.  Following the Effective Date, the Plan Administrator shall (a) pay the U.S. Trustee Fees as such fees are assessed and come due for the Chapter 11 Case for each quarter (including any fraction thereof) and (b) file quarterly reports in a form reasonably acceptable to the United States Trustee.  The Plan Administrator shall remain obligated to pay U.S. Trustee Fees to the United States Trustee and to file quarterly reports until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE III
## DESIGNATION OF CLASSIFIED CLAIMS AND INTERESTS

3.1     Classification of Claims.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and interests against the Debtor.  A Claim or interest is placed in a particular Class only to the extent that the Claim or interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or interest falls within the description of such other Classes.  A Claim or interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or interest is an Allowed Claim or interest in that Class and such Claim or interest has not been paid, released, or otherwise settled prior to the Effective Date.

3.2     Classes.  Other than Administrative Claims, Professional Fee Claims, U.S. Trustee Fees, Priority Tax Claims, and Post-Petition Financing Claim, Claims and interests are classified as set forth below:

| Class Number | Class | Impairment | Entitled to Vote |
|---|---|---|---|
| 1. | Priority Non-Tax Claim | Unimpaired | No |
| 2. | Emigrant Mortgage Claim | Unimpaired | No |
| 3. | Allowed Lynx Secured Claim | Impaired | Yes |
| 4. | Prime Plus Mortgages Claims | Impaired | Yes |
| 5. | Attachment Lien Claims | Impaired | Yes |
| 6. | Wenig Saltiel Claim | Impaired | Yes |

14

| Class Number | Class | Impairment | Entitled to Vote |
|:---:|:---:|:---:|:---:|
| 7. | Other Secured Claims | Unimpaired | No |
| 8. | General Unsecured Claims | Impaired | Yes |
| 9. | Equity Interests | Impaired | No |

## ARTICLE IV
## TREATMENT OF CLASSES UNDER THE PLAN

4.1    **Class 1: Priority Non-Tax Claim**

(a)    <u>Classification</u>:  Class 1 consists of Holders of Priority Non-Tax Claims.

(b)    <u>Treatment</u>:  Except to the extent a Holder of an Allowed Priority Non-Tax Claim has been satisfied prior to the Effective Date or agrees to less favorable treatment, on the Effective Date or as soon as practicable after the date such Priority Non-Tax Claim becomes Allowed, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, release and settlement of such Claim, at the option of the Trustee or Plan Administrator, as applicable, (a) a Distribution in Cash in the Allowed amount of its Claim, or (b) on the Effective Date, such Holder's Priority Non-Tax Claim shall be Reinstated.

(c)    <u>Impairment</u>:  Class 1 is Unimpaired under the Plan and, therefore, the Holder in Class 1 is deemed to accept the Plan.

4.2    **Class 2: Emigrant Mortgage Claim.**

(a)    <u>Classification</u>:  Class 2 consists of Holders of Emigrant Mortgage Claims.

(b)    <u>Treatment</u>:  Except to the extent that the Holder of the Allowed Emigrant Mortgage Claim agrees to different treatment, subject to section 5.1 of the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder shall receive, in full satisfaction, release and settlement of the Emigrant Mortgage Claim, Cash in an amount equal to the Allowed amount of such Claim, *less* any applicable 506(c) Charge and/or 363(j) Charge; <u>provided</u>, <u>however</u>, <u>that</u>, nothing in the Plan shall limit the Trustee's ability to sell the Townhouse and consummate the Transaction free and clear of all Liens, claims and encumbrances pursuant to the Sale Procedures Order and/or Bankruptcy Code section 363(f).  Distributions on account of

this Section 4.2 shall be subject to repayment or reservation in full of the Post-Petition Financing Claim.

(c)    Impairment:  Class 2 is Unimpaired under the Plan and, therefore, the Holder in Class 2 is deemed to accept the Plan.

4.3    **Class 3:  Allowed Lynx Secured Claim.**

(a)    Classification:  Class 3 consists of Holder of the Allowed Lynx Secured Claim.

(b)    Treatment:  Except to the extent that the Holder of the Allowed Lynx Secured Claim agrees to different treatment, the Holder of the Allowed Lynx Secured Claim shall be paid in accordance with the terms and conditions of the Post-Petition Financing Order, as amended by the Post-Petition Financing Stipulation.  No 506(c) Charge or 363(j) Charge will be assessed against the Allowed Lynx Secured Claim or the Liens securing the Allowed Lynx Secured Claim.

(c)    Impairment:  Class 3 is Impaired under the Plan and is entitled to vote on this Plan.

4.4    **Class 4:  Prime Plus Mortgages Claims.**

(a)    Classification:  Class 4 consists of Holders of Prime Plus Mortgages Claims.

(b)    Treatment:  Except to the extent that a Holder of an Allowed Prime Plus Mortgages Claim agrees to different treatment, subject to section 5.1 of the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder shall receive, in full satisfaction, release and settlement of such the Prime Plus Mortgages Claims, Cash in an amount equal to the Allowed amount of such Claim *less* any applicable 506(c) Charge and / or 363(j) Charge;  provided, however, that, nothing in the Plan shall limit the Trustee's ability to sell the Townhouse and consummate the Transaction free and clear of all Liens, claims, and encumbrances pursuant to the Sale Procedures Order and / or Bankruptcy Code section 363(f);  provided, further, the Holder of the Prime Plus Mortgages Claim shall be entitled to assert a Secured Creditor Deficiency Claim to the extent the applicable Allowed Claim exceeds the value of the Townhouse or Transaction Proceeds securing such Claim;  provided, further, that, Distributions on account of this Section 4.4 shall be subject to repayment or reservation in full of (i) the Post-Petition Financing Claim, (ii) the Emigrant Mortgage Claim, (iii) the Judgment Liens, and (iv) the Allowed Lynx Secured Claim.

(c)    Impairment:  Class 4 is Impaired under the Plan and is entitled to vote on this Plan.

4.5    **Class 5:  Attachment Lien Claims.**

(a)    Classification:  Class 5 consists of Holders of Attachment Lien Claims.

(b)    <u>Treatment</u>:  Except to the extent that a Holder of the Allowed Attachment Lien Claim agrees to different treatment, subject to section 5.1 of the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder shall receive, in full satisfaction, release and settlement of the Attachment Lien Claim, Cash in an amount equal to the Allowed amount of such Claim *less* any applicable 506(c) Charge and/or 363(j) Charge;  <u>provided</u>, <u>however</u>, <u>that</u>, nothing in the Plan shall limit the Trustee's ability to sell the Townhouse and consummate the Transaction free and clear of all Liens, claims, and encumbrances pursuant to the Sale Procedures Order and/or Bankruptcy Code section 363(f);  <u>provided</u>, <u>further</u>, the Holder of the Attachment Lien Claim shall be entitled to assert a Secured Creditor Deficiency Claim to the extent the applicable Allowed Claim exceeds the value of the Townhouse or Transaction Proceeds securing such Claim;  <u>provided</u>, <u>further</u>, that, Distributions on account of this Section 4.5 shall be subject to repayment or reservation in full of (i) the Post-Petition Financing Claim, (ii) the Emigrant Mortgage Claim, (iii) the Judgment Liens, (iv) the Allowed Lynx Secured Claim, and (v) the Prime Plus Mortgage Claims.

(c)    <u>Impairment</u>:  Class 5 is Impaired under the Plan and is entitled to vote on this Plan.

4.6    **Class 6:  Wenig Saltiel Claim**.

(a)    <u>Classification</u>:  Class 6 consists of the Holder of the Wenig Saltiel Claim.

(b)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Wenig Saltiel Claim agrees to different treatment, subject to section 5.1 of the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder shall receive, in full satisfaction, release and settlement of the Wenig Saltiel Claim, (i) Cash in an amount equal to the Allowed amount of such Claim *less* any applicable 506(c) Charge and/or 363(j) Charge;  <u>provided</u>, <u>however</u>, <u>that</u>, nothing in the Plan shall limit the Trustee's ability to sell the Townhouse and consummate the Transaction free and clear of all Liens, claims, and encumbrances pursuant to the Sale Procedures Order and/or Bankruptcy Code section 363(f);  <u>provided</u>, <u>further</u>, the Holder of the Wenig Saltiel Claim shall be entitled to assert a Secured Creditor Deficiency Claim to the extent the applicable Allowed Claim exceeds the value of the Townhouse or Transaction Proceeds securing such Claim;  <u>provided</u>, <u>further</u>, that, Distributions on account of this Section 4.5 shall be subject to repayment or reservation in full of (i) the Post-Petition Financing Claim, (ii) the Emigrant Mortgage Claim, (iii) the Judgment Liens, (iv) the Allowed Lynx Secured Claim, (v) the Prime Plus Mortgage Claims, (vi) the Attachment Lien Claims, and (vii) the Attachment Liens.

(c)    <u>Impairment</u>:  Class 6 is Impaired under the Plan and is entitled to vote on this Plan.

4.7    **Class 7:  Other Secured Claims**.

(d)    <u>Classification</u>:  Class 7 consists of Holders of Other Secured Claims.

(e)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to different treatment, subject to section 5.1 of the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder shall receive, in full satisfaction, release and settlement of the Other Secured Claim, (i) Cash in an amount equal to the Allowed amount of such Claim *less* any applicable 506(c) Charge and/or 363(j) Charge;  (ii) Reinstatement of such Allowed Other Secured Claim; (iii) property securing such Allowed Other Secured Claim, with any deficiency to result in an General Unsecured Claim;  or (iv) to the extent applicable, treatment as permitted under Bankruptcy Code section 1129(a)(9)(D);  <u>provided</u>, payments made pursuant to Bankruptcy Code section 1129(a)(9)(D) shall be made prior to five (5) years after the date of the order for relief under sections 301 and 302 of the Bankruptcy Code; <u>provided</u>, <u>further</u>, <u>that</u>, nothing in the Plan shall limit the Trustee's ability to sell the Townhouse and consummate the Transaction free and clear of all Liens, claims, and encumbrances pursuant to the Sale Procedures Order and/or Bankruptcy Code section 363(f); <u>provided</u>, <u>further</u>, the Holder of an Other Secured Claim shall be entitled to assert a Secured Creditor Deficiency Claim to the extent the applicable Allowed Claim exceeds the value of the Townhouse or Transaction Proceeds securing such Claim.

(f)    <u>Impairment</u>:  Class 7 is Unimpaired under the Plan and, therefore, the Holder in Class 7 is deemed to accept the Plan.

4.8    **Class 8:  General Unsecured Claims**.

(a)    <u>Classification</u>:  Class 8 consists of Holders of General Unsecured Claims.

(b)    <u>Treatment</u>:  Each Holder of an Allowed General Unsecured Claim, which shall include any Allowed Secured Creditor Deficiency Claims, shall neither receive nor retain any Distribution, property, or interest in property on account of such Claim;  <u>provided</u>, <u>that</u>, in the event all Administrative Claims, all Claims that are senior to Allowed General Unsecured Claims, and Valid Liens have been satisfied, Holders of Allowed General Unsecured Claims, including Allowed Secured Creditor Deficiency Claims, may receive a Distribution of any remaining Assets of the Estate, in full satisfaction, release and settlement of such General Unsecured Claims.

(c)    <u>Impairment</u>:  Class 8 is Impaired under the Plan and is entitled to vote on this Plan.

4.9    **Class 9:  Equity Interests**.

(a)    <u>Classification</u>:  Class 9 consists of Holders of Equity Interests.

(b)    <u>Treatment</u>:  On the Effective Date, all Equity Interests shall be canceled, released, eliminated and extinguished and be of no further force or effect, and no payments on account of Equity Interests shall be made, absent further Bankruptcy Court order.

(c)    Impairment: Class 9 is Impaired under the Plan and is deemed to reject the Plan pursuant to section 1126 of the Bankruptcy Code and is therefore not entitled to vote for or against this Plan.

4.10    Reservation of Rights Regarding Claims, Interests, and Liens.  Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtor's, the Trustee's or the Plan Administrator's rights and defenses, both legal and equitable, with respect to any Claims, interests, or Liens including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE V
## MEANS FOR IMPLEMENTATION AND EXECUTION

5.1    Plan Funding.  The Plan shall be funded by (i) unrestricted Cash on hand on the Effective Date, including any Disposable Income, (ii) the Transaction Proceeds, if any, less any 506(c) Charges and/or 363(j) Charges, (iii) Avoidance Action proceeds, if any, (iv) Insurance Claims proceeds, if any, (v) Retained Causes of Action proceeds, if any, (vi) the proceeds from the liquidation of any other available Assets of the Estate, and (vii) the Contempt Payments.

(a)    The Transaction.  As soon as reasonably practicable after the Transaction is consummated, the Transaction Proceeds will be transferred to the Post-Confirmation Fund and will be used to satisfy obligations under this Plan in accordance with the terms and conditions of this Plan, the Approval Order, and the Confirmation Order.

(b)    506(c) Charges.  The 506(c) Charges shall be used to fully fund, among other things, the Allowed Administrative Claims, the Allowed Professional Fee Claims, the Allowed Priority Claims, and any other amounts that are necessary to confirm the Plan.  The amount of any 506(c) Charge shall be determined either (i) pursuant to a settlement among such parties and, as applicable, the Trustee or the Plan Administrator, or (ii) by adjudication by the Bankruptcy Court;  provided, for the avoidance of doubt, upon determination of the amount of the 506(c) Charge, if any, chargeable against a Holder of an Allowed Secured Claim, the Trustee or Plan Administrator, as applicable, may issue a Distribution to such Holder on or as reasonably practicable after the Effective Date.  Until the specific amount of any 506(c) Charges that are recoverable from any of the Holders of Secured Claims is resolved: (a) the Secured Claims shall be deemed Disputed;  (b) no Distributions shall be made to the Holder of a Secured Claim on account of such Holder's Secured Claim;  (c) no interest shall accrue on and such Disputed Claims;  and (d) the Plan Administrator and Trustee Professionals shall be entitled to seek compensation from amounts maintained in the Disputed Claim Reserve on account of the Secured Claims for fees and expenses (if any) in connection with resolving such 506(c) Charges and resolving the allowance of such Disputed Secured Claims.  Nothing herein shall preclude the Plan Administrator from objecting to the Secured Claims on any other basis.  For the avoidance of doubt, no 506(c) Charge will be assessed against the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim or the Liens securing the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim.

19

(c)    363(j) Charges.  The 363(j) Charges shall be used to fully fund, among other things, the Allowed Administrative Claims, the Allowed Professional Fee Claims, the Allowed Priority Claims, and any other amounts that are necessary to confirm the Plan.  The amount of any 363(j) Charge shall be determined either (i) pursuant to a settlement among such parties and, as applicable, the Trustee or the Plan Administrator, or (ii) by adjudication by the Bankruptcy Court;  provided, for the avoidance of doubt, upon determination of the amount of the 363(j) Charge, if any, chargeable against a Holder of an Allowed Secured Claim and/or Valid Lien, the Trustee or Plan Administrator, as applicable, may issue a Distribution or payment to such Holder on or as reasonably practicable after the Effective Date.  Until the specific amount of any 363(j) Charges that are recoverable from any of the Holders of Valid Liens is resolved:  (a) the Secured Claims and Liens shall be deemed Disputed Claims and/or Disputed Liens, as applicable;  (b) no Distributions or payments shall be made to the Holder, as applicable, of a Secured Claims on account of such Holder's Secured Claim or Holder of a Lien on account of such Holder's Valid Lien;  (c) no interest shall accrue on and such Disputed Claims;  and (d) the Plan Administrator and Trustee Professionals shall be entitled to seek compensation from amounts maintained in the Disputed Claim Reserve on account of the  Secured Claims and Liens for fees and expenses (if any) in connection with resolving such 363(j) Charges and resolving the validity, priority, and extent of such Disputed Liens.  Nothing herein shall preclude the Plan Administrator from objecting to the Secured Claims and Liens on any other basis.  For the avoidance of doubt, no 363(j) Charge will be assessed against the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim or the Liens securing the Post-Petition Financing Claim and/or the Allowed Lynx Secured Claim.

5.2    Distributions on Account of Assets.  The Plan Administrator shall establish, maintain, and administer the Post-Confirmation Fund and make Distributions therefrom in accordance with the following procedures:

(i)    First, to make Distributions as necessary to satisfy Allowed Administrative Claims, Allowed Professional Fee Claims, the Allowed Priority Claims, and the Allowed Post-Petition Financing Claim (the latter of which is to be paid in full in Cash on the Transaction Closing Date as required under the Post-Petition Financing Order) as set forth in Article II of the Plan, and to retain an amount of Cash to establish the Post-Confirmation Reserve.

(ii)    Second, to make Distributions as necessary to satisfy the Allowed Claims in Classes 1-8 and the Valid Liens, pursuant to the terms of this Plan in the order of priority as set forth in the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, and to retain an amount of Cash to fund the Disputed Claim Reserve in accordance with the terms and conditions of the Plan.

5.3    Tax Exemption.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to this Plan, including but not limited to a Transaction involving the Townhouse, shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other

documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (a) the Transaction;  (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest by the Trustee or Plan Administrator;  (c) the making or assignment of any contract, lease or sublease;  or (d) the making or delivery of any deed or other instrument or transfer under, in furtherance of, or in connection with the Plan or the Transaction.  All such transfers, assignments and sales will not be subject to any stamp tax, or other similar tax held to be a stamp tax or other similar tax by applicable non-bankruptcy law.

       5.4    <u>Closing of the Chapter 11 Case</u>.  After all Disputed Claims filed against the Debtor have become Allowed Claims or have been Disallowed, and all Assets have been liquidated and converted into Cash (other than those Assets that have been or may be abandoned), and such Cash has been distributed in accordance with the Plan, or at such earlier time as the Plan Administrator deems appropriate, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

       5.5    <u>Powers and Duties of the Plan Administrator Under the Plan</u>.  The Trustee shall be discharged on the Effective Date, and on the Effective Date, the Confirmation Order shall approve the appointment of the Plan Administrator.  The Plan Administrator shall have all the powers, authority and responsibilities necessary and appropriate to implement this Plan and the other transactions contemplated by this Plan and all contracts, instruments, releases, and other agreements or documents entered into or delivered in connection with this Plan, including without limitation the powers and authority of a trustee under sections 704 and 1106 of the Bankruptcy Code.  The compensation for the Plan Administrator shall be based upon his customary hourly billing rate.  The Plan Administrator will act in accordance with the terms and conditions of this Plan and shall make and effectuate all Distributions to Holders of Allowed Claims required under this Plan, shall have the exclusive right to settle or compromise any Disputed Claim and be responsible for the reserve to be established hereunder for Disputed Claims, if any.  In addition to the duties and rights described above, the powers and duties of the Plan Administrators shall also include, without limitation:

       (a)    making Distributions to Holders of Allowed Claims and paying taxes and other obligations owed by the Estate or incurred by the Plan Administrator in connection with winding down the Estate, subject to the terms of this Plan;

       (b)    engaging or retaining, without any further order of the Bankruptcy Court, attorneys, consultants, agents, employees, and any other professional Persons, to assist the Plan Administrator with respect to the Plan Administrator's responsibilities;

       (c)    executing and delivering all documents and taking all actions necessary to consummate the Plan, the Transaction and wind up of the Estate;

       (d)    coordinating the turnover of Estate property, if any;

(e)      coordinating the storage, maintenance, abandonment, and destruction of the books and records of the Estate;

(f)      overseeing compliance with the accounting, finance, and reporting obligations of the Estate;

(g)      preparing financial statements and United States Trustee post-Effective Date quarterly reports, until such time a final decree has been entered;

(h)      overseeing the filing of final tax returns of the Estate, refund requests, audits, and other corporate dissolution documents, as required;

(i)      performing any additional corporate actions as necessary to carry out the wind up and liquidation of the Estate;

(j)      paying the fees and expenses of the Case Professionals and the attorneys, consultants, agents, employees, and other professional Persons retained by the Plan Administrator and the Trustee and to pay all other expenses for winding down the affairs of the Debtor and the Estate, subject to the terms of this Plan;

(k)      disposing of, and delivering title to others of, or otherwise realizing the value of, all the remaining Assets (including, without limitation, litigation of the Retained Causes of Action, which may include prosecution, settlement, abandonment, or dismissal of any such Causes of Action, without further order of the Bankruptcy Court or consent of any other party, except as provided herein);

(l)      obtain and pay for, out of the Assets, all reasonably necessary insurance coverage for the Plan Administrator and his designees, employees, agents, representatives, or professionals;

(m)      objecting to, prosecuting, compromising, and settling Claims;

(n)      prosecuting, compromising, and settling of any Retained Causes of Action, including the Avoidance Actions or the Insurance Claims;

(o)      prosecuting, compromising, and settling Avoidance Actions;

(p)      objecting to, prosecuting, compromising, and settling the validity, priority or extent of Liens;

(q)      objecting to, prosecuting, compromising, and settling exemptions asserted by the Debtor;

(r)      asserting, prosecuting, compromising, and settling claims under Bankruptcy Code section 506(c) and 363(j);

(s)      acting on behalf of the Estate, the Trustee and the post-Effective Date Debtor in all adversary proceedings, appeals and contested matters (including,

without limitation, any Causes of Action) pending on the Effective Date, if any, and to settle, retain, enforce, dispute, or adjust any Claim and otherwise pursue actions involving the Estate's Assets that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise waived or relinquished in this Plan;

(t)    establish or release appropriate reserves for administration of the Chapter 11 Case;

(u)    implementing and/or enforcing all provisions of this Plan; and

(v)    such other powers as may be vested in or assumed by the Plan Administrator pursuant to this Plan or other order of the Bankruptcy Court, or as may be needed or appropriate to carry out the provisions of this Plan.

5.6    <u>Vesting of Assets</u>.  After the Effective Date, the Debtor shall have no interest in the Assets and the Plan Administrator and all Assets shall be managed and distributed by the Plan Administrator pursuant to the terms of the Plan and Confirmation Order, and shall be held in the name of the Plan Administrator free and clear of all Claims and interests except for rights to such Distributions provided to Holders of Allowed Claims, as provided in the Plan; <u>provided</u>, that, except as otherwise provided in this Plan and the Confirmation Order, and after all Distributions in accordance with Section 5 of this Plan have been made, Assets, if any, remaining shall vest in the Debtor pursuant to section 1141(b) of the Bankruptcy Code, in each case free and clear of all Claims, Liens and interests.

On the Effective Date, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) of the Debtor and Trustee shall vest in the Plan Administrator and his representatives (and the Plan Administrator and his representatives shall be deemed to be successors in interest with respect to such privileges), and the Debtor, Trustee, and Plan Administrator are authorized and directed to take all necessary actions to effectuate transfer of such privileges.

5.7    <u>No Liability</u>.  The Plan Administrator shall not be liable for any actions taken, or not taken, and Distributions made in accordance with this Plan and Confirmation Order.  Unless otherwise ordered by a Final Order of the Bankruptcy Court or otherwise provided in this Plan, the record date for Distributions shall be the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case.  The Plan Administrator shall not be liable to the Debtor, M. Nestor, Gemeaux, the Purchaser, any Holder or any other Person, firm or corporation, for any error of judgment or for any mistake of law or fact or any act done, caused to be done, or omitted to be done, by the Plan Administrator or any of his agents, except for acts of willful misconduct, gross negligence or breach of fiduciary duty by itself or such agents.

5.8    <u>Payment of Case Professionals for Post-Effective Date Services and Reimbursement of Expenses</u>.  The Plan Administrator is further authorized to retain such Case Professionals that the Plan Administrator in his discretion believes are necessary to carry out the terms of this Plan, including retaining the same Case

Professionals that were retained to represent the Trustee and the Estate in the Chapter 11 Case, without any further notice to or action, order, or approval of the Bankruptcy Court.  The fact that such Case Professionals may have represented the Trustee or the Estate during the Chapter 11 Case shall not disqualify those Case Professionals from continuing to provide services to the Plan Administrator, or impact their disinterestedness, or give rise to a conflict of interest that would preclude such representation, provided, however, no Professional shall be entitled to compensation from the Plan Administrator or the Estate for services rendered to the Debtor or Trustee after the Effective Date without the express written consent of the Plan Administrator. The reasonable compensation and out-of-pocket expenses incurred after the Effective Date by Case Professionals retained by the Plan Administrator, including the Plan Administrator, for post-Effective Date services and shall be paid by the Plan Administrator within thirty (30) days after presentation of invoices for such professional services to the Plan Administrator without any further order of the Bankruptcy Court;  provided, however, that if the Plan Administrator and any Case Professional cannot agree on the amount of post-Effective Date fees and expenses to be paid to such Case Professionals, such amount shall be determined by the Bankruptcy Court.

5.9    Direction to Parties.  From and after the Effective Date, the Plan Administrator may apply to the Bankruptcy Court for an order directing any necessary party or entity to execute or deliver, or to join in the execution or delivery of, any instrument required to perform any act that is necessary for the consummation of the Plan, pursuant to section 1142(b) of the Bankruptcy Code.

5.10    Exemptions.  Any state and/or federal exemption asserted by the Debtor in Schedule C of the Schedules or otherwise is Disputed and shall be subject to further order of the Bankruptcy Court.

5.11    Insurance.  Notwithstanding any other provision of the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code and in accordance with the terms of the Plan, the Insurance Policies shall be treated as an Executory Contract to the extent permitted by law, unless any Insurance Policy was previously assumed, assumed and assigned, or rejected  by the Debtor or the Trustee, as applicable, pursuant to a Bankruptcy Court order or is the subject of a motion to assume or motion to reject pending on the Effective Date.

Nothing in the Plan shall affect, impair or prejudice the rights of the insurance carriers, insureds, the Debtor, the Trustee, and the Plan Administrator, as applicable, under the Insurance Policies (including, but not limited to, with respect to the Insurance Claims and the Insurance Stipulation) in any manner, and such insurance carriers, insureds, the Debtor, the Trustee, the Plan Administrator, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds, the Trustee, and the Plan Administrator in the same manner and according to the same terms and practices applicable to the Debtor and the Trustee, as existed prior to the Effective Date, as modified by the Insurance Stipulation.

5.12    Settlements.  To the extent the Trustee is able to reach settlements with Holders of Secured Claims and/or Liens, such settlements will be incorporated into the Plan, and a copy of such settlements will be provided in the Plan Supplement.

5.13    Closing the Transaction, and Sections 363(i), 363(j), and 1146(a).

(a)    Section 363(i).

(i)    Pursuant to the prior orders of the Bankruptcy Court, M. Nestor is estopped from asserting an ownership interest in the Townhouse.

(ii)    A holder of Section 363(i) Rights, if any, shall be deemed to have waived and relinquished all rights and interests of such holder pursuant to section 363(i) of the Bankruptcy Code, and such holder shall be forever barred from seeking to exercise or enforce any such rights or interests if the following is not submitted within one (1) business day following the Bankruptcy Court's entry of the Confirmation Order:  (A) a bid at or exceeding the purchase price provided in the Purchase Agreement, (B) a Cash deposit equal to five (5%) percent of the purchase price provided in the Purchase Agreement, and (C) sufficient financial information that demonstrates, to the Trustee's satisfaction, the ability to close the Transaction on or prior to March 15, 2026;  provided, in the event that such showing is not made by a holder of Section 363(i) Rights within one (1) business day following the entry of the Confirmation Order, then the Trustee is authorized to close the Transaction pursuant to the terms of the Purchase Agreement, the Approval Order, and the Confirmation Order.

(b)    Section 363(j).  Distributions, if any, pursuant to Section 363(j) of the Bankruptcy Code, shall be subject to further order of the Bankruptcy Court.

(c)    Authorization to Close the Transaction.  The Trustee is authorized, but not required, to close the Transaction prior to the Effective Date.

(d)    Section 1146(a).  The Transaction is pursuant to the Plan and as a result, the provisions of section 1146(a) of the Bankruptcy Code apply to the Transaction.

5.14    General Settlement of Claims and Interests.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, interests, and controversies released, settled, compromised, discharged or otherwise resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of all such compromises and/or settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such compromises and/or settlements are in the best interest of the Debtor, the Estate and Holders of Claims, Liens and interests and are fair, equitable and reasonable.

## ARTICLE VI
## DISTRIBUTIONS UNDER THE PLAN

6.1     <u>Distributions</u>.  The Trustee or Plan Administrator, as applicable, shall make all Distributions from the Post-Confirmation Fund.  Whenever any Distribution shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the day immediately succeeding a Business Day, but shall be deemed to have been made on the date due.  For federal income tax purposes, a Distribution will be allocated to the principal amount of a Claim first and then to the extent the Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest, to the extent applicable.

6.2     <u>Manner of Payment Under the Plan</u>.  Unless the Person receiving a payment agrees otherwise, any payment in Cash made by the Plan Administrator shall be made by check drawn on a domestic bank, wire transfer  or by automated clearing house transfer.

6.3     <u>Payment Dates</u>.  If any payment or act under the Plan is required to be made, or falls, on a date which shall be a Saturday, Sunday or a legal holiday, then the making of such payment or performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed timely.

6.4     <u>*De Minimis* Distributions</u>.  The Plan Administrator  shall not be required to make any Cash payment of less than twenty-five dollars ($25.00) with respect to any Claim unless a request therefor is made in writing to the Plan Administrator on or before twenty (20) days after the Effective Date.  Any de minimis distributions not subject to a timely request for payment shall be forfeited and deposited into either the Disputed Claim Reserve or the Post-Confirmation Reserve, at the discretion of the Plan Administrator.

6.5     <u>Unclaimed Distributions and Property</u>.  Except as otherwise provided herein, in the event any Holder fails to claim by a writing delivered to the Plan Administrator and negotiate any Distribution within ninety (90) days from the date of such Distribution, such claimant shall forfeit all rights thereto and to any and all future payments, and thereafter the Allowed Claim for which such Cash was distributed shall be treated as a Disallowed Claim or interest as the case may be.  Distributions to claimants entitled thereto shall be sent to their last known address set forth on the most recent proof of claim filed with the Bankruptcy Court or, if no proof of claim is filed, on the Schedules filed by the Debtor or to such other address as may be later designated by a creditor in writing to, as applicable, the Trustee or the Plan Administrator.  All unclaimed Cash shall be distributed or remitted in accordance with the terms and conditions of this Plan.

6.6     <u>Distributions Free and Clear</u>.  Except as otherwise provided herein, Distributions to Holders of Allowed Claims under the Plan shall be clear of any Liens, claims and encumbrances, and no other Entity shall have any interest (legal, beneficial or otherwise) in such Distribution.

## ARTICLE VII
## RESOLUTION OF DISPUTED CLAIMS

7.1    <u>Objections</u>.  An objection to either the allowance of a Claim or an amendment to the Schedules shall be in writing and may either be filed with the Bankruptcy Court or pursued and resolved by other means by, as applicable, the Trustee or the Plan Administrator, at any time within ninety (90) days after the Effective Date, or within such other time period as may be fixed by the Bankruptcy Court for cause, without prejudice to, as applicable, the Trustee or the Plan Administrator's right to seek an extension of such deadline.  The Plan Administrator may object to, and settle, any Claims and may settle, compromise or prosecute all Claim objections in accordance with this Plan.

7.2    <u>Amendment of Claims</u>.  A Claim may be amended prior to the Effective Date only as agreed upon by the Trustee and the Holder of such Claim and as approved by the Bankruptcy Court or as otherwise permitted by the Bankruptcy Code and Bankruptcy Rules.  After the Effective Date, a Claim may be amended as agreed upon by the Holder thereof and the Plan Administrator only to decrease, but not increase, the face amount thereof.

7.3    <u>Reserve for Disputed Claims and Disputed Liens</u>.

(a) As soon as practicable after the Effective Date, the Plan Administrator shall establish, fund, and maintain a reserve account for Holders of Disputed Claims and Disputed Liens with Cash that would otherwise be distributable to such Holder on the Effective Date if such Disputed Claim or Disputed Lien were an Allowed Claim or Valid Lien on the Effective Date, after deduction for any 506(c) Charge and/or 363(j) Charge, or such other amount as either: (i) the Holder of such Disputed Claim or Disputed Lien and the Plan Administrator or Trustee, as applicable, may agree upon; or (ii) as may be fixed by an order of the Bankruptcy Court.

(b) The Cash so reserved for such Holder, to the extent such Disputed Claim is Allowed or such Disputed Lien is a Valid Lien, and only after such Disputed Claim or Disputed Lien becomes a subsequently Allowed Claim or Valid Lien, as applicable, shall thereafter be distributed to such Holder.

(c) Until the specific amount of a 506(c) Charge and/or 363(j) Charge from each of the Holders of Allowed Secured Claims and/or Valid Liens is resolved: (a) the Secured Claims and Liens shall be deemed Disputed Claims and/or Disputed Liens, as applicable;  (b) no Distributions shall be made to the Holders of Allowed Secured Claims on account of such Holder's Secured Claim and no payment shall be made to the Holders of Valid Liens on account of such Liens;  (c) no interest shall accrue on such Secured Claim(s);  and (d) the Plan Administrator and his professionals shall be entitled to seek compensation from amounts maintained in the Disputed Claim Reserve on account of the Secured Claims and Liens, for fees and expenses (if any) in connection with resolving the 506(c) Charge, the 363(j) Charge, and resolving the allowance of the Allowed Secured Claims and the validity, priority, and extent of the Valid Liens.

(d) The Holder of a subsequently Allowed Claim shall not be entitled to any interest on the Allowed amount of its Claim, regardless of when Distribution thereon is made to or received by such Holder.

(e) In the event there is any excess Cash held in the Disputed Claim Reserve following resolution of the Disputed Claims and Disputed Liens, such excess Cash will be distributed pursuant to the terms and conditions under the Plan.

7.4     Claim Procedures Not Exclusive.  All of the aforementioned Claims procedures are cumulative and not necessarily exclusive of one another.  On and after the Effective Date, Claims which were previously Disputed may subsequently be compromised, settled, withdrawn, or otherwise resolved by the Plan Administrator pursuant to further order of the Bankruptcy Court.

## ARTICLE VIII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1     Assumption or Rejection of Executory Contracts and Unexpired Leases. Effective on the Confirmation Date, except as expressly provided herein, all Executory Contracts and Unexpired Leases, to the extent such exist, are hereby specifically deemed rejected, except for any Executory Contract or Unexpired Lease (a) that has been specifically assumed, or assumed and assigned, by the Debtor or Trustee on or before the Confirmation Date with the approval of the Bankruptcy Court, (b) in respect of which a motion for assumption or assumption and assignment has been filed with the Bankruptcy Court on or before the Confirmation Date, or (c) that is specifically designated as a contract to be assumed on a schedule to be included as part of the Plan Supplement.

8.2     Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.  Entry of the Confirmation Order, but subject to the occurrence of the Effective Date, shall constitute (a) the approval pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code of the assumption, or assumption and assignment, of the Executory Contracts and/or Unexpired Leases assumed, or assumed and assigned, in accordance with Section 8.1 of the Plan, and (b) the approval pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code of the rejection of the Executory Contracts and/or Unexpired Leases rejected in accordance with Section 8.1 of the Plan.

8.3     Bar Date for Proofs of Claim Relating to Rejected Executory Contracts and Unexpired Leases.  Claims against the Debtor arising out of the rejection of Executory Contracts and/or Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court no later than thirty (30) days after the later of service of (a) notice of entry of an order approving the rejection of such Executory Contract and/or Unexpired Lease which Order may be the Confirmation Order, and (b) notice of occurrence of the Effective Date.  Any such Claims not filed within such time shall be forever barred from assertion against the Estate, and any and all of the Assets of the Estate.

8.4     Reservation of Rights.  Neither the inclusion of any Executory Contract or Unexpired Lease on the Schedules, the schedule of Executory Contracts and Unexpired Leases in the Plan Supplement, nor anything contained in the Plan, shall constitute an

admission by the Trustee that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Estate has any liability thereunder.

**ARTICLE IX**
**EFFECT OF THE CONFIRMATION DATE,**
**AND, SURRENDER AND CANCELLATION OF CLAIMS**

9.1     <u>Discharge</u>.  The Debtor shall not be entitled to a discharge of any debt unless the Bankruptcy Court approves a motion of the Trustee or the Plan Administrator, as applicable, in which the Trustee certifies that (a) all Trustee expenses have been paid or reserved for, (b) the Debtor has fully complied with all of the terms and conditions of this Plan, Confirmation Order, and all orders entered in the Chapter 11 Case that require the Debtor to act or otherwise perform an obligation, (c) all Distributions required to be made under this Plan are made, including payments made to Holders of Allowed Claims, and (d) all of the Debtor's non-exempt property, including any Disposable Income, of the Estate is turned over to, as applicable, the Trustee or the Plan Administrator.  No discharge granted to the Debtor shall be inconsistent with the terms of any Order of the Bankruptcy Court determining that any debt is nondischargeable, or with the provisions of sections 1141(d)(2) or (d)(6) of the Bankruptcy Code.

Notwithstanding anything to the contrary in this Article IX, except as may otherwise be prohibited by the provisions of the Bankruptcy Code, nothing herein shall preclude a holder of an Allowed Claim, which Allowed Claim has been determined by order of the Court to be nondischargeable, from enforcing, levying, attaching or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, from any assets or property of the Debtor which are not the Assets of the Estate, including any Disposable Income.

9.2     <u>Confirmation Date Injunction</u>.  Effective upon the Confirmation Date, all Persons who have held, hold or may hold Claims or interests are enjoined from taking any of the following actions against or affecting the Debtor's, the Trustee's or the Plan Administrator's administration of the Plan on account of or in connection with any Claims or interests, except as otherwise set forth in the Plan and the Confirmation Order (other than actions brought to enforce any rights or obligations under the Plan or appeals, if any):

(a)     Commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, arbitration, or other proceeding of any kind against the Debtor, the Trustee, the Trustee Professionals, the Plan Administrator, or the Townhouse, the Assets, on account of or in connection with any Claims or interests;

(b)     Enforcing, levying, attaching, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Townhouse, the Assets, the Trustee, or the Plan Administrator;

(c)     Creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Townhouse, the Assets, the Trustee, the Plan Administrator, or the Purchaser;

(d)     Asserting any setoff, right of subrogation, or recoupment of any kind, directly or indirectly, against the Debtor, the Trustee, or the Plan Administrator;

(e)     Commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or interests released, settled or discharged pursuant to the Plan;

(f)     Proceeding or acting in any manner and any place whatsoever that does not conform to or comply with the provisions of the Plan, the Confirmation Order or any other Order of the Bankruptcy Code;  and

(g)     Challenging Purchaser's ownership (in accordance with the Approval Order) of the Townhouse, or in any manner whatsoever interfering with Purchaser's quiet enjoyment of the Townhouse.

9.3     <u>Releases by the Trustee and the Estate</u>.  Except for the right to enforce this Plan, or as otherwise provided herein, the Estate, and the Trustee shall, effective upon occurrence of the Effective Date, be deemed to forever release, waive and discharge each Released Party of and from any and all Claims, demands, Causes of Action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise; <u>provided</u>, <u>however</u>, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any such party effective from and after the Effective Date; <u>provided</u>, <u>further</u>, that notwithstanding the foregoing or any other provision of the Plan, nothing in the Plan, any Plan Supplement, or any order confirming the Plan shall affect any Causes of Action, Claims, or counter-Claims that may be asserted by the Trustee in connection with an objection to a Claim that has not been Allowed, in each case as determined by the Bankruptcy Court; <u>provided</u>, <u>further</u>, that nothing herein shall prohibit the Trustee and the Trustee Professionals from enforcing their rights under the Plan;  <u>provided</u>, <u>further</u>, that such release shall not operate as a release of Claims or obligations determined by a final order to have arisen from bad faith, willful misconduct, gross negligence, breach of fiduciary duty, malpractice, fraud, criminal conduct, unauthorized use of confidential information that causes damages, and/or ultra vires acts.

9.4     <u>Exculpation</u>.  Effective as of the Effective Date, to the extent permitted under section 1125(e) of the Bankruptcy Code, no Exculpated Party shall have or incur liability for, and each Exculpated Party is exculpated from any Cause of Action related to any act or omission taking place between the Petition Date and the Effective Date, in connection with, relating to, or arising out of, the Chapter 11 Case and the proceedings therein, the formulation, preparation, dissemination, negotiation, or filing of this Plan, the Disclosure Statement, any Plan Supplement, or Transaction approved by the Bankruptcy Court in these Chapter 11 Case, the Post-Petition Financing Facility, except for (a) any Cause of Action related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted fraud, willful

misconduct, or gross negligence of such Person, and (b) any Cause of Action related to any liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1);  provided,  however,  that, for the avoidance of doubt, any such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit.

9.5    Release of Liens.  Except as otherwise provided in the Plan, the Confirmation Order, or any instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall revert to the Trustee or the Plan Administrator, as applicable.

## ARTICLE X
## CONDITIONS PRECEDENT TO CONFIRMATION
## DATE AND EFFECTIVE DATE OF THE PLAN

10.1    Conditions to the Occurrence of the Confirmation Date.  The following are conditions precedent to the occurrence of the Confirmation Date:

(a)    The Confirmation Order is in form and substance reasonably satisfactory to the Trustee.

(b)    The Confirmation Order shall approve the terms and conditions of the Plan.

(c)    The Confirmation Order shall approve the appointment of the Plan Administrator and authorize him to take all actions necessary or appropriate to implement the Plan and the other transactions contemplated by the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, and the Approval Order.

(d)    The Plan shall not have been materially amended, altered or modified, unless such material amendment, alteration or modification has been made in accordance with the terms of this Plan.

(e)    All exhibits and schedules to the Plan are in form and substance reasonably satisfactory to the Trustee.

(f)    The Approval Order is in form and substance reasonably satisfactory to the Trustee.

10.2    Conditions to the Occurrence of the Effective Date.  The following are conditions precedent to the occurrence of the Effective Date of the Plan:

(a)    The Bankruptcy Court shall have entered the Confirmation Order, which shall grant final approval of the Plan and the exculpation contained therein;

(b)    No stay of the Confirmation Order shall then be in effect, unless the Plan shall have been substantially consummated before entry of any stay.

(d)    The Plan and the Plan Supplement, and any exhibits and schedules thereto, shall not have been materially amended, altered or modified, unless such material amendment, alteration or modification has been made in accordance with the Plan.

(e)    The Transaction shall have been consummated and not be subject to any stay.

(f)    The Bankruptcy Court shall have entered the Approval Order.

provided, that, notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Effective Date; provided, further, that to the extent a condition precedent (a "Prerequisite Condition") may be required to occur prior to another condition precedent (a "Subsequent Condition") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

10.3    Non-Occurrence of the Effective Date; Non-Waiver of Conditions.  In the event that:  (a) the Trustee determines that the conditions to the Effective Date set forth in Section 10.2 of this Plan cannot be satisfied;  or (b) the Effective Date has not occurred within ninety (90) days of the Confirmation Date, this Plan shall, at the Trustee's election in his sole discretion, be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by the Debtor or Trustee or Claims against the Debtor; (ii) prejudice in any manner the rights of the Debtor, the Trustee, any Holders of a Claim or interest or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, the Trustee, any Holders, or any other Entity in any respect.  The Trustee may propose a new plan, may modify this Plan as permitted by law, or may request other relief.

10.4    Substantial Consummation.  "Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**ARTICLE XI**
**[RESERVED]**

[Reserved].

## ARTICLE XII
## <u>RETENTION OF JURISDICTION</u>

Pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case, the Transaction, and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Allow, Disallow, determine, subordinate, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or interest (whether filed before or after the Effective Date and whether or not contingent, Disputed, or unliquidated or for contribution, indemnification, or reimbursement), including the compromise, settlement, and resolution of any request for payment of any Claims or interests, the resolution of any objections to the allowance or priority of Claims or interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any objection to such Claim or interest to the extent permitted under applicable law; <u>provided</u>, <u>that</u>, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Trustee or the Plan Administrator, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

(b)     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)     hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider an act upon the compromise and settlement of any Claim or interest, or Cause of Action;

(d)     determine and resolve the amount(s) and allocation(s) with respect to any claims under Bankruptcy Code sections 506(c) and 363(j);

(e)     determine and resolve exemptions asserted by the Debtor;

(f)     determine and resolve matters concerning Liens, including, without limitation, the validity, priority, and extent of Liens;

(g)     determine and resolve any matters related to (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, and (ii) any dispute regarding whether a contract or lease is or was executory or unexpired;

(h)     ensure that all Distributions to Holders of Allowed Claims under the Plan and the performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(i)     construe, take any action, and issue such orders, prior to and following the Confirmation Date and consistent with Bankruptcy Code section 1142, as may be necessary for the enforcement, implementation, execution, and consummation of the Plan and all contracts, instruments, releases, other agreements, or documents created in connection with the Plan, including, without limitation, the Approval Order and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with Bankruptcy Code sections 524 and 1141 following the occurrence of the Effective Date;

(j)     determine and resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation of the Plan or interpretation, implementation, or enforcement of the Plan (and all exhibits and schedules to the Plan) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

(k)     modify this Plan or the Confirmation Order before or after the Effective Date, pursuant to Bankruptcy Code section 1127, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

(l)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation of the Plan or implementation or enforcement of the Plan or the Confirmation Order;

(m)    enter and implement such orders as are necessary or appropriate if the Approval Order or Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)     determine any other matters that may arise in connection with or relating to the Plan, the Approval Order, the Confirmation Order, the Transaction, or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order;

(o)    determine such other matters and for such other purposes as may be provided in the Approval Order or the Confirmation Order;

(p)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(q)    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(r)    determine and resolve controversies related to the Estate, the Debtor, the Trustee, and the Plan Administrator, from and after the Effective Date;

(s)    hear and determine any other matter relating to this Plan; and

(t)    enter a final decree closing the Chapter 11 Case.

**ARTICLE XIII**
**GENERAL AND MISCELLANEOUS PROVISIONS**

13.1    <u>Modification of the Plan</u>.  The Trustee reserves the right, in accordance with section 1127(a) of the Bankruptcy Code, to amend or modify the Plan prior to the Confirmation Date.  After the Confirmation Date, the Trustee may, upon order of the Bankruptcy Court in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile and inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.  The Trustee may withdraw or revoke the Plan prior to the Confirmation Date.  If such a withdrawal or revocation occurs, or if the Confirmation Date does not occur, the Plan will be null and void.  In such event, nothing contained in the Plan will constitute a waiver or release of any Claim by, or against, the Debtor or Trustee or any other Person, or to prejudice in any manner the rights of the Debtor or the Trustee or any other Person in any further proceedings involving the Debtor or this Chapter 11 Case.

13.2    <u>Notices</u>.  Any notices to be forwarded under the Plan shall be in writing and sent by certified mail, return receipt requested, postage pre-paid; electronic mail; or by overnight mail or hand delivery, addressed as follows:

(1)    <u>Attorneys for the Trustee and Plan Administrator</u>
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Attn: Brian F. Moore and Martha E. Martir
Email: bmoore@teamtogut.com;  mmartir@teamtogut.com.

The above notice parties may designate in writing any other address for purposes of this section, which designation shall be effective upon receipt.  Any payment required

under the Plan shall be deemed to have been paid on the date when such payment is received.

13.3    <u>Enforceability</u>.  Should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any and all other provisions of the Plan.

13.4    <u>Applicable Law</u>.  Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the law of the State of New York.

13.5    <u>Successors and Assigns</u>.  The rights and obligations of any Person or Entity named or referred to in the Plan shall be binding upon and inure to the benefit of the successors and assigns of such Person or Entity.

13.6    <u>Reservation of Rights</u>.  Neither the filing of this Plan, nor any statement or provision contained herein, shall be or be deemed to be an admission against interest. In the event that the Effective Date does not occur, neither this Plan nor any statement contained herein may be used or relied upon in any manner in any suit, action, proceeding or controversy within or outside of the Chapter 11 Case.

13.7    <u>Continuation of Bankruptcy Stays</u>.  All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Approval Order, the Removal Order or the Confirmation Order), shall remain in full force and effect until the Closing of the Chapter 11 Case.  All injunctions or stays contained in the Plan, the Approval Order, the Removal Order or the Confirmation Order shall remain in full force and effect in accordance with their terms.

13.8    <u>Prior Orders</u>.  All prior orders of the Bankruptcy Court in the Chapter 11 Case and any related adversary proceeding shall be incorporated into the Confirmation Order, including, without limitation, the Approval Order and the Removal Order, and entry of the Confirmation Order shall in no way impair or otherwise affect the ability of the Bankruptcy Court, the United States Trustee, and the United States Marshal's Service from enforcing all such prior orders.

Dated:   New York, New York
         February 3, 2026

                                    ALBERT TOGUT, not individually but solely
                                    in his capacity as Chapter 11 Trustee,
                                    By His Attorneys,
                                    TOGUT, SEGAL & SEGAL LLP
                                    By:

                                    */s/ Brian F. Moore*
                                    BRIAN F. MOORE
                                    MARTHA E. MARTIR
                                    One Penn Plaza
                                    New York, New York 10119
                                    (212) 594-5000

**EXHIBIT 2**

**Liquidation Analysis**

## General Notes to Liquidation Analysis and Estimated Assets and Liabilities

### Purpose and Scope

The Liquidation Analysis, and accompanying estimated assets and liabilities schedule, are provided to assist parties in interest in evaluating the Plan in accordance with section 1129(a)(7) of the Bankruptcy Code.  These materials are intended solely to provide an illustrative comparison of estimated outcomes under the Plan and a hypothetical liquidation under chapter 7 of the Bankruptcy Code and do not purport to predict or guarantee actual results.

### Estimates and Assumptions

The Liquidation Analysis and projected distributions are based on estimates and assumptions made by the Trustee using information available as of the date of this Disclosure Statement.  Such estimates and assumptions are inherently subject to significant uncertainties, contingencies, and risks, including, without limitation, changes in market conditions, approval and timing of consummation of the sale of the Townhouse, the resolution and allowance or disallowance of Claims, the outcome of litigation or settlement negotiations, the timing and costs of administration, and other factors that may differ materially from those assumed.  Accordingly, actual results may vary materially from the estimates reflected herein.

### Variability of Claims and Potential Dilution

The projected recoveries reflected herein assume certain estimates regarding the aggregate amount and composition of Allowed Claims.  The ultimate amount of Allowed Claims, including Administrative Claims, priority claims, and any Secured Creditor Deficiency Claims, may differ from current estimates and may materially affect projected recoveries, if any, to Holders of Claims.

### Reservation of Rights

The Liquidation Analysis and accompanying estimated assets and liabilities schedule, are provided solely for information purposes and do not and shall not constitute a guarantee, representation, or admission regarding the amount or timing of any distribution to any Holder of a Claim or Interest against the Debtor, the Estate, or any Assets of the Estate.  Parties in interest should not rely on these estimates as a prediction of actual results.  The Trustee reserves all rights with respect to the administration of the Estate, including the right to revise estimates, object to Claims, pursue or abandon assets, resolve disputes, and take such other actions as may be permitted under the Plan, the Bankruptcy Code, and applicable law.

**Peggy Nestor**
**Projected Liquidation Analysis**
**As of March 15, 2026**

| | Liquidation in Chapter 11 subject to a Plan | Liquidation in Chapter 7 | Note |
|---|---|---|---|
| **Sale price** | **34,500,000.00** | **34,500,000.00** | **1** |
| **Costs of sale (Estimated)** | | | |
| Broker Commissions - co-fee @4% | 1,380,000.00 | 1,380,000.00 | |
| NYS and NYC Transfer Tax | 0.00 | 1,129,875.00 | 2 |
| Property Taxes | 868,327.11 | 868,327.11 | |
| NYC Building Violations | 44,272.27 | 44,272.27 | |
| Other closing costs (estimated) | 50,000.00 | 50,000.00 | 3 |
| **Total cost of sales** | **2,342,599.38** | **3,472,474.38** | |
| **Net Proceeds after cost of sales** | **32,157,400.62** | **31,027,525.62** | |
| Gains Tax Liability (estimated) | 10,000.00 | 10,000.00 | 4 |
| **Net Sale Proceeds after taxes** | **32,147,400.62** | **31,017,525.62** | |
| Mortgages & Judgments owed | | | |
| Emigrant Mortgage Claim | 4,086,862.61 | 4,086,862.61 | 5 |
| Katz Judgment Lien | 472,400.32 | 472,400.32 | 6, 7 |
| Public Administrator Judgment Lien | 2,016,958.41 | 2,016,958.41 | 6, 7 |
| **Post Petition Financing Claim** | **0.00** | **511,019.48** | **8** |
| **Allowed Lynx Secured Claim** | **21,442,707.57** | **24,286,482.92** | **8** |
| **Carve-out for the Bankruptcy Estate** | **4,128,471.71** | **0.00** | |
| **Net Proceeds to other Creditors** | **0.00** | **(356,198.12)** | |

**Footnotes:**

1) The sales price reflected herein is based on the current terms of the Stalking Horse Agreement for the sale of the Townhouse, and is subject to change as a result of the auction process and any competitive bidding conducted in accordance with the Modified Sales Procedures approved by the Bankruptcy Court.  Accordingly, the actual proceeds realized from the sale of the Townhouse may be higher or lower than the amount listed herein.  There can be no assurances as to the final purchase price or net proceeds set forth herein, which are for informational purposes solely.

2) The sale of property under Chapter 11 pursuant to a plan would be exempt from NYS and NYC transfer tax pursuant to §1146 of the Bankruptcy Code.

3) Estimated contingency for other Townhouse sale closing costs payable from the sale proceeds.

4) Estimated capital gains tax payable by the Estate from the sale of the property based on capital improvement report by Preferred Construction Mgt. Co. Inc., retained by the Trustee as his estimator, which assisted in reducing the capital gains tax burden from approx. $500,000 to approx. $10,000.

5) Amount payable to Emigrant Bank includes interest estimated through March 15, 2026, which is calculated at a 6.25% interest rate.

6) Amounts payable to Judgment creditors of M. Nestor with Judgment Liens against the Townhouse. The amounts include interest at 9% estimated through March 15, 2026. The distributions made on account of the Judgment Liens are subject to the 506(c) and 363(j) Charges, as applicable, and the Trustee reserves all rights, privileges, and defenses with respect to the Judgment Liens, including with respect to any 506(c) and 363(j) Charges the Trustee may seek to pursue.

7) Certain obligations secured by, or otherwise affecting, the Townhouse are obligations of M. Nestor and not obligations of the Debtor or the Estate.  Because such obligations are secured by liens or encumbrances against the Townhouse, they may be satisfied in connection with the sale of the Townhouse.  Such amounts will be held by the Trustee or the Plan Administrator and paid pursuant to order(s) of the Bankruptcy Court toward satisfaction of such obligations.

8) The total aggregate amount of the Post-Petition Financing Claim, with interest pursuant to the Post-Petition Financing Agreement, and the Allowed Lynx Secured Claim, with interest, is approximately $24.8 million.  Pursuant to the Post-Petition Financing Stipulation, Lynx has agreed to a total aggregate amount in respect of the Post-Petition Financing Claim and the Allowed Lynx Secured Claim of $21.25 million plus 60% of the Net Sale Proceeds (as defined in the Post-Petition Financing Stipulation) over $34 million and carve out the net amount to the professionals.

**Peggy Nestor**
**Chapter 11 Bankruptcy Estate**
**Estimated Assets and Liabilities as of March 15, 2026**

| | Claim Filed | Liquidation in Chapter 11 subject to a Plan | Liquidation in Chapter 7 | Note |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash | | TBD | TBD | |
| Townhouse Sale Net Proceeds | | 4,128,471.71 | 0.00 | 1 |
| Sale of Personal Property (e.g. Artwork) | | 12,150.00 | 12,150.00 | |
| Avoidance Actions Proceeds | | 350,000.00 | 350,000.00 | |
| Retained Causes of Action Proceeds | | TBD | TBD | 2 |
| Insurance Claims | | TBD | TBD | 3 |
| Contempt Payments | | TBD | TBD | |
| Total Assets | | 4,490,621.71 | 362,150.00 | |
| | | | | |
| **Liabilities/Claims** | | | | |
| Chapter 11 Trustee's commission | 1,073,250.00 | TBD | TBD | |
| Chapter 11 Professional Fees | 8,200,000.00 | TBD | TBD | |
| Other professional fees claim | 200,000.00 | TBD | TBD | |
| Other Administrative Claim | TBD | TBD | TBD | |
| Priority Tax Claims | 58,469.78 | TBD | 0.00 | |
| Class 1 Priority Non-Tax Claims | TBD | TBD | 0.00 | |
| Class 4 Prime Plus Mortgages Claims | 4,010,589.02 | TBD | 0.00 | 4 |
| Class 5 Attachment Lien Claims | 2,594,813.41 | TBD | 0.00 | 4, 5 |
| Class 6 Wenig Saltiel Claims | 88,450.38 | TBD | 0.00 | 4 |
| Class 7 Other Secured Claims | TBD | TBD | 0.00 | |
| Class 8 General Unsecured Claims | 7,862,085.94 | TBD | 0.00 | 6 |
| Class 9 Equity Interests | TBD | 0.00 | 0.00 | |
| Total Liabiliites/Claims | 23,014,408.53 | TBD | TBD | |

**Footnotes:**

1) Proceeds from the sale of the Townhouse, payable to the Bankruptcy Estate pursuant to the Carve-Out under the Post-Petition Financing Order, as amended by the Post-Petition Financing Stipulation.

2) This includes causes of action filed or to be filed by the Trustee. No value is attributed to the Estate's Retained Causes of Action due to the inherent risk and uncertainty involved with litigation and potential defenses, collectibility, timing, and the costs of pursuing such matters; accordingly, any recovery, if obtained would be speculative.

3) This includes any proceeds from the Water Leak Claim in connection with the Water Leak sustained by the Townhouse. No value has been attributed to the Water Leak Claim because coverage has not yet been determined by Argonaut. The existence, amount, and timing of any recovery are uncertain and may be subject to coverage determinations, deductibles, exclusions, policy limits, and associated costs; accordingly, any recovery is speculative.

4) These claims exclude post-petition interest, which may be payable pursuant to the terms of the financing or loan agreements or underlying judgment, as applicable.

5) The distributions made on account of the Attachment Lien Claims, if any, are subject to the 506(c) and 363(j) Charges, as applicable, and the Trustee reserves all rights, privileges, and defenses with respect to the Attachment Lien Claims, including with respect to any 506(c) and 363(j) Charges the Trustee may seek to pursue.

6) Any distribution to Holders of Allowed General Unsecured Claims may be diluted by Secured Creditor Deficiency Claims, if any.