UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x
                                                    :
In re:                                              :    Chapter 11
                                                    :
PEGGY NESTOR,                                       :    Case No. 23-10627 (MEW)
                                                    :
                        Debtor.                     :
                                                    :
----------------------------------------------------------------- x

### CHAPTER 11 TRUSTEE'S MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE AMENDED CHAPTER 11 TRUSTEE'S PLAN

TOGUT, SEGAL & SEGAL LLP
Brian F. Moore, Esq.
Martha E. Martir, Esq.
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

*Counsel for Albert Togut,*
*not individually but solely in*
*his capacity as Chapter 11 Trustee*

Dated:  March 9, 2026
          New York, New York

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 2

FACTS .................................................................................................................................. 3

ARGUMENT .......................................................................................................................... 3

I.    The Plan Should Be Approved ...................................................................................... 3

    A.    The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code ........... 3

        i.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code ...................................................................... 4

        ii.    The Plan Complies with Section 1123(a) of the Bankruptcy Code ....... 7

        iii.    The Plan Complies with Section 1123(b) of the Bankruptcy Code ..... 10

        iv.    The Plan Complies with Section 1123(c) of the Bankruptcy Code ..... 12

        v.    Section 1123(d) Is Inapplicable to the Plan ........................................... 13

    B.    The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code ......... 13

        i.    The Trustee has Complied with the Disclosure and Solicitation Requirements of Section 1125 of the Bankruptcy Code .............................. 15

        ii.    The Trustee has Satisfied the Plan Acceptance Requirements of Section 1126 of the Bankruptcy Code ............................................................ 16

    C.    The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code ......... 17

    D.    The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code ......... 19

    E.    The Plan Complies With Section 1129(a)(5) of the Bankruptcy Code ........ 19

    F.    Section 1129(a)(6) of the Bankruptcy Code Is Inapplicable to the Plan ..... 20

    G.    The Plan Complies with Section 1129(a)(7) of the Bankruptcy Code ......... 20

    H.    Section 1129(a)(8) of the Bankruptcy Code .................................................... 23

    I.    The Plan Complies with Section 1129(a)(9) of the Bankruptcy Code ......... 24

    J.    The Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code. ................. 26

    K.    The Plan Complies with Section 1129(a)(11) of the Bankruptcy Code ....... 26

    L.    The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code ....... 29

    M.    The Plan Complies with Section 1129(a)(15) of the Bankruptcy Code ....... 29

    N.    Sections 1129(a)(13), (14) and (16) of the Bankruptcy Code Are Not Applicable to the Plan .................................................................................... 30

O.   The Plan Satisfies the "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code ................................................................................. 31

P.   Section 1129(c) of the Bankruptcy Code Is Inapplicable to the Plan .......... 36

Q.   The Plan Complies with Section 1129(d) of the Bankruptcy Code............. 37

R.   Section 1129(e) is Inapplicable to the Plan ...................................................... 37

II.   The Plan's Release, Exculpation and Injunction Provisions Are Appropriate and Should be Approved and the Court Should Overrule the UST Objection ........... 37

i.   The Estate Release .................................................................................. 38

ii.   Exculpation ............................................................................................ 44

iii.   Injunction ............................................................................................... 51

III.   All Other Objections to the Plan are Without Merit and Should be Overruled ... 52

IV.   The Modifications Comply with Section 1127 of the Bankruptcy Code ............... 58

REQUEST FOR WAIVER OF BANKRUPTCY RULE 3020(e) ............................................ 61

CONCLUSION ................................................................................................................. 62

TABLE OF AUTHORITIES

**Page**

**Cases**

*Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.)*, 528 F.3d 162 (2d Cir. 2008) ...................................................................... 20

*Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)........................................................................................................ 42

*Boston Post Rd. L.P. v. FDIC (In re Boston Post Rd, L.P.)*,
21 F.3d 477 (2d Cir. 1994) ............................................................................................. 5

*Citicorp Acceptance Co., Inc. v. Ruti-Sweetwater (In re Sweetwater)*,
57 B.R. 354 (D. Utah 1985)............................................................................................ 70

*Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
627 F.3d 496 (2d Cir. 2010) ........................................................................................... 46

*Enron Corp. v. New Power Co., (In re New Power Co.)*,
438 F.3d 1113 (11th Cir. 2006)...................................................................................... 69

*Frito-Lay v. LTV Steel Co. (In re Chateaugay Corp.)*,
10 F.3d 944 (2d Cir. 1993) ............................................................................................. 5

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*,
994 F.2d 1160 (5th Cir. 1993) ........................................................................................ 24

*In re 500 Fifth Ave. Assocs.*,
148 B.R. 1010 (Bankr. S.D.N.Y. 1993) .......................................................................... 6

*In re Adelphia Bus. Solutions, Inc.*,
341 B.R. 415 (Bankr. S.D.N.Y. 2003) ............................................................................ 32

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................................................... 25, 39

*In re Aegean Marine Petroleum Network, Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019) ............................................................................ 54

*In re Alpha Natural Resources, Inc.*,
556 B.R. 249 (Bankr. E.D. Va. 2016).............................................................................. 55

*In re Am. Solar King*,
90 B.R. 808 (Bankr. W.D. Tex. 1988)............................................................................. 68

*In re Ambanc La Mesa Ltd. P'ship*,
115 F.3d 650 (9th Cir. 1997)........................................................................................... 39

*In re Aztec Co.*,

107 B.R. 585 (Bankr. M.D. Tenn. 1989) .............................................................................. 39

*In re Azul S.A.,*
No. 25-11176 (SHL), 2026 WL 40912 (Bankr. S.D.N.Y. Jan. 6, 2026) ................................ 56

*In re Bally Total Fitness of Greater N.Y., Inc.,*
No. 07-12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ............................... 6, 46

*In re BearingPoint, Inc.,*
453 B.R. 486 (Bankr. S.D.N.Y. 2011) ................................................................................ 54

*In re Best Prods. Co., Inc.,*
168 B.R. 35 (Bankr. S.D.N.Y. 1994) .................................................................................. 24

*In re Breitburn Energy Partners LP,*
582 B.R. 321 (Bankr. S.D.N.Y. 2018) ................................................................................ 40

*In re Buttonwood Partners, Ltd.,*
111 B.R. 57 (Bankr. S.D.N.Y. 1990) .................................................................................. 39

*In re Calpine Corp.,*
No. 05-60200 (BRL), 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007) .................. 47, 70

*In re Cano Petroleum, Inc.,*
No. 12-31549 (BJH), 2012 WL 2931107 (Bankr. N.D. Tex. July 18, 2012) ....................... 47

*In re Charter Commc'ns,*
419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................................................. 3

*In re Chateaugay Corp.,*
89 F.3d 942 (2d Cir. 1996) .................................................................................................. 6

*In re Chemtura Corp.,*
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ................................................................................ 55

*In re CIT Grp., Inc.,*
No. 09-16565 (ALG), 2009 WL 4824498 (Bankr. S.D.N.Y. Dec. 8, 2009) ........................ 70

*In re CLST Enterprises, LLC,*
No. 24-10596 (MG), 2025 WL 3708328 (Bankr. S.D.N.Y. Dec. 19, 2025) ........................ 32

*In re Crowthers McCall Pattern, Inc.,*
120 B.R. 279 (Bankr. S.D.N.Y. 1990) ................................................................................ 24

*In re Dana Corp.,*
No. 06-10354 (BRL) 2007 WL 4589331 (Bankr. S.D.N.Y. Dec. 26, 2007) ........................ 70

*In re DBSD N. Am., Inc.,*
419 B.R. 179 (Bankr. S.D.N.Y. 2009) ................................................................................ 46

*In re Ditech Holding Corp.,*
No. 19-10412 (JLG), 2021 WL 3716398 (Bankr. S.D.N.Y. Aug. 20, 2021) ...................... 60

*In re Ditech Holding Corporation,*
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) ............................................................ 45

*In re Drexel Burnham Lambert Grp., Inc.,*
  138 B.R. 714 (Bankr. S.D.N.Y. 1992) ..................................... 5, 6, 31, 39

*In re Eletson Holdings Inc.,*
  664 B.R. 569 (Bankr. S.D.N.Y. 2024) ............................................................ 38

*In re EUSA Liquidation Inc.,*
  No. 09-15008 (SMB), 2010 WL 4916559 (Bankr. S.D.N.Y. June 10, 2010) ....................... 32

*In re Exide Techs.,*
  303 B.R. 48 (Bankr. D. Del. 2003) ............................................................... 42

*In re Finlay Enters., Inc.,*
  No. 09–14873 (JMP), 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) ....................... 33

*In re Finlay Enters., Inc.,*
  No. 09–14873 (JMP), 2010 WL 6580629 (Bankr. S.D.N.Y. May 18, 2010) ....................... 42

*In re Fur Creations by Varriale, Ltd.,*
  188 B.R. 754 (Bankr. S.D.N.Y. 1995) ............................................................ 24

*In re Genesis Global Holdco, LLC,*
  660 B.R. 439 (Bankr. S.D.N.Y. 2024) ............................................................ 53

*In re Granite Broad. Corp.,*
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) ....................................................... 20, 42, 57

*In re GTT Communications, Inc.,*
  No. 21-11880 (MEW) (Bankr. S.D.N.Y. Dec. 28, 2022) ....................................... 51

*In re Hollander Sleep Prods., LLC,*
  No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sept. 5, 2019) ....................................... 57

*In re Ionosphere Clubs, Inc.,*
  98 B.R. 174 (Bankr. S.D.N.Y. 1989) .............................................................. 6

*In re JCK Legacy Company,*
  No. 20-10418 (MEW) (Bankr. S.D.N.Y. Sept. 25, 2020) ....................................... 61

*In re Johns-Manville Corp.,*
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) ..................................................... 4, 15, 22, 39

*In re KB US Holdings, Inc.,*
  No. 20-22962 (SHL) (Bankr. S.D.N.Y. Feb. 22, 2021) ....................................... 51

*In re Koelbl,*
  751 F.2d 137 (2d Cir. 1984) ..................................................................... 20

*In re Lear Corp.,*
  No. 09-14326 (ALG), 2009 WL 6677955 (Bankr. S.D.N.Y. Nov. 5, 2009) ....................... 47

*In re Lehr Construction Corp.*,
   No. 11-10723 (SHL), 2015 WL 5174467 (Bankr. S.D.N.Y. Sept. 2, 2015) ......................... 47

*In re Lionel L.L.C.*,
   No. 04-17324 (BRL), 2008 WL 905928 (Bankr. S.D.N.Y. Mar. 31, 2008) ......................... 21

*In re LSC Commc'ns, Inc.*,
   No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 24. 2021) ......................................... 51

*In re Motors Liquidation Co.*,
   447 B.R. 198 (Bankr. S.D.N.Y. 2011) ........................................................ 46

*In re Northeast Dairy Co-op. Federation, Inc.*,
   73 B.R. 239 (Bankr. N.D.N.Y. 1987) ......................................................... 25

*In re One Times Square Assocs. Ltd. P'ship*,
   159 B.R. 695 (Bankr. S.D.N.Y. 1993) ........................................................ 32

*In re Oneida Ltd.*,
   351 B.R. 79 (Bankr. S.D.N.Y. 2006) ..................................................... 21, 56

*In re Pacific Drilling S.A.*,
   No. 17-13193 (MEW) (Bankr. S.D.N.Y. Nov. 2, 2018) ....................................... 57

*In re Pfeifer*,
   No. 12-13852 (ALG), 2013 WL 5687512 (Bankr. S.D.N.Y. Oct. 18, 2013) ...................... 35

*In re Relativity Media, LLC*,
   No. 18-11358 (MEW) (Bankr. S.D.N.Y. Jan. 31, 2019) ....................................... 57

*In re Revlon, Inc.*,
   No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023) ........................................ 51

*In re Sabine Oil & Gas Corp.*,
   No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016) ....................................... 52

*In re Salander*,
   450 B.R. 37 (Bankr. S.D.N.Y. 2011) ......................................................... 47

*In re Sea Launch Co., L.L.C.*,
   No. 09-12153 (BLS), 2009 WL 8189047 (Bankr. D. Del. July 30, 2009) ....................... 37

*In re Texaco, Inc.*,
   84 B.R. 893 (Bankr. S.D.N.Y. 1988) .......................................................... 4

*In re Toy & Sports Warehouse, Inc.*,
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) ......................................................... 16

*In re Victory Constr. Co., Inc.*,
   42 B.R. 145 (Bankr. C.D. Cal. 1984) ......................................................... 24

*In re Windstream Holdings, Inc.*,
   No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) ....................................... 51

*In re WorldCom,*
No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...................... 22, 39, 40

*In re Young Broad. Inc.,*
430 B.R. 99 (Bankr. S.D.N.Y. 2010) .................................................................................. 3

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns),*
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ............................................................................ 46

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),*
843 F.2d 636 (2d Cir. 1988) ................................................................................. 4, 20, 31

*Pub. Fin. Corp. v. Freeman (In re Pub. Fin. Corp.),*
712 F.2d 219 (5th Cir. 1983) ......................................................................................... 20

*SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),*
960 F.2d 285 (2d Cir. 1992) ..................................................................................... 19, 27

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.),*
326 B.R. 497 (S.D.N.Y. 2005) ...................................................................................... 56

**Statutes**

11 U.S.C. § 1122 .................................................................................................. 4, 5, 71

11 U.S.C. § 1123 .................................................................................................. 4, 5, 71

11 U.S.C. § 1123(a) ........................................................................................................ 8

11 U.S.C. § 1123(a)(2) ................................................................................................ 8, 9

11 U.S.C. § 1123(a)(3) ................................................................................................ 8, 9

11 U.S.C. § 1123(a)(4) ................................................................................................ 8, 9

11 U.S.C. § 1123(a)(5) ................................................................................. 8, 9, 10, 62

11 U.S.C. § 1123(a)(7) ................................................................................................ 9, 11

11 U.S.C. § 1123(a)(8) ................................................................................................ 9, 11

11 U.S.C. § 1123(b) ...................................................................................................... 12

11 U.S.C. § 1123(b)(1) .................................................................................................. 12

11 U.S.C. § 1123(b)(1)-(6) ........................................................................................... 44

11 U.S.C. § 1123(b)(2) ............................................................................................. 12, 13

11 U.S.C. § 1123(b)(3) .................................................................................................. 12

11 U.S.C. § 1123(b)(3)(A) ............................................................................................. 45

11 U.S.C. § 1123(b)(6) ............................................................................................. 12, 62

11 U.S.C. § 1123(c) ................................................................................................... 13

11 U.S.C. § 1123(d) ................................................................................................... 15

11 U.S.C. § 1125(b) ................................................................................................... 17

11 U.S.C. § 1126 ........................................................................................................ 19

11 U.S.C. § 1126 ........................................................................................................ 16

11 U.S.C. § 1126(c) ................................................................................................... 27

11 U.S.C. § 1126(f) ........................................................................................... 19, 25, 27

11 U.S.C. § 1126(g) ................................................................................................... 28

11 U.S.C. § 1127(a) ................................................................................................... 68

11 U.S.C. § 1127(d) ......................................................................................... 68, 69, 70

11 U.S.C. § 1129(a) ................................................................................................... 37

11 U.S.C. § 1129(a)(1) ................................................................................................. 4

11 U.S.C. § 1129(a)(10) ............................................................................................. 31

11 U.S.C. § 1129(a)(11) ........................................................................................ 31, 33

11 U.S.C. § 1129(a)(12) ............................................................................................. 34

11 U.S.C. § 1129(a)(13) ............................................................................................. 36

11 U.S.C. § 1129(a)(14) ............................................................................................. 36

11 U.S.C. § 1129(a)(15) ............................................................................................. 35

11 U.S.C. § 1129(a)(16) ........................................................................................ 36, 37

11 U.S.C. § 1129(a)(2) ............................................................................................... 15

11 U.S.C. § 1129(a)(3) ........................................................................................... 20, 21

11 U.S.C. § 1129(a)(4) ............................................................................................... 22

11 U.S.C. § 1129(a)(5) ............................................................................................... 23

11 U.S.C. § 1129(a)(5)(A)(i) ..................................................................................... 23

11 U.S.C. § 1129(a)(5)(A)(ii) .................................................................................... 23

11 U.S.C. § 1129(a)(5)(B) ......................................................................................... 23

11 U.S.C. § 1129(a)(6) ............................................................................................... 24

11 U.S.C. § 1129(a)(7) ............................................................................................... 25

11 U.S.C. § 1129(a)(8) ........................................................................................................ 27, 37

11 U.S.C. § 1129(a)(9) ........................................................................................................... 28

11 U.S.C. § 1129(a)(9)(A) ...................................................................................................... 29

11 U.S.C. § 1129(a)(9)(B) ...................................................................................................... 29

11 U.S.C. § 1129(b) ........................................................................................................... 37, 38

11 U.S.C. § 1129(b)(1) ........................................................................................................... 38

11 U.S.C. § 1129(b)(2)(B)(ii) ................................................................................................. 41

11 U.S.C. § 1129(b)(2)(C)(ii) ............................................................................................. 41, 42

11 U.S.C. § 1129(c) ................................................................................................................ 44

11 U.S.C. § 1129(d) ................................................................................................................ 44

11 U.S.C. § 1325(b)(2) ....................................................................................................... 11, 35

11 U.S.C. § 365 ...................................................................................................................... 13

11 U.S.C. § 503(b) .................................................................................................................. 29

11 U.S.C. § 507(a)(1) ............................................................................................................. 29

11 U.S.C. § 507(a)(2) ............................................................................................................. 29

11 U.S.C. § 507(a)(4) ............................................................................................................. 29

11 U.S.C. § 507(a)(7) ............................................................................................................. 29

11 U.S.C. § 507(a)(8) ............................................................................................................. 29

28 U.S. Code § 1930 ............................................................................................................... 34

42 U.S.C. § 407 ...................................................................................................................... 35

42 U.S.C. § 407(a) .................................................................................................................. 36

**Rules**

Fed. R. Bankr. P. 2002(b) ....................................................................................................... 18

Fed. R. Bankr. P. 3017 ............................................................................................................ 16

Fed. R. Bankr. P. 3017(d) ....................................................................................................... 18

Fed. R. Bankr. P. 3017(e) ........................................................................................................ 18

Fed. R. Bankr. P. 3017(f) ........................................................................................................ 18

Fed. R. Bankr. P. 3018 ............................................................................................................ 16

Fed. R. Bankr. P. 3019 ................................................................................................... 69

Fed. R. Bankr. P. 3020(e) .............................................................................................. 71

**Other Authorities**

*7 Collier on Bankruptcy* ¶1129.03[4][a] ..................................................................... 42

H.R. Rep. No. 31, 109th Cong., 1st Sess. 145 (2005) .................................................. 37

H.R. Rep. No. 595, 95th Cong., 1st Sess.  412 (1977) .......................................... 5, 15

S. Rep. No. 989, 95th Cong., 2d Sess. 123 (1978) ...................................................... 28

S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) ........................................................ 5

TO THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE:

Albert Togut, not individual but solely in his capacity as the chapter 11

trustee (the "Trustee") of the estate (the "Estate") of Peggy Nestor (the "Debtor"), the

debtor in the above-captioned chapter 11 case (this "Chapter 11 Case"), by and through

his attorneys, Togut, Segal & Segal LLP (the "Togut Firm"), hereby submits this

memorandum of law and omnibus reply (this "Memorandum") in support of

confirmation of the *Amended Chapter 11 Trustee's Plan* [Docket No. 954] (as it may be

amended, modified, and/or supplemented from time to time, the "Plan")[1] and approval

of the *Disclosure Statement for the Amended Chapter 11 Trustee's Plan*, filed on February 4,

2026 [Docket No. 872] (the "Disclosure Statement") on a final basis.[2]

In support of this Memorandum, the Trustee relies upon and incorporates

herein by reference:

(i)  the Declaration of Brian F. Moore, a partner of the Togut Firm, a copy of which is attached hereto as **Exhibit A** (the "Moore Declaration");

(ii)  the *Affidavit of Service,* dated February 6, 2026 [Docket No. 881] (the "Solicitation Declaration");  and

(iii)  the *Certification of Christian Ribeiro Regarding the Voting and Tabulation of Ballots Cast on the Amended Chapter 11 Trustee's Plan,* filed on March 6, 2026 [Docket No. 950] (the "Voting Declaration" and together with the Moore Declaration and the Solicitation Declaration, the "Declarations").

In support of confirmation of the Plan and approval of the Disclosure

Statement on a final basis, the Trustee respectfully states as follows:

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

[2]  Pursuant to the Solicitation Procedures Order (as defined below), the Court approved the Disclosure Statement on a provisional basis, subject to final approval at the Combined Hearing (as defined below).

## PRELIMINARY STATEMENT

1.      The United States Bankruptcy Court for the Southern District of New York (the "Court") should confirm the Plan because it is in the best interests of the Estate, is the product of extensive good-faith and arm's length negotiations by and among the Trustee, the Estate's post-petition lender, Lynx Asset Services, LLC ("Lynx"), and other stakeholders, and has been accepted by the requisite Holders of Claims (in reliance on section 1129(b)(1)).

2.      The Plan is based on the sale of the Debtor's real property located at 15 East 63rd Street, New York, NY 10065 (the "Townhouse" and the sale of the Townhouse, the "Transaction"), which is the Plan's main source of funding and was approved pursuant to this Court's *Order Approving Sale of Property* [Docket No. 920] (the "Approval Order").  Embodying the Transaction, the Plan is a liquidating plan that, among other things, provides for the establishment of a Post-Confirmation Fund from, in large part, the proceeds of the Transaction (the "Transaction Proceeds"), which fund will be used to satisfy obligations under the Plan, and the administration of the post-confirmation Estate by the Plan Administrator.

3.      The Trustee respectfully submits that failure to confirm the Plan would inevitably result in the Chapter 11 Case being converted to a case under chapter 7 of the Bankruptcy Code.  Such a result is not in any Estate stakeholder's best interests as distributions to creditors would be significantly delayed, if made at all.  Accordingly, the Plan is consistent with the Trustee's fiduciary responsibility to maximize recoveries for all creditors.

4.      As demonstrated herein, the Plan satisfies each of the requirements for confirmation under the Bankruptcy Code.  In addition, the Plan is supported by

Lynx.  Therefore, and for the reasons set forth in more detail below and in the

Declarations, the Court should confirm the Plan.

## FACTS

5.     The factual background relevant for confirmation of the Plan and

approval of the Disclosure Statement on a final basis is set forth in the Disclosure

Statement, the Declarations, and, to the extent necessary, the evidence that will be

presented or adduced at the Combined Hearing.

## ARGUMENT

6.     To obtain confirmation of the Plan, the Trustee must establish by a

preponderance of the evidence, that the Plan has satisfied the requirements set forth in

section 1129 of the Bankruptcy Code.  *See JPMorgan Chase Bank, N.A. v. Charter

Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 243–44 (Bankr. S.D.N.Y.

2009) (finding that the plan proponent bears the burden of establishing compliance with

the factors set forth in section 1129 by a preponderance of the evidence);  *see also In re

Young Broad. Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010) (same).  The Trustee

respectfully submits that the Plan complies with, and satisfies, each of the applicable

provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence,

and thus should be confirmed.

## I.     The Plan Should Be Approved[3]

## A.     The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code

7.     Section 1129(a)(1) of the Bankruptcy Code provides that a plan

must comply with the applicable provisions of the Bankruptcy Code—notably, those

---

[3]     Notwithstanding the relief sought in this Memorandum or anything contained herein to the contrary,
the Trustee reserves the right to make non-substantive and/or technical modifications to the Plan,
Disclosure Statement, Plan Supplement, and related documents, without further order of the Court.

governing classification of claims and interests, and the contents of a plan. *See* 11 U.S.C. § 1129(a)(1); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986) (noting that "[o]bjections to confirmation raised under § 1129(a)(1) generally involve the failure of a plan to conform to the requirements of § 1122(a) or § 1123"), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988); *In re Texaco, Inc.*, 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988) ("In determining whether a plan complies with section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to the classification of claims and the contents of a plan of reorganization."). Thus, to satisfy section 1129(a)(1), the Plan must comply with sections 1122 and 1123 of the Bankruptcy Code.[4]

8.     As demonstrated below, the Plan fully complies with sections 1122 and 1123 of the Bankruptcy Code.

### i.     The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

9.     Under section 1122 of the Bankruptcy Code, claims or interests within a given class must be "substantially similar" to the other claims or interests in the class. *See* 11 U.S.C. § 1122. Such claims or interests may be placed in separate classes provided a rational basis exists for doing so. *See Boston Post Rd. L.P. v. FDIC (In re Boston Post Rd. L.P.)*, 21 F.3d 477, 483 (2d Cir. 1994) (holding that a debtor may classify unsecured claims in separate classes if the debtor adduces credible proof of a legitimate reason for separate classification of similar claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification

---

[4]     *See Kane v. Johns-Manville Corp.*, 843 F.2d at 648–49 (suggesting that Congress intended the phrase "'applicable provisions' in this subsection to mean provisions of Chapter 11 . . . such as section 1122 and 1123"); *see also In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (same); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) ("Paragraph (1) requires that the plan comply with the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of plan."); H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977) (same).

appropriate because classification scheme had a rational basis; separate classification was based on bankruptcy court-approved settlement); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (finding that plan proponent "has considerable discretion to classify claims and interests according to the facts and circumstances of the case . . . ."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177–78 (Bankr. S.D.N.Y. 1989) (allowing classification of claims of same rank in different classes).

10. Courts in this district have identified several grounds justifying the separate classification of claims, including (a) where members of a class possess different legal rights and (b) where the debtor has good business reasons for separate classification. *See In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996) (finding that separate classification of similarly situated claims is appropriate where supported by credible proof to justify separate classification of unsecured claims); *In re Bally Total Fitness of Greater N.Y., Inc.*, Case No. 07-12395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) (same); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 714, 715–16 (Bankr. S.D.N.Y. 1992) (same).

11. Under the Plan, each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within such Class. *See* Plan, Art. IV. Specifically, the Plan provides for the following Classes of Claims and Equity Interests:

| Class | Classification |
|-------|----------------|
| Class 1 | Priority Non-Tax Claim |
| Class 2 | Emigrant Mortgage Claim |
| Class 3 | Allowed Lynx Secured Claim |
| Class 4 | Prime Plus Mortgages Claims |

| Class | Classification |
|-------|----------------|
| Class 5 | Attachment Lien Claims |
| Class 6 | Wenig Saltiel Claim |
| Class 7 | Other Secured Claims |
| Class 8 | General Unsecured Claims |
| Class 9 | Equity Interests |

12.    The Plan's classification scheme is supported by valid legal, and factual reasons.  For example, the Emigrant Mortgage Claim (Class 2), the Allowed Lynx Secured Claim (Class 3), and the Prime Plus Mortgages Claims (Class 4) are in different Classes because such Claims arise under separate prepetition loan, mortgage or financing agreements, and each of the Holders in such Classes have different rights under the respective agreements.  The Attachment Lien Claims (Class 5) and the Wenig Saltiel Claim (Class 6) are in different Classes because such Claims arise under separate court orders or judgments, and each of the Holders in such Classes have different rights under such orders or judgments, and the liens underlying such Claims have differing priorities.  General Unsecured Claims (Class 8) are classified separately from Claims in other Classes because such claims are entitled to different priority under section 507(a) of the Bankruptcy Code.  In addition, other aspects of the Plan's classification scheme are related to the different legal or factual basis of each Class, such as Other Secured Claims (Class 7), Priority Non-Tax Claims (Class 1), and Equity Interests (Class 9), which are classified separately due to their required treatment under the Bankruptcy Code.  The Plan's classifications not only serve the purpose of facilitating ease of Distributions on the Effective Date but also acknowledge the fundamental differences between those types of Claims and Equity Interests.  Accordingly, valid factual and

legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and the Plan satisfies section 1122 of the Bankruptcy Code.

**ii.    The Plan Complies with Section 1123(a) of the Bankruptcy Code**

13.    Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which the Plan must comply.  11 U.S.C. § 1123(a).  Specifically, the Plan must:

a.    designate classes of claims and interests, other than administrative expense claims under section 507(a)(2) of the Bankruptcy Code, and priority tax claims under section 507(a)(8) of the Bankruptcy Code (11 U.S.C. § 1123(a)(1));

b.    specify any class of claims or interests that is not impaired under the plan (11 U.S.C. § 1123(a)(2));

c.    specify the treatment of any class of claims or interests that is impaired under the plan (11 U.S.C. § 1123(a)(3));

d.    provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest (11 U.S.C. § 1123(a)(4));

e.    provide adequate means for the plan's implementation (11 U.S.C. § 1123(a)(5));

f.    contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee (11 U.S.C. § 1123(a)(7))

g.    provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan (11 U.S.C. § 1123(a)(8)).[5]

---

[5]    Section 1123(a)(6) is only applicable to corporate debtor cases and is, therefore, not addressed herein.

14.     The Plan satisfies these requirements.  *First*, the Plan designates

Classes of Claims and Equity Interests as required by section 1123(a)(1).  *See* Plan § 3.2.

15.     *Second*, as required by sections 1123(a)(2) and (3) of the Bankruptcy

Code, the Plan specifies which Classes of Claims and Equity Interests are Impaired and

Unimpaired, and sets forth the treatment of such Classes.  *See* Plan §§ 3.3, 4.1-4.9.

16.     *Third*, unless a Holder of a Claim or Equity Interest agrees to less

favorable treatment, the Plan provides for the same treatment for each Claim or Equity

Interest in the same Class.  Therefore, the Plan satisfies section 1123(a)(4) of the

Bankruptcy Code.  *See* Plan §§ 4.1-4.9.

17.     *Fourth*, the Plan provides adequate means for its implementation as

required under section 1123(a)(5) of the Bankruptcy Code.  *See* Plan, Art. V.  The Plan,

together with the documents and forms of agreement included in the Plan Supplement,

provides a detailed blueprint for the transactions contemplated by the Plan including its

primary features:  implementation of the Plan by the Plan Administrator,

consummation of the Transaction of the Debtor's main asset—the Townhouse, the

establishment of the Post-Confirmation Fund which shall be funded from Transaction

Proceeds, and distributions to creditors from the Post-Confirmation Fund in accordance

with the treatment set forth in Article IV and section 5.2 of the Plan.  Article V of the

Plan further describes the implementation of the Plan, including:  (a) the vesting of

Assets, including the Retained Causes of Action, in the Plan Administrator;  (b) the

primary source of Distributions;  (c) the powers and obligations of the Plan

Administrator;  and (d) the closing of the Chapter 11 Case.

18.     In addition to these core features of the Plan, Article V of the Plan

sets forth the other critical mechanics of the Plan, such as the application of 506(c)

Charges and 363(j) Charges, as applicable, to Holders of Secured Claims as is necessary

8

for the full funding of Allowed Administrative Claims, Allowed Professional Fee

Claims, and Allowed Priority Claims, and any other amounts that are necessary to

confirm the Plan, preservation of Retained Causes of Action, granting the Plan

Administrator the authority to pursue or settle Retained Causes of Action, preservation

of insurance, and ensuring compliance with the Stalking Horse Agreement or the Back-

Up Agreement, as applicable, and the Plan.  The precise terms governing the

implementation of the Plan are set forth in greater detail in the Plan, and, where

applicable, the relevant definitive documents or forms of agreements are included in

the Plan Supplement.  Thus, the Plan satisfies section 1123(a)(5) of the Bankruptcy

Code.

19.    *Fifth*, the requirement under section 1123(a)(6) of the Bankruptcy

Code is inapplicable to the Plan.  Subsection (a)(6) applies in the event the debtor is a

corporation and requires the inclusion of a provision prohibiting the issuance of

nonvoting equity securities in the charter of the debtor.  As the Debtor is an individual

and not a corporation, the requirement that the Debtors' organizational documents

prohibit the issuance of non-voting equity securities does not apply in this Chapter 11

Case.

20.    *Sixth*, the Plan complies with section 1123(a)(7) as it contains only

those provisions that are consistent with the interests of Holders of Claims and Equity

Interests and with public policy with respect to the manner of selection of any officer,

director, or trustee under the Plan, and any successor to such officer, director, or trustee.

As the Debtor is an individual, the Plan does not contemplate the appointment of any

directors or officers.  The Trustee has disclosed the identity of the Plan Administrator in

Section 1.68 of the Plan, as Albert Togut, who is the duly qualified Chapter 11 Trustee

previously appointed by this Court in this Chapter 11 Case.  As such, the Trustee's

appointment as Plan Administrator is consistent with the interest of creditors and with

public policy.  Accordingly, the Trustee submits that the Plan satisfies section 1123(a)(7)

of the Bankruptcy Code.

21.    *Lastly*, the requirement under section 1123(a)(8) of the Bankruptcy

Code is inapplicable to the Plan.  Subsection (a)(8) requires a plan to provide for the

payment to creditors of all or such portion of earnings from personal services

performed by the Debtor after the commencement of the case or other future income of

the Debtor as is necessary for execution of the Plan.  The Trustee has determined, based

on information currently available, that the Debtor does not have any earnings from

personal services performed after the commencement of the Chapter 11 Case.

Additionally, the Trustee has determined that the Debtor does not project significant, if

any, disposable income, as defined under section 1325(b)(2) of the Bankruptcy Code.  To

the extent it is determined that there are material changes in the Debtor's financial

circumstances, or if it is later determined that the Debtor has disposable income not

presently disclosed or anticipated, the Trustee has reserved the right to seek

appropriate relief, and the Plan provides for the turnover of all of the Debtors' non-

exempt property, including any Disposable Income prior to the Debtor being eligible

for a discharge.  *See* Plan § 9.1.  Accordingly, section 1123(a)(8) is inapplicable and, to

the extent it is determined that section 1123(a)(8) is applicable to the Plan, the Plan

provides the mechanism for the contribution of any disposable income of the Debtor in

satisfaction of subsection (a)(8).

### iii.    The Plan Complies with Section 1123(b) of the Bankruptcy Code

22.    In addition to the provisions required by section 1123(a) of the

Bankruptcy Code, the Plan also contains numerous discretionary provisions permitted

by section 1123(b) of the Bankruptcy Code.  Among other things, the Plan provides for

the:  (a) impairment of certain Claims;  (b) retention of the Retained Causes of Action,

which may be pursued or settled by the Plan Administrator;  (c) procedures for the

resolution of Disputed Claims; (d) assumption or rejection of Executory Contracts and

Unexpired Leases;  and (d) release, injunction, and/or exculpation of certain parties.

*See* Plan, Arts. III, IV, V, VII, VIII, & X.  Each of these provisions of the Plan is consistent

with section 1123(b) of the Bankruptcy Code and permissible under applicable law.  *See*

11 U.S.C. §§ 1123(b)(1), (2), (3) & (6).  .

23.    With respect to the assumption or rejection of executory contracts

and unexpired leases, section 1123(b)(2) of the Bankruptcy Code allows a plan, subject

to section 365 of the Bankruptcy Code, to provide for the assumption, rejection, or

assignment of any executory contract or unexpired lease not previously assumed or

rejected under section 365 of the Bankruptcy Code.  11 U.S.C. § 1123(b)(2).  In

accordance with section 1123(b)(2), Section 8.1 of the Plan provides for the rejection of

the Debtor's Executory Contracts or Unexpired Leases, except where (a) it has been

specifically assumed, or assumed and assigned, by the Debtor or Trustee on or before

the Confirmation Date with the approval of the Bankruptcy Court, (b) in respect of

which a motion for assumption or assumption and assignment has been filed with the

Court on or before the Confirmation Date, or (c) it has been specifically designated as a

contract to be assumed on a schedule to be included as part of the Plan Supplement.

Further, pursuant to Section 1.69 of the Plan, the Plan Supplement includes a "schedule

of Executory Contracts and Unexpired Leases to be assumed."  The Plan Supplement,

which was filed by the Trustee on February 25, 2026 [Docket No. 917], lists no

Executory Contracts or Unexpired Leases to be assumed.  Accordingly, the rejection of

Executory Contracts and Unexpired Leases should be approved.

### iv.    The Plan Complies with Section 1123(c) of the Bankruptcy Code

24.    Section 1123(c) of the Bankruptcy Code provides that "in a case concerning an individual, a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale, or lease." 11 U.S.C. § 1123(c).

25.    The Debtor has not filed an objection to confirmation of the Plan. As such, the Trustee submits that section 1123(c) of the Bankruptcy Code is satisfied. Moreover, the Debtor previously sought authority to sell the Townhouse by commencing an adversary proceeding requesting approval of such relief (*see* Adv. Pro. No. 23-01195 (MEW) [Docket No. 1]), thereby evidencing consent to the sale of the Townhouse. In any event, the sale of the Townhouse has already been authorized by this Court pursuant to section 363(h) of the Bankruptcy Code, *see* Adv. Pro. No. 23-01195 (MEW) [Docket No. 18], and the Approval Order. To the extent the Debtor now seeks to challenge the sale of the Townhouse through the confirmation process, such arguments are barred by judicial estoppel. *See Adelphia Recovery Trust v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014) (setting forth three elements for judicial estoppel: (1) a party's later position must be clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept its earlier position, so that judicial acceptance of an inconsistent position creates the perception that the court was misled; and (3) whether the party asserting an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.).

26.    Moreover, the evidence before the Court demonstrates that the Townhouse is encumbered by consensual liens that exceed the value of the property, such that the sale proceeds will be applied to the payment of secured claims and related

costs, with no equity remaining in the property itself.  Nevertheless, to the extent any proceeds remain after satisfaction of such liens and expenses, the Debtor's exemption, if any, would attach to those proceeds and be subject to further order of the Court, as provided in Section 5.10 of the Plan.  Accordingly, the Plan's provision for the sale of the Townhouse fully complies with section 1123(c) of the Bankruptcy Code.

### v.    Section 1123(d) Is Inapplicable to the Plan

27.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."  11 U.S.C. § 1123(d).  As the Trustee is not planning to assume any Executory Contracts or Unexpired Leases (*see* Plan Supplement), the Trustee is not proposing to cure any defaults.  Thus, section 1123(d) of the Bankruptcy Code is inapplicable in this Chapter 11 Case.

### B.    The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code

28.    Section 1129(a)(2) of the Bankruptcy Code also requires the proponent of a chapter 11 plan to comply with the applicable provisions of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(2).  Notably, the legislative history provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements contained in sections 1125 and 1126 of the Bankruptcy Code.  *See* S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.");  H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977) (same);  *see also In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986) ("Objections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code.");  *In re Toy*

13

*& Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) ("Code § 1129(a)(2) requires that the proponent of the plan must comply with chapter 11. Thus, the proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with Code §§ 1125 and 1126.").

29.      As set forth below, the Trustee has complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, as well as Bankruptcy Rules 3017 and 3018, by distributing, through the Togut Firm, the Disclosure Statement and soliciting acceptances of the Plan, in accordance with the *Order (I) Approving Certain Key Dates Relating to Confirmation of the Trustee's Plan, Including Scheduling a Combined Hearing to Consider Approval of Trustee's Disclosure Statement and Plan;  (II) Approving the Form and Manner of Combined Hearing Notice;  (III) Approving the Trustee's Disclosure Statement on a Provisional Basis;  (IV) Approving (A) Procedures for Solicitation, (B) Forms of Ballots, (C) Procedures for Tabulation of Votes, And (D) Procedures for Objections* [Docket No. 875] (the "Solicitation Procedures Order"). Among other things, the Solicitation Procedures Order:  (a) conditionally approved the Disclosure Statement for use in soliciting acceptances and rejections of the Plan;  (b) scheduled a hearing to be held on March 11, 2026 at 2:00 p.m. (prevailing Eastern Time) (the "Combined Hearing") to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan;  (c) approved certain procedures for solicitation and tabulation of votes to accept or reject the Plan (the "Solicitation Procedures");  and (d) approved the Ballots (as defined in the Solicitation Procedures Order) and the other materials distributed by the Trustee in connection with Confirmation of the Plan (collectively, the "Solicitation Materials").

    **i.**    **The Trustee has Complied with the Disclosure and Solicitation Requirements of Section 1125 of the Bankruptcy Code**

30.    Section 1125(b) of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted . . . the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). The Trustee has satisfied section 1125(b) of the Bankruptcy Code.

31.    Before the Trustee began soliciting votes on the Plan, the Court, under the Solicitation Procedures Order, approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code on a provisional basis, and further approved the Solicitation Procedures.

32.    The Trustee and the Togut Firm complied in all respects with the Solicitation Procedures outlined in the Solicitation Procedures Order. On February 4, 2026, the Togut Firm transmitted the Solicitation Materials in accordance with the Solicitation Procedures Order. *See* Solicitation Decl. Specifically, the Togut Firm served copies of the following documents, via first-class mail, to the Holders of Claims in Classes 3, 4, 5, 6, and 8 (*i.e.*, the Voting Classes, as defined in the Solicitation Procedures Order): (a) the Combined Hearing Notice (as defined in the Solicitation Procedures Order); (b) a copy of the Solicitation Procedures Order; (c) the Disclosure Statement; (d) the solicitation version of the Plan [Docket No. 870], and (d) the appropriate personalized Ballot. In accordance with the Solicitation Procedures Order, the Togut Firm also served copies of the following documents, via first-class mail, to the Holders of Claims and Equity Interests in Classes 2 and 9 of the Plan (*i.e.* the Non-Voting

Classes, as defined in the Solicitation Procedures Order):[6]  (a) the Combined Hearing

Notice;  (b) the Disclosure Statement;  (c) the solicitation version of the Plan.

33.      The Voting Declaration and the Solicitation Declaration

demonstrate that the Trustee, through the Togut Firm, served the Solicitation Packages

in accordance with the requirements of Bankruptcy Rules 2002(b) and 3017(d)–(f), and

the Solicitation Procedures Order.  The Trustee, through the Togut Firm, also complied

in all respects with the content and delivery requirements of the Solicitation Procedures

Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.  The Trustee

also transmitted the same solicitation version of the Disclosure Statement to all Holders

of Claims or Equity Interests as authorized by the Solicitation Procedures Order and in

compliance with section 1125(c) of the Bankruptcy Code.  Finally, the Trustee did not

solicit acceptances of the Plan from any creditor or interest holder prior to the

transmission of the Disclosure Statement.  As such, the Trustee has complied with

section 1125 of the Bankruptcy Code.

### ii.      The Trustee has Satisfied the Plan Acceptance Requirements of Section 1126 of the Bankruptcy Code

34.      Section 1126 of the Bankruptcy Code specifies the requirements for

acceptance of a plan and provides which holders of claims or interests are entitled to

vote on the plan.  *See* 11 U.S.C. § 1126.  Specifically, section 1126 of the Bankruptcy Code

details the requirements for acceptance of a plan, providing, in relevant part, that only

holders of allowed claims in impaired classes that will receive or retain property under

a plan on account of such claims may vote to accept or reject a plan.  *See id.*  A class that

is not impaired under a plan, and each holder of a claim or interest in such class, is

---

[6]      Because there were no Holders in Classes 1 and 7, no service of any Solicitation Materials was required or effectuated for such Classes.

conclusively presumed to have accepted the plan.  *See* 11 U.S.C. § 1126(f);  *see also SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 290 (2d Cir. 1992) (noting that an unimpaired class is presumed to have accepted the plan);  S. Rep. No. 989, 95th Cong., 2d Sess. 123 (1978) (same).

35.    Pursuant to the Plan, and in accordance with section 1126 of the Bankruptcy Code, the Trustee did not solicit votes on the Plan from Class 1 (Priority Non-Tax Claims), Class 2 (Emigrant Mortgage Claim), and Class 7 (Other Secured Claims), which Classes are unimpaired under the Plan and hence deemed to accept the Plan.  *See* 11 U.S.C. § 1126(f).  The Trustee did not solicit votes from Class 9 (Equity Interests) because such Class is impaired, and not receiving or retaining any value under the Plan and, thus, deemed to reject the Plan.

36.    The Trustee solicited votes from Holders of Claims in Class 3 (Allowed Lynx Secured Claim), Class 4 (Prime Plus Mortgages Claims), Class 5 (Attachment Lien Claims), Class 6 (Wenig Saltiel Claim), and Class 8 (General Unsecured Claims) because the Holders of Allowed Claims in these Classes are Impaired, and may be entitled to receive a distribution under the Plan.  Therefore, the Trustee submits that its solicitation of votes on the Plan was conducted in compliance with sections 1125 and 1126 of the Bankruptcy Code.

**C.    The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code**

37.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Courts in the Second Circuit have found that the good faith standard requires "a showing that the plan [was] proposed with honesty, good intentions and with a basis for expecting that a reorganization can be effected."  *In re Granite Broad. Corp.*, 369 B.R. 120, 128 (Bankr. S.D.N.Y. 2007)  (alteration in original) (internal quotation

marks omitted);  *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.)*, 528 F.3d 162, 174 (2d Cir. 2008) (same) (citing *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984));  *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) (quoting *Koelbl*).

38.     Additionally, good faith is to be determined "in light of the totality of the circumstances surrounding" formulation of the plan.  *Pub. Fin. Corp. v. Freeman (In re Pub. Fin. Corp.)*, 712 F.2d 219, 221 (5th Cir. 1983);  *see also In re Oneida Ltd.*, 351 B.R. 79, 85 (Bankr. S.D.N.Y. 2006) ("Good faith should be evaluated in light of the totality of the circumstances surrounding confirmation.");  *In re Lionel L.L.C.*, No. 04-17324 (BRL), 2008 WL 905928, at *6 (Bankr. S.D.N.Y. Mar. 31, 2008) (looking to the totality of the circumstances in order to determine that a plan was proposed in good faith under section 1129(a)(3)).

39.     Here, the Plan is the product of arm's-length negotiations between the Trustee, as proponent of the Plan, and Lynx, the Estate's post-petition lender, which were conducted in good faith and culminated in the Plan, which provides for the fair allocation of the Estate's assets consistent with the requirements of the Bankruptcy Code and other applicable law.  Indeed, the Plan provides for the payment in full of all Priority Claims against the Debtors and contains a mechanism for recoveries for holders of Allowed General Unsecured Claims by the re-vesting of all of the Debtors' remaining assets in the Plan Administrator, to be administered by the Plan Administrator.  It is beyond dispute that the Plan formulation process was conducted in good faith and all participants in the process are sophisticated and independently represented by competent counsel.  Thus, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

**D.**     **The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code**

40.     Section 1129(a)(4) of the Bankruptcy Code requires that a payment "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved, or is subject to approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  This section has been construed to require that all payments of professional fees that are made from assets of a debtor's estate be subject to bankruptcy court review and approval as to their reasonableness. *See In re WorldCom, Inc.*, Case No. 02-13533 (AJG), 2003 WL 23861928, at *54 (Bankr. S.D.N.Y. Oct. 31, 2003) ("Section 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the Court.");  *see also In re Johns-Manville Corp.*, 68 B.R. at 632 (holding that a bankruptcy court is not required to rule on fees paid by individual creditors to their counsel, but only those fees that affect the administration of a debtor's estate).

41.     Pursuant to Section 2.2 of the Plan, all Case Professionals seeking an allowance of their Professional Fee Claim for services rendered and expenses incurred through and including the Effective Date shall file an application for such allowance by no later than thirty (30) days after the Effective Date, or such other date as may be fixed by the Bankruptcy Court.  *See* Plan § 2.2.  Accordingly, all Professional Fee Claims remain subject to final review and approval by the Court under the applicable provisions of the Bankruptcy Code.

**E.**     **The Plan Complies With Section 1129(a)(5) of the Bankruptcy Code**

42.     Section 1129(a)(5) of the Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor, or a successor to the debtor under the plan.  *See* 11

U.S.C. § 1129(a)(5)(A)(i).  Section 1129(a)(5)(A)(ii) further requires that the appointment

or continuance of such officers and/or directors be consistent with the interests of

creditors and equity security holders and with public policy.  *See* 11 U.S.C.

§ 1129(a)(5)(A)(ii).  Finally, section 1129(a)(5)(B) requires the plan proponent to disclose

the identity of any insider that will be employed or retained by the reorganized debtor,

and the nature of any compensation for such insider.  *See* 11 U.S.C. § 1129(a)(5)(B).

43.     On the Effective Date, the Trustee will be appointed as the Plan

Administrator, who will act as a successor to the Debtor under specified circumstances

as laid out under the Plan.  *See* Plan §§ 1.68, 5.5 & 5.6.  The appointment of the Trustee, a

duly qualified fiduciary previously appointed by this Court to serve as a Chapter 11

Trustee, as Plan Administrator, is consistent with the interests of the creditors and with

public policy.  Accordingly, the Plan complies with section 1129(a)(5) of the Bankruptcy

Code.

**F.      Section 1129(a)(6) of the Bankruptcy Code Is Inapplicable to the Plan**

44.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation

only if any regulatory commission that will have jurisdiction over the debtor after

confirmation has approved any rate change provided for in the plan.  *See* 11 U.S.C.

§ 1129(a)(6).  As the Debtor will not be charging any rates that are the subject of any

regulatory commission's jurisdiction, section 1129(a)(6) of the Bankruptcy Code is

inapplicable.

**G.      The Plan Complies with Section 1129(a)(7) of the Bankruptcy Code**

45.     Section 1129(a)(7) of the Bankruptcy Code requires that each holder

of a claim or interest either accept the plan or receive or retain property having a

present value, as of the effective date of the plan, not less than the amount such holder

would receive or retain if the debtor were liquidated in a hypothetical liquidation under

chapter 7 of the Bankruptcy Code, a requirement commonly referred to as the "best

interests" test. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe*

*Enters., Ltd., II)*, 994 F.2d 1160, 1167 (5th Cir. 1993); *In re Fur Creations by Varriale, Ltd.*,

188 B.R. 754, 759 (Bankr. S.D.N.Y. 1995); *In re Best Prods. Co., Inc.*, 168 B.R. 35, 72 (Bankr.

S.D.N.Y. 1994); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y.

1990); *In re Ne. Dairy Coop. Fed'n, Inc.*, 73 B.R. 239, 253 (Bankr. N.D.N.Y. 1987); *In re*

*Victory Constr. Co., Inc.*, 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984) .

46.    Importantly, section 1129(a)(7) of the Bankruptcy Code applies only

to non-accepting holders of impaired claims. *See* 11 U.S.C. § 1129(a)(7).  Similarly,

pursuant to section 1126(f) of the Bankruptcy Code, a class that is not "impaired" under

the plan is deemed to have accepted the plan and, therefore, has waived application of

the "best interests" test. *See id*; 11 U.S.C. § 1126(f).  Because Classes 1, 2, and 7 are

Unimpaired under the Plan, such Classes are deemed to have accepted the Plan and,

therefore, waived application of the "best interests" test.

47.    The best interests test is generally satisfied by a liquidation analysis

demonstrating that an impaired class will receive no less under the plan than under a

chapter 7 liquidation. *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr.

S.D.N.Y. 2007) (holding that section 1129(a)(7) was satisfied when an impaired holder of

claim would receive "no less than such holder would receive in a hypothetical chapter 7

liquidation").  However, where, as here, a chapter 11 plan is a liquidating plan, this

Court has explained that a separate liquidation analysis is unnecessary. *See In re Zuca*

*Properties LLC*, Case No. 21-11082 (MG) (Bankr. S.D.N.Y. 2021), July 22, 2021 Hr'g Tr. at

21:19-20.

48.    Nevertheless, the "best interests" test is satisfied as to each member

of an impaired Class that has rejected or is deemed to reject the Plan.  Notably, the Plan

already provides for the liquidation of the Debtor.  Holders in impaired Classes (other than Class 3) are not expected to receive a distribution under the Plan because the proceeds from the sale of the Townhouse will be insufficient, after payment of Administrative Claims and other Claims senior in priority, to provide a distribution to such Holders.  Importantly, Holders of Claims in impaired classes (other than Class 3) would likewise receive no distribution in a hypothetical chapter 7 liquidation, where the Transaction Proceeds would be further reduced by the costs of conversion, additional professional fees, and delay associated with a renewed marketing and sale process.  Although no distribution to Holders in impaired classes (other than Class 3) is anticipated, the Plan nevertheless provides that, in the event all Claims with a higher priority are paid in accordance with the Plan, such Holders may receive a *pro rata* distribution of any proceeds from the liquidation of any remaining Assets of the Estate, including the Retained Causes of Action, Avoidance Actions, Insurance Claims and the Contempt Payments.

49.    Accordingly, the Trustee submits that the Plan satisfies the best interests of creditors test under section 1129(a)(7) of the Bankruptcy Code because Holders of impaired Classes will receive at least as much under the Plan as they would receive in a chapter 7 liquidation—namely, no distribution—while avoiding the additional costs, delay, and value erosion that would result from conversion.  Any speculative recovery for Holders in impaired Classes in a chapter 7 liquidation may be further diminished by the uncertainty, cost, and delay inherent in restarting the sale process under a different fiduciary.

50.    This is particularly true at this advanced stage of the Chapter 11 Case, where the Trustee's efforts have already resulted in a committed purchaser for the Townhouse, and conversion to chapter 7 would risk the closing of the Transaction and

increase administrative expenses through a more protracted liquidation process.  A sale

of the Townhouse pursuant to the Plan also enables parties in interest to realize the

savings and benefits of section 1146(a) of the Bankruptcy Code, which would not be

available under chapter 7 of the Bankruptcy Code.

51.    Moreover, conversion of the Debtor's case to chapter 7 would delay

both the Sale and Distributions to Holders of Allowed Claims, to the detriment of all

parties in interest.  The Trustee therefore submits that the Plan will result in lower total

costs, greater net value to the Estate, and faster Distributions for creditors than would

liquidation under chapter 7 of the Bankruptcy Code, and the Plan satisfied section

1129(a)(7) of the Bankruptcy Code.

## H.    Section 1129(a)(8) of the Bankruptcy Code

52.    Section 1129(a)(8) of the Bankruptcy Code requires that each class

of claims or interests must either accept a debtor's plan or be unimpaired under the

plan.  *See* 11 U.S.C. § 1129(a)(8).  Pursuant to section 1126(c) of the Bankruptcy Code, a

class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount

and more than one-half in number of the claims in that class actually vote to accept the

plan.  *See* 11 U.S.C. § 1126(c).  A class that is not impaired under a plan, and each holder

of a claim or interest in such a class, is conclusively presumed to have accepted the plan.

*See* 11 U.S.C. § 1126(f);  *see also SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel*

*Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 290 (2d Cir. 1992) (noting that an unimpaired

class is presumed to have accepted the plan);  S. Rep. No. 989, 95th Cong., 2d Sess. 123

(1978) (section 1126(f) of the Bankruptcy Code "provides that no acceptances are

required from any class whose claims or interests are unimpaired under the Plan or in

the order confirming the Plan").  A class is deemed to have rejected a plan if the plan

provides that the claims or interests of that class do not receive or retain any property

under the plan on account of such claims or interests.  *See* 11 U.S.C. § 1126(g).

53.    All unimpaired Classes of Claims under the Plan (*i.e.*, Classes 1, 2,

and 7) are conclusively presumed to have accepted the Plan pursuant to section 1126(g)

of the Bankruptcy Code and, thus, have not voted on the Plan.  As set forth in the

Voting Declaration, Class 3 has voted to accept the Plan.  *See* Voting Decl. at Ex. A.

Accordingly, with respect to Class 3 described above, the requirements of section

1129(a)(8) of the Bankruptcy Code have been satisfied.

54.    Holders of Claims in Classes 4, 5, 6, and 8 were provided Ballots

and have either voted to reject the Plan (Class 6) or did not submit votes on the Plan

(Classes 4, 5, and 8).  Holders of Equity Interests in Class 9 will not receive a

distribution under the Plan, so such Class is deemed to reject the Plan.  Nevertheless, as

discussed below, the Plan is a confirmable plan because it satisfies the "cram down"

provisions of section 1129(b) of the Bankruptcy Code with respect to these non-

accepting Classes.

**I.**    **The Plan Complies with Section 1129(a)(9) of the Bankruptcy Code**

55.    Section 1129(a)(9) of the Bankruptcy Code requires that certain

priority claims be paid in full on the effective date of a plan and that the holders of

certain other priority claims receive deferred cash payments.  *See* 11 U.S.C. § 1129(a)(9).

In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of

claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative

claims allowed under section 503(b) of the Bankruptcy Code—must receive on the

effective date cash equal to the allowed amount of such claims.  *Id.*  Section 1129(a)(9)(B)

of the Bankruptcy Code requires that each holder of a claim of a kind specified in

section 507(a)(1) or (4) through (7) of the Bankruptcy Code—which generally include

domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). *See* 11 U.S.C. § 1129(a)(9)(B). Finally, section 1129(a)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, allowed priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim. 11 U.S.C. § 1129(a)(9)(C).

56.     The Plan's treatment of the Administrative Claims, Professional Fee Claims, and Priority Tax Claims complies with section 1129(a)(9) of the Bankruptcy Code. *First*, the Plan provides that Holders of Allowed Administrative Claims, Professional Fee Claims, and Allowed Priority Tax Claims will receive payment in full in Cash on the Effective Date or as soon as practicable thereafter, unless such Holder otherwise agrees to a different treatment (*see* Plan §§ 2.1, 2.2 & 2.3), which complies with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. *Second*, the Plan provides that (i) Priority Non-Tax Claims will receive, at the option of the Trustee or the Plan Administrator, as applicable, (a) a Distribution in Cash in the Allowed amount of its Claim, or (b) reinstatement of such Holder's Claim on the Effective Date, *see* Plan § 4.1, and (ii) Other Secured Claims will receive, (a) Cash in an amount equal to the Allowed amount of such Claim *less* any applicable 506(c) Charge and/or 363(j) Charge (if any, and which is subject to further Court order), (b) Reinstatement of such Allowed Claim; (iii) property securing such Allowed Claim, with any deficiency to result in a General Unsecured Claim, or (d) to the extent applicable, treatment as permitted under Bankruptcy Code section 1129(a)(9)(D); *provided* that payments made pursuant to

25

section 1129(a)(9)(D) shall be made prior to five (5) years after the date of the Petition

Date. *See* Plan § 4.7. *Third*, on the Effective Date, the Trustee or the Plan Administrator

will have sufficient Cash to pay Administrative Claims, Priority Tax Claims, and

Priority Non-Tax Claims, and to fund the Post-Confirmation Reserve and the Disputed

Claim Reserve. Allowed Professional Fee Claims will be paid to the extent possible

whereby each Holder of a Professional Fee Claim shall receive its *pro rata* share of the

remaining funds in the Post-Confirmation Fund as determined by the Trustee or as

otherwise agreed. However, the Trustee believes the Estate stands to receive additional

proceeds from the liquidation of Assets following the Effective Date (*see infra* ¶ 112),

and pursuant to section 2.2 of the Plan, when the Estate receives additional proceeds

from the liquidation of Assets after the Effective Date, Case Professionals shall receive

additional payments on account of such Case Professionals' pre-Effective Date fees and

expenses until such fees and expenses can be fully satisfied. *See* Plan § 2.2. Based on

the foregoing, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy

Code.

**J.**     **The Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code.**

57.    Section 1129(a)(10) of the Bankruptcy Code requires that at least

one impaired class of claims, excluding acceptances of insiders, accept the Plan.

11 U.S.C. § 1129(a)(10). Class 3 is Impaired and voted to accept the Plan by the requisite

majorities, determined without including any acceptance of the Plan by any insider,

thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code. *See*

Voting Decl. at Ex. A. Thus, section 1129(a)(10) of the Bankruptcy Code is satisfied.

**K.**     **The Plan Complies with Section 1129(a)(11) of the Bankruptcy Code**

58.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court

find that confirmation of the Plan is not likely to be followed by the liquidation, or the

need for further financial reorganization, of the debtor unless such liquidation or reorganization is proposed in the Plan—often called the feasibility requirement. *See* 11 U.S.C. § 1129(a)(11); *see In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 772 ("Section 1129(a)(11) requires that a plan must be 'feasible[.]'"). To demonstrate that a plan is feasible, it is not necessary that success be guaranteed. *See Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."). "In making determinations as to feasibility . . . a bankruptcy court does not need to know to a certainty, or even a substantial probability, that the plan will succeed. All it needs to know is that the plan has a reasonable likelihood of success." *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 421–22 (Bankr. S.D.N.Y. 2003); *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) ("It is not necessary that the success be guaranteed, but only that the plan present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.") (internal quotations and citations omitted). Moreover, where a plan proposes to liquidate a debtor, courts have held that section 1129(a)(11) is satisfied. *See In re EUSA Liquidation Inc.*, No. 09-15008 (SMB), 2010 WL 4916559, at *6 (Bankr. S.D.N.Y. June 10, 2010) ("The Plan satisfies section 1129(a)(11) because it provides for the liquidation of the Debtor. The Debtor has sold or abandoned substantially of its assets and will distribute cash to creditors."); *see also In re CLST Enterprises, LLC*, No. 24-10596 (MG), 2025 WL 3708328, at *10 (Bankr. S.D.N.Y. Dec. 19, 2025) (finding section 1129(a)(11) satisfied where the plan proposes the liquidation of all assets of the debtor and provides for payments from the proceeds of the sale of those assets).

59.     Accordingly, the feasibility standard is simplified when a liquidating chapter 11 plan is tested against section 1129(a)(11) of the Bankruptcy Code.

27

In the context of a liquidating plan, feasibility is established by demonstrating that the debtor is able to satisfy the conditions precedent to the plan effective date and otherwise has sufficient funds to meet its post-confirmation obligations to pay for the costs of administering and fully consummating the plan and closing the chapter 11 cases. *See In re Finlay Enters., Inc.*, No. 09–14873 (JMP), 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) ("As demonstrated in the Coles Declaration, the Debtors will have sufficient resources to timely meet all of their obligations under the Plan, including Post-Effective Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases. Accordingly, the Plan is feasible and section 1129(a)(11) of the Bankruptcy Code is satisfied.").

60.     The Plan provides for the sale of the Debtor's main asset, the Townhouse, and use of the Transaction Proceeds from such sale, along with any unrestricted Cash on hand, the Avoidance Action proceeds, the Insurance Claims proceeds, the Retained Causes of Action proceeds, the proceeds from the liquidation of any other available Assets of the Estate, and Contempt Payments, to fund the Post-Confirmation Fund for the purposes of making distributions to Allowed Claims. Moreover, the Trustee has the ability and means to meet each of the conditions precedent to the occurrence of the Effective Date under the Plan (i.e., entry of the Confirmation Order, lack of stay of the Confirmation Order unless the Plan has been substantially consummated before the entry of any stay, lack of any material amendments, alterations, or modifications of the Plan unless such amendments, alterations or modifications are made in accordance with the Plan, consummation of the Transaction, and entry of the Approval Order—which was entered on February 26, 2026). Accordingly, as the Plan provides for the liquidation of the Debtor's non—exempted assets—and the Trustee will be able to meet the conditions precedent to the

28

Plan and consummation of the Transaction will provide the funds necessary to make distributions under the Plan, the Trustee respectfully submits that section 1129(a)(11) of the Bankruptcy Code is satisfied.

**L.      The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code**

61.      Section 1129(a)(12) of the Bankruptcy Code requires that either all fees payable under section 1930 of title 28 of the United States Code, as determined by the Court at the confirmation hearing, have been paid or that the Plan provides for the payment of all such fees on the Effective Date. *See* 11 U.S.C. § 1129(a)(12).   Section 2.5 of the Plan provides for the payment of all U.S. Trustee Fees by the Plan Administrator due and payable on the Effective Date and, as applicable, the payment of all U.S. Trustee Fees as such fees are assessed and come due for each quarter after the Effective Date until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The Plan thus satisfies section 1129(a)(12) of the Bankruptcy Code.

**M.      The Plan Complies with Section 1129(a)(15) of the Bankruptcy Code**

62.      Section 1129(a)(15) of the Bankruptcy Code provides that if a creditor objects to confirmation of an individual chapter 11 plan, the plan may only be confirmed if "(A) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the amount of such claim; or (B) the value of the property to be distributed under the Plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2))  to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer." 11 U.S.C. § 1129(a)(15).  The value of the property to be distributed under the Plan considers the property distributed under the Plan to *all* creditors.  *See In re Pfeifer*,

No. 12-13852 (ALG), 2013 WL 5687512, at *3 (Bankr. S.D.N.Y. Oct. 18, 2013) ("§ 1129(a)(15)(B) requires that the total value of *all* property distributed in a plan must be equal to or greater than the debtor's projected disposable income.").

63.    The Trustee has determined based on information currently available that the Debtor does not project significant, if any disposable income.  Based on the Debtor's Schedules, the Debtor's monthly income consists solely of social security payments in an amount of $3,300 per month.  *See* [Docket No. 28] at 20; *see also* [Docket No. 36] at 13.  The Social Security Act (42 U.S.C. § 407) protects the right of any person to any future payments under subchapter II of chapter 7 of title 42 of the U.S. Code, and such payments are not subject to operation of any bankruptcy law.  *See* 42 U.S.C. § 407(a).  Moreover, section 101(10A) explicitly excludes "benefits received under the Social Security Act (42 U.S.C. 301 et seq.)" from the defined term "current monthly income" as used in the Code.  *See* 11 U.S.C. § 101(10A)(B)(ii)(I).  Section 1325(b)(2) defines "disposable income" as "current monthly income received by the debtor . . ." Accordingly, the Trustee believes the Debtor has no disposable income and the value of the property to be distributed under the Plan—consisting in large part of the Transaction Proceeds in the amount of $34,500,000—therefore, is not less than the projected disposable income of the Debtor to be received during the 5-year period following the Effective Date of the Plan, and section 1129(a)(15) of the Bankruptcy Code is satisfied.

**N.    Sections 1129(a)(13), (14) and (16) of the Bankruptcy Code Are Not Applicable to the Plan**

64.    Section 1129(a)(13) of the Bankruptcy Code requires the debtor to continue to provide retiree benefits for the period the debtor has obligated itself to provide such benefits.  11 U.S.C. § 1129(a)(13).  The Debtor has none of those obligations

at present, and if the Debtor had any such obligations those obligations are rejected under the Article VIII of the Plan.  Therefore, section 1129(a)(13) is inapplicable.

65.    Section 1129(a)(14) of the Bankruptcy Code requires the payment of certain domestic support obligations.  11 U.S.C. § 1129(a)(14).  The Debtor has none and, therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable.

66.    Section 1129(a)(16) of the Bankruptcy Code applies to transfers by "a corporation or trust that is not a moneyed, business, or commercial corporation or trust."  11 U.S.C. § 1129(a)(16).  The legislative history of section 1129(a)(16) of the Bankruptcy Code demonstrates that this section was intended to "restrict the authority of a trustee to use, sell, or lease property by a nonprofit corporation or trust."  *See* H.R. Rep. No. 31, 109th Cong., 1st Sess. 145 (2005);  *In re Sea Launch Co., L.L.C.*, No. 09-12153 (BLS), 2009 WL 8189047, at *12 (Bankr. D. Del. July 30, 2009) ("Section 1129(a)(16) by its terms applies only to corporations and trusts that are not moneyed, business, or commercial.") (internal quotation marks and citation omitted).  Because the Debtor is not a nonprofit entity, section 1129(a)(16) of the Bankruptcy Code is inapplicable.

**O.    The Plan Satisfies the "Cram Down" Requirements
under Section 1129(b) of the Bankruptcy Code**

67.    Section 1129(b) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) are met, other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) are met. *See* 11 U.S.C. § 1129(b).  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.  *See* 11 U.S.C. § 1129(b)(1);  *In re Eletson Holdings Inc.*, 664 B.R. 569, 611 (Bankr. S.D.N.Y. 2024)

("[P]ursuant to Section 1129(b), a Chapter 11 plan that is not fully consensual can be confirmed so long as such plan has at least one impaired accepting class, and so long as the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.")

68.     Here, the Holders of Claims in Class 6 (Wenig Saltiel Claim) voted to reject the Plan.  In addition, because the Holders of Equity Interests in Class 9 will not receive a distribution under the Plan, such Class is deemed to reject the Plan.  Accordingly, the Trustee invokes section 1129(b) of the Bankruptcy Code with respect to Classes 6 and 9.[7]

### i.     The Plan Does Not Unfairly Discriminate with Respect to Classes 6 and 9

69.     The Plan does not discriminate unfairly with respect to Class 6, which voted to reject the Plan or Class 9, which is deemed to reject the Plan.  Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.  *See In re WorldCom Inc.*, 2003 WL 23861928, at *59 (citing *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990));  *Adelphia Commc'ns Corp.*, 368 B.R. at 247.  However, there is no unfair discrimination if (a) the classes are comprised of dissimilar claims or interests, *see, e.g., In re Johns-Manville Corp.*, 68 B.R. at 636;  *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 656–57 (9th Cir. 1997);  *In re Aztec Co.*, 107 B.R.

---

[7]     Although the Holders of the Claims in Classes 4 (Prime Plus Mortgages Claim), 5 (Attachment Lien Claims) and 8 (General Unsecured Claims) did not submit votes on the Plan, the Trustee need not invoke section 1129(b) of the Bankruptcy Code with respect to these Classes because such Classes are deemed to accept the Plan for "cram down" purposes.  *See Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*, 836 F.2d 1263, 1267-68 (10th Cir. 1988) (holding that impaired classes of claims entitled to vote on the plan that did not vote are deemed to accept the plan for purposes of section 1129(b) of the Bankruptcy Code); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 260 (Bankr. S.D.N.Y. 2007) (holding that *Ruti-Sweetwater* "is rightly decided").

585, 589–91 (Bankr. M.D. Tenn. 1989), or (b) taking into account the particular facts and

circumstances of the case, there is a reasonable basis for such disparate treatment, *see,*

*e.g., In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 715 (separate classification and

treatment was rational where members of each class "possess[ed] different legal

rights"); *In re Aztec Co.*, 107 B.R. at 590.  In this regard, the case law is clear that not all

discrimination is impermissible under section 1129(b).  *See* Confirmation Hr'g Tr.

[Docket No. 758] at 118:4–7, *In re Reader's Digest Ass'n*, No. 09-23529 (RDD) (Bankr.

S.D.N.Y. Jan. 15, 2010) ("Clearly, one of the areas of flexibility that Congress provided in

Chapter 11 is the unfair discrimination test of 1129, recognizing implicitly in the plain

language that some forms of discrimination are fair.").

70.     If discrimination is present, courts in this District have typically

applied a four-part test to determine if the discrimination is fair, which considers

whether: (a) there is a reasonable basis for discriminating; (b) the debtor cannot

consummate the plan without discrimination; (c) the discrimination is proposed in

good faith; and (d) the degree of discrimination is in direct proportion to its rationale.

*See, e.g., In re Genco Shipping & Trade Ltd.*, 513 B.R. 233, 241–42 (Bankr. S.D.N.Y. 2014);

*WorldCom, Inc.*, 2003 WL 23861928, at *59 (citing *Buttonwood*, 111 B.R. at 63).  In

construing the test, leading courts and commentators have concluded that the "test

boils down to whether the proposed discrimination has a reasonable basis and is

necessary for reorganization." *In re Breitburn Energy Partners LP*, 582 B.R. 321, 351

(Bankr. S.D.N.Y. 2018) (citing 7 Alan N. Resnick & Henry J. Sommer, *Collier on

Bankruptcy* ¶ 1129.03(3)(a), at 1129–66); Confirmation Hr'g Tr. [Docket No. 758] at

112:21-23, *In re Reader's Digest Ass'n*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010)

(interpreting the *Buttonwood* test as providing a "reminder[] to the fact finder to focus

his or her inquiry on the reasonable basis for discriminating").

33

71.    Here, the Claims or Equity Interests comprising Class 6 and Class 9 are legally distinct from those classified in other Classes under the Plan and are therefore appropriately classified and treated separately.

72.    Specifically, the Class 6 Claim (Wenig Saltiel Claim) arises from the judgment entered on August 12, 2021 in favor of Wenig Saltiel LLP by the Supreme Court of the State of New York, County of Kings (Index No. 508287/2020) (the "Wenig Saltiel Judgment"), which was recorded in the New York County Clerk's Office on August 17, 2022, and thereby created a judicial lien against the Townhouse). *See* Plan §§ 1.115; Proof of Claim No. 12-1 ¶¶ 4, 9. Because the Wenig Saltiel Judgment was recorded after all other liens against the Townhouse,[8] the Wenig Saltiel Claim is junior in priority to all Claims secured by the Townhouse (i.e., Emigrant Mortgage Claim, the Allowed Lynx Secured Claim, the Prime Plus Mortgages Claims, and the Attachment Lien Claims).

73.    With respect to Class 9 (Equity Interests), the interest is separately classified because it is the only Class relating to equity interests of a Debtor, which have a distinct legal character than any other Claims against the Debtor. *See* Plan §§ 1.43 & 4.9. Accordingly, the Plan does not unfairly discriminate against the Holders of Claims or Eqauity Interests in Classes 6 and 9. *See In re Finlay Enterprises, Inc.*, No. 09-14873

---

[8]    The mortgage underlying the Emigrant Mortgage Claim was recorded with the Office of the City Register on September 9, 2010. *See* Proof of Claim No. 5-1 at 17. The judgment lien underlying the Public Administrator Judgment Lien was recorded against the Townhouse on or about November 5, 2015. The mortgage underlying the Allowed Lynx Secured Claim was recorded with the Office of the City Register on February 27, 2017. *See Verified Complaint for Foreclosure of Mortgage*, Lynx Asset Services, LLC v. Nestor *et al.*, (Sup. Ct. N.Y.) Index No. 850129/2019 [NYSCEF Doc. No. 2]. The mortgages underlying the Prime Plus Mortgages Claims were recorded with the Office of the City Register on March 15, 2018, and January 2, 2019. *See* Proof of Claim Nos. 7-1, 8-1. The liens underlying the Attachment Lien Claims were granted by the Surrogate's Court of the State of New York (Nassau County) on June 26, 2020, and a notice of attachment was filed with the County Clerk for New York County on July 17, 2020. *See* Proof of Claim No. 9-2.

(JMP), 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) (finding that plan did not

unfairly discriminate because the rejecting class consists of "all Equity Interests in the

Debtors and no other class of interests exists" and the rejecting class is "of a different

legal nature and priority than the other classes created under the Plan").

### ii.    The Plan is Fair and Equitable

74.    Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy

Code provide that a plan is fair and equitable with respect to a class of impaired

unsecured claims or interests if no holder of any claim or interest junior to such class

receives or retains any property under the plan on account of such junior claim or

interest.  *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii), (b)(2)(C)(ii).  This central tenet of bankruptcy

law, known as the "absolute priority rule," requires that if the holders of claims in a

particular class receives less than full value for their claims, no holders of claims or

interests in a junior class may receive any property under the plan.  *See Bank of Am. Nat.*

*Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999).  The corollary to

the absolute priority rule is that senior classes cannot receive more than a 100%

recovery for their claims.  *See 7 Collier on Bankruptcy* ¶1129.03[4][a];  *see also In re Granite*

*Broad. Corp.*, 369 B.R. at 140 ("There is no dispute that a class of creditors cannot receive

more than full consideration for its claims, and that excess value must be allocated to

junior classes of debt or equity, as the case may be.");  *In re Exide Techs.*, 303 B.R. 48, 61

(Bankr. D. Del. 2003) ("[A] corollary of the absolute priority rule is that a senior class

cannot receive more than full compensation for its claims.") (citation omitted).

75.    Here, the Plan satisfies the "fair and equitable" rule because there

are no Class of Claims or Equity Interests junior to Class 9.  *See In re Finlay Enters. Inc.*,

2010 WL 6580629, at *7 (holding that fair and equitable test was satisfied where no

interest junior to the interest of the rejecting class received any property under the

plan).  Moreover, no senior creditor will receive property in excess of the full value of its Claims under the Plan.

76.      Similarly, the Plan is "fair and equitable" as to Class 6 because the treatment of Claims in Class 6 comports with the "absolute priority rule" in that each Holder of a Class 6 Claim shall receive Cash in amount equal to the Allowed amount of such Claim *less* any applicable 506(c) Charge and/or 363(j) Charge (which apply to all Holders of Claims secured by the Townhouse).  However, pursuant to section 506(a) of the Bankruptcy Code, the secured nature of the Wenig Saltiel Claim is limited by the value of the Estate's interest in the property securing the Claim after satisfaction of liens senior to the judicial lien securing the Wenig Saltiel Claim.  Because the amount of the senior liens exceeds the value of the Townhouse, the Wenig Saltiel Claim is unsupported by any realizable collateral value and is therefore, in substance, an unsecured claim as the remaining amount of such Holder's Claim constitutes a Secured Creditor Deficiency Claim (i.e., a General Unsecured Claim).  Accordingly, the Plan satisfies the absolute priority rule because no class of Claims senior to Class 6 will receive more than full payment on account of its Claims and no Class junior to Class 6 will receive or retain any property under the Plan or will receive any residual property shared on a pro rata basis with all other Holders of Allowed General Unsecured Claims.  Thus, the Plan is "fair and equitable" and therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

**P.**   **Section 1129(c) of the Bankruptcy Code Is Inapplicable to the Plan**

77.      The Plan is the only plan solicited in this Chapter 11 Case and, therefore, section 1129(c) of the Bankruptcy Code is inapplicable.

**Q.**      **The Plan Complies with Section 1129(d) of the Bankruptcy Code**

78.      Section 1129(d) of the Bankruptcy Code states that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933." 11 U.S.C. § 1129(d). The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933. Moreover, no party that is a governmental unit, or any other entity, has requested that the Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. For these reasons, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**R.**      **Section 1129(e) is Inapplicable to the Plan**

79.      This Chapter 11 Case is not a "small business case," as that term is defined in the Bankruptcy Code, and accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

**II.      The Plan's Release, Exculpation and Injunction Provisions Are Appropriate and Should be Approved and the Court Should Overrule the UST Objection**

80.      Section 1123(b) of the Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan. *See* 11 U.S.C. § 1123(b)(1)–(6). As set forth below, the Plan includes certain of these discretionary provisions, which the Trustee has determined, in the exercise of their reasonable business judgment, are appropriate in these Chapter 11 Cases.

81.      Article IX of the Plan sets forth the Plan's releases, exculpation and injunction provisions. The Office of the U.S. Trustee (the "U.S. Trustee") has filed an objection [Docket No. 951] (the "UST Objection") challenging, in large part, the release, exculpation, and no liability provisions of the Plan. As described below, these

provisions are appropriate, comply with applicable law, and should be approved and the Court should overrule the UST Objection.

### i.    The Estate Release

82.    Section 9.3 of the Plan contains a release of potential claims and causes of action belonging to the Trustee, the Debtor or the Estate against the Released Parties (the "Estate Release").  The Estate Release does not release (a) any post-Effective Date obligations of any Person or Entity under the Plan or any other contractual obligation effective from and after the Effective Date, or (b) the liability of any Released Party that would otherwise result from bad faith, willful misconduct, gross negligence, breach of fiduciary duty, malpractice, fraud, criminal conduct, unauthorized use of confidential information that causes damages, and/or ultra vires act.

83.    Claims held by a debtor against third parties are property of the estate and may be released in exchange for settlement.  *See* 11 U.S.C. § 1123(b)(3)(A) ("a plan may provide for—the settlement or adjustment of any claim or interest belonging to the debtor or to the estate"); *In re Ditech Holding Corporation*, 606 B.R. 544, 622 (Bankr. S.D.N.Y. 2019).  When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.  *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) (analyzing a plan and embodied settlement under a best interests standard);  *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (finding debtor releases appropriate where they represented a valid exercise of the debtors' business judgment and were in the best interests of the estate), *rev'd in part on other grounds sub nom. Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 627 F.3d 496 (2d Cir. 2010);  *In re Bally Total Fitness,* Case No. 07-12395 (BRL), 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007) (same).  Debtors have considerable

leeway in issuing releases of their own claims, and such releases are considered non-
controversial.  *See In re Adelphia Commc'ns Corp.*, 368 B.R. at 263 n.289; *In re Motors
Liquidation Co.*, 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Releases by estates involve a
give-up of potential rights that are owned by the estate, and are perfectly permissible in
a plan[.]").  Courts in this District and others recognize that releases by debtors are often
in the best interests of the estate where "the costs involved [in pursuing the released
claims] likely would outweigh any potential benefit from pursuing such claims."  *In re
Lear Corp.*, No. 09-14326 (ALG), 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009);
*see also In re Cano Petroleum, Inc.*, No. 12-31549 (BJH), 2012 WL 2931107, at *15 (Bankr.
N.D. Tex. July 18, 2012) (same);  *In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL
4565223, at *9 (Bankr. S.D.N.Y. Dec. 19, 2007) (same).  Moreover, the Trustee has the
authority to release the Debtor's claims as he stands in the shoes of the Debtor.  *See In re
Lehr Construction Corp.*, No. 11-10723 (SHL), 2015 WL 5174467, at *6 (Bankr. S.D.N.Y.
Sept. 2, 2015) ("As the legal representation of the bankruptcy estate, the trustee has the
legal obligation to pursue the estate's claims or to settle them, based upon the best
interests of the estate.") (internal citations and quotations omitted);  *cf. In re Salander*, 450
B.R. 37, 46 (Bankr. S.D.N.Y. 2011) ("Any claims that accrued pre-petition, or as a result
of the petition, are property of the estate and may be pursued only by the bankruptcy
trustee, not the debtor.").

84.     Here, the Estate Release, which has been negotiated at arm's length
between the Trustee and the Released Parties, constitutes a sound exercise of the
Trustee's business judgment and meets the applicable legal standard—the Estate
Release is fair, reasonable, is in the best interests of the Estate, and constitutes good faith
compromises and settlements of the matters covered thereby, including, but not limited
to, resolution of the Trustee's right to seek a surcharge against Lynx and its collateral

pursuant to section 506(c) of the Bankruptcy Code.  The Estate Release is narrowly

tailored to the facts and circumstances of the Chapter 11 Case.

85.    The U.S. Trustee objects to the Estate Release on the ground that it

supported by "allegedly unknown consideration" and argues that Lynx already

received its bargained-for consideration as a lender under the Post-Petition Financing

Facility.  UST Obj. at 14-15.  That objection overlooks both the Trustee's assessment of

potential estate claims and the substantial benefits provided by Lynx in connection with

the administration and resolution of this Chapter 11 Case.  As an initial matter, the

Trustee does not believe the Debtor or the Estate holds any colorable or valuable claims

against Lynx or its related parties and, the potential benefits of pursuing any

hypothetical claims would be outweighed by the benefits obtained through the Estate

Release.  In evaluating an estate release, the relevant inquiry is whether the proposed

settlement is reasonable and in the best interests of the estate in light of the likelihood of

success on any claims and the costs and risks associated with pursuing them.  Here, the

Trustee has determined that the Estate Release satisfies that standard.

86.    In addition, the Estate Release is supported by substantial

consideration.  Lynx served as the post-petition lender to the Estate under the Post-

Petition Financing Order [Docket Nos. 264, 579, 617, 681, 784], providing $400,000 in

financing to the Estate shortly after the Trustee's appointment, which was necessary to

preserve the value of the Townhouse and stabilize the Estate.  Lynx has agreed to limit

its recovery to the Transaction Proceeds, which the Trustee estimates will effectively

result in a voluntary reduction of Lynx's Claim by approximately $4.1 million.  This

substantial reduction will allow the Trustee to fund the reasonable and necessary costs,

commissions, compensation and other expenses incurred by the Trustee and his

retained professionals in connection with the sale of the Townhouse, preserving the

40

Townhouse, and administering the Chapter 11 Case (subject to the terms and conditions

of the Post-Petition Financing Order).  Further, since July 2025, Lynx has paid all

insurance premium financing payments on behalf of the Estate (approximately $18,000

per month) (*see Order (A) Authorizing the Chapter 11 Trustee to Enter into Amendment of

Insurance Premium Financing Agreement and (B) Authorizing Lynx Asset Services, LLP to

Make Payments Thereunder* [Docket No. 722]) and advanced funds in connection with the

Water Leak at the Townhouse.  Moreover, despite its right to call the DIP loan in default

and seek relief from the automatic stay to compel the Trustee to deliver Lynx a deed to

the Townhouse, Lynx agreed not to do that to give the Trustee the opportunity to

maximize value from the Townhouse for the benefit of the Estate.  Lynx's funding,

contributions and forbearance from calling a default materially facilitated the

administration of the Estate and the Trustee's ability to formulate a confirmable plan.

And while the Post-Petition Financing Order included a limited release by the Trustee

relating to the validity and enforceability of Lynx's prepetition obligations and loan

documents, that provision was narrowly tailored and does not, nor should it, foreclose

the Trustee's ability to agree to a broader Estate release in connection with the

comprehensive resolution embodied in the Plan—particularly where, as here, the

Trustee has determined that the Estate does not possess valuable claims against Lynx in

any event.

87.    The U.S. Trustee also objects to the Estate Release to the extent it

covers Lynx's Related Parties, arguing that there is no evidence in the record regarding

the contributions of these parties.  *See* UST Obj. at 15.  This objection likewise overstates

the scope and effect of that provision.  As noted above, the Trustee does not believe that

the Estate holds any colorable or valuable claims against Lynx or its Related Parties.

Moreover, Plan carefully limits the definition of "Related Party" providing that such

parties are deemed Related Parties only "solely in [their] capacity as such . . . (and not independently thereof)[.]" Plan § 1.88.  Accordingly, the Estate Release applies only to claims that could be asserted derivatively or through Lynx by virtue of those parties' relationship with Lynx;  it does not release any independent claims the Estate might have against those parties unrelated to that relationship.  In this respect, the inclusion of Related Parties is a customary feature of estate releases and simply ensures that the release fully resolves claims that could otherwise be asserted indirectly against affiliates or representatives based on the same underlying conduct.

88.    As set forth above, the Released Party has made significant concessions and economic and non-economic contributions to the Estate that support approval of the Debtor Release.  Without those concessions and contributions, the Trustee would not have had the liquidity necessary to insure, maintain, and preserve the Townhouse following his appointment.  Nor would the Estate have had the resources to conduct the extensive marketing process undertaken with respect to the Townhouse, which process was designed to maximize value and ensure the Estate obtained the highest and best available price for the Estate's primary asset.  Absent such funding and contributions, the Trustee's ability to administer the Estate, market and sell the Townhouse, and ultimately formulate and confirm the Plan would have been materially impaired.  In addition, the Estate Release serves the important purpose of providing finality to transactions contemplated by the Plan and avoiding the risk of collateral litigation against Lynx and its Related Parties (solely in their capacity as such) relating to the financing, administration of the Estate, and sale of the Townhouse, which litigation could otherwise undermine the certainty and finality necessary to implement the Plan and distribute proceeds to creditors.  Under these circumstances, the Trustee's agreement to grant the Estate Release represents a reasonable and appropriate exercise

of the Trustee's business judgment and is in the best interests of the Estate and its creditors.

89.    The Estate Release was also included in the solicitation version of the Plan and Disclosure Statement and conspicuously reprinted on the ballots used by creditors to vote to accept or reject the Plan.

90.    The Estate Release is similar to releases by debtors commonly approved by courts in this jurisdiction. *See e.g. In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023) [Docket No. 1746]; *In re GTT Communications, Inc.*, No. 21-11880 (MEW) (Bankr. S.D.N.Y. Dec. 28, 2022) [Docket No. 821]; *In re LSC Commc'ns, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 24. 2021) [Docket No. 1246]; *In re KB US Holdings, Inc.*, No. 20-22962 (SHL) (Bankr. S.D.N.Y. Feb. 22, 2021) [Docket No. 581]; *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [Docket No. 2243]; *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016) [Docket No. 1358].

91.    As an active participant who made valuable contributions to this Chapter 11 Case and worked constructively with the Trustee in assisting with preservation of the Townhouse and formulation of a Plan that resolves this Chapter 11 Case, and in light of the contentious nature of the Case, the Trustee believes that the protection conferred to Lynx by the Estate Release is appropriate and, contrary to the U.S. Trustee's contention, is provided in exchange for valuable consideration.  In light of the foregoing, and for the reasons set forth above, the Trustee submits that the Estate Release is appropriate and should be approved, and the UST Objection in this respect overruled.

### ii.    Exculpation

92.    Section 9.4 of the Plan (the "<u>Exculpation Provision</u>") provides for an exculpation of the Exculpated Parties[9] from any Causes of Action for any claim related to, any act or omission in connection with, related to, or arising out of the Chapter 11 Case, of certain court-approved transactions, including without limitation the sale of the Townhouse, the Post-Petition Financing Facility, and the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Case, the liquidation of the Debtor, or the administration of or property to be distributed under the Plan.  The Exculpation Provision expressly excludes claims arising from any act or omission that is determined in a Final Order to constitute actual fraud, willful misconduct, gross negligence, or a criminal act.  The Exculpation Provision is further narrowly tailored in that it applies only to conduct occurring during the period between the commencement of the Chapter 11 Case and the Effective Date of the Plan.

93.    The Exculpation Provision is also appropriately limited in scope. Although it extends to certain "Related Parties"[10] of the Exculpated Parties, it does so solely with respect to work performed on behalf of the applicable Exculpated Party in

---

[9]    Section 1.45 of the Plan defines "Exculpated Party" as "collectively, and in each case in its capacity as such:  (i) the Trustee;  (ii) Togut, Segal & Segal LLP;  (iii) Vinay Agarwal, CPA, LLC;  (iv) Phillips Nizer LLP;  (v) Sotheby's International Realty;  (vi) Brown Harris Stevens Residential Sales, LLC;  (vii) Preferred Construction Management Co. Inc.;  (viii) Fairview Adjuster Company, Inc.;  (ix) Roland Antiques Gallery, Inc.;  (x) Lynx;  (xi) the Successful Bidder;  and (xii) with respect to each of the forgoing clauses (i)–(xi), to the fullest extent permitted by law, such Person's or Entities' Related Parties, solely with respect to work performed on behalf of the applicable Related Party in connection with the negotiation, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Case."  Plan § 1.45.

[10]    Section 1.88 of the Plan defines "Related Party" as "with respect to any Entity or Person, in each case solely in its capacity as such with respect to such Entity or Person (and not independently thereof), such Entity's or Person's former and current officer, directors, employees managers, equity holders (regardless of whether such interests are held directly or indirectly), successors, assigns, affiliates, partners, principals, members, agents, financial advisors, attorneys, accountants, and representatives."  Plan § 1.88.

connection with the negotiation, execution, and implementation of transactions approved by the Court in this Chapter 11 Case. Accordingly, the provision protects only conduct undertaken in furtherance of the administration of the Estate or the implementation of Court-approved transactions.

94.    The UST Objection asserts that the Plan's exculpation provision should not be approved because certain Exculpated Parties are not estate fiduciaries. However, courts in this District routinely approve exculpation provisions where they "insulate court-supervised fiduciaries **and some other parties** from claims that are based on actions that relate to the restructuring." *In re Genesis Global Holdco, LLC*, 660 B.R. 439, 527 (Bankr. S.D.N.Y. 2024) (quoting *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019)) (emphasis added). As the court explained in *Aegean Marine*:

> a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court approved transactions. If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations.

*In re Aegean Marine Petroleum Networks, Inc.*, 599 B.R. at 721. Other courts have echoed this rationale. *See, e.g.*, *In re BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) (observing that exculpation provisions are common in chapter 11 plans because "stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case."); *American Bankruptcy Institute Commission to Study the Reform of Chapter 11: 2012-2014 Final Report and Recommendations*, 23 Am. Bankr. Inst. L. Rev. 1, 273 (2015) (noting that the public policy underlying exculpation provisions includes "encouraging parties to engage in the process and assist the debtor

45

in achieving a confirmable plan—actions that . . . estate representatives and their

professionals, and certain parties (such as key lenders) may not be willing to undertake

in the fact of litigation risk.").  Indeed, such provisions provide an appropriate and

"certain measure of finality to the interested parties and their professionals, and

assure[] them they will not be second-guessed and hounded by meritless claims

following the conclusion of the bankruptcy case."  *In re Alpha Natural Resources, Inc.*, 556

B.R. 249, 260-261 (Bankr. E.D. Va. 2016) (citing *In re Chemtura Corp.*, 439 B.R. 561, 610

(Bankr. S.D.N.Y. 2010)).  These considerations are particularly relevant here, where

various parties have repeatedly sought to challenge or relitigate this Court's orders

approving key transactions in this Chapter 11 Case, and the Trustee has sufficient

reason to believe such actions would continue following consummation of the

Transaction and the Plan.  The Exculpation Provision reflects the reality that the actions

of the Exculpated Parties were undertaken at the direction of, or with the approval of,

this Court.

95.    Moreover, the Exculpated Parties have each made significant

contributions to the administration of the Estate and formulation of the Plan.  The

Trustee—a court-appointed fiduciary—and his professionals have devoted substantial

time and effort to investigating the Debtor's assets and liabilities, preserving the value

of the Estate's primary asset, marketing and selling the Townhouse, pursuing Estate

causes of action, and formulating a confirmable chapter 11 plan, all while dealing with

the obfuscations and meritless objections and appeals of this Court's orders by certain

parties.  Lynx, in turn, provided critical post-petition financing that enabled the Trustee

to preserve the value of the Townhouse and continue administering the Estate, and has

further agreed to provide additional financing for the payment of the Trustee's

professional fees while limiting its recovery to the Sale Proceeds.  Finally, the Successful

Bidder (as defined in the Plan) is providing the substantial majority of funds necessary

to consummate the Plan and satisfy liens encumbering the Townhouse pursuant to a

Court-approved sale transaction.  Without the support, cooperation, and contributions

of these parties, the Trustee would not have been able to administer the Estate or

propose a confirmable plan.

96.    For the foregoing reasons, the Trustee respectfully submits that the

Exculpation Provision is appropriate and consistent with the well-established practice

in this District.  *See, e.g., In re Azul S.A.*, No. 25-11176 (SHL), 2026 WL 40912, at *7

(Bankr. S.D.N.Y. Jan. 6, 2026) (approving exculpation provision that applies to

fiduciaries and non-fiduciaries and their related parties);  *In re Oneida Ltd.*, 351 B.R. 79,

94 n.22 (Bankr. S.D.N.Y. 2006) (approving exculpation provision releasing claims

relating to any "pre-petition or post-petition act or omission in connection with, or

arising out of, the Disclosure Statement, the Plan or any Plan Document . . . the

solicitation of votes for and the pursuit of Confirmation of [the] Plan, the Effective Date

of [the] Plan, or the administration of [the] Plan or the property to be distributed under

[the] Plan," where, as here, no release was provided for "gross negligence, willful

misconduct, fraud, or criminal conduct, and the release cover[ed] only conduct taken in

connection with Chapter 11 cases");  *Upstream Energy Servs. v. Enron Corp. (In re Enron

Corp.)*, 326 B.R. 497, 501 (S.D.N.Y. 2005) (citing Bankruptcy Court's finding that plan's

exculpation provision was "appropriately limited to a qualified immunity for acts of

negligence and [did] not relieve any party of liability for gross negligence or willful

misconduct" and that such clause was "reasonable and customary");  *In re Granite Broad.

Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation of the debtors

and their pre- and postpetition lender and their respective representatives "for actions

in connection, related to, or arising out of the Reorganization Cases");  *In re Relativity*

*Media, LLC,* No. 18-11358 (MEW) (Bankr. S.D.N.Y. Jan. 31, 2019) [Docket No. 689-1]

(approving exculpation provision for estate fiduciaries and non-fiduciaries); *In re Pacific*

*Drilling S.A.,* No. 17-13193 (MEW) (Bankr. S.D.N.Y. Nov. 2, 2018) [Docket No. 746]

(finding that exculpation for both estate fiduciaries and non-fiduciaries was "consistent

with prior case law, reasonable in scope, integral to the Plan, and appropriate"); *In re*

*Hollander Sleep Prods. LLC,* No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sept. 5, 2019) [Docket

No. 356] (approving exculpation provision for estate fiduciaries and other parties that

"constructively participated in and contributed to the Debtors' chapter 11 process

consistent with this Court's Orders").

       97.    The UST Objection also challenges the Exculpation Provision

because it should not shield Exculpated Parties who rely upon the advice of counsel.

*See* UST Obj. at 12.  This argument is equally unavailing.  This language is also a

common feature in exculpation provisions included in confirmed plans in this district.

*See In re Azul S.A.*, Case No. 25-11176 (SHL) (Bankr. S.D.N.Y. Jan. 6, 2026) [Docket No.

1169] (confirming plan with exculpation provision that stated exculpated parties may

rely upon advice of counsel); *In re Genesis Global Holdco, LLC*, Case No. 23-10063 (SHL)

(Bankr. S.D.N.Y. May 31, 2024) [Docket No. 1736] (same); *In re LATAM Airlines Group*

*S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. June 18, 2022) [Docket No. 5754] (same);

*In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021)

[Docket No. 2300] (same).  In approving this particular provision, the *Genesis Global*

court noted that, to the extent the provision was overbroad, because the provision was

later modified to provide that exculpated parties may only reasonably rely on advice of

counsel "to the extent permitted by and under applicable law", the U.S. Trustee

concerns were resolved and approved the provision.  *See In re Genesis Global Holdco,*

*LLC*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y. May 31, 2024) [Docket No. 1736] at 15;

*see also In re Azul S.A.*, Case No. 25-11176 (SHL) (Bankr. S.D.N.Y. Dec. 7, 2025) [Docket

No. 1007] at 44. The Exculpation Provision includes an identical qualifier to those

included in the Azul and Genesis chapter 11 plans, which were approved by this Court.

*See* Plan § 9.4 ("each Exculpated Party shall be entitled to reasonably rely upon the

advice of counsel concerning its duties and responsibilities pursuant to, or in connection

with, this Plan, **to the extent permitted by and under applicable law**").

98.     Notably, the U.S. Trustee does not rely on a single case or authority

from this Circuit to support its arguments with respect to the Exculpation Provision.

However, in an effort to address the U.S. Trustee's remaining concerns with respect to

the Exculpation Provision, the Trustee has made certain modifications to the Plan to (i)

remove any exculpation of Exculpated Parties for any act taken or omitted to be taken

"in contemplation of the Chapter 11 Case", which the U.S. Trustee identified as overly

broad, *see* UST Obj. at 11; Plan § 9.4, (ii) revise the defined term for "Exculpated Party"

to remove reference to Trustee Professionals, which would have captured any

professional providing post-Effective Date services to the Plan Administrator, *see* Plan

§§ 1.45, 1.108, and (iii) to delete references to "released" and "discharged" in connection

with the Exculpation Provision, *see* Plan § 9.4.

99.     As set forth above, the Exculpation Provision is narrowly tailored,

applies only to post-petition conduct relating to the administration of this Chapter 11

Case and Court-approved transactions, and excludes liability for fraud, gross

negligence, willful misconduct, or criminal acts. Accordingly, it should be approved,

and the UST Objection should be overruled in this respect.

100.    The UST Objection also challenges Section 5.7 of the Plan (the "<u>No

Liability Provision</u>"), a provision that protects the Plan Administrator's ability to make

distributions "**in accordance with th[e] Plan and Confirmation Order**," Plan § 5.7. The

U.S. Trustee contends that the provision impermissibly extends to activity outside of the Chapter 11 Case and to actions occurring after the Effective Date, citing solely non-Second Circuit authority.  *See* UST Obj. at 13.  The objection mischaracterizes the scope of the provision.  As the Plan makes clear, the No Liability Provision functions as a limited exculpation for an *estate fiduciary*—the Trustee—when acting in accordance with the Plan as confirmed by this Court.  The Plan defines "Plan Administrator" as "Albert Togut . . . *solely in his capacity as plan administer pursuant to the provisions of this Plan and as designated by the Confirmation Order*[.]"  *Id.* § 1.68.  The No Liability Provision's application to the Plan Administrator, therefore, is solely in his capacity as such and should resolve any concern that any action by the Plan Administrator (even those taken outside the scope of the Plan) would be exculpated and shielded from any liability whatsoever.

101.    Moreover, the No Liability Provision does not exculpate conduct constituting willful misconduct, gross negligence, or breach of fiduciary duty.  *See id.* § 5.7.  These limitations address any concern that the provision could shield improper conduct or extend beyond actions taken in administering the plan.  Given the contentious nature of this Chapter 11 Case (which has resulted in considerable time and expense spent on frivolous and unmeritorious challenges to the Trustee's authority and ability to administer the case) and the need to ensure that the Plan Administrator may carry out the Court-approved distribution scheme without the threat of collateral challenges, such protection is appropriate and consistent with applicable law.  Given these limitations, an exculpation for the Plan Administrator acting in accordance with the Plan for actions taken in the future is appropriate and the UST Objection should be overruled in this respect.

102.    Courts in this District have approved similar provisions prospectively exculpating plan fiduciaries for actions taken in implementing a confirmed plan.  For example, in *Genesis Global Holdco*, this Court approved a comparable provision protecting a distribution agent where the actions subject to exculpation were "prescribed by the terms of the Plan or taken solely in furtherance of the Plan," noting that "[n]otwithstanding the UST's view, exculpation may be appropriate even for actions taken after the effective date."  *See In re Genesis Global Holdco, LLC*, Case No. 23-10036 (SHL) (Bankr. S.D.N.Y. May 17, 2024) [Docket No. 1691] at 123; *see also In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021) ("It is settled that exculpatory provisions are proper to protect those authorized by bankruptcy courts to carry out the bankruptcy process, even after the effective date of a plan.").

103.    Accordingly, because the No Liability Provision applies only to a single estate fiduciary acting in a limited capacity and is subject to customary carve-outs for wrongful conduct, it is appropriately tailored and should be approved.  The Trustee respectfully submits that the UST Objection should therefore be overruled in this respect.

### iii.    Injunction

104.    Section 9.2. of the Plan provides for an injunction that, upon the Confirmation Date, enjoins Holders of Claims and Equity Interests from commencing or continuing actions against the Debtor, the Trustee, the Trustee's professionals, the Plan Administrator, the Townhouse, or the Assets on account of or in connection with Claims or Equity Interests, except as otherwise provided in the Plan or the Confirmation Order.  The injunction further prohibits actions to enforce judgments, create or enforce liens or other encumbrances, assert setoff, subrogation, or recoupment

rights, or otherwise take actions inconsistent with the Plan or the Confirmation Order. In addition, the injunction protects the Successful Bidder's ownership and quiet enjoyment of the Townhouse in accordance with the Approval Order.

105.    Such an injunction is a customary and appropriate provision in chapter 11 plans, as it ensures that the Plan may be implemented in an orderly manner and prevents parties from taking actions that would interfere with the administration of the Plan or the transactions contemplated thereby.  No party has objected to this provision, and it is therefore appropriate for the Court to approve it as part of confirmation of the Plan.  Such injunction is consistent with the guidance from this Court.  *See In re JCK Legacy Company*, No. 20-10418 (MEW) (Bankr. S.D.N.Y. Sept. 25, 2020), ¶ 1 (providing for an injunction from "interfering with the distributions and payments contemplated by the Plan" in a liquidating chapter 11 case where the discharge under section 1141 of the Bankruptcy Code was not available).

106.    Thus, the proposed injunction is appropriate under sections 1123(b)(6) and 1123(a)(5) of the Bankruptcy Code and should be approved.

**III.    All Other Objections to the Plan are
        Without Merit and Should be Overruled**

107.    In addition to the UST Objection, the Plan has also received objections from Wenig Saltiel LLP ("Wenig Saltiel"), a Holder of a Class 6 Claim, *see Wenig Saltiel LLP's Objection to: (A) the Amended Chapter 11 Trustee's Plan; and (B) the Disclosure Statement to the Amended Chapter 11 Trustee's Plan* [Docket No. 938] (the "Wenig Saltiel Objection") and Marianne Nestor, an interested party in this Chapter 11 Case.  *See* [Docket Nos. 885, 914, 926] (collectively, the "MNC Objection").

108.    In substance, the Wenig Saltiel Objection challenges the Plan's imposition of a Section 506(c) Charge on Wenig Saltiel's Claim on the basis that Wenig

Saltiel receives no direct benefit from the sale of the property securing its Claim.  *See* Wenig Saltiel Obj. ¶ 9-10.  The objection misconstrues the nature of the Wenig Saltiel Claim.  As set forth above in Section I.O.ii, pursuant to section 506(a) of the Bankruptcy Code, the secured status of Wenig Saltiel's Claim is limited to the value of the Estate's interest in the property securing such Claim after satisfaction of liens senior in priority to Wenig Saltiel's judicial lien.  Here, the liens senior to Wenig Saltiel's lien exceed the value of the Townhouse.  Accordingly, Wenig Saltiel's Claim is not supported by any realizable collateral value and therefore has no secured value.  As a result, Wenig Saltiel holds only a Secured Creditor Deficiency Claim for the full amount of its Claim, which is treated as General Unsecured Claim under the Plan.  *See* Plan §§ 1.51, 7.3 (deeming Secured Creditor Deficiency Claims as General Unsecured Claims); *id.* § 4.6(b) (entitling Wenig Saltiel to assert a Secured Creditor Deficiency Claim to the extent the Wenig Saltiel Claim exceeds the value of the Townhouse or Transaction Proceeds securing such Claim);  *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 239 (1989) ("Subsection (a) of § 506 provides that a claim is secured only to the extent of the value of the property on which the lien is fixed;  the remainder of that claim is considered unsecured."); *cf. In re Pond*, 252 F.3d 122, 126-128 (2d Cir. 2001) (finding claim asserted as secured not protected by antimodification exception of section 1322(b)(2) of the Bankruptcy Code because the statute only applies where the claim is at least partially secured and such claim was fully unsecured after accounting for other encumbrances that have priority over the underlying lien).  Because Wenig Saltiel holds no secured claim supported by collateral value, no portion of Wenig Saltiel's Claim is subject to, or affected by, the 506(c) Charge (or the 363(j) Charge for that matter) contemplated by the Plan.  Accordingly, the Wenig Saltiel Objection raises a purely hypothetical concern that has no practical effect on the treatment of its Claim under the Plan.

109.    The UST Objection asserts a similar objection with respect to the 506(c) Charges and the 363(j) Charges and argues that the Plan's treatment of Secured Claims and the proposed Disputed Claim Reserve create a risk that there will be in sufficient funds to pay Administrative Claims and U.S. Trustee Fees in full.  *See* UST Obj. at 16-17.  The U.S. Trustee focuses in particular on the Plan's mechanism for establishing the Disputed Claim Reserve.  The Plan allows the Plan Administrator to determine the amount of any potential 506(c) Charge or 363(j) Charge in calculating the reserve necessary to satisfy Disputed Secured Claims.  To address this perceived risk, the U.S. Trustee argues that the Plan should be amended to require a hearing and determination regarding the Disputed Claim Reserve and any proposed 506(c) Charge or 363(j) Charge prior to the Effective Date.  *See id.*

110.    The U.S. Trustee's concern that the Estate may be administrative insolvent is based on a hypothetical scenario that does not reflect the economic realities of the Claims asserted against the Estate or the significant progress the Trustee has made in resolving those Claims.  First, all of the Secured Claims under the Plan are secured by the Townhouse, and the majority of the Secured Claims are substantially or fully undersecured.  As with the Wenig Saltiel Claim, these Claims are limited under section 506(a) to the value of the Estate's interest in the collateral securing the Claim.  To the extent the value of the collateral is insufficient to satisfy the asserted Secured Claim, the balance constitutes a Secured Creditor Deficiency Claim that is treated as a General Unsecured Claim under the Plan.  *See* Plan §§ 1.51, 7.3.  Accordingly, for many of the Secured Claims, the portion of the Claim that could be asserted as a Secured Claim has little or no value.  Because these Claims are economically out of the money, the U.S. Trustee's concern that the Plan must reserve funds for the full amount of the asserted Secured Claims is misplaced.  Moreover, to avoid any confusion about the applicability

of 506(c) Charges and 363(j) Charges to such Claims, the Plan has been revised to make

clear that no 506(c) Charges or 363(j) Charges will be imposed or sought in connection

with Secured Claims the Trustee has determined are, in effect, fully unsecured due to

the lack of any interest of the Estate to the property securing such Claim.  *See* Plan §

5.1(b) ("to the extent the Transaction Proceeds results in a deficiency, the Trustee will

not seek a 506(c) Charge on account of such deficient Secured Claim"); *id.* § 5.1(c) (same

as to 363(j) Charge); *id.* § 7.3 ("to the extent the Transaction Proceeds result in a

deficiency, the Trustee will not seek a 506(c) Charge and/or 363(j) Charge on account of

such deficient Secured Claim or Lien").  As revised, the Plan removes the concern

identified by the U.S. Trustee that the Plan Administrator could unilaterally determine

such charges in connection with establishing the Disputed Claim Reserve because there

is no need to reserve for such Claims.

111.    Second, the Trustee has been actively negotiating with secured

creditors who stand to receive some value based on their secured interests in the

Townhouse and the anticipated Transaction Proceeds.  Those discussions have been

productive, and the Trustee is close to finalizing stipulations with the relevant creditors

that will resolve the treatment and allowed amounts of their Claims and any 506(c)

Charges or 363(j) Charges to be imposed.  The Trustee anticipates that these stipulations

will be completed prior to the Effective Date.  As a result, the need to reserve funds for

Disputed Secured Claims is expected to be eliminated entirely, rendering the U.S.

Trustee's concern regarding the Disputed Claims Reserve largely academic.

112.    Third, the Plan's feasibility and the Estate's ability to satisfy

administrative expenses do not depend solely on the proceeds from the Townhouse.

The Estate has additional potential sources of recovery that will augment the funds

available to satisfy Claims and expenses and make payments under the Plan.  For

example, the Trustee's recent success in avoiding the transfer of a membership interest of the Debtor in a Connecticut limited liability company which holds a Connecticut property valued in excess of $5 million (*see Order Granting Chapter 11 Trustee's Motion for Summary Judgment*, Adv. Pro No. 24-4023 [Docket No. 64]), which the Trustee will seek to sell.  The Court has also recently approved settlements with avoidance action defendants resulting in the Estate's receipt of settlement payments (*see Order Approving Stipulations Settling Claims Against Lee Nestor, Flying Dog Productions, Inc. and Colleen Johnson* [Docket No. 906]).  The Estate's public adjuster, Fairview Adjuster Company, Inc., has also estimated that the Water Leak Claim may have a value of approximately $4 million.  Any proceeds recovered from these sources would further increase the funds available to satisfy payments under the Plan and, if necessary, fund any reserve.

113.    For all these reasons, the administrative insolvency scenario posited by the U.S. Trustee is speculative and does not reflect the expected resolution of the secured claims or the additional sources of recovery available to the Estate.  With the revisions to the Plan and the Trustee's ongoing efforts to finalize consensual resolutions with the relevant secured creditors, the Plan provides a feasible path to confirmation and consummation without the need for the additional procedures proposed by the U.S. Trustee.

114.    The MNC Objection does not present any discernable objection to confirmation of the Plan.  Instead, it largely reiterates arguments this Court has already considered and rejected on multiple occasions.  For example, Ms. Nestor Cassini asserts that the Debtor's petition was incorrectly filed, that certain documents were not actually signed by the Debtor, that the Debtor is not insolvent, that Gemeaux Ltd. was the intended debtor in this Chapter 11 Case, and that all claims have been resolved other than the Emigrant Mortgage Claim.  Each of these arguments has previously been

raised, considered, and rejected by the Court. *See, e.g., Order Denying Debtor's Motion to Dismiss Case* [Docket No. 356]; *Decision After Trial Denying Debtor's Renewed Motion to Dismiss Her Voluntary Chapter 11 Case* [Docket No. 847]; [Docket No. 930].

115.    Ms. Nestor Cassini raises complaints concerning water damage to the Townhouse and accuses the Trustee and his professionals of causing damage to the property, while seeking dismissal of the Trustee for cause. The Trustee categorically denies any such conduct. As the Court itself noted during the February 25, 2026 hearing, "why would anyone do that on purpose." *See* Feb. 25, 2026 Hr'g Tr. at 37:12. In any event, these allegations are unsupported, unrelated to the requirements for Plan confirmation, and do not provide any basis to deny confirmation of the Plan. Moreover, the Townhouse is insured for any such damage.

116.    Finally, Ms. Nestor Cassini again asserts that she is a co-owner of the Townhouse and therefore entitled to purchase the Debtor's interest in the Townhouse, and she objects to the Trustee's authority to sell the Townhouse without her consent or consultation. The Court has already considered and addressed this issue as well. As the Court noted at the February 25 hearing, Ms. Nestor Cassini is estopped from asserting an ownership interest in the Townhouse in light of her prior representations to the Court disclaiming such ownership. *See* Feb. 25 Hr'g Tr. at 12:7-17 & 92: 14-18; *see also Memorandum Endorsed Order* dated Mar. 9, 2026 [Docket No. 957] ("The Court has ruled that Ms. Nestor Cassini is estopped from claiming an ownership interest in the relevant property (see e.g., ECF Nos. 153, 156, 160, 162)"). In any event, even assuming *arguendo* that Ms. Nestor Cassini could assert a right under section 363(i) of the Bankruptcy Code, she has not provided any proof of funds or irrevocable financing commitment demonstrating an ability to purchase the property, as previously ordered by the Court. *See* Mar. 5, 2026 Hr'g Tr. at 28:20-39:3, 30:9-16 & 34:24-35:14.

Accordingly, because the MNC Objection raises arguments that have already been rejected by the Court or otherwise fails to articulate any cognizable basis to deny confirmation, the Trustee respectfully submits that the MNC Objection should be overruled.

## IV.    The Modifications Comply with Section 1127 of the Bankruptcy Code

117.    Since the filing and solicitation of votes with respect to the Plan, the Trustee has made the following modifications to the Plan (the "Modifications"):[11]

i.   Added provisions to clarify the ability of the Trustee to consummate the Transaction free and clear of liens and interests and to pivot to consummation of the Back-Up Agreement in the event he is unable to consummate the Stalking Horse Agreement;

ii.  Clarified the treatment of Professional Fee Claims in the event there are insufficient funds in the Post-Confirmation Fund to pay all Allowed Professional Fee Claims in full as of the Effective Date;

iii. Modified the definition of Exculpated Parties to include the Successful Bidder and limit exculpation of Related Parties "to the fullest extent permitted by law";

iv.  Modified the Exculpation Provision set forth in Section 9.4 of the Plan (and related defined terms) to conform to the standard exculpation terms typically approved in this jurisdiction and to address certain of the U.S. Trustee's arguments;

v.   Clarified the treatment for Holders of Liens asserted against Ms. Nestor Cassini's interest in the Townhouse;  and

vi.  Clarified the treatment of Holders of Secured Claims or Liens in the event the Transaction Proceeds result in a deficiency and applicability of 506(c) Charges and 363(j) Charges in that circumstance.

118.    The Modifications do not materially and adversely affect the way that any Claim or Interest Holder is treated under the Plan.

119.    Section 1127 of the Bankruptcy Code provides:

---

[11]    The list below does not include minor typographical changes that the Trustee made to the Plan.

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of the title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan….
>
> Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

11 U.S.C. §§ 1127(a), (d).

120.    Accordingly, bankruptcy courts typically allow plan proponents to make non-material changes to a plan without any special procedures or vote re-solicitation.  *See, e.g., In re Am. Solar King,* 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) ("[I]f a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.") (citation omitted);  *see also Enron Corp. v. New Power Co., (In re New Power Co.),* 438 F.3d 1113, 1117-18 (11th Cir. 2006) ("[T]he bankruptcy court may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way that claim or interest holder is treated.").

121.    In addition, Bankruptcy Rule 3019, designed to implement section 1127(d) of the Bankruptcy Code, provides in relevant part that:

> In a . . . chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the Court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019.

122.     Section 1127 of the Bankruptcy Code gives a plan proponent the right to modify the plan "at any time" before confirmation.  This right would be meaningless if the promulgation of all plan modifications, ministerial or substantive, adverse to certain claimants or not, necessitated the resolicitation of votes.  Accordingly, in keeping with traditional bankruptcy practice, courts have typically allowed a plan proponent to make non-material changes to a plan without any special procedures or vote resolicitation.[12]

123.     Because all creditors in this Chapter 11 Case have notice of the Combined Hearing, and will have an opportunity to object to any modifications at that time, the requirements of section 1127(d) of the Bankruptcy Code have been met. *See Citicorp Acceptance Co., Inc. v. Ruti-Sweetwater (In re Sweetwater)*, 57 B.R. 354, 358 (D. Utah 1985) (creditors who have knowledge of pending confirmation hearing had sufficient opportunity to raise objections to modification of the plan).

124.     Accordingly, the Trustee respectfully submits that the Modifications should not require the Trustee to resolicit the Plan because (a) the Modifications will not materially or adversely affect the treatment of any creditor that has previously accepted the Plan and (b) the Plan, as modified, will continue to comply with the requirements of sections 1122 and 1123 of the Bankruptcy Code.

---

[12]    *See, e.g., In re CIT Grp., Inc.,* No. 09-16565 (ALG), 2009 WL 4824498, at *28 (Bankr. S.D.N.Y. Dec. 8, 2009) (approving modifications that "did not materially or adversely modify the treatment of any Claims or Interests" without the need for resolicitation of votes on the plan); *In re Dana Corp.,* No. 06-10354 (BRL) 2007 WL 4589331, at *2 (Bankr. S.D.N.Y. Dec. 26, 2007) (approving modifications to plan that did not "materially or adversely affect or change the treatment of any Claim or Interest in any Debtor" without the need for resolicitation of votes on the plan); *In re Calpine Corp.,* No. 05-60200 (BRL) 2007 WL 4565223, at *6 (Bankr. S.D.N.Y. Dec. 19, 2007) (approving certain non-material modification to reorganization plan without the need for resolicitation).

## REQUEST FOR WAIVER OF BANKRUPTCY RULE 3020(e)

125.    The Trustee requests that the Confirmation Order be effective immediately upon its entry notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).  Under Bankruptcy Rule 3020(e), "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  As the Advisory Committee notes to Bankruptcy Rule 3020(e) state, "[t]he court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately."  Fed. R. Bankr. P. 3020(e), Advisory Comm. Notes – 1999 Amendment.

126.    Under the circumstances, it is appropriate for the Court to exercise its discretion with respect to the stay imposed by Bankruptcy Rule 3020(e) and permit the Trustee to consummate the Plan and the Transaction and commence its implementation without delay after entry of the Confirmation Order.

## CONCLUSION

The Trustee respectfully submits that the Disclosure Statement and Plan comply with all applicable requirements under the Bankruptcy Code and the Bankruptcy Rules.  Accordingly, the Trustee respectfully requests that the Court approve the Disclosure Statement on a final basis and confirm the Plan.

Dated:   New York, New York
         March 9, 2026

ALBERT TOGUT, not individually but solely
in his capacity as Chapter 11 Trustee,
By His Attorneys,
TOGUT, SEGAL & SEGAL LLP
By:

/s/ Brian F. Moore
BRIAN F. MOORE
MARTHA E. MARTIR
One Penn Plaza
New York, New York 10119
(212) 594-5000

## EXHIBIT A

**Moore Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                      :
In re:                                                :    Chapter 11
                                                      :
PEGGY NESTOR,                                         :    Case No. 23-10627 (MEW)
                                                      :
                              Debtor.                 :
                                                      :
------------------------------------------------------------------ x

### DECLARATION OF BRIAN F. MOORE IN SUPPORT OF
### CONFIRMATION OF AMENDED CHAPTER 11 TRUSTEE'S PLAN

Under 28 U.S.C. § 1746, I, Brian F. Moore, declare as follows, under penalty of perjury:

1.      I am a member of Togut, Segal & Segal LLP (the "Togut Firm"), counsel to Albert Togut, not individually but solely in his capacity as the chapter 11 trustee (the "Trustee") for the estate (the "Estate") of Peggy Nestor (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"). The Trustee, as "proponent of the plan" within the meaning of section 1129 of title 11 of the United States Code (the "Bankruptcy Code"), filed the solicitation versions of the *Amended Chapter 11 Trustee's Plan,* dated February 4, 2026 [Docket No. 870] (as further amended, modified, revised or supplemented on February 24, 2026 [Docket No. 902] and March 9, 2026 [Docket No. 954], the "Plan")[1] and the *Disclosure Statement for the Amended Chapter 11 Trustee's Plan,* dated February 4, 2026 [Docket No. 872] (the "Disclosure Statement").

2.      I respectfully submit this declaration (this "Declaration") in support of confirmation of the Plan and approval of the Disclosure Statement on a final basis. I have reviewed, and I am generally familiar with, the terms and provisions of

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the *Chapter 11 Trustee's Memorandum of Law in Support of Confirmation of the Amended Chapter 11 Trustee's Plan* (the "Confirmation Brief"), filed contemporaneously herewith.

the Plan, the Disclosure Statement, and the requirements for Confirmation of the Plan

under section 1129 of the Bankruptcy Code.

3.      Except as otherwise set forth herein, all statements in this

Declaration are based on my personal knowledge, my familiarity with the Debtor and

her financial situation, discussions with my legal and financial advisors, and/or my

review of relevant documents.  If I were called upon to testify, I could and would, based

on the foregoing, testify competently to the facts set forth herein.

I.  **The Trustee's Liquidation Plan**

4.      The Trustee is seeking confirmation of a liquidation Plan

predicated on consummating the previously-approved sale of the Debtor's primary

asset, the Townhouse, free and clear of all liens, claims, and interests, and distributing

the net proceeds of such sale to holders of Allowed Claims in accordance with their

legal interests and relative priorities under the Bankruptcy Code and orders of this

Court.

5.      The Plan is the product of extensive good-faith and arm's length

negotiations by and among the Trustee, the Estate's post-petition Lender, Lynx, and

other stakeholders.

6.      The Plan will be implemented by the Trustee, in his capacity as the

Plan Administrator once appointed on the Effective Date, and the Debtor's Assets will

vest in the Plan Administrator upon the Effective Date.  The Plan Administrator will

reduce the Assets to Cash and make Distributions to holders of Allowed Claims

pursuant to the Plan.

7.      Failure to confirm the Plan would inevitably result in the Chapter

11 Case being converted to a case under chapter 7 of the Bankruptcy Code, which I do

2

not believe will be in any Estate stakeholder's best interests as distributions to creditors would be significantly delayed, if made at all.

## II.   The Plan Satisfies Section 1129 of the Bankruptcy Code

8.     Based on my understanding of the Plan, I believe that the Plan satisfies all of the applicable requirements of section 1129 of the Bankruptcy Code.

9.     Section 1129(a)(1).  I understand that the Plan satisfies section 1129(a)(1) of the Bankruptcy Code because it complies with sections 1122 and 1123 of the Bankruptcy Code.  In that regard, I understand that the Plan designates the classification of Claims and Interests in accordance with section 1122 of the Bankruptcy Code.  I also understand that the Plan provides for the separate classification of Claims against, and Interests in, the Debtor based upon the differences in legal nature and/or priority of such Claims and Interests.  I further believe that the Plan satisfies each requirement set forth in section 1123(a) of the Bankruptcy Code regarding the required contents of a Chapter 11 plan.

10.    I believe that valid factual and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Equity Interests.  I also understand that all Claims and Equity Interests within each Class have the same or substantially similar rights as the other Claims and Equity Interests in that Class and will receive the same treatment under the Plan for their respective Claims and Equity Interests in the same Class.

11.    I am aware that Article IV of the Plan identifies Classes of Claims that are not impaired by the Plan, as required under section 1123(a)(2) of the Bankruptcy Code, and specifies the treatment of such impaired Classes of Claims and Interests as required by section 1123(a)(3) of the Bankruptcy Code.  It is my

3

understanding that the Plan provides for the same treatment for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

12.     It is my understanding that Article V of the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code by setting forth the means for implementation of the Plan.  I understand that Article V of the Plan includes further provisions with respect for implementation of the Plan, including, but not limited to: (a) the vesting of Assets, including the Retained Causes of Action, in the Plan Administrator;  (b) the primary source of Distributions;  (c) the powers and obligations of the Plan Administrator;  and (d) the closing of the Chapter 11 Cases.  I understand that Sections 1.68 and 5.5 of the Plan of the Liquidation Trust Agreement disclose that Albert Togut will be appointed as the Liquidation Trustee.  I also understand that Article V of the Plan sets forth other critical mechanics of the Plan, such as the application of 506(c) Charges and 363(j) Charges, as applicable, to Holders of Secured Claims as is necessary for the full funding of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Priority Claims, and any other amounts that are necessary to confirm the Plan, preservation of Retained Causes of Action, granting the Plan Administrator the authority to pursue or settle Retained Causes of Action, preservation of insurance, and ensuring compliance with the Stalking Horse Agreement or the Bank-Up Agreement, as applicable, and the Plan.

13.     It is my understanding that the Plan is a liquidation plan and does not provide for the issuance of equity or other securities by the Debtor, and that, accordingly, the requirements of section 1123(a)(6) of the Bankruptcy Code do not apply to the Plan.

14.    I understand the Plan complies with section 1123(a)(7) as it contains only those provisions that are consistent with the interests of Holders of Claims and Equity Interests and with public policy with respect to the manner of selection of any officer, director, or trustee under the Plan, and any successor to such officer, director, or trustee.  Because the Debtor is an individual, the Plan does not contemplate the appointment of any directors or officers.  The Trustee has disclosed the identity of the Plan Administrator in the Plan, which is consistent with the interest of creditors and with public policy.

15.    I understand the Plan that section 1123(a)(8) is inapplicable to the Plan because the Trustee has determined, based on information currently available, that the Debtor does not have any earnings from personal services performed after the commencement of the Chapter 11 Case.  Additionally, the Trustee has determined that the Debtor does not project significant, if any, disposable income, as defined under section 1325(b)(2) of the Bankruptcy Code.  To the extent section 1123(a)(8) is found to be applicable to the Plan, the Plan provides the mechanism for the contribution of any disposable income of the Debtor and, therefore, would satisfy subsection (a)(8).

16.    I understand that as contemplated by section 1123(b)(1) of the Bankruptcy Code, Articles III and IV of the Plan describes the treatment for unimpaired Classes of Claims and impaired Classes of Claims and Interests.

17.    I understand that with respect to section 1123(b)(2) of the Bankruptcy Code, except as otherwise provided in the Confirmation Order, under Section 8.1 of the Plan, on the Effective Date, all remaining Executory Contracts of the Debtor still in effect shall be deemed rejected in accordance with sections 365 and 1123 of the Bankruptcy Code, unless where (a) it has been specifically assumed, or assumed and assigned, by the Debtor or Trustee on or before the Confirmation Date with the

5

approval of the Bankruptcy Court, (b) in respect of which a motion for assumption or

assumption and assignment has been filed with the Court on or before the Confirmation

Date, or (c) it has been specifically designated as a contract to be assumed on a schedule

to be included as part of the Plan Supplement.  Further, pursuant to Section 1.69 of the

Plan, the Plan Supplement includes a "schedule of Executory Contracts and Unexpired

Leases to be assumed."  The Plan Supplement, which was filed by the Trustee on

February 25, 2026 [Docket No. 917], lists no Executory Contracts or Unexpired Leases to

be assumed.

18.     Article X of the Plan contains certain exculpation, release and

injunction provisions that are consistent with applicable provisions of the Bankruptcy

Code and relevant case law, and thus, as I understand, and as set forth in further detail

below, is permitted by section 1123(b)(6) of the Bankruptcy Code.

19.     I understand that Section 9.3 of the Plan contains a release of

potential claims and causes of actions belonging to the Trustee, the Debtor, or the Estate

against certain Released Parties (the "Estate Release"). I believe that the releases set

forth in Section 9.3 of the Plan represents a valid exercise of the Trustee's business

judgment, is fair and equitable, and constitutes good faith compromises and settlements

of the matters covered thereby, including, but not limited to, resolution of the Trustee's

right to seek a surcharge against Lynx and its collateral pursuant to section 506(c) of the

Bankruptcy Code.  I believe that the Releases are appropriately tailored to the facts and

circumstances of the Chapter 11 Case.  The Estate Release has been negotiated at arm's

length between the Trustee and the Released Parties.  I believe that the Estate Release is

supported by substantial consideration, in light of the fact that Lynx agreed to serve as

the post-petition lender to the Estate under the Post-Petition Financing Order,

providing $400,000 in financing to the Estate shortly after the Trustee's appointment,

6

which was necessary to preserve the value of the Townhouse and stabilize the Estate. Lynx has agreed to limit its recovery to the Transaction Proceeds, which I estimate will effectively result in a voluntary reduction of Lynx's Claim by appropriately $4.1 million. This substantial reduction will allow the Trustee to fund the reasonable and necessary costs, commissions, compensation and other expenses incurred by the Trustee and his retained professionals in connection with the sale of the Townhouse, preserving the Townhouse, and administering the Chapter 11 Case (subject to the terms and conditions of the Post-Petition Financing Order). Further, since July 2025, Lynx has paid all insurance premium financing payments on behalf of the Estate (approximately $18,000 per month) (*see Order (A) Authorizing the Chapter 11 Trustee to Enter into Amendment of Insurance Premium Financing Agreement and (B) Authorizing Lynx Asset Services, LLP to Make Payments Thereunder* [Docket No. 722]) and advanced funds in connection with the Water Leak at the Townhouse. These concessions materially facilitated the administration of the Estate and the Trustee's ability to formulate a confirmable plan. Without Lynx's concessions and contributions, the Trustee would not have had the liquidity necessary to insure, maintain, and preserve the Townhouse following his appointment. Nor would the Estate have had the resources to conduct the extensive marketing process undertaken with respect to the Townhouse. Moreover, despite its right to call the DIP loan in default and seek relief from the automatic stay to compel the Trustee to deliver Lynx a deed to the Townhouse, Lynx agreed not to do that to give the Trustee the opportunity to maximize value from the Townhouse for the benefit of the Estate. Without Lynx's funding, contributions and forbearance from calling a default, the Trustee's ability to administer the Estate, market and sell the Townhouse, and ultimately formulate and confirm the Plan would have been materially impaired. I also believe that the Estate Release is beneficial because it provides finality to

7

transactions contemplated by the Plan and avoids the risk of collateral litigation against

Lynx and its Related Parties (solely in their capacity as such) relating to the financing,

administration of the Estate, and sale of the Townhouse, which litigation could

otherwise undermine the certainty and finality necessary to implement the Plan and

distribute proceeds to creditors.

20.    The Estate Release was also included in the solicitation version of

the Plan and Disclosure Statement and conspicuously reprinted on the ballots used by

creditors to vote to accept or reject the Plan.

21.    I am aware that Section 9.4 of the Plan exculpates the Exculpated

Parties from, among other things, certain claims related to any act or omission in

connection with, related to, or arising out of the Chapter 11 Case, of certain court-

approved transactions, including without limitation the sale of the Townhouse, the

Post-Petition Financing Facility, and the Plan, or any other act taken or omitted to be

taken in connection with the Chapter 11 Case, the liquidation of the Debtor, or the

administration of or property to be distributed under the Plan (the "Exculpation

Provision").  I understand that this provision provides necessary and customary

protections to those parties in interest (whether estate fiduciaries or otherwise) whose

efforts were instrumental in facilitating the Sale, negotiation and confirmation of the

Plan and the conclusion of the Chapter 11 Case.  I believe the Exculpation Provision is

an essential inducement to cause parties to participate collaboratively and

constructively in the formulation and negotiation of the Plan and that the Exculpation

Provision is appropriately tailored to protect the Exculpated Parties from disgruntled,

litigious stakeholders seeking to challenge or relitigate this Court's orders approving

key transactions in this Chapter 11 Case, who the Trustee believes will continue such

actions following consummation of the Transaction and the Plan.

8

22.     I also believe that the Exculpated Parties have each made significant contributions to the administration of the Estate and formulation of the Plan. The Trustee—a court-appointed fiduciary—and his professionals have devoted substantial time and effort to investigating the Debtor's assets and liabilities, preserving the value of the Estate's primary asset, marketing and selling the Townhouse, pursuing Estate causes of action, and formulating a confirmable chapter 11 plan, all while dealing with the obfuscations and meritless objections and appeals of this Court's orders by certain parties. Lynx, in turn, provided critical post-petition financing and other consideration as detailed above that enabled the Trustee to preserve and maximize the value of the Townhouse and continue administering the Estate, and has further agreed to limit its recovery from the Transaction Proceeds in order to provide additional financing for the payment of the Trustee's professional fees. Finally, the Successful Bidder (as defined in the Plan) is providing the substantial majority of funds necessary to consummate the Plan and satisfy liens encumbering the Townhouse pursuant to a Court-approved sale transaction. Without the support, cooperation, and contributions of these parties, the Trustee would not have been able to administer the Estate or propose a confirmable plan.

23.     I am aware that the no liability provision set forth in Section 5.7 of the Plan (the "No Liability Provision") protects the Plan Administrator's ability to make distributions "in accordance with th[e] Plan and Confirmation Order." I understand that the provision applies to the Plan Administrator solely in his capacity as such and does not exculpate conduct constituting willful misconduct, gross negligence, or breach of fiduciary duty, and would not provide the Plan Administrator with an exculpation for actions taken outside the scope of the Plan or shields the Plan Administrator for any liability whatsoever. The No Liability Provision is necessary to ensure that the Plan

9

Administrator may carry out the Court-approved distribution scheme without the threat of collateral challenges.

24.     I am aware that Section 9.2 of the Plan provides for an injunction that upon the Confirmation Date, enjoins Holders of Claims and Equity Interests from commencing or continuing actions against the Debtor, the Trustee, the Trustee's professionals, the Plan Administrator, the Townhouse, or the Assets on account of or in connection with Claims or Equity Interests, except as otherwise provided in the Plan or the Confirmation Order.  The injunction further prohibits actions to enforce judgments, create or enforce liens or other encumbrances, assert setoff, subrogation, or recoupment rights, or otherwise take actions inconsistent with the Plan or the Confirmation Order. In addition, the injunction protects the Successful Bidder's ownership and quiet enjoyment of the Townhouse in accordance with the Approval Order.

25.     I believe the injunction is a customary and appropriate provision in chapter 11 plans, as it ensures that the Plan may be implemented in an orderly manner and prevents parties from taking actions that would interfere with the administration of the Plan or the transactions contemplated thereby.  No party has objected to this provision, and it is therefore appropriate for the Court to approve it as part of confirmation of the Plan.

26.     <u>Section 1129(a)(2)</u>.  To the best of my knowledge and belief, and as evidenced by the Court's entry of the *Order (I) Approving Certain Key Dates Relating to Confirmation of the Trustee's Plan, Including Scheduling a Combined Hearing to Consider Approval of Trustee's Disclosure Statement and Plan;  (II) Approving the Form and Manner of Combined Hearing Notice;  (III) Approving the Trustee's Disclosure Statement on a Provisional Basis;  (IV) Approving (A) Procedures for Solicitation, (B) Forms of Ballots, (C) Procedures for Tabulation of Votes, And (D) Procedures for Objections* [Docket No. 875] (the "<u>Solicitation</u>

10

Procedures Order"), prior orders of the Court entered in the Chapter 11 Case, and the filings submitted by the Trustee, I believe that the Trustee has complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126 regarding disclosure and solicitation of the Plan.

27.    I understand that, as set forth in the *Affidavit of Service,* dated February 6, 2026 [Docket No. 881] (the "Solicitation Declaration") and the *Declaration of Christian Ribeiro Regarding Voting and Tabulation of Ballots Cast on Amended Chapter 11 Trustee's Plan,* dated March 6, 2026 [Docket No. 950] (the "Voting Declaration"), each Holder of a Claim or Equity Interest was sent the solicitation materials required by the Solicitation Procedures Order. *See* Solicitation Declaration. I understand that in accordance with the Solicitation Procedures Order, the Holders of Claims entitled to vote received the Solicitation Procedures Order, the Combined Hearing Notice, the Disclosure Statement, the solicitation version of the Plan, and the appropriate personalized Ballot. I understand that those Holders of Claims or Equity Interests not entitled to vote received the Combined Hearing Notice, the Disclosure Statement, and the solicitation version of the Plan.

28.    To the best of my knowledge and belief, I believe that acceptances of the Plan were solicited in good faith and the Trustee did not solicit acceptances of the Plan from any creditor prior to entry of the Solicitation Procedures Order. Based on the Voting Declaration and the Solicitation Declaration, I believe the Trustee properly solicited votes with respect to the Plan in accordance with the Solicitation Procedures Order.

29.    To the best of my knowledge and belief, good, sufficient, and timely notice of the Combined Hearing and all other hearings in the Chapter 11 Case has been provided to all holders of Claims and Interests, and all other parties in interest

to whom notice was required to have been provided. *See* Solicitation Declaration. Accordingly, I believe that the Plan satisfies section 1129(a)(2) of the Bankruptcy Code.

30.    To the best of my knowledge and belief, and pursuant to the Plan and in accordance with section 1126 of the Bankruptcy Code, the Trustee did not solicit votes on the Plan from Class 1 (Priority Non-Tax Claims), Class 2 (Emigrant Mortgage Claim), and Class 7 (Other Secured Claims), which Classes are unimpaired under the Plan and hence deemed to accept the Plan. *See* 11 U.S.C. § 1126(f). The Trustee did not solicit votes from Class 9 (Equity Interests) because such Class is impaired, and not receiving or retaining any value under the Plan and, thus, deemed to reject the Plan.

31.    To the best of my knowledge and belief, the Trustee solicited votes from Holders of Claims in Class 3 (Allowed Lynx Secured Claim), Class 4 (Prime Plus Mortgages Claims), Class 5 (Attachment Lien Claims), Class 6 (Wenig Saltiel Claim), and Class 8 (General Unsecured Claims) because the Holders of Allowed Claims in these Classes are Impaired, and may be entitled to receive a distribution under the Plan. Therefore, I believe that that the Trustee's solicitation of votes on the Plan was conducted in compliance with sections 1125 and 1126 of the Bankruptcy Code.

32.    <u>Section 1129(a)(3)</u>. I believe the Trustee has proposed the Plan in good faith and not by any means forbidden by law. I believe the Plan is the product of arm's-length negotiations between the Trustee, as proponent of the Plan, and Lynx, the Estate's post-petition lender, which were conducted in good faith and culminated in the Plan, which provides for the fair allocation of the Estate's assets consistent with the requirements of the Bankruptcy Code and other applicable law. Furthermore, I understand that the Plan has been proposed for the legitimate purpose of winding down the Estate of the Debtor and distributing the assets of the Estate in accordance with the priority scheme set forth in the Bankruptcy Code, thereby maximizing the

12

recovery available to Holders of Claims.  Accordingly, I believe that the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

33.    Section 1129(a)(4).  I understand that payments made or to be made by the Trustee for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case have been approved by, or are subject to the approval of, the Bankruptcy Court. Accordingly, the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

34.    Section 1129(a)(5).  I am aware that Albert Togut has been identified as the Plan Administrator pursuant to Sections 1.68, 5.5 and 5.6 of the Plan. Accordingly, I believe the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.  I also believe that the appointment of the Trustee, a duly qualified fiduciary previously appointed by this Court to serve as a Chapter 11 Trustee, as Plan Administrator, is consistent with the interests of the creditors and with public policy.

35.    Section 1129(a)(6).  I understand that because the Debtor is not charging rates that are the subject of any regulatory commission jurisdiction, section 1129(a)(6) of the Bankruptcy Code is inapplicable.

36.    Section 1129(a)(7).  I understand that the Bankruptcy Code requires that, with respect to each impaired Class of Claims and Equity Interests, each holder of such Claim or Equity Interest must either (a) accept the Plan or (b) receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

37.    I believe that the "best interests" test routinely employed in connection with application of section 1129(a)(7) of the Bankruptcy Code is satisfied as to each member of an impaired Class that has rejected or is deemed to reject the Plan.

13

Holders in impaired Classes (other than Class 3) are not expected to receive a distribution under the Plan because the proceeds from the sale of the Townhouse will be insufficient, after payment of Administrative Claims and other Claims senior in priority, to provide a distribution to such Holders. Importantly, Holders of Claims in impaired classes (other than Class 3) would likewise receive no distribution in a hypothetical chapter 7 liquidation, where the Transaction Proceeds would be further reduced by the costs of conversion, additional professional fees, and delay associated with a renewed marketing and sale process. Although no distribution to Holders in impaired classes (other than Class 3) is anticipated, the Plan nevertheless provides that, in the event all Claims with a higher priority are paid in accordance with the Plan, such Holders may receive a *pro rata* distribution of any proceeds from the liquidation of any remaining Assets of the Estate, including the Retained Causes of Action, Avoidance Actions, Insurance Claims and the Contempt Payments.

38.     In light of the foregoing, I believe that the Plan satisfies the best interests of creditors test because Holders of impaired Classes will receive at least as much under the Plan as they would receive in a chapter 7 liquidation—namely, no distribution—while avoiding the additional costs, delay, and value erosion that would result from conversion. Any speculative recovery for Holders in impaired Classes in a chapter 7 liquidation may be further diminished by the uncertainty, cost, and delay inherent in restarting the sale process under a different fiduciary. This is particular true at this advanced stage of the Chapter 11 Case, where the Trustee's efforts have already resulted in a committed purchaser for the Townhouse, and conversion to chapter 7 would risk the closing of the Transaction and increase administrative expenses through a more protracted liquidation process. A sale of the Townhouse pursuant to the Plan also enables parties in interest to realize the savings and benefits of section 1146(a) of

14

the Bankruptcy Code, which would not be available under chapter 7 of the Bankruptcy

Code.

39.    <u>Section 1129(a)(8)</u>.  I understand that the Plan may be confirmed

even though section 1129(a)(8) of the Bankruptcy Code is not satisfied with respect to

Class 6 (Wenig Saltiel Claim) and Class 9 (Equity Interests), which classes have either

voted against the Plan (Class 6) or are deemed to reject the Plan (Class 9).  Nevertheless,

the Plan may still be confirmed under section 1129(b) of the Bankruptcy Code because

(a) an impaired Class voted to accept the Plan (Class 3);  and (b) the Plan does not

discriminate unfairly and is fair and equitable with respect to the Claims and Equity

Interests in the Classes not accepting the Plan or deemed to reject the Plan.  As set forth

in further detail below, I believe the Plan does not discriminate unfairly and is fair and

equitable with respect to the Claims and Equity Interests in the Classes not accepting

the Plan or deemed to reject the Plan.  As a result, the Plan satisfies the requirements of

section 1129(b) of the Bankruptcy Code.

40.    <u>Section 1129(a)(9)</u>.  I understand that, in accordance with

section 1129(a)(9), the Plan's treatment of the Administrative Claims, Professional Fee

Claims, and Priority Tax Claims complies with section 1129(a)(9) of the Bankruptcy

Code.  *First*, the Plan provides that Holders of Allowed Administrative Claims,

Professional Fee Claims, and Allowed Priority Tax Claims will receive payment in full

in Cash on the Effective Date or as soon as practicable thereafter, unless such Holder

otherwise agrees to a different treatment (*see* Plan §§ 2.1, 2.2 & 2.3), which complies with

the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  *Second*, the Plan

provides that (i) Priority Non-Tax Claims will receive, at the option of the Trustee or the

Plan Administrator, as applicable, (a) a Distribution in Cash in the Allowed amount of

its Claim, or (b) reinstatement of such Holder's Claim on the Effective Date, *see* Plan §

15

4.1, and (ii) Other Secured Claims will receive, (a) Cash in an amount equal to the Allowed amount of such Claim *less* any applicable 506(c) Charge and/or 363(j) Charge (if any, and which is subject to further Court order), (b) Reinstatement of such Allowed Claim; (iii) property securing such Allowed Claim, with any deficiency to result in a General Unsecured Claim, or (d) to the extent applicable, treatment as permitted under Bankruptcy Code section 1129(a)(9)(D); *provided* that payments made pursuant to section 1129(a)(9)(D) shall be made prior to five (5) years after the date of the Petition Date. *See* Plan § 4.7. *Third*, on the Effective Date, the Trustee or the Plan Administrator will have sufficient Cash to pay Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims, and to fund the Post-Confirmation Reserve and the Disputed Claim Reserve. Allowed Professional Fee Claims will be paid to the extent possible whereby each Holder of a Professional Fee Claim shall receive its *pro rata* share of the remaining funds in the Post-Confirmation Fund as determined by the Trustee or as otherwise agreed. However, the Trustee believes the Estate stands to receive additional proceeds from the liquidation of Assets following the Effective Date, and pursuant to section 2.2 of the Plan, when the Estate receives additional proceeds from the liquidation of Assets after the Effective Date, Case Professionals shall receive additional payments on account of such Case Professionals' pre-Effective Date fees and expenses until such fees and expenses can be fully satisfied. *See* Plan § 2.2. Based on the foregoing, I believe the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

41.     Section 1129(a)(10). I understand that section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one Class of impaired Claims. I am aware that the Voting Declaration includes a table setting forth the voting results with respect to each voting Class of Claims. It is my understanding

that 100% in number and 100% in amount of Class 3 (Allowed Lynx Secured Claim) has

voted to accept the Plan.  I understand that Lynx, the Holder of the Class 3 Claim, is not

an insider of the Debtor.  Thus, I believe section 1129(a)(10) of the Bankruptcy Code is

satisfied.

42.     Section 1129(a)(11).  I understand that section 1129(a)(11) of the

Bankruptcy Code permits a plan to be confirmed if it is feasible, *i.e.*, it is not likely to be

followed by liquidation or the need for further financial reorganization.  I understand

that in the context of a liquidating plan, feasibility is established by demonstrating that

the plan proponent is able to satisfy the conditions precedent to the Effective Date and

otherwise has sufficient funds to meet post-confirmation obligations of the Estate and to

pay for the costs of administering and fully consummating the Plan.

43.     The Plan provides for the sale of the Debtor's main asset, the

Townhouse, and use of the Transaction Proceeds from such sale, along with any

unrestricted Cash on hand, the Avoidance Action proceeds, the Insurance Claims

proceeds, the Retained Causes of Action proceeds, the proceeds from the liquidation of

any other available Assets of the Estate, and Contempt Payments, to fund the Post-

Confirmation Fund for the purposes of making distributions to Allowed Claims.

Moreover, the Trustee has the ability and means to meet each of the conditions

precedent to the occurrence of the Effective Date under the Plan (i.e., entry of the

Confirmation Order, lack of stay of the Confirmation Order unless the Plan has been

substantially consummated before the entry of any stay, lack of any material

amendments, alterations, or modifications of the Plan unless such amendments,

alterations or modifications are made in accordance with the Plan, consummation of the

Transaction, and entry of the Approval Order—which was entered on February 26,

2026).  Accordingly, as the Plan provides for the liquidation of the Debtor's non-

17

exempted assets—and the Trustee will be able to meet the conditions precedent to the

Plan and consummation of the Transaction will provide the funds necessary to make

distributions under the Plan, I believe that section 1129(a)(11) of the Bankruptcy Code is

satisfied.

44.    Section 1129(a)(12).  I am aware that Section 2.5 of the Plan

provides for the payment of all U.S. Trustee Fees by the Plan Administrator due and

payable on the Effective Date and, as applicable, the payment of all U.S. Trustee Fees as

such fees are assessed and come due for each quarter after the Effective Date until the

earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under

chapter 7 of the Bankruptcy Code.  Accordingly, I believe that the Plan satisfies section

1129(a)(12) of the Bankruptcy Code.

45.    Section 1129(a)(15).  I understand that the value of property to be

distributed under the Plan is currently estimated to exceed at least $32 million (the

amount of the Transaction Proceeds after deducting costs of the sale, including

commissions, taxes, building violations and other closing costs), which does not include

other Assets that may be available for further distribution following the Effective Date.

On the other hand, I understand that the Debtor does not project significant, if any,

disposable income, which understanding is based on my review of the Debtor's

Schedules, which only report benefits received under the Social Security Act, which

benefits are to be excluded from the defined term "current monthly income" as used in

the Code.  Accordingly, the value of property to be distributed under the Plan to all

creditors is not less than the projected disposable income of the Debtor to be received

during he 5-year period following the Effective Date of the Plan, and I believe section

1129(a)(15) of the Bankruptcy Code is satisfied.

46.    <u>Sections 1129(a)(13), (14) and (16)</u>.  It is my understanding that sections 1129(a)(13), (14) and (16) of the Bankruptcy Code are inapplicable to the Debtor.  Therefore, I believe such requirements are deemed satisfied.

47.    <u>Section 1129(b)</u>.  It is my understanding that, pursuant to section 1129(b) of the Bankruptcy Code, a plan may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or interests so long as the plan does not discriminate unfairly and is "fair and equitable" as to such non-accepting class.  Here, I am aware that Holders of Claims in Class 6 (Wenig Saltiel Claims) have voted to reject the Plan, and Holders of Equity Interests in Class 9 (Equity Interests) are deemed to reject the Plan, and I understand that section 1129(b) of the Bankruptcy Code applies with respect to such Classes.

48.    I believe the Plan does not unfairly discriminate against Class 6 (Wenig Saltiel Claims) and Class 9 (Equity Interests).  I understand that the Claims or Equity Interests comprising Class 6 and Class 9 are legally distinct from those classified in other Classes under the Plan and are therefore appropriately classified and treated separately.

49.    Specifically, the Class 6 Claim (Wenig Saltiel Claim) arises from the judgment entered on August 12, 2021 in favor of Wenig Saltiel LLP by the Supreme Court of the State of New York, County of Kings (Index No. 508287/2020) (the "Wenig Saltiel Judgment"), which was recorded in the New York County Clerk's Office on August 17, 2022, and thereby created a judicial lien against the Townhouse).  *See* Plan §§ 1.115; Proof of Claim No. 12-1 ¶¶ 4, 9.  Because the Wenig Saltiel Judgment was recorded after all other liens against the Townhouse,[2] the Wenig Saltiel Claim is junior

---

[2]        The mortgage underlying the Emigrant Mortgage Claim was recorded with the Office of the City Register on September 9, 2010.  *See* Proof of Claim No. 5-1 at 17.  The judgment lien underlying the Public Administrator

in priority to all Claims secured by the Townhouse (i.e., Emigrant Mortgage Claim, the

Allowed Lynx Secured Claim, the Prime Plus Mortgages Claims, and the Attachment

Lien Claims).

50.    With respect to Class 9 (Equity Interests), the interest is separately

classified because it is the only Class relating to equity interests of a Debtor, which have

a distinct legal character than any other Claims against the Debtor.  *See* Plan §§ 1.43 &

4.9.  Accordingly, I do not believe the Plan does not unfairly discriminate against the

Holders of Claims or Equity Interests in Classes 6 and 9.

51.    I also believe the "fair and equitable" requirement is satisfied as to

holders of Claims and Interests in Class 6 (Wenig Saltiel Claims) and Class 9 (Equity

Interests) because (a) no Claim or Equity Interest that is junior to such Claim or Equity

Interest will receive or retain any property under the Plan on account of such junior

Claim or Equity Interest and (b) no Class of Claims or Equity Interests senior to Class 6

(Wenig Saltiel Claims) and Class 9 (Equity Interests) is receiving more than full

payment on account of the Claims or Equity Interests in such Class.  Therefore, I believe

the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

52.    <u>Sections 1129(c)–(e)</u>.  The Plan is the only plan that has been

solicited in the Chapter 11 Case, and accordingly, it is my understanding that section

1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is

inapplicable in the Chapter 11 Case.  The principal purpose of the Plan is not the

---

Judgment Lien was recorded against the Townhouse on or about November 5, 2015.  The mortgage underlying the Allowed Lynx Secured Claim was recorded with the Office of the City Register on February 27, 2017.  *See Verified Complaint for Foreclosure of Mortgage*, Lynx Asset Services, LLC v. Nestor *et al.*, (Sup. Ct. N.Y.) Index No. 850129/2019 [NYSCEF Doc. No. 2].  The mortgages underlying the Prime Plus Mortgages Claims were recorded with the Office of the City Register on March 15, 2018, and January 2, 2019.  *See* Proof of Claim Nos. 7-1, 8-1.  The liens underlying the Attachment Lien Claims were granted by the Surrogate's Court of the State of New York (Nassau County) on June 26, 2020, and a notice of attachment was filed with the County Clerk for New York County on July 17, 2020.  *See* Proof of Claim No. 9-2.

avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933.  Thus, I understand that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.  Finally, I understand that the Chapter 11 Case is not a "small business case," as that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

### III.    Responses to Remaining Objections

53.    My understanding is that because the secured status of the Wenig Saltiel Claim is limited to the value of the Estate's interest in the property securing such Claim after satisfaction of liens senior in priority to Wenig Saltiel's judicial lien pursuant to section 506(a) of the Bankruptcy Code, and because the liens senior to Wenig Saltiel's lien exceed the value of the Townhouse, Wenig Saltiel's Claim is not supported by any realizable collateral value and therefore has no secured value.  Under the Plan, I understand that Wenig Saltiel would hold only a Secured Creditor Deficiency Claim for the full amount of its Claim, which is treated as a General Unsecured Claim under the Plan.  *See* Plan §§ 1.51, 4.6, 7.3.  As such, no portion of Wenig Saltiel's Claim would be subject to, or affected by, the 506(c) Charge or the 363(j) Charge contemplated by the Plan.

54.    My understanding is that all of the Secured Claims under the Plan are secured by the Townhouse, and the majority of the Secured Claims are substantially or fully undersecured.  I also understand that the Plan (as revised) now provides that no 506(c) Charges or 363(j) Charges will be imposed or sought in connection with Secured Claims the Trustee has determined are, in effect, fully unsecured due to the lack of any interest of the Estate to the property securing such Claim.  Accordingly, there would be

no need to reserve for these Claims in a Disputed Claims Reserve because they are General Unsecured Claims under the Plan.

55.    I also understand that the Trustee, through myself and other members of the Togut Firm, have been involved in discussions with certain Holders of Secured Claims or Liens against the Townhouse who stand to receive some value based on their secured interests and the anticipated Transaction Proceeds.  The Trustee is close to finalizing stipulations with the relevant creditors that will resolve the treatment and allowed amounts of their Claims and any 506(c) Charges or 363(j) Charges to be imposed.  I anticipate that these stipulations will be completed prior to the Effective Date.  I understand that finalization and entry into these contemplated stipulations would eliminate the need to reserve funds for Disputed Secured Claims entirely.

56.    I understand that while the substantial majority of the property to be distributed under the Plan consists of the Transaction Proceeds, the Estate has additional potential sources of recovery that will augment the funds available to satisfy Claims and expenses and make payments under the Plan.  For example, the Trustee's recent success in avoiding the transfer of a membership interest of the Debtor in a Connecticut limited liability company which holds a Connecticut property valued in excess of $5 million (*see Order Granting Chapter 11 Trustee's Motion for Summary Judgment*, Adv. Pro No. 24-4023 [Docket No. 64]), which the Trustee will seek to sell. The Court has also recently approved settlements with avoidance action defendants resulting in the Estate's receipt of settlement payments (*see Order Approving Stipulations Settling Claims Against Lee Nestor, Flying Dog Productions, Inc. and Colleen Johnson* [Docket No. 906]).  The Estate's public adjuster, Fairview Adjuster Company, Inc., has also estimated that the Water Leak Claim may have a value of approximately $4 million.

Any proceeds recovered from these sources would further increase the funds available to satisfy payments under the Plan and, if necessary, fund any reserve.

57.     In response to the MNC Objection, the Trustee and the Togut Firm categorically deny knowledge of any conduct that contributed to or caused the water damage to the Townhouse.  To the contrary, since discovering the damage, the Trustee and the Togut Firm have worked diligently to remediate the condition and ensure that any potential long-term effects are minimized so that the Townhouse remains in a condition suitable for sale.  The Trustee and the Togut Firm have also been actively coordinating with the applicable insurance carrier to ensure that the related insurance claim is properly processed and that the Estate is appropriately compensated for any covered losses.

58.     I understand that as of the date hereof, Marianne Nestor has not provided any proof of funds or irrevocable financing commitment demonstrating to the Trustee's satisfaction an ability to purchase the Townhouse.

## IV.    **Miscellaneous Provisions**

59.     Immediate Binding Effect.  I understand that pursuant to Bankruptcy Rule 3020(e), the Court may order the Confirmation Order immediately effective after its entry.  I believe that the Confirmation Order should become immediately effective in light of the facts and circumstances of this Chapter 11 Case. Specifically, the parties are using their best efforts to close the Sale on or around March 15, 2026, in part due to the timelines set forth in the Post-Petition Financing Order and the Stalking Horse Agreement, as well as strained liquidity.  In addition, ongoing costs of administration would accrue that would further erode the value of the Estate and threaten the ability to consummate the Plan.  Accordingly, I believe it is

23

appropriate to waive the 14-day stay and order the Confirmation Order effective immediately upon its entry.

60.    <u>Post-Solicitation Modifications</u>.  I understand that section 1127 of the Bankruptcy Code gives a plan proponent the right to modify the plan "at any time" before confirmation and such modified plan need not require resolicitation of votes if the modifications do not materially impact the plan.  Here, I understand that the modifications to the Plan after the Trustee solicited votes do not require resolicitation and should be approved because such modifications (i) clarify or fine-tune existing provisions of the Plan or (ii) address informal responses to the Plan from parties in interest.  In any event, none of the changes to the Plan adversely impact the treatment or voting status for the holders of Claims and Equity Interests under the Plan. Accordingly, I believe that the Plan, including such modifications, should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED:  March 9, 2026
New York, New York

/s/ Brian F. Moore
BRIAN F. MOORE