UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
                                                                    :
In re:                                                              :     Chapter 11
                                                                    :
PEGGY NESTOR,                                                       :     Case No. 23-10627 (MEW)
                                                                    :
                    Debtor.                                         :
                                                                    :
------------------------------------------------------------------- x

### CHAPTER 11 TRUSTEE'S STATEMENT REGARDING THE EXPECTED OFFER TO BE MADE BY MARIANNE NESTOR FOR THE TOWNHOUSE

Albert Togut, not individually but solely in his capacity as the Chapter 11 trustee of the estate ("Estate") of Peggy Nestor (the "Debtor"), the debtor in the above-captioned case (the "Chapter 11 Case"), hereby submits this statement in response to the letter proposal sent to Bankruptcy Judge Wiles by Marianne Nestor Cassini ("Marianne" and, together with the Debtor, the "Nestors") to purchase the Debtor's real property located at 15 East 63rd Street, New York, NY 10065 (the "Townhouse") for $34.5 million ("Marianne's Offer"),[1] which letter was filed today at Docket No. 955 in the Chapter 11 Case. I have also read the Court's memorandum endorsement on that letter [Docket No. 957] that in part, requires Marianne to prove to me her financial wherewithal to make an offer to purchase the Townhouse. As explained in detail below, that requires a showing of significantly more than $34.5 million. I respectfully make this Statement to explain my views on any offer by Marianne that may be made at this late date so that she and the Court may have the benefit of my current thinking.

---

[1]  Marianne's Offer also indicates her return address is that of the Townhouse, which is a misrepresentation because she does not reside at the Townhouse. It also refers to a 2021 title report and identifies the Back-Up Bidder under the Sale Order as the anticipated purchaser of the Townhouse.

1. To begin with, Marianne's Offer does not take into account the requirement that any new bid for the Townhouse needs to cover the Break-Up Fee and Expense Reimbursement (each as defined in the Trustee's sale application (the "Sale Application") [Docket No. 823]),[2] as required under the Sales Procedure Order [Docket No. 851].

2. Here, that would require a proposal that requires at least an additional $340,000. Marianne needs to present an offer at or exceeding $34,840,000 (comprised of the Stalking Horse Consideration ($34,500,000) *plus* the Break-Up Fee ($270,000) and the Expense Reimbursement ($70,000), along with proof of funds, confirmation that it can be paid in cash with no financing or other contingencies, and a deposit. The Stalking Horse Agreement has no contingencies, particularly respecting the payment of the entire purchase price at closing.

3. On its face, Marianne's Offer is insufficient and this deficiency alone supports my belief that as the fiduciary for the Estate, I could not accept a $34.5 million offer (just days before the scheduled closing of the Sale to the Stalking Horse Bidder that was approved by the order entered by the Court on February 26, 2026 approving the sale [Docket No. 920]).

4. My decision is premised on the well-established principle of bankruptcy law that the objective of bankruptcy sales is to obtain the highest price or greatest overall benefit possible for the estate. *See In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Moreover, as a general matter, the trustee must demonstrate that the proposed sale price is the higher or best offer. *See In re Moore*, 608

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Application.

2

F.3d 253, 263 (5th Cir. 2010) (citing 3 COLLIER ON BANKRUPTCY ¶ 363.02[1][f] (15th ed. rev. 2009)).

5.  Here, sound business reasons include (i) Marianne's lacking the financial wherewithal to complete the sale, and (ii) moving forward with the current sale of the Townhouse would uphold public policy concerns as to the condition and disrepair of the Townhouse, which in my view, would be in keeping with the greatest overall benefit for the Estate.

6.  Ever since the Debtor filed her Chapter 11 plan [Docket No. 62], it was clear that if she was unable to raise the necessary funds to refinance the debt on the Townhouse, it would have to be sold. She retained Sotheby's to find a buyer [Docket No. 77]. Then, she did not cooperate in the marketing of the Townhouse [Docket No. 106 at 3, 9].

7.  With no progress in the case, Lynx, the largest secured creditor, moved for the appointment of a Chapter 11 Trustee, whereupon I was appointed [Docket Nos. 95, 112].

8.  From the time of my appointment to date, neither the Debtor nor her sister, Marianne, have cooperated or helped me do my job. Quite the opposite has happened requiring my attorneys to make motions for orders which were not obeyed, requiring us to move for sanctions, use the United States Marshals Service to obtain possession of the Townhouse, make way too many Court appearances (some of which without the Nestors bothering to appear), and responding to far too many filings made principally by Marianne but also by the Debtor. All of the Nestors' litigation, wild accusations, name-calling, belligerence, and the like has made for hugely expensive litigation costs, nearly all of which would not have been incurred in a routine case.

9. One or both of the Nestors have appealed virtually every action I have taken. They did so with homemade pleadings, without counsel, that cost them next to nothing to file. This forced my attorneys and me to have to respond, and although the Nestors showed hardly any respect for being in a Federal court, I did not have that same luxury. I and my attorneys had to spend thousands of hours responding to all of these frivolous filings. To add insult to injury, the Nestors, particularly Marianne, would file appeals and then fail to pursue them, requiring Federal judges and me to have to spend time that could have been better spent elsewhere. Nearly all of her appeals have been dismissed. Federal judges and I have had to respond to all of these appeals nonetheless.

10. Marianne has said on many occasions that she wants to buy the Townhouse. The Court on many occasions has said that she should make her offer to me and demonstrate her financial wherewithal to be able to do so. I have yet to receive an offer. And, only on the eve of the sale closing has she promised to "show us the money." In Marianne's Offer docketed today, she has still has not done that. But even if she did, I do not find her $34.5 million offer to be the higher or best offer that I would recommend that the Court approve. There are a number of reasons why.

11. Throughout the Bankruptcy Code, there are requirements that a party must show financial wherewithal, particularly in a sale. It is not enough to offer an amount without more. It is necessary to show that following the sale, a party can perform.

12. While section 363 of the Bankruptcy Code does not expressly require "adequate assurance of future performance," courts frequently require proof that the buyer has the financial capacity to stabilize and repair the property before approving

4

the sale. This comes from intersecting doctrines. If the property is dangerous or deteriorating, courts may ask:

- Will the buyer actually repair or stabilize the building?
- Does the buyer have financing to complete renovations?
- Could the sale create future nuisance or safety liability**?**

13. Where unsafe conditions threaten neighbors, courts may require: (i) structural stabilization plans; (ii) environmental remediation; or (iii) demolition funding before allowing the sale. If neighbors or municipalities object, courts may consider whether the proposed sale will reduce or worsen the danger to neighboring property owners. Bankruptcy courts sometimes impose conditions such as:

- repair escrows
- performance bonds
- construction financing proof

14. In that regard, citing public safety concerns, courts have emphasized that the bankruptcy process cannot become a vehicle to transfer hazardous property to an undercapitalized buyer. *See generally In re Wall Tube & Metal Products Co.,* 831 F.2d 118 (6th Cir. 1987) (holding that the Chapter 7 trustee may not maintain or possess estate property in ongoing violation of state environmental laws aimed at protecting public health and safety); *In re Franklin Signal Corp.,* 65 B.R. 268 (Bankr. D. Minn. 1986) (disallowing abandonment when there was an imminent and identifiable harm to the public health or safety).

15. Thus, courts must consider environmental or safety consequences of property, and here the Court heard testimony from an expert in upper east side townhouse sales that the Townhouse requires some $25 million of work renovate the property.

5

16. On June 5, 2025, this Court visited the Townhouse to evaluate the Nestors' claim that they own most of the fixtures therein. I was present during that visit, which lasted many hours, and I saw that the Townhouse is in need of repair.

17. It is worth noting that the Nestors produced and have several times, including at the hearing to enjoin them from interfering with the sale, an appraisal showing the Townhouse to be worth approximately $55 million. Taking the $34.5 million offer that has been approved and adding to it the $25 million repair cost yields a $59.5 million overall cost. That is in line with the $55 million appraisal from the Nestors. But the point is that <u>after</u> the sale is closed, more than $20 million in renovations and repairs is required to bring the Townhouse up to the level of the market.

18. Marianne has not shown an ability to pay for any such work. She cannot show any assurance that she can perform in the future, let alone close next week.

19. When a buyer is acquiring distressed real estate in Chapter 11 that requires major repairs, courts often require financial wherewithal to be shown at the sale approval stage, particularly if: (a) the property poses health or safety risks, or(b) there are environmental or nuisance concerns affecting neighbor

20. Courts want assurance the buyer will not leave a property deteriorating after closing. Here, there is nothing encouraging us that the Nestors won't continue to let the property run down further. The water breaks and recent issues are directly attributable to the Nestors' failure to properly maintain the Townhouse. I did nothing more than have the locks changed and install an alarm system. It was the Nestors' neglect that caused the problems.

21. Separate from the ability to fix the property post-closing, while the Court has already found that the Stalking Horse is a good faith purchaser under §363(m) of the Bankruptcy Code, Marianne is clearly not entitled to be treated the same.

22. I believe that Mariane has not acted in good faith. Quite the opposite. Rather than help facilitate the sale, she has done everything she could think of to slow it down at best or stop it altogether at worst. Indeed, at the September 25, 2026 hearing to approve the sale, the Court took note, "I know you're not happy with the sale price, but I wouldn't be at all surprised if your own troublemaking has inhibited the sale efforts." *See* Feb. 26, 2026 Hr'g Tr. at 13:19-21. By inhibiting the sale price, and in now making a "last ditch" proposal, Marianne should not be able to be the beneficiary of a "post-sale order" sale, and be entitled to a good faith finding.

23. With the benefit of hindsight, it is clear that Marianne hoped that by opposing everything that I was doing, she would create a litigation cloud over the Townhouse that would deter potential buyers from wanting to get involved in its purchase and/or she would make it so expensive for me to litigate that I would simply give up out of fear of not being able to be paid for my efforts and the work of my attorneys and professionals. In that, she seriously misjudged me.

24. But the point is that what she did caused a skyrocketing of the costs of my administration and if the Estate is to be made whole, she should, as part of any purchase of the Townhouse, be required to reimburse the Estate for those costs. And the cost is significant, totaling several millions of dollars.

25. I have no doubt that she will not do any such thing. She has acted in bad faith, and I will oppose any effort on her part to obtain section 363(m) protections.

26. Here, as the Trustee, I followed every step of that process. The Court approved bidding procedures, a Stalking Horse Bidder stepped forward, the sale was

7

marketed, there was an opportunity for competitive bidding, and the contract was approved.

27. The Stalking Horse bidder invested substantial time and resources in reliance on the integrity and finality of that process. Yet throughout, the Nestor sisters, particularly Marianne, did everything possible to undermine it. They refused to cooperate with marketing, filed repeated frivolous appeals and objections, created a litigation cloud that may have deterred potential buyers, forced the Trustee and his professionals to spend massive hours managing the chaos they have caused, including requiring the Trustee to use U.S. Marshals just to gain access to the property. Now, at the eleventh hour, Marianne seeks to blow up the deal with an insufficient offer that comes only after the Stalking Horse Bidder and a Back-up Bidder have already been approved, and the process has run its course.

28. The Court should not permit such a result. Allowing a party who has deliberately made the process as difficult and expensive as possible to step in and derail the transaction would destroy the very certainty and finality that buyers demand. It would send a clear message that good-faith bidders—who follow the rules—can still lose to the very party that spent months obstructing the sale and driving up costs. The practical effect would be fewer buyers, lower bids, higher administrative expenses, and weaker recoveries for creditors in this and every future case. The Stalking Horse Bidder is entitled to the benefit of the bargain it struck in reliance on the Court's process. The Nestors' conduct should not be rewarded by letting them interfere now.

29. In sum, the Bankruptcy sale process is designed to deliver speed, certainty, and maximum value to creditors by attracting serious buyers who can close quickly and pay top dollar.

8

30. There is another reason the Stalking Horse Bid is a better offer than one that might be made by Marianne for the same amount. With the Stalking Horse Bid, there is finality. With Marianne, there is not, and the sale could be overturned in the future. The Estate and its creditors need finality.

For all of these reasons, I oppose a sale to Marianne. Marianne's Offer is not a higher offer and most certainly is not the best offer.

DATED: March 9, 2026
        New York, New York

ALBERT TOGUT, not individually but solely in his capacity as Chapter 11 Trustee,

*/s/ Albert Togut*
ALBERT TOGUT